```
1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------------X
     YEMISI AKINYEMI,
4
                              PLAINTIFF,
5                             07-CV-4048(CM)(AJP)

6            -against-

7    MICHAEL CHERTOFF, SECRETARY,
     DEPARTMENT OF HOMELAND
8    SECURITY,

9                             DEFENDANTS.
     ------------------------------------------X
10                   DATE: October 31, 2007

11                   TIME: 12:30 p.m.

12

13       EXAMINATION BEFORE TRIAL of the

14   Defendants, by a witness, SHARMILA ZAMAN, taken

15   by the Plaintiff, pursuant to a Notice, held at

16   the offices of United States Attorney's Office,

17   Southern District of New York, 86 Chambers

18   Street, New York, New York 10007, before Helen

19   Shum, a Notary Public of the State of New York.

20

21

22

23

24

25
```

```
 1                    S. ZAMAN
 2   birth?
 3        A.   Bangladesh.
 4        Q.   The name you gave, Sharmila Zaman,
 5   is it Zaman or Zaman?  How do you pronounce
 6   that?
 7        A.   Zaman.
 8        Q.   Since when did you begin using that
 9   name?
10        A.   September 2005 after my divorce.
11        Q.   Prior to September 2005, what name
12   did you use?
13        A.   H-A-Q, Haq.
14        Q.   What's your race for the record?
15        A.   Asian.
16        Q.   That's Asian as in east Asian?
17        A.   Bangladesh is besides India, so
18   India nation.
19        Q.   What's your highest level of
20   education?
21        A.   College degree, BBA.
22        Q.   From what college did you obtain
23   your BBA?
24        A.   City University of New York,
25   borough college.
```

```
 1                          S. ZAMAN
 2          Q.    That's here in Manhattan?
 3          A.    Yes.
 4          Q.    Who's your current employer?
 5          A.    U.S. Customs and Border Protection.
 6          Q.    Since when did you become employed
 7   by the Customs and Border Protection?
 8          A.    January 5, 2004.
 9          Q.    I'll call it CBP for short.  Is
10   that okay?
11          A.    (Indicating.)
12          Q.    When you were first hired by CBP,
13   what was your title?
14          A.    CBPO.
15          Q.    As part of your hiring, were you
16   required to complete a probationary period?
17          A.    Yes, I was.
18          Q.    When did your probationary period
19   begin?
20          A.    January 5, 2004, the starting date.
21          Q.    When did your probation end?
22          A.    January 5, 2006, two years.
23          Q.    What's your current job title?
24          A.    CBPO.
25          Q.    Who's your current supervisor?
```

1          S. ZAMAN

2   of the shops at Terminal B?

3       A.   No.

4       Q.   Have you ever seen any officers

5   window-shop there?

6       A.   No.

7            MR. CLOPPER: Objection.

8   Ambiguous, but go ahead.

9       Q.   Have you ever had occasion to go to

10  any location of the airport beyond TSA

11  screening?

12      A.   Have I ever what?

13      Q.   The part of the airport where

14  you're assigned for your duties, is that beyond

15  the TSA screening area?

16      A.   No. We have separate entrance. We

17  walk through TSA, but that's not part of the

18  public entrance. Walk through TSA, and you can

19  go to your customs area. There is no public

20  place over there.

21      Q.   As part of your job, are you

22  required to carry a firearm?

23      A.   Yes, I am.

24      Q.   Has there ever been an occasion

25  where you left your firearm unattended at the

```
 1                      S. ZAMAN
 2   airport?
 3        A.    Yes, there has been.
 4        Q.    How many times has that occurred?
 5        A.    Only once.
 6        Q.    When did that occur?
 7        A.    I can tell you the month, but I
 8   don't remember the date.  It's April 2004
 9   right after I came back from law enforcement
10   training center, one or two days after I came
11   back from law enforcement training center.
12        Q.    April 2004?
13        A.    Yes.
14        Q.    What make of weapon was that?
15        A.    Pardon.
16        Q.    What make of weapon was that?
17        A.    Glock.
18        Q.    Is that an automatic pistol or
19   something else?
20        A.    Yes.  I have it with me now.
21        Q.    It's an automatic weapon?
22        A.    Semiautomatic.
23              MR. TALARICO:  Can we go off the
24   record a second.
25              (Whereupon, an off-the-record
```

```
 1                    S. ZAMAN
 2      discussion was held.)
 3      Q.   How many rounds does the glock
 4 take?
 5      A.   Seventeen and one on the -- so all
 6 together 18, and then extra 17 and 17
 7 (indicating).
 8      Q.   Could you describe the place where
 9 you left this gun unattended in April 2004?
10      A.   I could.  This was training room,
11 something like this, and right outside the
12 training room on Terminal C, there is a
13 restroom.  It's within that FIS area, no public
14 entrance, but at the same time, airline
15 Continental reps can get in.  Those who have
16 hologram IDs, they can get in through there,
17 and only customs officers but not general
18 public.
19           So after the training was done, I
20 went to the restroom when we were done for that
21 day, and I left the restroom.  I was driving
22 home.  I got the phone call that if I have my
23 weapon.  First I said yes because I was under
24 the impression I had it.  Then the person who
25 called me, the trainer, he said check it to
```

1                    S. ZAMAN

2   make sure. So I pulled over, checked. It

3   wasn't with me. So the whole thing took place

4   within half an hour.

5        Q.    How far were you from the airport

6   at the time that you received this call?

7        A.    I was on the tunnel, Lincoln

8   Tunnel. So it's a matter of 20 minutes, 15 to

9   20 minutes.

10       Q.    In terms of distance, how far would

11  you say approximately; how many miles?

12       A.    From Newark Airport to Lincoln

13  Tunnel, it should be -- how many miles? Three

14  to four miles, five.

15            MR. CLOPPER: Just answer to the

16       best of your ability.

17       Q.    To the best of your ability, your

18  estimation. I'm not holding you to it.

19       A.    I would say five to seven miles. I

20  know the exact location. I don't know the

21  miles.

22       Q.    Now, you said this bathroom where

23  you left it unattended, airlines officials

24  could also access that location?

25       A.    Continental people who have

```
 1                  S. ZAMAN
 2   hologram IDs, only those people and customs
 3   officers.
 4        Q.   Who was it that you received this
 5   call from?
 6        A.   Trainer Bruce Wescot.
 7        Q.   Is that the first and last name?
 8        A.   Wescot would be the last name.
 9        Q.   Is it a CBP employee?
10        A.   Yes.  He was in charge of the
11   training unit.
12        Q.   Could you tell us what transpired
13   during this conversation after you realized
14   that you didn't have your weapon?  What did you
15   do?
16        A.   You want me to explain?
17        Q.   Yes.
18        A.   Okay.  I pulled over, and he said,
19   "We have your weapon.  You left it in the
20   restroom."  And first thing I asked at that
21   point, "What do I do now?  Do I call the cops
22   because my weapon is not with me?  What if
23   somebody took it?"  He explained right after I
24   left, the airline female, when they saw the
25   weapon there, she notified him -- she notified
```

```
 1                         S. ZAMAN
 2    him, and he went there, retrieved the weapon.
 3    And the reason it took 15 to 20 minutes, from
 4    the serial number, he called another trainer
 5    who is in charge of firearms and figured out
 6    that this is mine.  That's the point they
 7    called.
 8              So the second question I asked,
 9    "Did you notify Ms. Fowlkes?"  Because at that
10    time, that's the only supervisor I knew.  I
11    came in only two days, and Ms. Fowlkes is the
12    training supervisor.  He said, "No.  Don't
13    worry about it.  I took care of it."  Then I
14    asked, "What should I do?  I don't feel
15    comfortable.  I should notify the cops.  What
16    if somebody did something with it?"  He said,
17    "It's in safe hands."  I said, "Can I come
18    back?"  He said, "I've been cut," which means
19    he's also done for the day.  "It's in the
20    locker.  It's going to be with Officer Cararie,
21    the other trainer from the firearms division.
22    Tomorrow morning when you are 8:00 to 4:00 when
23    you come, go and collect it from him."  That
24    was that day.
25         Q.     So when you went back to work, you
```

```
 1                    S. ZAMAN
 2   resumed 8:00 to 4:00?  That would be 8:00 in
 3   the morning to 4:00 in the afternoon?
 4        A.   (Indicating.)
 5        Q.   Did you then retrieve your weapon
 6   from Officer Cararie?
 7        A.   Officer Cararie, who's the other
 8   trainer, and they explained the gun law and
 9   proper handling of weapon.
10        Q.   When you say they explained the
11   proper handling of weapon, what exactly did
12   they explain to you?
13        A.   I should never take out the weapon
14   from the holster.  I should take off the gun
15   belt when I want to take it off.  When I came
16   back from FLETC, I used to take the weapon out.
17   I thought I was instructed to totally take out
18   the weapon.  He said not to do that, and he
19   went through explaining.  So he said, "Don't
20   take the weapon out."  I was under the wrong
21   impression.
22        Q.   After you retrieved the weapon,
23   what did you do?
24        A.   He said, "Go back to the class."
25   So I went back to the class.
```

```
 1                    S. ZAMAN
 2       Q.    For how long did that class last?
 3       A.    Until four o'clock, normal.
 4       Q.    When did you finish that particular
 5  training?
 6       A.    That training went on and off for a
 7  whole probationary period.  It's a periodical
 8  thing.  At that time, I believe it was two and
 9  a half months or three months.  This is
10  post-academy training.  Then you do customs
11  part, immigration part, different, different.
12  So these whole two years, you have some kind of
13  training going on in-between.  You do passenger
14  processing, then again training.
15       Q.    On the day that you retrieved your
16  weapon, did you tell Supervisor Fowlkes of what
17  happened?
18       A.    No.  We don't have direct contact
19  with the supervisor.  Trainers are taking
20  between steps.  So first day when I got the
21  news, I specifically asked Mr. Wescot.  First
22  thing I asked, "Did you notify the cops?"
23  Second thing I say, "Did you notify
24  Ms. Fowlkes," because that's the only
25  supervisor I know.  So he say, "Don't worry
```

```
 1                    S. ZAMAN
 2   about it.  I took care of it."  So when I saw
 3   another trainer getting involved the next day,
 4   I took it from another trainer.  They said they
 5   took care of it.  They took care of it.
 6         Q.   I understand that.  The point I'm
 7   asking you is did you personally report to --
 8         A.   No, I did not.
 9         Q.   Other than the trainers that you
10   mentioned, did you report to any supervisor
11   about what happened to your gun?
12         A.   No, I did not.
13         Q.   As you sit here today, do you know
14   how many Continental Airlines people with the
15   customs holograph -- did you say holograph ID?
16         A.   Hologram.
17         Q.   With customs hologram had access to
18   the area where you left your gun?
19         A.   No, I don't know.
20         Q.   Do you know whether any of these
21   Continental Airlines people had psychiatric
22   problems who had access to that place?
23         A.   No.  That's why I'm mentioning that
24   these are the people who have access already
25   have hologram.  Hologram is something they go
```

1                       S. ZAMAN

2   through investigation, background check and

3   every investigation before they get hologram,

4   and that's what let them get into the FIS area.

5   It doesn't apply to every Continental worker,

6   only selected Continental workers get hologram.

7        Q.   Since the day when you retrieved

8   your weapon, did anyone at CBP other than the

9   two supervisors that you mentioned, did anyone

10  ever question you concerning your leaving your

11  weapon unattended in that bathroom?

12       A.   Yes.

13       Q.   When was the first time that anyone

14  questioned you about that?

15       A.   Within two months.

16       Q.   Who was it that questioned you?

17       A.   The training supervisor,

18  Ms. Fowlkes. I was called there for

19  investigation.

20       Q.   How did you get called to

21  Ms. Fowlkes for an investigation?

22       A.   Came to the job. When I signed in,

23  I believe at that point I was told to see

24  Ms. Fowlkes, and I went to see Ms. Fowlkes at

25  her office.

```
 1                    S. ZAMAN

 2      Q.   Do you belong to a union?

 3      A.   Do I belong to a union?

 4      Q.   Yes.

 5      A.   Now I do.

 6      Q.   At the time, did you belong to a
 7  union?

 8      A.   First two years, you can't.

 9      Q.   Who told you you couldn't belong to
10  a union the first two years?

11      A.   That was my understanding.  First
12  two years, I thought I couldn't join.  As soon
13  as two years was done, I joined the union.

14      Q.   Which union are you talking about?

15      A.   NTEU.

16      Q.   NTEU?

17      A.   (Indicating.)

18      Q.   So it was your understanding that
19  as a probationary employee, you cannot belong
20  to NTEU?

21      A.   That was my understanding at that
22  time.

23      Q.   From who did you derive this
24  understanding?

25      A.   I don't remember.
```

1                    S. ZAMAN

2     Q.    At this meeting that you had with
3 Ms. Fowlkes, who else was present?
4     A.    There was more than one
5 conversation between me and Ms. Fowlkes.
6     Q.    Could you give us the sum and
7 substance of the conversation?
8     A.    Yes, I could. She asked what
9 happened. I explained what happened like I
10 explained to you. Then she asked why I didn't
11 notify her. I explained who I notified. I
12 explained that to me, trainer was chain of
13 command. After two days coming out of FLETC,
14 trainer was my chain of command between
15 supervisor and myself as a new trainee. So
16 when trainer say, "I took care of it," that's
17 why I didn't come and tell her.
18        So she went through it, every
19 detail, what happened, how I lost, where I
20 lost, then how I retrieved it, why did it
21 happen like how -- as I explained to you, how I
22 took the gun. I used to take the gun out of
23 the whole belt. She explain again. She gave
24 me a handbook about gun handling procedures.
25 She told me that if any incident happens, first

```
 1                    S. ZAMAN
 2   line supervisor should be notified, not the
 3   trainer, which I didn't know at that point, and
 4   she went through explaining how to handle the
 5   weapons.
 6         Q.    During that meeting with
 7   Ms. Fowlkes, were you taking any notes?
 8         A.    Was I taking any notes?  No.
 9         Q.    Did you see her taking any notes?
10         A.    I don't remember.
11         Q.    Were you recording the conversation
12   with her?
13         A.    No.
14         Q.    Did you see her recording the
15   conversation?
16         A.    I don't remember.
17         Q.    Do you have a document which
18   would indicate the date that you met with
19   Ms. Fowlkes?
20         A.    No, I don't.
21         Q.    After your meeting with
22   Ms. Fowlkes, what else happened in relation to
23   this gun issue?
24         A.    At the end of the meeting, I asked
25   her like what's the next step because I'm
```

```
 1                    S. ZAMAN
 2   brand-new.  What's the next step?  When am I
 3   going to get resolved of this investigation?
 4   What's going to happen?  What could happen?
 5   What are the outcomes?  So she say she has to
 6   follow further details just to investigate me
 7   more.  So I kept waiting, kept waiting,
 8   thinking what could happen, what could happen.
 9   Meanwhile, nothing happens for almost one year
10   and up.  Then again, I get called by Chief
11   Cardinale.
12         Q.    How do you spell that?
13         A.    C-A-R-D-I-N-E-L-E, I believe, or
14   N-A-L-E.
15         Q.    You said after more than one year
16   you were called by Chief Cardinale?
17         A.    Right.
18         Q.    What did Chief Cardinale tell you?
19         A.    He said, "I'm here to do some
20   factfinding and what took place."  So I
21   explained what took place.  He asked if there
22   was any 12 or 13 involved, meaning supervisor
23   or deputy chief involved in it.  I explained
24   that I was called by Ms. Carol Fowlkes,
25   whatever went on.  I explained everything.  So
```