```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------------------X
     YEMISI AKINYEMI,
 4
                                         PLAINTIFF,
 5
 6                -against-              Case No.
                                         07 CV 4048
 7
     MICHAEL CHERTOFF, SECRETARY, DEPARTMENT OF
 8   HOMELAND SECURITY,

 9                                       DEFENDANTS.
     ------------------------------------------------X
10
11
12                       DATE: October 4, 2007
13                       TIME: 10:04 a.m.
14
15            EXAMINATION BEFORE TRIAL of the
16   Defendant, DEPARTMENT OF HOMELAND SECURITY,
17   by a Witness, SUSAN MITCHELL, taken by the
18   Plaintiff, pursuant to a Court Order, held
19   at the law offices of K.C. Okoli, Esq., 330
20   Seventh Avenue, 15th floor, New York, New
21   York 10001, before Lieng Boua, a Registered
22   Professional Reporter and Notary Public of
23   the State of New York.
24
25
```

```
                          MITCHELL
 1
 2       A.     The EEO program manager.
 3       Q.     Are you aware that Ms. Akinyemi
 4  filed a formal charge with the EEOC?
 5       A.     Yes, I am.
 6       Q.     Do you know that an investigative
 7  file was generated as a result of that charge?
 8       A.     I don't know.  I've never seen
 9  one, but.
10       Q.     As you sit here, you've never seen
11  one?
12       A.     An investigative file for EEOC,
13  no, I never saw an investigative file.
14       Q.     Did you see an investigative file
15  generated by the U.S. Customs and Border
16  Protection?
17              MR. CLOPPER:  Objection,
18       ambiguous.  Are we speaking of
19       Ms. Akinyemi or Ms. Haq?
20              MR. OKOLI:  Ms. Akinyemi.
21       A.     Again, I guess -- can I ask a
22  clarifying question?  Are we talking about the
23  discipline file or the EEOC file?
24       Q.     I'm talking, are you aware of any
25  investigation that was conducted by the
```

```
 1                      MITCHELL
 2   that found the weapon made a report of it to
 3   their supervisor?
 4        A.    I did find out about that.
 5        Q.    What did you find out is what I am
 6   asking?  Did you then find out that the person
 7   who found the weapon actually reported it?
 8        A.    I found that they did not, for
 9   several months, report it.
10        Q.    The people who found it did not
11   report it for several months?
12        A.    Correct.
13        Q.    Did you learn when they then
14   reported it?
15        A.    Several months later.
16        Q.    But how many months before
17   Ms. Akinyemi's issue came up?
18        A.    I don't know the exact time line
19   but it was before Ms. Akinyemi's issue came up
20   that they reported it to a supervisor.
21        Q.    Did you find out from them why it
22   took several months for them to report it at
23   the time that they did?
24        A.    I did find out.
25        Q.    What did you find out?
```

```
 1                    MITCHELL
 2      A.      They decided to take care of it
 3  themselves.
 4      Q.      What are the names of these people
 5  who decided to take care of it themselves?
 6      A.      CBPO Wescott.
 7      Q.      Wescott, can you spell that?
 8      A.      W-e-s-c-o-t-t.
 9      Q.      Okay.
10      A.      And there's another individual
11  whose name is escaping me right now.
12      Q.      Is that individual's name a
13  female?
14      A.      Male.
15  _____
16      Q.      We will leave a space in the
17  transcript so you can provide the name of that
18  person.
19              MR. CLOPPER:  She is answering
20          that she does not know, but we will
21          respond to it in an appropriate discovery
22          request for that information.
23              MR. OKOLI:  She said the name is
24          escaping her.
25              Can you read back the answer?
```

```
 1                     MITCHELL
 2    result of her investigation?
 3        A.      I was advised that the case was
 4    closed.
 5        Q.      Did you ask her why the case was
 6    closed?
 7        A.      No, I did not.
 8        Q.      Did she tell you?
 9        A.      I believe it was handled at her
10    level, handled at the level below me.
11        Q.      But the question is this: She did
12    not take action of her own volition?  You
13    instructed her to take action to look into the
14    matter?
15        A.      To look into the matter, yes.
16        Q.      And you didn't ask her whether or
17    not the matter you asked her to look into was
18    proven or not proven?
19        A.      She told me it was taken care of,
20    that it had been reviewed.
21        Q.      Did you understand that it was not
22    established or that it was established?  What
23    was your understanding?
24        A.      My understanding was that an
25    incident did occur and it was handled at a
```

```
 1                  MITCHELL
 2    level lower than myself.
 3         Q.    Your understanding was that an
 4    incident occurred?
 5         A.    Correct.
 6         Q.    What did you understand occurred?
 7    What incident, quote-unquote, did you
 8    understand occurred?
 9         A.    I never got a copy of the case
10    file because I was advised that any actions
11    that needed to be taken were already handled
12    below me.
13         Q.    And the person who handled it
14    below you is somebody you supervised; correct?
15         A.    Yes.
16         Q.    When you say it was handled, what
17    specifically do you mean?
18         A.    I was advised by my senior manager
19    that it was handled.
20         Q.    Okay. And did you get the sense
21    of whether or not Ms. Gluba was disciplined
22    for it or not?
23         A.    I got the sense that there was
24    discipline taken.
25         Q.    What discipline did you learn was
```

```
1                       MITCHELL
2       she told you she has no knowledge of
3       Ms. Gluba's discipline.
4               MR. OKOLI:  Okay.
5               MR. CLOPPER:  There's documents
6       that bear on this issue.  I am not quite
7       sure where we are going with this.
8          Q.     Just to be clear, you asked
9       Ms. Haage to look into the allegation that
10      Ms. Gluba had revealed sensitive government
11      information; correct?
12         A.     Correct.
13         Q.     And you never found out
14      specifically from Ms. Haage what her
15      conclusion was as a result of the
16      investigation?
17         A.     I didn't say that.
18         Q.     Did you find out from Ms. Haage
19      what she found as a result of her
20      investigation?
21         A.     Yes, I did.
22         Q.     What did she tell you she found?
23         A.     That sensitive information was not
24      revealed to members of the traveling public.
25         Q.     Did you say that some discipline
```

```
                        MITCHELL
 1
 2    her probation?
 3         A.    It would have to be case specific.
 4    Perhaps, perhaps not.  It is dependent on the
 5    circumstances of the case.
 6         Q.    Thank you.  Is Ms. Gluba still on
 7    probation?
 8         A.    No.
 9         Q.    By the way, what is Kathleen
10    Haage's race?
11         A.    She is white.
12         Q.    Do you know Ms. Gluba's current
13    title?
14         A.    CBPO.
15         Q.    Just to be clear, you did not
16    become aware of the claim or allegation that
17    Ms. Gluba had revealed sensitive information
18    to the public until my client raised it in the
19    course of the investigation of her claim.
20    Correct?
21         A.    Correct.
22         Q.    Now, you said Ms. Haage did this
23    investigation and told you it was handled at
24    her level.  Correct?
25         A.    Correct.
```

```
 1                    MITCHELL
 2           MR. OKOLI:  Okay.  Even though I
 3   will put it in writing, I want to have
 4   every memoranda relating to Ms. Haage's
 5   investigation of Ms. Gluba's situation or
 6   the investigation by anyone else at
 7   Customs relating to the allegation of
 8   Ms. Gluba revealing sensitive
 9   information.
10      Q.   Do you know an employee by the
11   name of Elba Mendez?
12      A.   Not personally.
13      Q.   Do you know of Elba Mendez?
14      A.   Yes.
15      Q.   How did you come to know of her?
16      A.   Your client's allegations.
17      Q.   And what did you learn were my
18   client's allegations against Ms. Mendez?
19      A.   I believe that Ms. Mendez had been
20   involved in a similar situation.
21      Q.   When you say "similar situation,"
22   would you be more specific to the best that
23   you recall?
24      A.   I believe the allegation was that
25   she also met family members arriving on a
```

```
 1                     MITCHELL
 2    flight.
 3         Q.    At a gate area?
 4         A.    I don't know that that was part of
 5    the allegation.
 6         Q.    As a result of that allegation,
 7    did you take any steps?
 8         A.    I referred the allegations to the
 9    area director.
10         Q.    And who would the area director be
11    in that case?
12         A.    Kathleen Haage.
13         Q.    Do you recall when it was that you
14    referred the allegation to the area director?
15         A.    That day or the next day when
16    Mr. Angevine gave me the list of allegations.
17    It was the exact same time.
18         Q.    When you referred this allegation
19    to Ms. Haage, did you do that by memo or was
20    it just verbal?
21         A.    Verbal.
22         Q.    Did you give her any documents in
23    connection with the verbal instruction that
24    you gave her?
25         A.    No.
```

```
 1                    MITCHELL
 2   in connection with investigating the
 3   underlining complaints or allegations by my
 4   client were done verbally?
 5        A.    Yes.
 6        Q.    Okay.  So in relation to that of
 7   Mr. Murphy, it was also a verbal reference to
 8   Ms. Haage to investigate it?
 9        A.    Correct.
10        Q.    And did Ms. Haage come back to you
11   to tell you the results of the investigation?
12        A.    No.  I did not hear anything about
13   it.
14        Q.    How soon after you learned of the
15   allegation did you make this reference to
16   Ms. Haage to investigate Mr. Murphy's
17   situation?
18        A.    As I said before, all the
19   allegations were made to me by Mr. Angevine at
20   the same time and they were all referred to
21   Ms. Haage at the same time.
22        Q.    Where is Ms. Haage now?
23        A.    Retired.
24        Q.    So from the time that you referred
25   these three allegations to Ms. Haage until her
```

```
                     MITCHELL
1
2       A.      I don't know what people's
3   perceptions are.
4       Q.      Okay.  Did you ever hear any
5   rumors, not in the press, from the workplace?
6       A.      So now is your question employees?
7       Q.      Employees.
8       A.      I have never heard employees say
9   that we are profiling Nigerians or passengers
10  on Nigerian planes.
11      Q.      Now, I will ask a slightly
12  different question.  Since Ms. Akinyemi's
13  case, have you learned, maybe third-hand or
14  fourth-hand, learned that a customs employee
15  thought that Nigerian passengers were being
16  profiled?
17      A.      I have never learned that a
18  customs employee thought that Nigerian
19  passengers were being profiled.
20      Q.      Okay.  If they were being
21  profiled, would you see anything wrong with
22  that?
23      A.      We don't profile passengers at
24  all.
25      Q.      I am just asking.  If they were,
```

```
                        MITCHELL
1
2    would you find anything wrong with that?
3         A.     Yes.  I don't believe profiling is
4    an effective law enforcement tool.
5         Q.     As the director of field
6    operations, are you aware of any policies in
7    place regarding drug trafficking that are
8    applied differently to Nigerians than they are
9    applied to others?
10        A.     I don't know of any policy that
11   applies to one nationality versus another.
12        Q.     So as you sit here today, you do
13   not know whether Nigerians have ever been
14   profiled by customs officers within your area
15   of command based on the perception of
16   trafficking and drugs?
17        A.     I don't know of any of my
18   employees that ever profiled anyone.  I do
19   believe that flights from Nigeria have been
20   targeted, but it is the country as opposed to
21   the people.
22        Q.     What is the distinction between
23   the country and the people?
24        A.     We have a variety of countries of
25   interest, whether for terrorism or for
```

```
                       MITCHELL
 1
 2    narcotics.  Anyone coming from that country
 3    could be questioned for those reasons, not
 4    necessarily the people, the nationality.
 5              It is the country where the flight
 6    is coming from, where the passenger is coming
 7    from, not where the passenger was born, that
 8    is of interest for a law enforcement
 9    perspective.
10        Q.    When you say "the country where
11    the flight is coming from," as a matter of
12    common sense, would you expect more people on
13    that flight be citizens of that country than
14    non-citizens?
15        A.    That would be the norm.
16        Q.    So if you were targeting a flight
17    coming from Nigeria, you would expect the
18    majority of the people flying on that plane to
19    be Nigerian citizens?
20        A.    Correct, but they may not be the
21    ones of interest to us.  In fact, it may be
22    the non-Nigerians that is of more interest to
23    us from a law enforcement perspective.
24        Q.    Do you have any documentation of
25    the people that you have interdicted or
```

```
                        MITCHELL
 1
 2    challenged as persons of interest coming on
 3    flights from Nigeria?  Do you have any such
 4    documents?
 5         A.    Every passenger coming through has
 6    to go through a clearance process, so I could
 7    tell you every passenger has been talked to
 8    and has been examined for CBP.
 9         Q.    That is not my question.  When you
10    talk about targeting, what does targeting mean
11    to you?  Explain that to us when you say
12    certain countries, flights from certain
13    countries are targeted.  Explain that to us.
14    What does that mean?
15         A.    Certain countries might be --
16    depending on the particular area of interest,
17    certain flights coming from certain countries
18    might have more interest and so I would expect
19    that resources would be more dedicated to
20    looking and determining the threat of those
21    individual passengers in that flight.
22         Q.    When you say certain flights
23    coming from certain countries have more
24    interest, what is that in plain speak?
25         A.    It could be for terrorism.  We
```

```
                         MITCHELL
 1
 2    have a variety of flights that are of interest
 3    for that.  For narcotics, we have flights of
 4    interest.  For agriculture, we have flights of
 5    interest for those various items.
 6         Q.      Could you name the flights of
 7    interest in relation to narcotics that you are
 8    aware of since you became director of field
 9    operations?
10              MR. CLOPPER:  Objection.  I think
11    we need to take a break.  I need to --
12              MR. OKOLI:  Not while a question
13    is pending on the record and the fact
14    that counsel is asking for a break --
15              MR. CLOPPER:  Sure.  I am
16    concerned about a privilege issue here.
17              Do you think you can answer that
18    question without violating a privilege,
19    including law enforcement privilege?
20              THE WITNESS:  That is law
21    enforcement sensitive information.
22              MR. CLOPPER:  I am with National
23    Security.  I am instructing my client not
24    to answer.
25         Q.      But you do admit that there are
```

```
                        MITCHELL
1
2    flights coming from certain countries that
3    Customs targets?
4         A.    Correct, we do have targets.
5         Q.    Okay.  And some of the targets are
6    based on the perception that those flights are
7    likely to have drug traffickers?
8         A.    I would not use the word
9    "perception."
10        Q.    In terms of drugs, what would
11   cause you to have specific interest in flights
12   coming from a certain country, whatever that
13   country is?
14        A.    It could be the region of the
15   world that it is.  It could be specific
16   information.  It could be general information
17   in the intelligence community.  It could be
18   past history of successful interdiction.
19   There's a variety of reasons that together
20   could form the basis for a risk assessment.
21        Q.    So if a customs officer were to
22   say that they targeted Nigerians because of
23   their possible drug involvement, that would be
24   incorrect?
25        A.    I would think that it would be
```

```
                        MITCHELL
1
2    incorrect to target Nigerians.
3         Q.    No, no, no.  I am --
4         A.    That is the question you asked
5    though.
6         Q.    No.  My question is -- let me
7    rephrase my question.  My question is, if a
8    customs officer were to testify that they, at
9    their location at the airport, targeted
10   Nigerian passengers, you would say that that
11   customs officer's testimony is incorrect?
12        A.    In the context that you just said,
13   yes, I would say that is incorrect.
14        Q.    But you do not work at the
15   airport; do you?
16        A.    Not anymore.  That is within my
17   area of responsibility, but I am not assigned
18   at the airport.
19        Q.    So even as the director of field
20   operations, if a customs officer who actually
21   works at the airport were to say that they
22   targeted Nigerians, Nigerian passengers, you
23   would dispute that?
24        A.    I would think that that was not a
25   good law enforcement tool, and I don't think
```