UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X          Case No. 07 CV 4048
YEMISI AKINYEMI,                                                        (AJP)

                                  Plaintiff

-against-




MICHAEL CHERTOFF,
SECRETARY, DEPARTMENT OF HOMELAND
SECURITY,

                                  Defendant
---------------------------------------------------X


## <u>DECLARATION OF YEMISI AKINYEMI</u>


**YEMISI AKINYEMI,** hereby declares as follows pursuant to 28 U.S.C. §1746:

1.      I am the plaintiff in the above-entitled action by virtue of which I am fully
        familiar

with the facts and circumstances described herein.

2.      I submit this Declaration in opposition to the motion of the defendant for

summary judgment herein.

3.      I am a Nigerian-born African American citizen of the United States of America.

4.      The probationary officers who were terminated by CBP during their probation

were terminated mostly for criminal offenses which would have made them ineligible for their

positions if those offenses had been on their record at the time of their applications.

5.      Those probationary officers who were terminated by CBP for reasons other than

criminal offenses, were counseled at least once or more than once, and were only terminated

after they failed to heed the counseling or warning given to them.

6.      Kathleen Haage-Gaynor, Mitchell's immediate subordinate who recommended my termination, had previously, for no apparent reason, attempted to find a reason to discipline me.

7.      One time when I was assigned to the port and was wearing a uniform skirt, Ms. Haage-Gaynor visited the location.  She stated that I could not wear skirt to work despite the fact that it was one of the options provided to CBP female officers which I chose from the website.

8.      From that day, I began wearing pants uniform so as to comply with Ms. Haage-Gaynor's directive even though, based upon my religion, my preference would be the skirt uniform.

9.      Shortly after, Ms. Haage-Gaynor, acting through SCBPO Kathleen Hawkins, called my Raymond Boulevard place of work to ask Helen Izworski to verify whether I was wearing a skirt uniform.

10.      I do not know why the type of CBP-approved uniform which I wore would be of particular interest to Ms. Haage-Gaynor who was many supervisory levels above me.  Given her poor history with Nigerian-born employees, I believe that Ms. Haage-Gaynor was looking for a pretext to get rid of me as a Nigerian-born officer.

11.      Officer Gregory Jurczak, who was one of the officers my husband and I encountered on December 5, 2005, the date of the incident, submitted an unsworn declaration to CBP during the investigation of this matter.  In it, he offered contradictory statements.  In one breadth, Officer Jurczak claims "I do not know where she [Akinyemi] worked at that time".  In another breadth, he claimed "Officer Akinyemi did not have a badge issued by PA *but had a badge for Raymond Boulevard where she worked*".

12.      There are numerous other matters concerning this case which raise serious questions about Officer Jurczak's credibility.  In his own unsworn declaration, DCO Herbert Herter reported his conversation with Officer Jurczak which contradicts parts of Officer Jurczak's account of what happened on December 5, 2005.

13.      DCO Herter claimed in his unsworn declaration that the two CBP officers who

made contact with my husband told him that my husband exited the plane to prove that he was married to me. If my husband had already boarded the plane, as claimed, what benefit would my husband or I derive at that point for him coming back out just to prove to the officers who had cleared him, his relationship with me.

14.     CBP officers have made so much of the fact that my address in some CBP database is different from my husband's address. Officer Jurczak also claimed that he found something derogatory in my husband's background. I categorically state that Officer Jurczak lied because there is nothing derogatory in the background of the man I have been married to all these years.

15.     When I applied for the CBP job, my address was 10 Marshall Street, Irvington, NJ 07111. During the hiring process, I bought my own house and moved to 36 Hennessy Place, Irvington, NJ 07111. I duly effected a change of address with Human Resources, and TECS employee information system did not require me to indicate my past address.

16.     When I was hired on December 29, 2003, my emergency contact point was Ruth Oluloye, 1460 Pennsylvania Avenue, Brooklyn, New York, because my husband was not in the United States, and I could not have given an emergency contact outside the U.S. Somehow, I never bothered to change this emergency contact after my husband returned to the U.S., but all my documents with CBP show him as my spouse.

17.     At the time I bought my house on April 30, 2003, my husband was outside the U.S., having left in mid-April 2003 and returned in March 2004.

18.     When my husband returned to the U.S., I had already started my training with the U.S. Customs at Federal Law Enforcement Training Center ("FLETC"), which began on 1/28/04 and lasted till 4/21/04. When my husband returned to the U.S. in my absence, he went to stay with his brother in New York until I returned to NJ upon completion of my training at FLETC.

19.     On the occasions that I was assigned to work at Newark International Airport, I

had seen CBP officers visit restaurants beyond the TSA checkpoints (restricted areas) at a time when those officers were on break. Joseph Martella, a Union Representative and CBP officer who had worked at the Newark International Airport, submitted an unsworn declaration during the investigation of this matter.

20.    In response to a question whether off-duty CBP Officers ever go past security to use restaurants or shops in the passenger waiting areas, Mr. Martella stated that, to the best of his knowledge, CBP officers did so before and after their tours, as well as during their breaks.  He further explained that such officers were considered to be off-duty during break periods.

21.    In further response to the question whether CBP Table of Offenses and Penalties applied to probationary officers, like me, Officer Martella stated that the Table applies to all CBP officers.  He further stated that, based upon his experience as a union representative, "other probationary employees, who have committed more egregious acts, have not been terminated".

22.    Another CBP Officer, Brendan L. McPhail, submitted an unsworn declaration during the investigation of this matter in which he admitted that they profile Nigerians at Newark Airport but not someone who works with them.  Based upon everything which I learned during this case, including the manner in which the transgressions of other non-Nigerian CBP officers were handled, I have no doubt that I was discriminated against because I am a Nigerian.

23.    Upon information and belief, based upon his previous travels out of Newark Airport, and his encounter with Officer Jurczak on December 5, 2005, my husband believes that he was profiled by Officer Jurczak when he discovered that he was a Nigerian, and I became guilty by association, despite being a CBP officer.

24.    Prior to December 5, 2005, I never received any verbal or written instruction stating that I was not allowed to go past TSA security during my off-duty hours to see off a relation.  I also never received any such instruction not to go to the departure gate at Newark International Airport. And, based upon the fact that prior to December 5, 2005, I had seen many CBP officers go past TSA security when they were off-duty, I had no reason to believe that it was such an egregious offence which would subject me to discipline, including termination

without prior warning.

25.     To the best of my knowledge, in my case, CBP did not follow the Standard Operating Procedures applicable to the Separation of Probationary and Trial Period Employees.

26.     I did not use my CBP identification for personal gain either for myself or my husband on December 5, 2005. Neither did I use same to intimidate, coerce or deceive anyone at Newark International Airport on that day.

27.     Kathleen Haage-Gaynor and Susan Mitchell, who treated non-Nigerian employees

different from how they treated me, are the same characters who were responsible for adverse employment action against another Nigerian, Timothy O. Sonuga.  Mr. Sonuga is currently litigating his failure to promote claim against CBP, based upon the conduct of Mitchell and Haage-Gaynor towards him.

28.     Ms. Haage-Gaynor, who has since retired from CBP, also discriminated against Femi, another Nigerian-born officer who later moved to the Internal Revenue Service.

29.     On December 9, 2005, Supervisory CBP Officer Loraine Spina summoned me to 1210 Corbin Street, from my 1100 Raymond Boulevard location, and I went.  When I got there, there was Mr. Fox, Mr. Calise, Mr. Martella, union representative, who I had informed of the meeting.  Ms. Spina inquired about why I was at Newark International Airport on December 5, 2005, and who excused me from work.

30.     After I responded to her questions, she informed me that she was required to obtain a written statement from me which I gave her.  Said statement is attached herewith as **Exhibit 1.**

31.     About one week later, Mr. Robert Oscard told me that I had to go back to speak with Dominick Calise about my presence at Newark International Airport on December 5, 2005, and that I should take a Union Representative with me.

32.     Again, I went with Joe Martella, and when we arrived, Mr. Edward Fox was there as was Dominick Calise. When they began to question me, Mr. Martella objected on the ground

that I had not been provided Weingarten Rights and Kalkines Rights, as required by the union contract and the meeting was suspended.

33.    At a subsequent interview on December 19, 2005, with Edward Fox, Dominic Calise and Joseph Martella (Union Representative), I was given a copy of my Kalkines Rights and Weingarten Rights.

34.    At this December 19, 2005 interview, Edward Fox said that the interview would lead to an investigation.  He further stated that my case would be forwarded to Ms. Lucia Baez, Labor Employee Relations (LER) Officer for investigation.  He also stated that either Ms. Baez or an LER representative would contact me and the officers mentioned at the interview regarding my matter.

35.    Neither Ms. Baez nor anyone from LER ever contacted me as stated by Mr. Fox. Moreover, I was not aware of any "investigation" as suggested by Edward Fox.

36.    The next contact I had with anyone at CBP concerning my case was when two CBP officers showed up at my home on December 21, 2005, while I was at home with my sick daughter, and gave me a letter dated December 20, 2005, signed by Susan T. Mitchell, Director of Field Operations, terminating my employment with CBP.

37.    CBP documented that no attempt was made at the time of the aforesaid interview of December 19, 2005, to determine the validity of the "unsolicited" statements which I made to them.

38.    These unsolicited statements relate to the fact that I lost my father in law, and consulted with some more senior CBP officers at my office (Brendan McPhail and Bradford Slutsky) whether I could go to the airport in my uniform since I was short of time and I could not go home to change before going to the airport.

39.    Throughout my almost two years with the CBP, I was never reprimanded or subjected to any kind of discipline until my termination in December 2005.

40.    Also, nobody, within or outside CBP, ever lodged any complaint against me for anything.

41.     I did my job conscientiously, did overtime whenever required of me, worked weekends when asked to do so, and performed my duties by the book and in  accordance with my training as a CBP officer.

42.     On occasions, Deputy CBP Robert Oscard had asked me to work extra hours, and I did so without being paid any overtime compensation. This is because of my desire and enthusiasm for the job.

43.     Also on occasions, Supervisory CBP Officer Dominic Calise had made use my sick time on assignments which I finished early when he had nothing else for me to do.  I also did this because of my desire for the job.

44.     I had performed many good works for the CBP, the latest of which occurred during my last days.  This involved the improper release of a vehicle by CBP Officer Stanzione of JFK Business Service Center (BSC), who released a 2003 Lexus vehicle which did not meet EPA and DOT requirement for permanent registration in the U.S.

45.     When the owner came to Newark BSC on the assumption that the vehicle was there for pick up, I requested the clearance documents and, during my examination, I discovered that the owner did not present the required clearance documents at JFK before he was given a paper release.

46.     I immediately notified the vehicle team at my location which agreed with me that the vehicle should not have been released without a letter from the manufacturer attesting that it meets U.S. EPA and DOT standards. Alternatively, the owner could have the vehicle released through a Custom House Broker to guarantee that the vehicle would not be on the road until all the requisite requirements had been met.

47.     As of the last day I worked, the owner had not provided the requisite documentation and requested that the vehicle be shipped back to the United Arab Emirates from where it was imported into the United States. SIS Mitchel Landau and CIS Matt Sullivan were aware of this Lexus incident.

48.     In the summer of 2005, I was on duty at Cape Liberty Cruise Terminal when

Senior CBP Officer Patrick Murphy showed up in full uniform to pick up his sister in law who was returning from a cruise.  He was not on duty at that location on that day and used his AOA card to gain access to the cruise terminal, which is a restricted area.

      I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this February 25, 2008             /s/ Yemisi Akinyemi

                                                   _____

                                                   Yemisi Akinyemi