## UNSWORN DECLARATION

**SUBJECT:** Discrimination Complaint of Yemisi Akinyemi and Michael Chertoff, Secretary, U.S. Department of Homeland Security, Case Number HS-06-CBP-000306-040105.

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

In accordance with the following provisions of 28 U.S.C. 1746, I, Susan T. Mitchell, the undersigned, do hereby make the following unsworn declaration, under penalty of perjury, pertinent to the above stated complaint:

1. Question: What is your position title, grade, and organizational unit?

    Answer: I am the Director of Field Operations (DFO) for the New York Office of Customs and Border Protection (CBP). That is an SES position. I have administrative and operational oversight over all the 3000 CBP employees in the New York and New Jersey areas.

2. Question: What is your national origin, race and skin color?

    Answer: I am Caucasian. I am Irish/American.

3. Question: How long have you worked for CBP?

    Answer: Since it was created in March 2003, but all together, I have 28 years of Federal Service.

4. Question: Who was your first level supervisor in December, 2005.

    Answer: The Deputy Assistant Commissioner William Heffelfinger.

5. Question: How do you know Yemisi Akinyemi, and are you aware of her national origin or race?

Page one of eleven pages                    Initials

129



Answer: I don't know her personally or by sight. I don't know her national origin. I don't know her race.

6. Question: Prior to Ms. Akinyemi's termination, do you recall discussing her performance with other supervisors or managers?

Answer: No, unless there was some negative issue, I would not have.

7. Question: What is your understanding of the CBP rules or regulations regarding access to restricted areas by CBP officers at the Newark airport?

Answer: My understanding is that access is granted for official reasons only. If you are off duty, that would mean you don't have an official reason for being there. CBP Officers have wide access to restricted areas in the airport and seaport, but that access is granted for their official duties and when they are doing assignments.

8. Question: What are the restricted areas at the airport, to your knowledge?

Answer: There are a variety of them. The airport operations area is one, and there are some very specific areas dedicated in the FAR (FAA Federal Air Regulations), like the customs area and the federal inspection site and the gate areas, and other areas dedicated as security zones by the TSA or other security agency. The tarmac would be one such area.

9. Question: To your knowledge, do CBP Officers from other facilities, who are not on duty at the airport, or those coming off duty at the airport, go through security there in order to use the restaurants or shops in the passenger waiting areas or to hang around after work?

Page two of eleven pages                Initials /s/

131

Answer: I don't know of anyone who works in a different facility coming to the terminal food courts. The warehouse and cargo areas are on a completely different side and you would have to drive there and park and walk across the street to access the airport passenger terminal. I don't know of people who do that. It would be unusual for a CBP Officer to come in early or hang around after a tour.

There isn't any rule that would prevent a CBP officer who was on duty at the airport from going through security to get food, that would be fine. I don't know how many people do that, but if they are there for official reasons they could do that.

10. Question: You signed the termination letter for Ms. Akinyemi in December, 2005. How did that issue come to your attention?

Answer: It was sent to my attention by the Area Port Director, Kathleen Haage. I received a written report of a breach of security prepared by Supervisor Herb Herter, and it was a description of an incident involving Ms. Akinyemi. I also got a report from SIS Landau, who was the supervisor on duty at the facility where she had been assigned that day.

11. Question: What did you learn from those reports?

Answer: What I learned was that two officers stopped a passenger and spoke with him in the course of a routine outbound operation. He mentioned that his

Page three of eleven pages                    Initials

wife was a CBP Officer, although she was not with him at the time. They completed their interview and he went on to the plane. Before the flight was complete, they noticed him coming off the plane and they noticed Ms. Akinyemi, who they didn't know but who was in uniform, coming towards the passenger and them at the gate area. Ms. Akinyemi and the passenger had a conversation and some money changed hands and the passenger returned to the plane. The airline rep told the officers that the passenger said he had to get off the plane to meet his wife. At that time Ms. Akinyemi said to the two officers "you know me I work at the DAU". Ms. Akinyemi relayed a different story on the nature of the passenger's trip than the passenger had told. The difference in their stories stuck in the officers' minds as a bit unusual, and they went back to their office and spoke to their supervisor. The supervisor made a report up his chain of command to the Area Director. At that time, Ms. Akinyemi was asked to make a statement about why she was at the departure area.

12. Question: Why did they stop her husband?

Answer: In the course of outbound operations, they stop various passengers. I don't know why they stopped him specifically, but the flight was targeted for an outbound exam. In the course of normal business we verify currency-reporting requirements and export controls. The currency issues are the main factor in why we enforce the inspections. If you take out more than $10,000 you have to fill out some documentation.

13. Question: Who else was involved in the termination decision, who did you

Page four of eleven pages                           Initials

consult with?

Answer: The entire package would have gone to Labor and Employee Relations (LR), and also to the Associate Chief Counsel in New York, to advise whether there were grounds for removal or discipline. Labor Relations would have coordinated the process. Beth Bernstein was the LR Specialist involved.

14. Question: Why specifically was Ms. Akinyemi terminated?

Answer: I had a discussion with LR, Counsel, and Area Port Director Haage. Based on the discussion and analysis by LR, we had enough information to sustain removal for unauthorized access to a secure area. We discussed the reports that were submitted and Ms. Akinyemi's statements and the regulations about appropriate or inappropriate use of identification and access while off duty. It was her presence in the gate area in full uniform while off duty for personal reasons that was the deciding issue in the removal

15. Question: Section 6.3.5 of the CBP Officer code of conduct, which you cite in the termination letter, states: "Employees will not use any CBP identification in a manner which may reasonably give the perception that they are using the identification for personal benefit, attempting to exert undue influence, or to obtain, directly or indirectly, a favor, reward or preferential treatment for themselves or others, or to improperly enhance their own image." What specifically did Ms. Akinyemi do to violate that section as far as gaining any personal benefit?

Answer: She gained access to an area that people without the badge could not

Page five of eleven pages                    Initials [signature]

have access to. In this case she had no business reason for going through security or into the outbound area. She obtained access to a controlled area to communicate with a family member. Other people don't have that access

16. Question: Did you consider a lesser penalties?

Answer: I did, but with a probationary employee, it is not often we consider lesser penalties. If she had not been on probation, it probably would have gone to a disciplinary review board and gone through that whole process and the result might have been the same or different. When there is such an egregious act, we do tend to terminate. But there is a difference in the probationary status. We use that status so we can have the ability to assess an employee from a performance standpoint and decide whether they can progress to the journeyman status. We use that status to determine if the employee utilizes good judgment in a variety of situations that they encounter.

17. Question: Under the CBP Table of Offenses and Penalties, "Using a CBP badge to attempt to coerce, intimidate, deceive, or for personal gain" is punishable by a written reprimand to a 14-day suspension for the first offense. Why was termination used for Ms. Akinyemi for her first offense of this nature?

Answer: That is the point of probation. We do have greater flexibility in how we deal with probationary employees.

18. Question: Could you have given Ms. Akinyemi a lesser penalty?

Answer: It was possible to give her a lesser penalty. But I decided that the nature of the violation, the misuse of the badge, was so fundamental to the job

Page six of eleven pages                            Initials

of the uniformed officer, that I thought it was an offense that did warrant termination during the probationary period.

19. Question: Ms. Akinyemi states when she was originally questioned on December 9th by Officers Spina and Fox, she was not told what the charges were against her or given any statement of her rights. She states on December 16th, when she was asked to make a formal statement, she was again not told what the charges were or her rights until her union rep called union lawyers and refused to let her speak. Is this accurate to your knowledge?

Answer: I do not know if this is accurate.

20. Question: Why was the termination done the day after she gave a statement?

Answer: I don't know.

21. Question: Ms. Akinyemi says she was told by three other CBP Officers that she could go to the airport in her uniform since she was crossing over from her duty post. Was that accurate advice?

Answer: That was not accurate advice. I don't know what "crossing over" means. To go from one assignment to another, you would keep your uniform on. If Ms. Akinyemi was in her uniform, and she had stopped where all non-ticketed people stop, there would have been no problem. The problem was that she used the trappings of her authority to gain access where others couldn't go freely.

Page seven of eleven pages                                Initials

22. Question: Ms. Akinyemi says in the summer of 2005, Senior CBP Officer Pat Murphy was at the cruise terminal without authorization to meet a family member, and he was not disciplined. Were you aware of this incident?

Answer: I do not know anything about that.

23. Question: Ms. Akinyemi states that in the summer of 2005, probationary CBP Officer Elba Mendez escorted her parents to the gate at Newark Airport, and was not disciplined. Were you aware of that incident?

Answer: No.

24. Question: Ms. Akinyemi states another probationary CBP Officer, Shamila Haq, misplaced her weapon in a public bathroom and was not disciplined. Were you aware of that incident?

Answer: I do have knowledge of that incident. After Ms. Akinyemi raised the issue in the informal stage, I did look into that incident. However, under the Privacy Act, I am not permitted to disclose information about an employee without a signed waiver from the employee in question, or a protective order.

25. Question: Ms. Akinyemi states that CBP Officer Gluba gave government sensitive information to a passenger about an arrest warrant while she was on probation and she only received a letter of reprimand. Is that accurate?

Answer: I did also look into this incident, and the circumstances were not exactly as Ms. Akinyemi related. However, under the Privacy Act, I am not permitted to disclose information about an employee without a signed waiver from the employee in question, or a protective order.

Page eight of eleven pages                                      Initials

26. Question: Are you aware of other probationary and permanent CBP Officers who were in restricted areas without permission in the two years prior to December 22, 2005, and if so, did they face disciplinary action?

Answer: I am aware of a few cases, but I may not be aware of all incidents. LR is the central location for disciplinary records and I will consult with them for a complete list and forward to you under separate cover.

27. Have you terminated any other probationary employees in the two years prior to December 22, 2005? If so, what was the reason for the termination.

Answer: Yes I have.

**NEWARK-**

**Scott Hobbs**-Customs Inspector-GS-5-harassed a neighbor and was arrested for 2nd Degree Burglary/Illegal Entry. Terminated November 1, 2002.

**Michelle Cronin**-Customs Inspector-GS-5-failed to follow instructions and acted unprofessionally on the job. Terminated August 22, 2003.

**Adam Close**-Customs Inspector, GS-07-failed to show up for several overtimes assignments. Terminated 2/20/04.

**Emmanuel Burgos**-CBP Officer, GS-05, admitted to grabbing his wife's neck during an argument. Terminated 12/22/04.

**Robert Herbert**-CBP Officer-GS-5-arrested and charged with two counts of aggravated assault on a police officer and resisting arrest. Terminated June 22, 2005.

**Hakan Ozcelik**-CBP Officer-GS-7-arrested and terminated September 23, 2005.

Page nine of eleven pages                                    Initial

## JFK

**Stephen Higgins** - JFK Customs Inspector GS-5 - Arrested off duty for Disorderly conduct and resisting arrest. Termination effective July 19, 2002. Filed MSPB and agency won.

**Daniel Soldano**-CBP Officer-GS-7-negligence in the performance of duty. Terminated April 1, 2005.

**Mohamed Hewady** - JFK Agriculture Specialist GS-7 - Failed Background Investigation - Termination effective March 6, 2006

28. Question: According to the Complainant, there is suspicion about Nigerians in CBP because they are targeted for drug smuggling. Is this accurate?

Answer: No, I would say that this is not accurate.

29. Question: Ms. Akinyemi states her termination was discriminatory based on her race, national origin and color, because white and non-Nigerian employees, both on probation and permanent, with similar or much more serious offenses, have not been terminated. What is your response?

Answer: I would disagree. I would say that each case of misconduct is looked at individually and thoroughly and appropriate charges are leveled and appropriate discipline is meted out.

30. Question: Can you suggest witnesses who can provide relevant information?

Answer: Kathleen Haage, and also the Assistant Area Director for Passenger Operations, Joseph Rivera, and Supervisor Herter.

Page ten of eleven pages          Initials [signature]

130

I declare under penalty that the foregoing is true and correct.

Executed on __4/20/06__ at __New York/New York__
             (Date)                  (City/State)

Signature: _Susan T. Mitchell_

Name (Please print): Susan T. Mitchell

Title: Director of Field Operations

Address: US Customs and Border Protection

One Penn Plaza   Suite 11.0

New York, New York

10119

Initials: _____

Page eleven of eleven pages

139