PLAINTIFF'S EXHIBIT

## UNSWORN DECLARATION

**SUBJECT:** Discrimination Complaint of Yemisi Akinyemi and Michael Chertoff, Secretary, U.S. Department of Homeland Security, Case Number HS-06-CBP-000306-040105.

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

In accordance with the following provisions of 28 U.S.C. 1746, I, Gregory J. Jurczak, the undersigned, do hereby make the following unsworn declaration, under penalty of perjury, pertinent to the above stated complaint:

1. Question: Was is your position title, grade, and organizational unit?

   Answer: I am a CBP Officer GS-1895-11 in the React Unit under K-9 Enforcement. I worked as an INS Inspector from 2001 to 2003 (and became a CBPO) when Customs and Border Protection was formed.

2. Question: Who is your first level supervisor?

   Answer: Robert Johnson.

\* Where is #3 and #4? If I recall correctly, you asked my national origin/race. I asked what you meant by that and if I had to answer that question by law. You said: Caucasian, African American...and I was not required to answer that question. I declined to answer that question, however this is not reflected in this statement. There may have been a follow up question that I chose not to answer as well. My response was omitted yet #5 is still included.

5. Question: How do you know Yemini Akinyemi, and are you aware of her national origin? (I believe the question was "Did you know the national origin of Akinyemi")

Page one of thirteen

Initials

081

Answer: I don't actually know her. I recognized her on December 5, 2005, from seeing her in different settings. I have seen her at Raymond Boulevard where she works because it is adjacent to the gun range and I am a firearms instructor, and at the seized property office a couple of times. I (had) have no idea what country she is from. (I assumed) She must be a United States citizen since she worked for CBP **(and I believe that is a job requirement).**

6. Question: Can you describe the incident involving Ms. Akinyemi that occurred on December 5, 2005?

Answer: Officer Long and I were conducting an outbound inspection of an Air France flight. **(at this point in the conversation, I gave you a detailed explanation between what constitutes an "exam" and "inspection" and what the finite differences are and the documentary requirements for each, or lack there of. I explained that we speak with many people, and due to several reasons, including intuition, suspicion, behavioral traits, officer discretion, time, and resources, not all conversations or "exams" are recorded.)** We were interviewing several passengers and one of those who I spoke with was a Mr. Seweje. When I spoke to him, he mentioned immediately that his wife was employed by CBP. I asked her name and he kept saying a name, which I didn't recognize. I always (frequently) ask passengers the purpose of the trip and how long they would be gone for. From what I recall, Mr. Sewege said he was a limo driver going to Nigeria for two months. I asked him why he was going and he said the weather was bad in New Jersey. Mr. Seweje did not raise

Page two of thirteen                                                                                     Initials

any interest, ("interest" is not the verbiage I used if I recall. I stated there were other things happening simultaneously and chose to end my exam with Mr. Sewage based on the information he provided me with.) and I wanted to assist Officer Long who was involved with another couple who had over $10,000 with them, so I released him and said have a nice trip, and he boarded the flight.

7. Question: Did Mr. Seweje come back from the plane?

Answer: (yes) Shortly thereafter, he appeared back from (the direction of the plane, the jetway) the plane, coming up the jetway. I asked if he forgot something but he wouldn't make eye contact with either of us and he just got out his phone. I looked at the Air France rep who had escorted him up the jetway, because I was perplexed. She looked perplexed as well, as if she was looking to me for an answer as to why he was walking back off the plane. There are levels of security in boarding a flight, and sometimes when you get back out you can't get back in. I don't know if he had actually boarded the plane, but normally once you do you don't exit it. He did not give us a concise answer in any way about what he was doing except to say he was calling his wife. We tried to ask why or if we could help him. It was a very bizarre situation and it caught me off guard completely. (I stated this made me uncomfortable, was out of the ordinary, and made me suspicious and that something was not quite right) When we were talking originally, he asked if I wanted him to call his wife and I said there was no need to. He said his wife worked for us, but it is a common misconception that many people in the airport work for CBP, when they don't. She could have worked

Page three of thirteen

Initials

for anyone connected with the airport. **(I gave several examples here, such as working for the airline, a food vendor, another agency, etc. More importantly, and something that is omitted is the statement I made that in the past people who make such statements do so to intimidate or alleviate the challenge/exam/inspection, and equated it to "dropping a name or something to that extent. I also mentioned Mr. Seweje was adamant about calling his wife and appeared irritated when I hold him that it would not be necessary)** AA

8. Question: Did you see Ms. Akinyemi at any time in the gate area?

Answer: **(yes)** The person who I later identified as CBPO Akinyemi then came from the lounge area and approached Mr. Seweje. She was yelling from ten to fifteen yards away: that's my husband, that's my husband. I was stunned and staring at her in disbelief because the whole situation was very bizarre and uncommon and seemed very theatrical and unnecessary. I was thinking why was this unfolding before my eyes, and I was trying to make sense of it. **(I stated I was logically trying to determine was this seemingly obvious charade was playing out before my eyes)** Then Officer Akinyemi came up and hugged Officer Long in a way that you would hug someone who you don't even know that makes the person uncomfortable. Officer Akinyemi said "I know you" to Officer Long, and Officer Long said she knew her too **(I stated that officer Long appeared embarrassed and taken aback)** Then Officer Akinyemi said to us "I am here to take money" or "He is going to give me money"; and

Page four of thirteen                                      Initials: AA

then Mr. Sewege said "I called my wife". He pulled out his wallet in what I thought was an overly theatrical way, and gave her two fifty dollar bills. Then they stepped in between us and had what I thought was an inappropriately personal kiss for the area. (I described this detail very explicitly, and a "personal kiss" can be interpreted in many ways. Their kiss was wet, sloppy, and tongues were visible to anyone watching. This is what I told you.) After this he turned around and got on the plane and she walked away and we were kind of speechless.

9. Question: Did Officer Akinyemi tell you that her father-in-law had died, or that there was a death in the family?

Answer: No, never. (I answered the question: No, never. The next portion you recorded is taken out of context. I did make that statement at some point, however, certainly not after answering this question. How is this statement, regardless of when said, relevant to the question asked? The way I read this, it takes away from my answer, that is clear and concise, and dresses it up with irrelevant (to the question) banter. This addition does not appear to be objective.) All my previous experience with her had been very pleasant short conversations, and she was like that this day. (This sentence is taken out of context/chronology)

10. Question: Did you discuss this incident with anyone else?

Answer: (Yes. Officer Long and I discussed it initially amongst ourselves) Officer Long and I had a potential seizure (that included a pat-down of an individual) and several exams before that Air France flight, and we were discussing what a bizarre

Initials: AL

evening it was turning into. **(evening we were having)** We thought that the incident with Mr. Seweje was so far out there, we had to say something. **(we were obligated to say something)** We had a ton of work to catch up on when we got back to the office, and I asked DCO Herter, who I think was the Watch commander at that time, if I could speak to him because this was too strange not to. There were a lot of things in this encounter that indicated something was not quite kosher. **(and I was uncomfortable not sharing what had happened. Officer Long and I agreed our "gut-feeling" that something was not right and wanted some guidance)**

11. Question: What was DCO Herter's response?

Answer: He asked me to document what had happened in the best detail I could. I was also instructed to research passenger Sewege, **(which included law enforcement and immigration related queries)** which would not be that uncommon to do. In CBP we have trust in each other, and I wanted to believe Ms. Akinyemi was working and just came to see her husband off, which isn't that unusual. **(You have omitted the point I was attempting to convey with this statement: I wanted to believe she was in the right. Everything she did, her husband said, the entire kiss, money exchange, public display, led me to believe the contrary. That is why I felt obligated to report what I had witnessed.)**

12. Question: What did you do next?

Answer: **(I stated that I began compiling a report of the incident. I also stated this did not happen immediately but over the course of approx. 48 hrs. I**

continued my regular duties with REACT, worked other outbound flights, wrote reports, researched and targeted individuals, etc. The more I researched Sewege, the more derogatory information I discovered) I wrote down what I had witnessed and my impressions of the incident at the gate. I also found that Mr. Sewege was a green card holder with a Nigerian passport. I was going to also try to determine his marital status but in my fact finding, I found some derogatory information about him, and I wasn't comfortable doing any more research, since I am not in internal affairs. I also went to the immigration hall and described the Officer we had seen, since neither Officer Long nor myself actually knew her name. They said it sounded like Officer Akinyemi and she worked somewhere outside the airport. I was just trying to verify her identity. (I stated that I knew the officer, and by know, I mean recognize. I did not know her name. I knew where I had seen her in the past.) I didn't want to get a colleague in trouble, (statement is out of context—I did not want to wrongly accuse someone of something, or report what I had witnessed, until I could identify and verify who the officer was. At that time, I knew the face, not the name) but I felt obligated to report what I saw.

13. Question: Did you do any other research for Mr. Herter?

Answer: Mr (DCO) Herter asked me to see if Ms. Akinyemi had used her position to assist Mr. Sewege in bypassing or coming through security or asking for benefits from the airline. So I spoke with several Air France and Delta reps to determine who had checked Mr. Sewege in, and I tried to locate the woman who had walked him down

Page seven of thirteen                                                                 Initials

the jetway. I spoke to a gate agent at Air France and a couple of other people who had seen him when he initially checked in, and the person who took his ticket. One of them said that when Mr. Sewege checked in, Officer Akinyemi said she wanted to lock his luggage. When they said it was against TSA regulations, she said she had the authority to go down to the baggage room and put locks on it there. The agent said she could do whatever she wanted in the baggage room, but she couldn't put locks on his luggage in front of him. That was the only statement that I can recall. **(I spoke with and documented all airline representatives I spoke with in the report that I forwarded up the chain of command. This incident took place three months ago and I gave my answers as I recall them)** RECALLED AA

14. Question: Did you prepare a written statement for Mr. Herter?

Answer: I wrote up a statement for Mr. **(DCO)** Herter documenting the incident from my initially speaking to Mr. Sewege to how things unfolded. I tried to be as specific as I could be and have a clear time line. I wanted to get the facts straight because I didn't want it to be derogatory to Officer Akinyemi. **(I tried to be as objective as possible—a poor decision by ANY officer reflects negatively on all of us the wear the uniform. I wanted my information to remain impartial. This statement is out of context)** AA

15. Question: Did you speak to anyone in management about the incident after you gave the statement to Mr. Herter? **(I asked for clarification as to whom you meant by "management". You named Haage, Mitchell, and Rivera by name. This is not reflected in the statement)** AA

Initials AA

Answer: I feel uncomfortable talking about this, because based on some of the information I found about Mr. Sewege, other agencies were potentially involved. All I can say is that I sat in and discussed the information I had found with DCO Herter who forwarded it on to internal affairs. I Didn't talk to anyone in CBP management higher than Mr. Herter. (I **stated this was above my pay-grade, and information in my report that I submitted through the chain of command contained sensitive information. I would not disclose that information freely unless asked specific questions about it. I inferred politely that unless you had a copy of my report I would not discuss it's content.)**

16. Question: What is your understanding of the CBP rules or regulations regarding access to restricted areas at the Newark airport for CBP officers?

Answer: As A CBPO, you are only supposed to go within areas within your scope of employment. **(which theoretically is the entire airport/port/outer-portals, etc)** We all have "AOA" badges issued by the Port Authority with holograms which allow you to access different areas of increasing security. **(This statement is inaccurate and not how I explained it. I explained the clearance CBPO's possessed and other variations/access that AOA badges allow)** I thought all CBPO's had an AOA badge, but one thing I noticed about Officer Akinyemi at the gate was that she did not have an AOA badge issued by the Port Authority, she had a badge for Raymond Boulevard where she worked, **(I did not know where she worked at the time—I only knew I had seen her there and at the airport at different times)** that was issued by CBP.

Page nine of thirteen                                    Initials

17. Question: Could a CBPO who is working in another area come to the airport to use a restaurant or to see someone off on a flight? (I answered in theory, yes. However, this statement omits the point I made and the examples used referencing simple logic. Additionally, this is a two-part question: 1) Could a CBPO come to the airport to use a restaurant? I answered yes, theoretically you could. However, and this was my point. Why would you? During the conversation we had it was established CBPO Akinyemi worked at Raymond Blvd., which is located in downtown Newark. I explained that Newark has some of the best restaurants in the area, and are within walking distance of where she works. Moreover, I explained that it would be silly to come all the way to the airport for what you can get better and cheaper elsewhere. I used the example of buying a hotdog. I explicitly stated that a hotdog was the example to make my point. Why would any reasonable person, leave work, drive to the airport, pay for parking, walk through the parking lot, deal with the crowds, bypass security, and PAY MORE, for inferior food, when you could step onto the street in the area that you work, and buy fresh, more authentic food at a fraction of the cost and inconvenience?!? I used a hotdog as an example to convey this point. I stated I would theoretically only buy food at the airport if this food existed nowhere else. It is completely omitted from this statement.

Answer: There are restaurants in different areas, and you could use your I.D. to bypass security to use them if you were already working at the airport in a different

Page ten of thirteen                                                                                   Initials

terminal. It would be very uncommon for someone from Raymond Boulevard to come from downtown Newark to use a restaurant, just because it would be unreasonable to drive and then park and walk to the terminal. I don't think I would come to the airport to go past security to use a restaurant. ( see above— 2)Could a CBPO working in another area of the airport see someone off on a flight? Yes.) If I wanted to see off a family member, I could submit something to the chain of command that would allow me to access a restricted area when I wasn't working. I know people who have done that, but they got permission form someone higher up. It is done, and that in itself is not uncommon. But if you are not working at the airport, it would be uncommon to be in full uniform which would give the impression you were working. (I stated it WOULD be uncommon and even suspect to interfere with an outbound operation, especially when not on duty. Wearing the Uniform, to other officers and the public, WOULD GIVE THE IMPRESSION infers that you are on-duty and are conducting official business. I went on to say that if I saw someone I knew in an area they did not belong in uniform or out, I would challenge them. I have seen colleagues in civilian dress in the airport. Those people happened to be flying that day and had not used their credentials/position to bypass security.

18. Question: Are you aware of any CBPO's who have been found in restricted areas when they weren't working there or didn't have permission to be there?

Page eleven of thirteen                                    Initials

Answer: No. (Incorrect. This question is biased and misleading. The answer is not representative of my statement. I gave several examples of rumors I have heard 3rd and 4th hand about officer indiscretions. Objectively, the answer to this question is yes. CBPO Akinyemi was in an area she was not assigned to (I Know this now). Using her position as a CBPO, she attempted to influence airline personnel and this officer during an examination. She is the only officer I have personally seen in an area she technically did not have to be in. As far as I Know, she did not have permission to be where she is. This is what I stated and what I recall pertaining to this question about her, or any other CBPO.

Page twelve of thirteen                                              Initials ___

093

The response herein is to the best of my recollection true and accurate; however, I do not swear that the information provided is a verbatim recitation of any statements or similar declarations made to or by me. I reserve the right to amend my responses should additional information become available to me.

I declare under penalty that the foregoing is true and correct.

Executed on __03-25-06__ at __Newark, New Jersey__
  (Date)   (City/State)

Signature: _____

Name (Please print): Gregory Jurczak

Title: CBP Officer GS-1895-11

Address:

NEWARK INTERNATIONAL AIRPORT

NEWARK NJ 07114

Page thirteen of thirteen            Initials: ____