```
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ------------------------------------------X
      YEMISI AKINYEMI,
 4
                              PLAINTIFF,
 5                            07-CV-4048(CM)(AJP)

 6           -against-

 7    MICHAEL CHERTOFF, SECRETARY,
      DEPARTMENT OF HOMELAND
 8    SECURITY,

 9                             DEFENDANTS.
      ------------------------------------------X
10                    DATE: October 31, 2007

11                    TIME: 10:32 a.m.

12

13           EXAMINATION BEFORE TRIAL of the

14    Defendants, by a witness, JOLANTA GLUBA, taken

15    by the Plaintiff, pursuant to a Notice, held at

16    the offices of United States Attorney's Office,

17    Southern District of New York, 86 Chambers

18    Street, New York, New York 10007, before Helen

19    Shum, a Notary Public of the State of New York.

20

21

22

23

24

25
```

```
 1

 2    A P P E A R A N C E S:

 3

 4    K. C. OKOLI, ESQ.
         Attorney for the Plaintiff
 5       330 Seventh Avenue - 15th Floor
         New York, New York 10001
 6

 7

      UNITED STATES ATTORNEY'S OFFICE
 8    SOUTHERN DISTRICT OF NEW YORK
         Attorneys for the Defendants
 9       86 Chambers Street - 3rd Floor
         New York, New York 10007
10       BY: JOHN DALTON CLOPPER, ESQ.

11

12    ALSO PRESENT:
         Ralph Talarico, Esq.
13       Melanie Acevedo, Esq.

14            *         *         *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2      J O L A N T A    G L U B A, called as a
 3   witness, having been first duly sworn by a
 4   Notary Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY
 7   MR. OKOLI:
 8          Q.     Please state your name for the
 9   record.
10          A.     Jolanta Gluba.
11          Q.     What is your business address?
12          A.     1100 Raymond Boulevard, Newark,
13   New Jersey 07114.
14          Q.     Good morning.  My name is K. C.
15   Okoli.  I'll be asking you questions at this
16   deposition in connection with the lawsuit which
17   my client, Yemisi Akinyemi, has brought against
18   the Department of Homeland Security or more
19   appropriately, the Secretary, Michael Chertoff.
20   I'll ask that you verbalize all your answers.
21   If I ask you a question that you don't
22   understand, please let me know, and I'll
23   rephrase the question so that you do
24   understand.  I'll also ask you to be patient.
25   Even if you know what my question is going to
```

```
1                    J. GLUBA
2   be, let me finish my question before you
3   respond.  The reason for that is so the
4   stenographer can take down the question clearly
5   before you respond.
6              During the course of this
7   deposition if you wish to take a break, you may
8   do so.  We'll just state on the record that
9   you're taking a break.  You can take a break
10  for whatever reason you want.
11             What's your address?
12       A.    You mean my work address or?
13             MR. OKOLI:  Counsel, if you're not
14  going to accept subpoena on her behalf,
15  I would need her home address.
16             MR. CLOPPER:  Sure.  We'll be happy
17  to.
18       Q.    Then your work address.
19       A.    My work address is 1100 Raymond
20  Boulevard in Newark, New Jersey 07114.
21       Q.    Since when have you been working
22  out of this address?
23       A.    I've been working there since March
24  of 2002.
25       Q.    Where is your place of birth?
```

```
                         J. GLUBA
 1
 2        A.    Warsaw, Poland.
 3        Q.    Just for the record, what's your
 4   race?
 5        A.    White.
 6        Q.    Who's your employer?
 7        A.    Customs and Border Protection.
 8        Q.    What's your highest education level
 9   attainment?
10        A.    I have a graduate degree, master's.
11        Q.    When did you obtain that master's
12   degree?
13        A.    I obtained it -- I graduated June
14   of '07.
15        Q.    I take it then that you have a
16   bachelor's degree?
17        A.    I have a bachelor's degree.
18        Q.    When did you graduate with your
19   bachelor's degree?
20        A.    January of '04.
21        Q.    When did you first become employed
22   by the Customs and Border Protection?
23        A.    March 2002.
24        Q.    When you became employed, what was
25   your title?
```

```
 1                    J. GLUBA
 2   instructed to do something.
 3               So I proceeded to call the
 4   supervisor and supervisor asked me to come into
 5   the office and see him with a passport.  As I
 6   was exiting -- as I was exiting the area, I
 7   remember I locked my computer, walked into the
 8   supervisor's office.  Supervisor looked at the
 9   passport, told me to go see another officer in
10   another office, and as I'm walking to the other
11   office, the passenger was asking me if
12   everything's okay.  I told him, "Everything's
13   fine.  Just give me a few more minutes."
14               As I walked into the other office,
15   I proceeded to do what I was instructed to, and
16   during that time, the passenger walked into the
17   exam belt and played with something with the
18   computer, and another supervisor walked out of
19   the office and witnessed the passenger in the
20   area and instructed the passenger to leave the
21   area and had another officer watch the
22   passenger.  During the time -- during that
23   time, the supervisor walked into this other
24   room where I was doing what I was instructed
25   to, and he told me the incident that happened,
```

```
                            J. GLUBA
 1
 2    and I told him I -- no.  I locked the computer,
 3    and from then on, I know the supervisor spoke
 4    to the passenger, and that was it.
 5          Q.    Let's just go back a little bit.
 6    You said that the passenger was referred from
 7    control point.  What does that mean?
 8          A.    The control point is where a
 9    passenger walks up for an exit from the
10    immigration with his bags.  He's either
11    instructed by a control point officer to exit
12    the area.  He's free to go or he goes into
13    secondary.  If the passenger has a high stamp,
14    he comes into the secondary area.
15          Q.    In this particular passenger's
16    case, what was the reason that he was sent to
17    secondary?
18          MR. CLOPPER:  Objection; law
19      enforcement privilege.  I'm directing
20      the witness not to answer, but I may be
21      able to give an answer to this question.
22      So I'm going to step outside with
23      Officer Gluba for a moment very quickly
24      to see what we can answer and what we
25      can't, and we'll be right back.
```

```
 1                    J. GLUBA
 2   screen up, and there was a few seconds, and
 3   then he ran out of the office and instructed
 4   the passenger to leave the exam belt area.
 5        Q.   Just to be clear, this passenger
 6   went into the space where you would normally
 7   be, where you were working?
 8        A.   Yes.
 9        Q.   And in fact, did he go on the
10   computer?
11        A.   Yes.
12        Q.   But you don't know what he was able
13   to do with the computer?
14        A.   No, I don't.
15        Q.   As you sit here today, do you know
16   what that passenger was able to do with the
17   computer?
18        A.   No, I don't.
19        Q.   Did anybody ever tell you?
20        A.   No.
21        Q.   Did Mr. Frank tell you how long he
22   had observed this passenger before he went and
23   asked the passenger to leave the area?
24        A.   No, he didn't, but I'm assuming
25   seconds, seconds, maybe a minute.
```

1         J. GLUBA

2    Q.   But he clearly told you that he
3 observed the passenger touching the keyboard of
4 the computer?
5    A.   Yes.
6    Q.   So the passenger was there with
7 sufficient time for this passenger to go from
8 where he was outside the belt area into your
9 work space to actually go on the keyboard of
10 the computer?
11   A.   Yes.
12   Q.   What was Mr. Frank's title?
13   A.   Supervisor.
14   Q.   After Mr. Frank told you this, what
15 next did you do?
16   A.   I proceeded to give the passenger
17 his passport and explained everything, the
18 process to the passenger because he wanted an
19 explanation why he was stopped.  So I explained
20 the best I can, and I walked the passenger to
21 the door, to the exit door, and I thanked the
22 passenger, and I said, "Have a good day," and
23 that was it.
24   Q.   Just to be clear, this passenger
25 was not an employee of CBP?

1           J. GLUBA
2  any way of knowing whether or not that man had
3  that information prior?
4       A.  From the passenger stating to the
5  supervisor that he knew the information prior.
6       Q.  Just the passenger stating.  This
7  was a passenger he had never met before,
8  correct?
9       A.  Yes.
10      Q.  So he wouldn't know whether or not
11 the passenger was telling him the truth or not?
12      A.  Correct.
13      Q.  Do you have any specific
14 recollection of the information that this
15 passenger said he saw, which he knew earlier
16 on?
17      A.  No.
18      Q.  This computer that you work from,
19 could you access sensitive information from
20 that computer?
21      A.  Yes.
22      Q.  Some of the information you could
23 access on the computer was information that
24 should be known only to law enforcement
25 personnel, correct?

```
 1                    J. GLUBA
 2        A.   Yes.
 3        Q.   This passenger was not a law
 4   enforcement personnel?
 5        A.   No.
 6        Q.   After the passenger left, did
 7   Mr. Frank have any further conversation with
 8   you on this?
 9        A.   Yes, he did.
10        Q.   Did that conversation take place
11   the same day or some other day?
12        A.   Same day.
13        Q.   Approximately how long after the
14   passenger left did this other conversation take
15   place?
16        A.   Ten minutes later.
17        Q.   What was the nature of the
18   conversation?
19        A.   Kind of just question of what
20   happened, like what -- like the situation.
21        Q.   I'm trying to get at when you say
22   "what happened," was that all?  He just asked
23   you, "what happened?"
24        A.   He just wanted to know.  During the
25   time when I walked in to see Supervisor
```

```
                                                        29
 1                     J. GLUBA
 2   Scaringella, he wasn't present at the office.
 3   So he just wanted to know the whole situation,
 4   what was the reason I walked into the office,
 5   and what was the reason I left the passenger
 6   unattended.
 7        Q.    I'm talking about sum and
 8   substance.  Other than that, was there anything
 9   else about the conversation other than what you
10   just testified to?
11        A.    No.
12        Q.    Other than Supervisor Frank, did
13   anyone else question you about your interaction
14   with this passenger?
15        A.    That day, yes.
16        Q.    Who was it that questioned you?
17        A.    It was Deputy Herter, Herbert
18   Herter.
19        Q.    Do you remember how much time
20   passed from when this incident occurred to when
21   you were first questioned by Deputy Herter?
22        A.    Approximately maybe two hours.
23        Q.    Two hours?
24        A.    Yes.
25        Q.    How did you come to speak with
```

```
 1                   J. GLUBA
 2   director, and I was told my case was closed and
 3   that I'm receiving a disciplinary letter that
 4   will stay on file for a year and that if any
 5   incident happens within that year, I will be
 6   terminated.
 7         Q.    Who was the area director that
 8   you're referring to?
 9         A.    Kathleen Haage-Gaynor.
10         Q.    Could you describe Kathleen
11   Haage-Gaynor, her physical appearance?
12         A.    White female, six feet tall, blonde
13   hair, eyeglasses.
14         Q.    In the four and a half or so months
15   that you were at the cargo facility, did you
16   receive a salary?
17         A.    Yes, I did.
18         Q.    The same salary you were earning at
19   the time that you worked at the secondary, the
20   belt area?
21         A.    Yes, without overtime.
22         Q.    Sorry.
23         A.    Without overtime.
24         Q.    But you received your base salary?
25         A.    Base salary.
```

```
 1                      J. GLUBA
 2        Q.    After you received it, where were
 3   you assigned to?
 4        A.    I was reassigned to the airport,
 5   Terminal C.
 6        Q.    Is it the same exam area or another
 7   area?
 8        A.    Same exam area.
 9        Q.    Same duty post?
10        A.    Well, every day the duty post
11   changed so, but I was assigned to the baggage
12   area.
13        Q.    When you were reassigned to the
14   baggage area, were you doing essentially the
15   same kind of things you were doing before you
16   were transferred out of the area to the cargo
17   facility?
18        A.    Yes.
19        Q.    Since you went back to the cargo
20   area, have you received any raises in your
21   salary?
22        A.    Yearly regular grade raises.
23        Q.    Are you familiar with any of the
24   restaurants at the airport at Newark
25   International Airport?
```

```
 1                    J. GLUBA
 2        A.    Yes, I did.
 3        Q.    At the time, you knew that?
 4        A.    At that time, no.
 5        Q.    Do you know now whether or not the
 6   computer was working properly?
 7        A.    Yes.
 8        Q.    What do you know?
 9        A.    That another officer filed a
10   complaint a few months in advance that the
11   computer had some type of malfunctions.
12              MR. CLOPPER:  Thank you.
13              MR. OKOLI:  Just a few questions.
14   EXAMINATION BY
15   MR. OKOLI:
16        Q.    Now, when you said you attempted to
17   lock the computer, what specifically did you do
18   to attempt to lock the computer?
19        A.    I hit control, alt, delete.
20        Q.    Did you observe the screen of the
21   computer to see what happened after you hit
22   control, alt, delete?
23        A.    Yes.
24        Q.    What did you see on the computer?
25        A.    I saw a blank screen with the
```

```
 1                      J. GLUBA
 2    symbol of DHS, Homeland Security.
 3          Q.    After it was brought to your
 4    attention that the passenger had gone behind
 5    your work area, did you look at the screen of
 6    your computer?
 7          A.    Yes.
 8          Q.    What did you see?
 9          A.    A box that said workstation is
10    locked.
11          Q.    So you did not see any words?
12          A.    No.
13          Q.    You also testified that the
14    individual, the passenger had said that he saw
15    information which he knew already?
16          A.    Yes.
17          Q.    So did you get the sense then that
18    after he accessed whatever information he did,
19    he went to the computer, and he was able to
20    bring up what you saw when you came there?
21          A.    I don't understand what you mean.
22          Q.    You said when you left, it was a
23    blank screen with DHS?
24          A.    DHS sign.
25          Q.    This individual said he went on the
```

```
 1                    J. GLUBA
 2   computer and was able to see some information?
 3         A.    Yes.
 4         Q.    But then he already knew this
 5   information?
 6         A.    Yes.
 7         Q.    When the next time you went back,
 8   the next time after you left your work area and
 9   went back and saw your computer, you saw the
10   same blank screen, correct?
11         A.    Yes.
12         Q.    If the gentleman got information
13   from this computer, it means he went back out
14   to leave a blank screen for you to see when you
15   came; fair to say?
16         A.    Yes.
17
18
19              (Continued on next page to include
20         jurat.)
21
22
23
24
25
```