```
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ------------------------------------------X
      YEMISI AKINYEMI,
 4
                              PLAINTIFF,
                                         07-CV-4048(CM)(AJP)
 5
 6           -against-

 7    MICHAEL CHERTOFF, SECRETARY,
      DEPARTMENT OF HOMELAND
 8    SECURITY,
                              DEFENDANTS.
 9    ------------------------------------------X
                         DATE: October 31, 2007
10
                         TIME: 12:30 p.m.
11

12

13              EXAMINATION BEFORE TRIAL of the

14    Defendants, by a witness, SHARMILA ZAMAN, taken

15    by the Plaintiff, pursuant to a Notice, held at

16    the offices of United States Attorney's Office,

17    Southern District of New York, 86 Chambers

18    Street, New York, New York 10007, before Helen

19    Shum, a Notary Public of the State of New York.

20

21

22

23

24

25
```

```
 1
 2      A P P E A R A N C E S:
 3
 4      K. C. OKOLI, ESQ.
            Attorney for the Plaintiff
 5          330 Seventh Avenue - 15th Floor
            New York, New York 10001
 6
 7
        UNITED STATES ATTORNEY'S OFFICE
 8      SOUTHERN DISTRICT OF NEW YORK
            Attorneys for the Defendants
 9          86 Chambers Street - 3rd Floor
            New York, New York 10007
10      BY: JOHN DALTON CLOPPER, ESQ.
11
12      ALSO PRESENT:
            Ralph Talarico, Esq.
13          Melanie Acevedo, Esq.
14              *           *           *
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2        S H A R M I L A   Z A M A N, called as a
 3   witness, having been first duly sworn by a
 4   Notary Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY
 7   MR. OKOLI:
 8            Q.    Please state your name for the
 9   record.
10            A.    Sharmila Zaman.
11            Q.    What is your business address?
12            A.    Newark International Airport,
13   Terminal B, Newark, New Jersey 07114.
14            Q.    Good afternoon.
15            A.    Good afternoon.
16            Q.    My name is K.C. Okoli.  I represent
17   Yemisi Akinyemi, the Plaintiff in this case,
18   and I'll be asking you a couple of questions.
19   What I ask of you is your best recollection.
20   If I ask you a question and you don't
21   understand it, please let me know.  I'll
22   rephrase the question and ask it in such a way
23   that you do understand.
24            A.    Sure.
25            Q.    I'll also ask that when I start
```

```
 1                         S. ZAMAN
 2         Q.    That's here in Manhattan?
 3         A.    Yes.
 4         Q.    Who's your current employer?
 5         A.    U.S. Customs and Border Protection.
 6         Q.    Since when did you become employed
 7   by the Customs and Border Protection?
 8         A.    January 5, 2004.
 9         Q.    I'll call it CBP for short.  Is
10   that okay?
11         A.    (Indicating.)
12         Q.    When you were first hired by CBP,
13   what was your title?
14         A.    CBPO.
15         Q.    As part of your hiring, were you
16   required to complete a probationary period?
17         A.    Yes, I was.
18         Q.    When did your probationary period
19   begin?
20         A.    January 5, 2004, the starting date.
21         Q.    When did your probation end?
22         A.    January 5, 2006, two years.
23         Q.    What's your current job title?
24         A.    CBPO.
25         Q.    Who's your current supervisor?
```

```
 1                      S. ZAMAN
 2   of the shops at Terminal B?
 3        A.    No.
 4        Q.    Have you ever seen any officers
 5   window-shop there?
 6        A.    No.
 7              MR. CLOPPER:  Objection.
 8        Ambiguous, but go ahead.
 9        Q.    Have you ever had occasion to go to
10   any location of the airport beyond TSA
11   screening?
12        A.    Have I ever what?
13        Q.    The part of the airport where
14   you're assigned for your duties, is that beyond
15   the TSA screening area?
16        A.    No.  We have separate entrance.  We
17   walk through TSA, but that's not part of the
18   public entrance.  Walk through TSA, and you can
19   go to your customs area.  There is no public
20   place over there.
21        Q.    As part of your job, are you
22   required to carry a firearm?
23        A.    Yes, I am.
24        Q.    Has there ever been an occasion
25   where you left your firearm unattended at the
```

```
 1                          S. ZAMAN
 2    airport?
 3         A.    Yes, there has been.
 4         Q.    How many times has that occurred?
 5         A.    Only once.
 6         Q.    When did that occur?
 7         A.    I can tell you the month, but I
 8    don't remember the date.  It's April 2004
 9    right after I came back from law enforcement
10    training center, one or two days after I came
11    back from law enforcement training center.
12         Q.    April 2004?
13         A.    Yes.
14         Q.    What make of weapon was that?
15         A.    Pardon.
16         Q.    What make of weapon was that?
17         A.    Glock.
18         Q.    Is that an automatic pistol or
19    something else?
20         A.    Yes.  I have it with me now.
21         Q.    It's an automatic weapon?
22         A.    Semiautomatic.
23               MR. TALARICO:  Can we go off the
24    record a second.
25               (Whereupon, an off-the-record
```

```
                          S. ZAMAN
1
2        discussion was held.)
3        Q.    How many rounds does the glock
4   take?
5        A.    Seventeen and one on the -- so all
6   together 18, and then extra 17 and 17
7   (indicating).
8        Q.    Could you describe the place where
9   you left this gun unattended in April 2004?
10       A.    I could. This was training room,
11  something like this, and right outside the
12  training room on Terminal C, there is a
13  restroom. It's within that FIS area, no public
14  entrance, but at the same time, airline
15  Continental reps can get in. Those who have
16  hologram IDs, they can get in through there,
17  and only customs officers but not general
18  public.
19             So after the training was done, I
20  went to the restroom when we were done for that
21  day, and I left the restroom. I was driving
22  home. I got the phone call that if I have my
23  weapon. First I said yes because I was under
24  the impression I had it. Then the person who
25  called me, the trainer, he said check it to
```

```
                        S. ZAMAN
 1
 2    make sure.  So I pulled over, checked.  It
 3    wasn't with me.  So the whole thing took place
 4    within half an hour.
 5         Q.    How far were you from the airport
 6    at the time that you received this call?
 7         A.    I was on the tunnel, Lincoln
 8    Tunnel.  So it's a matter of 20 minutes, 15 to
 9    20 minutes.
10         Q.    In terms of distance, how far would
11    you say approximately; how many miles?
12         A.    From Newark Airport to Lincoln
13    Tunnel, it should be -- how many miles?  Three
14    to four miles, five.
15         MR. CLOPPER:  Just answer to the
16         best of your ability.
17         Q.    To the best of your ability, your
18    estimation.  I'm not holding you to it.
19         A.    I would say five to seven miles.  I
20    know the exact location.  I don't know the
21    miles.
22         Q.    Now, you said this bathroom where
23    you left it unattended, airlines officials
24    could also access that location?
25         A.    Continental people who have
```

S. ZAMAN

2   hologram IDs, only those people and customs
3   officers.
4       Q.   Who was it that you received this
5   call from?
6       A.   Trainer Bruce Wescot.
7       Q.   Is that the first and last name?
8       A.   Wescot would be the last name.
9       Q.   Is it a CBP employee?
10      A.   Yes.  He was in charge of the
11  training unit.
12      Q.   Could you tell us what transpired
13  during this conversation after you realized
14  that you didn't have your weapon?  What did you
15  do?
16      A.   You want me to explain?
17      Q.   Yes.
18      A.   Okay.  I pulled over, and he said,
19  "We have your weapon.  You left it in the
20  restroom."  And first thing I asked at that
21  point, "What do I do now?  Do I call the cops
22  because my weapon is not with me?  What if
23  somebody took it?"  He explained right after I
24  left, the airline female, when they saw the
25  weapon there, she notified him -- she notified

```
                        S. ZAMAN
```

1      S. ZAMAN
2   him, and he went there, retrieved the weapon.
3   And the reason it took 15 to 20 minutes, from
4   the serial number, he called another trainer
5   who is in charge of firearms and figured out
6   that this is mine. That's the point they
7   called.
8              So the second question I asked,
9   "Did you notify Ms. Fowlkes?" Because at that
10  time, that's the only supervisor I knew. I
11  came in only two days, and Ms. Fowlkes is the
12  training supervisor. He said, "No. Don't
13  worry about it. I took care of it." Then I
14  asked, "What should I do? I don't feel
15  comfortable. I should notify the cops. What
16  if somebody did something with it?" He said,
17  "It's in safe hands." I said, "Can I come
18  back?" He said, "I've been cut," which means
19  he's also done for the day. "It's in the
20  locker. It's going to be with Officer Cararie,
21  the other trainer from the firearms division.
22  Tomorrow morning when you are 8:00 to 4:00 when
23  you come, go and collect it from him." That
24  was that day.
25       Q.    So when you went back to work, you

```
 1                    S. ZAMAN

 2   resumed 8:00 to 4:00?  That would be 8:00 in

 3   the morning to 4:00 in the afternoon?

 4        A.    (Indicating.)

 5        Q.    Did you then retrieve your weapon

 6   from Officer Cararie?

 7        A.    Officer Cararie, who's the other

 8   trainer, and they explained the gun law and

 9   proper handling of weapon.

10        Q.    When you say they explained the

11   proper handling of weapon, what exactly did

12   they explain to you?

13        A.    I should never take out the weapon

14   from the holster.  I should take off the gun

15   belt when I want to take it off.  When I came

16   back from FLETC, I used to take the weapon out.

17   I thought I was instructed to totally take out

18   the weapon.  He said not to do that, and he

19   went through explaining.  So he said, "Don't

20   take the weapon out."  I was under the wrong

21   impression.

22        Q.    After you retrieved the weapon,

23   what did you do?

24        A.    He said, "Go back to the class."

25   So I went back to the class.
```

```
 1                      S. ZAMAN
 2   that's what he did.
 3          Q.    And then what did he do after you
 4   explained to him?
 5          A.    After six months of that -- within
 6   six months of that, back on June 6th last year,
 7   2006, I got 14-day suspension proposal.  It's
 8   not 14-day proposal.  I got 14-day suspension,
 9   which I have a right to fight through my union.
10   So I'm still fighting.
11          Q.    So you have not actually done the
12   suspension?  You're challenging it?
13          A.    They say within ten days it has to
14   be served.  So my union stepped in.  So when
15   union fight, everything is on hold.
16                Can you give me one second, please.
17          Q.    If you want to talk to Counsel
18   outside --
19                MR. CLOPPER:  I would prefer if you
20          just answer to the best of your
21          understanding.
22          A.    It has different phases of
23   fighting, like how union fights 14-day
24   suspension.  So it's still going through the
25   phases.  I haven't served as up to date yet.
```

S. ZAMAN

2  Q. That's what I wanted to find out.

3  A. Yes.

4  Q. Just to be clear, you said after you spoke with Ms. Fowlkes, more than a year elapsed before you were called in again by Chief Cardinale?

8  A. Yes.

9  Q. Between the time that you spoke with Ms. Fowlkes and when you spoke with Chief Cardinale, is it fair to say that no one at CBP ever questioned you concerning this gun issue?

13  A. Yes.

14  Q. On the day that you left your gun in the bathroom, did you consume any alcoholic beverage?

17  A. No. I do not take alcohol.

18  Q. From the time that you got hired by the CBP to this moment, have you ever heard of any CBP officer who was terminated solely because he or she was found in a gate area at the airport when she did not have permission to be there?

24  A. Yes.

25  Q. When did you first hear this?

S. ZAMAN

2   A.   When I spoke to you (indicating).
3   The details you are talking about?
4   Q.   The facts.
5   A.   That somebody got fired.
6   Q.   Solely for --
7   A.   I did not know the reason why this
8   person got fired, but I knew somebody got
9   fired.
10   Q.   Who was it that you knew was fired?
11   A.   Yemi.
12   Q.   Did you know her at the time she
13   was an employee of the CBP?
14   A.   Yes, because we went to FLETC
15   together.
16   Q.   FLETC is the training academy in
17   Georgia?
18   A.   Training academy, yes.
19   Q.   Again, my question is as you sit
20   here today, do you know of anyone who was
21   terminated, any CBP officer, who was terminated
22   solely because that officer gained access to a
23   gate area without authorization?
24   A.   There is no yes, no answer to it.
25   I have to explain.  If you want me to explain,

```
                    S. ZAMAN
 1
 2      Q.    Do you know what restricted areas
 3  are?
 4      A.    Yes, I do.
 5      Q.    Other than Ms. Akinyemi, have you
 6  ever heard or do you know of any customs
 7  officer who was terminated solely for gaining
 8  access to a restricted area without permission?
 9      A.    No, I don't know.
10            MR. OKOLI:  Thank you.
11            (Whereupon, an off-the-record
12  discussion was held.)
13            MR. CLOPPER:  I have no questions.
14            (Whereupon, at 1:05 p.m., the
15  Examination of this Witness was
16  concluded.)
17
                _____
18                 SHARMILA ZAMAN
19
20  Subscribed and sworn to before me
21  this 18th day of December 2007.
22  _____
23      NOTARY PUBLIC
24
                ROBYN L. BRANT
25          NOTARY PUBLIC OF NEW JERSEY
            My Commission Expires Aug. 3, 2011
```

Diamond Reporting, Inc.

# ERRATA SHEET

Plaintiff(s):  YEMISI AKINYEMI

Defendant(s): MICHAEL CHERTOFF, SECRETARY DEPARTMENT OF HOMELAND SECURITY

| Page | Line No. | Error | Correction |
|---|---|---|---|
| 5 | 18 | INDIA NATION | ASIAN INDIAN |
| 5 | 25 | BOROUGH COLLEGE | BARUCH COLLEGE |
| 7 | 11 | SINCE I'M IN APIS | SINCE I HAVE BEEN IN APIS |
| 8 | 2 | BUT BEFORE TRAINING | BUT BEFORE TRAINING PERIOD ENDED |
| 8 | 3 | TWO YEARS WAS | TWO YEARS WERE |
| 8 | 5 | THIS IS | THIS WAS |
| 9 | 5 | IF THEIR LINE IS | IF THE ~~AIR~~ AIRLINE IS |
| 9 | 17 | WE HAVE FIXED DUTIES | WE DON'T HAVE FIXED DUTIES |
| 17 | 14 | FROM THE HOLSTER | FROM THE HOLSTER IN RESTROOM |
| 18 | 23 | I SAY | I SAID |
| 18 | 25 | I KNOW | I KNEW |
| 18 | 25 | SO HE SAY | THEN HE SAID |
| 22 | 4 | THERE WAS MORE THAN ONE | THAT WAS ONE ON ONE |
| 22 | 16 | TRAINER SAY | TRAINER SAID |
| 22 | 23 | EXPLAIN AGAIN | EXPLAINED AGAIN |
| 24 | 5 | SO SHE SAY | SHE SAID |
| 24 | 6 | FOLLOW FURTHER DETAILS JUST TO INVESTIGATE ME MORE | INVESTIGATE IN FURTHER DETAILS |
| 25 | 9 | I HAVE | I HAD |
| 28 | 7 | YEMI GET | YEMI GOT |

DATE: 12-18-07

NAME OF WITNESS: SHARMILA ZAMAN

SIGNATURE: [signed]

Subscribed and sworn to before me this 18th day of December 2007.

[signed] Robyn L. Brant
NOTARY PUBLIC

ROBYN L. BRANT
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Aug. 3, 2011