1

2  UNITED DISTRICT DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
   YEMISI AKINYEMI,
4
                                        PLAINTIFF,
5
                         -against-
6

7  MICHAEL CHERTOFF, SECRETARY DEPARTMENT
   OF HOMELAND SECURITY,
8
                                        DEFENDANTS.
9  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

10

11                       DATE: October 25, 2007

12                       TIME: 1:15 p.m.

13

14            EXAMINATION BEFORE TRIAL of the

15  Defendant, MICHAEL CHERTOFF, SECRETARY DEPARTMENT

16  OF HOMELAND SECURITY, by a witness, HERBERT HERTER,

17  taken by the Plaintiff, pursuant to a Court Order

18  and to the Federal Rules of Civil Procedure, held

19  at the office of MICHAEL J. GARCIA, ESQ.,

20  86 Chambers Street, New York, New York 10007,

21  before KATE FRANCOMACARO, a Notary Public of the

22  State of New York.

23

24

25

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

```
 1

 2   A P P E A R A N C E S:

 3

 4        K.C. OKOLI, ESQ.
               Attorney for the Plaintiff
 5             330 Seventh Avenue, 15th floor
               New York, New York 10001
 6

 7

 8        MICHAEL J. GARCIA, ESQ.
          UNITED STATES ATTORNEY
          FOR THE SOUTHERN DISTRICT
 9             Attorney for the Defendant
               86 Chambers Street
10             New York, New York 10007
               BY: JOHN DALTON CLOPPER, ESQ.
11

12

          ALSO PRESENT:
13             CYNTHIA J. PREE

14

15

16             *              *              *

17

18

19

20

21

22

23

24

25
```

1

2    H E R B E R T    H E R T E R, called as a witness,

3    having been first duly sworn by a Notary Public of

4    the State of New York, was examined and testified

5    as follows:

6    EXAMINATION BY

7    MR. OKOLI:

8        Q.    Please state your name for the record.

9        A.    Herbert Herter.

10       Q.    Where do you reside?

11       A.    My business address is Terminal B, room

12   143, North Liberty International, Newark, New

13   Jersey 07114.

14       Q.    Good afternoon.  My name a K.C. Okoli.

15   I represent the Plaintiff in this lawsuit and I

16   will be asking you a couple of questions in

17   connection with the lawsuit.  What I ask is your

18   best recollection.  If I ask you a question and you

19   don't understand it, let me know.  I will rephrase

20   the question and ask it in a way that you do

21   understand and I ask that you wait for me to finish

22   my question before you give an answer even if you

23   anticipate what the question is.  The reason for

24   that is the reporter can't take down two people

25   speaking at once. I ask you to verbalize your

```
 1                        HERTER
 2   answers instead of a shake or a nod of the head;
 3   again, because she can't take down a shake or a nod
 4   of the head and if you answer a question, I will
 5   assume that you understood the question.  Do you
 6   understand?
 7        A.    Yes.
 8        Q.    And if you need to take a break, we'll
 9   allow to you do so.  What is your full name?
10        A.    Herbert Herter.
11        Q.    And the address that you just gave, is
12   that your work address?
13        A.    Yes.
14        Q.    Since when have you been working out of
15   that location?
16        A.    Since 1992.
17        Q.    Who is your employer?
18        A.    U.S. Customs and Border Protection.
19        Q.    What is your current title?
20        A.    Deputy chief officer.
21        Q.    When did you become deputy chief
22   officer?
23        A.    In September of 2002.
24        Q.    What is your place of birth?
25        A.    Newark, New Jersey.
```

1                           HERTER

2          Q.     And for the record, what's your race?

3          A.     Caucasian.

4          Q.     What's your highest level of education?

5          A.     Completed high school.

6          Q.     What year did you complete high school?

7          A.     1974.

8          Q.     When did you first become employed by

9     the customs and border protection or its

10    predecessor agency?

11         A.     October of 1978.

12         Q.     When you were first employed, what was

13    your title?

14         A.     Dog handler.

15         Q.     And does that mean what it says?

16         A.     That means exactly what it says.

17         Q.     Just for my identification, could you

18    explain a little bit what that means?

19         A.     That means that I utilized a director

20    in the employment of my duties to screen cargo,

21    conveyance, the mail and luggage on aircraft

22    entering the country looking for contraband.  There

23    are various different disciplines, explosive,

24    currency and food.

25         Q.     How long were you a dog handler?  Maybe

1               HERTER

2               MR. OKOLI: I am trying to obviously

3     exhaust his impressions speaking with the other

4     officers.

5          Q.    Can you answer the question or do you

6     want the reporter to read back the question to you?

7          A.    I truly don't understand what you are

8     after.  Can you rephrase it?

9          Q.    At the time that he came back, he had

10    no further business with the customs?  He had been

11    released by the customs?

12         A.    Correct.

13         Q.    And then, when he came back, your

14    impression was that he wanted to convince the

15    officers that he was truly married to Ms. Akinyemi;

16    am I correct?

17         A.    Yes.

18         Q.    And my question then is, did you get a

19    sense from your officers as to why he wanted to

20    convince them of his marital status with

21    Ms. Akinyemi?

22         A.    My sense from my officers as to why he

23    wanted do it -- I did get the sense from my

24    officers that he was attempting to do it.

25         Q.    And did he tell you what they did as a

1                       HERTER

2    result of -- can you tell us further what else they

3    told you in the course of this --

4         A.     I don't recall the exact verbiage as to

5    the description, but Officer Akinyemi did come back

6    to the area, she openly made contact with the two

7    officers, I believe making mention that she

8    recognized them, then they went on to kiss.  My

9    officers said that they did feel uncomfortable at

10   this and they thought it was a little

11   unprofessional as there were other passengers in

12   the area, for an uniformed officer to go into an

13   embrace and a very -- I can't think of the word --

14   and kiss the officer, but not a usual kiss on the

15   cheek or something like that.  They were very

16   involved.

17        Q.     When you say very involved, can you be

18   more explicit?

19        A.     Very strong kissing, overly

20   affectionate, those types of things.  Something

21   that they felt appeared to be kind of

22   unprofessional with other passengers around.  There

23   was also an exchange of money.  I don't recall how

24   much.  I don't even recall -- that may have been

25   part of his excuse to come off the aircraft.  I

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

1                          HERTER

2      described to me was they used the words they felt

3      uncomfortable which made me feel it was excessive.

4           Q.      They made the determination that it was

5      excessive, correct?

6           A.      Yes, that's what they relayed to me.

7           Q.      This kiss was a kiss on the mouth,

8      correct?

9           A.      As far as I understood.

10          Q.      As we sit here today, do you find

11     anything wrong with a husband kissing a wife on the

12     mouth in a public place?

13          A.      There are levels to that.

14          Q.      Where would you draw the line to that?

15          A.      That's speculative.

16          Q.      I am asking you?

17          A.      I don't know exactly where I would draw

18     the line.

19          Q.      Did you believe that from what your

20     officers told you, did you believe that -- I will

21     tell you the name of the passenger for this

22     purpose.  We'll call him Mr. Seweje -- did you

23     believe that Mr. Seweje felt that he needed to

24     prove that he was married to Ms. Akinyemi to your

25     officers?

1                    HERTER

2    manager regarding why Mr. Seweje was brought back

3    on the jet way?

4         A.      There came a time where Officer Jurczak

5    made me aware that he had some dialogue with

6    airline personnel.  I don't recall him saying the

7    station manager.

8         Q.      In that conversation, did Mr. Jurczak

9    tell you that Mr. Seweje was already boarded before

10   he was brought off the jet way?

11        A.      They told me that evening that he was

12   already on the plane.

13        Q.      Did either Ms. Long or Mr. Jurczak tell

14   you that the actions of Ms. Akinyemi and Mr. Seweje

15   were theatrical?

16        A.      I don't at this point recall that word

17   actually being utilized.

18        Q.      Did you get the sense from what they

19   related to you that the action was theatrical?

20        A.      I had a sense of that, yes.

21        Q.      Did you believe that there was more to

22   what was going on than Mr. Seweje coming out to

23   give some money to the wife?

24        A.      At that point, I had some questions as

25   to why this incident took place so, I felt there

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

1                    HERTER

2        Q.    What is the connection?  I guess I'm a

3    little at a loss here.  If you can explain that to

4    me, what was in your mind about what happened that

5    evening and the possible immigration status of

6    Mr. Seweje?

7        A.    If Mr. Seweje was not here under legal

8    immigration processing and Officer Akinyemi was

9    involved, then I could have a potential issue.

10       Q.    In your experience working with the

11   customs, how many times have you come across

12   somebody with a legal immigration problem who would

13   be let go onto the aircraft and come back and put

14   themselves in the hands of law enforcement?

15       A.    I can't give you an exact number, but

16   it does happen and has happened.

17       Q.    You have known a situation where

18   somebody who had an immigration problem was not

19   discovered by the customs, by the immigration to be

20   in an unlawful status and was on the way out and

21   came right back into the hands of law enforcement?

22       A.    Yes, I do.

23       Q.    How many times have you come across

24   those circumstances?

25       A.    I can't give you an exact number.  It

1                    HERTER

2   passenger?

3        A.    They didn't specifically come out and

4   say that during the course of questioning and

5   looking into it, it became relevant where I

6   determined he was from.  I don't recall.

7        Q.    Do you recall whether you learned that

8   he was a Nigerian passenger on December 5th?

9        A.    I don't recall.

10        Q.    Do you recall whether you learned that

11   he was black on December 5th?

12        A.    I don't recall.

13        Q.    Do you recall whether you learned that

14   the officer, even though they didn't know the name

15   at the time, that Ms. Akinyemi was black on

16   December 5th?

17        A.    I can't say I recall.

18        Q.    At the time that you asked that

19   Mr. Seweje's immigration status be checked, did you

20   believe that he was in fact married to

21   Ms. Akinyemi?

22        A.    I made no determination either way at

23   that time.

24        Q.    Since you had made no determination, it

25   means that -- is it fair to say that you did not

1                         HERTER

2    take Ms. Akinyemi's word for it that she was in

3    fact married to Mr. Seweje?

4         A.    I don't feel that taking her word for

5    it is a fair assessment.  There were

6    inconsistencies in the situation that raised

7    questions in my mind.

8         Q.    Tell me the inconsistencies that you

9    remembered?

10         A.    There were some inconsistencies as to

11    contact addresses that the passenger gave and,

12    again, going back to the statements of my officers

13    at the time.

14         Q.    When you say inconsistencies in contact

15    addresses, are you saying that Mr. Seweje gave more

16    than one contact address?

17         A.    Yes.

18         Q.    Which contact address did he give?

19         A.    I don't recall the specifics.  He gave

20    a contact address in New York, either Brooklyn or

21    Queens, and one in New Jersey.

22         Q.    At what point did he give these contact

23    addresses?

24         A.    To the officers when doing their

25    interview.

1                          HERTER

2        Q.    Which officers told you that he gave

3   them more than one contact address?

4        A.    I would say Jurczak, but I am not

5   completely sure.

6        Q.    On the day of the interview, your

7   recollection is that on the day of the interview or

8   examination, Mr. Seweje, he gave two different

9   contact addresses for himself to your officers?

10       A.    That's what I recall.

11       Q.    And did your officers question him

12  about the inconsistencies in the two contact

13  addresses that he gave them?

14       A.    I don't have specifics as to their

15  interview.

16       Q.    But do you recall them telling you

17  about questioning you about inconsistencies in the

18  address that he gave them?

19       A.    I don't recall them specifically at

20  that time saying that.

21       Q.    Did you attempt on that day to

22  ascertain any information on Ms. Akinyemi yourself?

23       A.    Yes, I did.

24       Q.    What did you do?

25       A.    I attempted to find out first of all if

1                    HERTER

2    she was assigned to the airport that evening.  I

3    attempted to find out what her normal duty

4    location, what her normal hours of duty were and I

5    also entered in that data.  I received some

6    personal information of the employees.  It's in the

7    same database.

8          Q.    When you say personal information, what

9    would that be?

10         A.    Lists, various items, both historical

11   and personnel in reference to the individual

12   officers.  Things like addresses, dates of birth,

13   emergency contact information, those types of

14   things.

15         Q.    Was there anything that you found --

16   first of all, did you do this on December 5th or on

17   some other day, what you just testified to?

18         A.    I really do believe I did it on

19   December 5th.

20         Q.    And did there come a time when you made

21   contact with Mr. Rivera on this matter?

22         A.    Yes.

23         Q.    What was the first contact that you

24   made with Mr. Rivera in connection with this

25   matter?

1                          HERTER

2         A.       I believe it was on the 5th, but, if

3    not, it was probably first thing the next morning.

4         Q.       Now, you said you were watch commander

5    on the 5th, correct?

6         A.       Yes.

7         Q.       And that would make you the highest

8    ranking customs personnel at the airport that day?

9         A.       Yes.

10        Q.       Where was Mr. Rivera when you made

11   contact with him?

12        A.       Off duty.

13        Q.       On the 5th?

14        A.       At that time.

15        Q.       How did you initiate this contact?

16        A.       I more than likely called him.

17        Q.       And what was the purpose of your making

18   contact with him on the 5th?

19        A.       He is the manager of the airport

20   operations branch and I wanted to make him aware of

21   the issue at this point in time.

22        Q.       What was the issue that specifically

23   caused you to make contact with Mr. Rivera at that

24   point?

25        A.       The culmination of the exchange in the

1                        HERTER

2     jet way, Officer Akinyemi's involvement and her

3     presence at the jet way.

4           Q.      Was there anything that you found when

5     you looked into Ms. Akinyemi's information that was

6     relevant about what you were looking for at the

7     time?

8           A.      One item that I found, if I would say

9     it was of relevance, it may have been of relevance,

10    but it did not answer a question for me is that her

11    emergency contact information did not list

12    Mr. Seweje as her emergency contact being her

13    husband.

14          Q.      Is it your understanding that people,

15    that everybody gives their husband as their

16    emergency contact?

17          A.      No, it's not to my knowledge that

18    everybody gives their husband as an emergency

19    contact and there is no requirement to my

20    recollection that there is.  However, this was, in

21    my opinion, another question that was building on

22    my question as to their marital status.

23          Q.      Were you able to determine at all from

24    -- I take it that this was something you were

25    doing electronically in a computer?

1                          HERTER
2        A.      Yes.
3        Q.      Were you able to determine from
4    whatever computer program you were looking at
5    whether Ms. Akinyemi was married or not?
6        A.      I did not recall seeing it. I don't
7    recall seeing her marital status.
8        Q.      As you sit here today, do you know if
9    Ms. Akinyemi was married as of December 2005?
10       A.      I don't know.
11       Q.      So you were not able to determine if in
12   fact Ms. Akinyemi was married or not at the time
13   that you were looking at this information?
14       A.      Yes.
15       Q.      So, if you could not determine if she
16   was married, you could not determine who she was
17   married to, correct?
18       A.      Correct.
19       Q.      Did you have any concern on the 5th
20   about Ms. Akinyemi's marital status at the time?
21              MR. CLOPPER: Objection.  Asked and
22   answered.  You can answer to the best of your
23   ability.
24       A.      Ms. Akinyemi's marital status, not
25   knowing if she was married to the passenger or not,

1                    HERTER

2    is irrelevant.  My concern was the marital status

3    of the non-U.S. Citizen, the passenger.

4         Q.    Were you concerned about the marital

5    status of Mr. Seweje?

6         A.    Yes.

7         Q.    And you were also concerned about his

8    immigration status?

9         A.    Not concerned.  I wanted to insure that

10   it was proper.

11        Q.    Did you ask Mr. Jurczak to look into

12   the marital status of Mr. Seweje?

13        A.    That's all part of the confirmation of

14   somebody having legal status.

15        Q.    Did you make a determination as to the

16   marital status of Mr. Seweje?

17        A.    Mr. Jurczak advised me that his

18   immigration status appeared at that time to be

19   proper.

20        Q.    And you don't remember, even though you

21   were asked for the marital status also to be

22   checked, you don't remember if Mr. Jurczak advised

23   you as to the marital status of Mr. Seweje?

24        A.    I was concerned as to the marital

25   status, if that was the condition that he used to

1                        HERTER

2    get legal immigration status in the United States

3    and, if that was not the issue, then the concern

4    is, was he here legally in the United States which

5    Officer Jurczak confirmed, so my question was to

6    him, to Officer Jurczak, is Mr. Seweje here as a

7    legal resident and that was answered.

8        Q.    Do you believe that people can only be

9    legal residents here only through marriage?

10       A.    No.

11       Q.    Why was it of importance to you as to

12   Mr. Seweje's legal residence? Couldn't you have

13   determined his immigration status without reference

14   to his marital status?

15       A.    If his marital status was part of his

16   immigration process and if it was not accurate and

17   it involved a customs officer then again, I have a

18   potential integrity issue which I am obligated to

19   follow up on and, as a manager, if I so much as

20   feel that I have a question as to a possible

21   integrity issue, it's my obligation to look into

22   that in either direction.  If it becomes a

23   non-issue, it's a non-issue.  If it becomes an

24   issue, it's my responsibility to pass it forward,

25   that in my mind there were some questions as to the

1                          HERTER

2        A.      I don't understand what you are getting

3    at with your question.

4        Q.      It's not so much what I am are getting

5    at.  It's what I am saying.  As you sit here, are

6    customs officers who are on break considered to be

7    off-duty during the time that they are on break?

8        A.      There are several fashions of breaks.

9    There are intermediate breaks or bathroom breaks

10   which they are still on duty.  We do not have a

11   non-paid lunch hour so if they are given their 20

12   to 30-minute lunch break, no, they are not off the

13   clock.  So, yes, they are still on duty.

14       Q.      Is there any break that they take where

15   they are off the clock?

16       A.      Not unless they take leave.

17       Q.      As you sit here today, do you know

18   whether an officer who is off-duty can get

19   permission to go meet with a family member at a

20   departure gate at the airport?

21       A.      Any individual, not even specifically

22   an officer, may get permission to go down to the

23   departure gate which is granted by the airline, not

24   customs, and those are for extenuating

25   circumstances, generally to assist a minor,

1                    HERTER

2        Q.     Yes.

3        A.     No, I am not aware of any.

4        Q.     Are you aware of any CPB officers who

5   have gained access to a restricted area in an

6   outbound area when they were off-duty?

7        A.     Not specifically, no.

8        Q.     Are you aware of any CPB officers who

9   were terminated solely for having access to a

10  restricted area of the airport?

11       A.     I am not privy to the information of

12  why any CPB officers are terminated, the reasons of

13  their termination, so I would have to say, no.

14       Q.     At what point did you become aware of

15  Mr. Seweje's national origin?

16       A.     I don't recall the specific place or

17  time.

18       Q.     Other than the conversation that you

19  had with Officers Long and Jurczak, did you obtain

20  any written statements from them?

21       A.     Yes, I did.

22              MR. CLOPPER: Let's take a five minute

23  bathroom break, if you don't mind.

24              (Whereupon, a short recess was taken.)

25       Q.     Other than Ms. Akinyemi, since you

HERTER

1
2    became a customs officer, do you know of any
3    customs or CPB officers who gained unauthorized
4    access to a restricted area?
5        A.    No specific knowledge.
6        Q.    Have you ever heard of any CPB officer
7    gaining unauthorized access to a restricted airport
8    area other than Ms. Akinyemi?
9        A.    I don't recall hearing.
10       Q.    Is it your testimony that the only CPB
11   officer that you are aware of, as you sit here
12   today, who ever gained unauthorized access to a
13   restricted area is Ms. Akinyemi?
14           MR. CLOPPER: Objection.
15       A.    I am aware of Ms. Akinyemi because I
16   was directly involved.
17       Q.    Are you aware of any other incident,
18   whether involved or indirectly involved?
19       A.    I don't recall hearing of any other
20   incidents and I am not aware of any.
21       Q.    In your position as a supervisor, have
22   you ever had to refer the matter concerning any
23   employee to the office of professional
24   responsibility?
25       A.    Yes.

```
1                        HERTER
2        Q.     How many times?
3        A.     One.
4        Q.     And what would that occasion be?
5        A.     As a supervisory enforcement officer
6   many years ago.  I don't recall the exact year.  I
7   had an issue of an employee who was out on
8   Workmen's Compensation.  His claim was that he
9   could not perform his duties as a dog handler.
10  However, information was relayed to me that while
11  he was off on a Department of Labor status, he was
12  performing personal dog training.
13       Q.     You were able to determine that he was
14  in fact performing personal dog training?
15       A.     Yes.
16       Q.     And that would be fraud on his
17  employer, correct?
18       A.     It's fraud as far as I understand
19  against the Department of Labor.
20       Q.     And in Ms. Akinyemi's case, would you
21  say there was fraud on her part of what you
22  believed happened?
23              MR. CLOPPER: Objection.
24              MR. OKOLI: No speaking objections.
25       Q.     Go ahead and answer?
```

1                         HERTER

2       A.      Fraud in her actions?

3       Q.      The incident that you relayed

4    concerning Ms. Akinyemi, I am not talking about her

5    husband.  Ms. Akinyemi, everything that you

6    relayed, either that your officers told you or that

7    you were able to find out, was there any fraud in

8    any of the actions that Ms. Akinyemi took?

9       A.      I can't answer to the specifics of some

10   of the information because it's information that I

11   am not privy to as far as her actions that day and

12   coming to the jet way.  No, that was not fraud.

13   That was violation of policy.

14      Q.      Was Ms. Akinyemi's situation referred

15   to the Office of Professional Responsibility?

16      A.      For her actions that day?

17      Q.      Yes.

18      A.      Not because of her gaining access to

19   the outbound area, no.

20      Q.      Are you aware of her matter being

21   referred to the Office of Professional

22   Responsibility for any reason?

23      A.      I am aware of my contact with them?

24      Q.      Why was Ms. Akinyemi's situation

25   referred to the Office of Professional

1                          HERTER

2    Responsibility?

3         A.      I am not at liberty to give specifics

4    to that.

5         Q.      Why do you say you're not at liberty to

6    give specifics to that?

7                 MR. CLOPPER: Objection.  He is thinking

8    about invoking a law enforcement privilege.  Let's

9    step outside for a second.

10                (Whereupon, a short recess was taken.)

11                MR. CLOPPER: Objection on the grounds

12   of law enforcement privilege and I direct the

13   witness not to answer that question.

14                MR.OKOLI: Mark that for a ruling as

15   well.

16                (Whereupon, the aforementioned

17   documents was marked as Plaintiff's Exhibits 2-4

18   for identification as of this date by the

19   Reporter.)

20        Q.      I am placing before you what has been

21   marked as Plaintiff's Exhibit 2 and 3 at this

22   deposition.  Take a look at them and tell me if you

23   recognize them as the statement of the officers

24   that worked with you?

25        A.      To the best of my recollection, I

DIAMOND REPORTING -718-624-7200- 16 Court St., B'klyn, NY

1                          HERTER

2          A.     Yes, sir.

3          Q.     Does that describe what occurred on

4    12/6/05?

5          A.     Again, to the best of my recollection,

6    I believe so, yes.

7          Q.     And the last full paragraph says

8    12/7/05.  Do you see that?

9          A.     Yes, sir.

10         Q.     Does that describe to the best of your

11   ability what occurred on 12/7/05?

12         A.     To the best of my recollections, yes.

13   I don't recall the exact language or verbiage used

14   that day.

15               MR. OKOLI:  Thank you.  Off the record.

16               (Whereupon, an off the record

17   discussion was held.)

18               (Continued on next page to include

19   jurat.)

20

21

22

23

24

25