1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    -------------------------------------------X
     YEMISI AKINYEMI,
4
                                PLAINTIFF,
5
             -against-         Case No.
6                             07-CV-4048(CM)(AJP)

7
     MICHAEL CHERTOFF, Secretary, Department of
8    Homeland Security,

9                              DEFENDANT.
     -------------------------------------------X
10

11                   DATE:  November 6, 2007

12                   TIME:  3:38 p.m.

13

14

15        EXAMINATION BEFORE TRIAL of the

16   Defendant, Department of Homeland Security, by

17   JOSEPH VINCENT MARTELLA, taken by the

18   Plaintiff, pursuant to a Notice and to the

19   Federal Rules of Civil Procedure, held at the

20   U.S. Attorney's Office, 86 Chambers Street, 3rd

21   Floor, New York, New York 10007, before a

22   Notary Public of the State of New York.

23

24

25

1

2    A P P E A R A N C E S :

3


4    LAW OFFICES OF K.C. OKOLI, P.C.
            Attorney for the Plaintiff
5            330 Seventh Avenue
            15th Floor
6            New York, New York 10001
            BY:  KENECHUKWU CHUDI OKOLI, ESQ.

7


8


9    UNITED STATES ATTORNEY'S OFFICE
     SOUTHERN DISTRICT OF NEW YORK
10            Attorney for the Defendant
            86 Chambers Street
11            3rd Floor
            New York, New York 10007
12            BY:  JOHN DALTON CLOPPER, ESQ.
                Assistant United States Attorney

13


14

15    ALSO PRESENT:
            CYNTHIA J. PREE, ESQ., Assistant
16            Counsel, U.S. Customs and Border
            Protection, U.S. Department of Homeland
17            Security

18            MR. TALARICO, ESQ.

19                    *            *            *

20

21

22

23

24

25

1                    J.V. MARTELLA

2    J O S E P H    V I N C E N T    M A R T E L L A,

3             called as a witness, having been first

4             duly sworn by a Notary Public of the

5             State of New York, was examined and

6             testified as follows:

7    EXAMINATION BY

8    MR. OKOLI:

9             Q.    Please state your name for the

10   record.

11            A.    Joseph Vincent Martella.

12            Q.    What is your address?

13            A.    1210 Corbin Street, Elizabeth, New

14   Jersey 07201.

15            Q.    Good afternoon.  My name is K. C.

16   Okoli.  I represent Yemisi Akinyemi in this

17   lawsuit.  I will be asking you some questions.

18            What I ask of you, sir, is your

19   best recollection.  If I ask a question and you

20   don't understand it, please let me know and I

21   will ask it in such a way that you do

22   understand.  I ask you to be patient.  When I

23   start asking the question I may hesitate a

24   little bit.  Wait for me to finish the question

25   before you answer even if you know what the

1                         J.V. MARTELLA

2    question will be.  The reason for this is so we

3    have a clear question and answer for the

4    record.

5                    If during the course of the

6    deposition you wish to take a break, either to

7    consult with counsel or to use the facilities

8    or for any reason, are you entitled to do that.

9    This may be the shortest deposition that you

10   ever attended.

11                   Are you currently employed?

12        A.    Yes.

13        Q.    By whom are you employed?

14        A.    United States Customs and Border

15   Protection.

16        Q.    Since when did you become employed

17   by the -- I will call it CBP for short.  Is

18   that okay?

19        A.    Yes.

20        Q.    When did you become employed by

21   CBP?

22        A.    September of 2001.

23        Q.    What's your current title?

24        A.    Officer.

25        Q.    Customs and Border Protection

1                              J.V. MARTELLA

2          A.    I don't remember the exact start

3     date.

4          Q.    Do you remember what year?

5          A.    Less than a year.

6          Q.    Before that, what did you do?

7          A.    I worked for the advanced targeting

8     unit.

9          Q.    What that?

10         A.    A.T.U.  We target shipments coming

11    into the country.

12         Q.    For inspection?

13         A.    Yes.

14         Q.    For how long did you do this?

15         A.    Approximately two and a half years.

16         Q.    In the year 2005, were you with

17    A.T.U.?

18         A.    I believe so.

19         Q.    Do you belong to a union?

20         A.    Yes.

21         Q.    For how long have you been a union

22    member?

23         A.    Since my start of employment.

24         Q.    And which union do you belong to?

25         A.    National Treasury Employees Union.

J.V. MARTELLA

1

2      Q.    As a union member, is there

3  anything that you do for the union on behalf of

4  the union?

5      A.    Currently, I am the executive vice

6  president of the chapter.

7      Q.    When you say the chapter, which

8  chapter?

9      A.    Chapter 161.

10     Q.    And where is that located?

11     A.    In Newark.

12     Q.    Since when did you become the

13 executive V.P. of Chapter 161?

14     A.    Approximately January 2007 it took

15 affect, I believe.

16     Q.    January this year?

17     A.    Yes.

18     Q.    As part of your duties as an

19 executive V.P., do you do any union

20 representational activities with the union for

21 the CBP?  Do you represent union members in

22 grievances and things like that with the CBP?

23     A.    Yes.

24     Q.    Since when did you start

25 representing union members in grievances and

J.V. MARTELLA

1

2    things like that with the CBP?

3          A.    When I performed -- when I started

4    performing as union representative.

5          Q.    When was that?

6          A.    I have been a union representative

7    since 2002.

8          Q.    Could you just flesh out a little

9    bit in more detail what your functions as a

10   union representative are?

11         A.    My job is to make sure that

12   management fulfills its contractual

13   obligations.

14         Q.    Anything else?

15         A.    That's pretty much the extent of

16   it.

17         Q.    Since you became a union

18   representative, could you give us an

19   approximate number of union members you have

20   had to represent in either grievances or things

21   of the sort with the management?

22         A.    I couldn't give you that number.

23         Q.    Have you represented more or less

24   than 50 people?

25         A.    I would be guessing.  No, I don't

J.V. MARTELLA

2    know.

3        Q.    More than 25?

4        A.    As I said, I would be guessing.    I

5    do not know an exact number.

6        Q.    I take it that you do not keep a

7    record of those that you represented?

8        A.    Mentally, no.

9        Q.    Is there a document that would

10   indicate who you have represented in any

11   disputes?

12       A.    No.

13       Q.    Because I am following up from when

14   you said mentally.  I am trying to see whether

15   there is anything.

16       A.    I don't keep a paper record of the

17   employees that I represent and how many I

18   represent.  It is not like a chalkboard that I

19   put up another one.  No, I don't do that.

20       Q.    Is there anyone within the union

21   that does that?

22       A.    Not that I know, no.

23       Q.    Do you know who Edward Fox is?

24       A.    Yes, I do.

25       Q.    Who is Edward Fox?

J.V. MARTELLA

1

2          A.    He is the deputy chief officer.

3          Q.    Have you ever met with Edward Fox

4    in the context of your union representational

5    activities?

6          A.    Yes, I have.

7          Q.    Did you meet with him in connection

8    with the Yemisi Akinyemi situation?

9          A.    Yes.

10         Q.    Other than Yemisi Akinyemi, before

11   the Yemisi Akinyemi situation, had you met with

12   Deputy Fox in connection with your union duties

13   prior to meeting with Deputy Fox in connection

14   with the present case, that's with the Yemisi

15   Akinyemi situation?  Had you previously met

16   with him in connection with the representation

17   of any other union member?

18         A.    Not that I remember.

19         Q.    Are you in Mr. Fox's direct

20   reporting line?

21         A.    No.

22         Q.    Do you know who Yemisi Akinyemi is?

23         A.    Yes.

24         Q.    How did you come to know her?

25         A.    As an employee who needed

```
1                        J.V. MARTELLA

2            Q.    Do you know who Lauren Spina is?

3            A.    Yes.

4            Q.    Do you recall whether you attended

5    a meeting with her at Lauren Spina's office?

6            A.    No, I don't recall that.

7            Q.    Tell me what you recall about your

8    first meeting you attended with her?  Do you

9    recall where that took place?

10               MR. CLOPPER:  Objection, vague an

11           ambiguous.  Who is her?

12           Q.    The first meeting in which you

13   represented Ms. Akinyemi, do you recall where

14   that took place?

15           A.    I remember Ms. Akinyemi came to me.

16   I was working in a cubicle.  She said she

17   needed to write a statement.

18           Q.    That she needed to write a

19   statement?

20           A.    That's correct.

21           Q.    When you say you were working at

22   the cubicle --

23           A.    I was performing my regular job

24   duties.

25           Q.    That would be at Corbin Street?
```

1                        J.V. MARTELLA

2          A.    Yes.

3          Q.    When she said she needed to write a

4    statement, did she explain to you why she

5    needed to write the statement?

6          A.    I believe so, yes.

7          Q.    What's your recollection of what

8    she told you why she needed to write the

9    statement?

10         A.    The exact wording I don't remember,

11   but the gist of it was that she was at the

12   airport, her husband went through security, she

13   went around security, met him at the jetway.

14   Walked away from the jetway after she said

15   goodbye to him.  He called her on her cell

16   phone, said he had to give her money.  Walked

17   back to the jetway and gave her money.  There

18   were two CBP officers there.  That's what I

19   recollect.

20         Q.    Did you help her in the writing of

21   the statement?  I am just trying to get at

22   after she said she wanted to write the

23   statement.

24               What, if anything, did you stay to

25   her?

```
 1                        J.V. MARTELLA
 2           A.    Well she wrote it and I reviewed
 3      it.
 4           Q.    And after she wrote it and you
 5      reviewed it, you gave it back to her?
 6           A.    Yes.  She signed it, I believe, and
 7      she gave it to management.
 8           Q.    You did not accompany her to where
 9      she actually handed in the statement; did you?
10           A.    I don't remember.
11           Q.    Do you remember when she came to
12      you if she told you what it was that required
13      her to write that statement?
14           A.    Sorry?
15           Q.    When she told that you she wanted
16      to write a statement, do you recall whether she
17      told you who it was in management that had
18      requested her to write the statement?
19           A.    No, I don't remember.
20           Q.    I believe you had testified that
21      you don't recall attending a meeting with her
22      at Ms. Spina's office?
23           A.    That's correct.
24           Q.    Is it then fair to say that you
25      were not present at the occasion that she
```

1                        J.V. MARTELLA

2    actually handed the statement over to someone

3    at management?

4         A.    I said I don't remember.

5         Q.    So it could have happened but you

6    just don't remember?

7              MR. CLOPPER:   Isn't that what I

8         don't remember means?  Objection, asked

9         and answered.

10        Q.    If you don't remember, I am just

11   trying to get some clarification of what you

12   don't remember.  I don't remember could be that

13   something happened but you don't remember it.

14        A.    That's pretty much the only meaning

15   that I don't remember has in my mind.

16        Q.    What do you recall of the very

17   first meeting that you attended with her and

18   management?

19        A.    I believe it was Dominic Callese

20   with Edward Fox, myself, Ms. Akinyemi and there

21   was an argument because they weren't fulfilling

22   their contractual agreement with giving Ms.

23   Akinyemi rights such as the Calkin rights,

24   general notice, and Weingarten rights.

25        Q.    And you said there was an argument?

1                        J.V. MARTELLA

2              A.    Not an argument, so to speak.  It

3    was that they weren't following contract and we

4    walked out of the meeting and it didn't take

5    place.

6              Q.    How did you learn about this

7    meeting?

8              A.    Ms. Akinyemi came to me, I believe.

9              Q.    And told you there was a meeting

10   taking place that you needed to accompany her?

11             A.    Yes.  I can't represent an employee

12   if they don't request representation.

13             Q.    Do you recall where that meeting

14   took place?

15             A.    In an office.  I don't remember

16   exactly which one.

17             Q.    You don't recall whose office it

18   was now?

19             A.    No.

20             Q.    But you have this specific

21   recollection that Mr. Fox was present at that

22   meeting, the one that you are talking about?

23             A.    That's correct.

24             Q.    Mr. Callese was there?

25             A.    Yes.

1                          J.V. MARTELLA

2          Q.    You were there and Ms. Akinyemi?

3          A.    That's correct.

4          Q.    Could you tell us how that meeting

5     started, as best you can recall it?

6          A.    I don't remember exactly how it

7     started.

8          Q.    But at some point there was a

9     question raised as to Ms. Akinyemi not being

10    given her Calkin and Weingarten rights.

11               What, if anything, did you do at

12    that point?

13         A.    We called a break, called the union

14    attorney and the union attorney said

15    discontinue having the meeting.

16         Q.    Do you recall whether Ms. Akinyemi

17    had been questioned at all before this break

18    was called?

19         A.    Without me present?

20         Q.    No, as you were present.

21         A.    I don't recall.

22         Q.    And to your recollection, was

23    Edward Fox the highest ranking employee of the

24    CBP who was present at that meeting?

25         A.    I believe so.

```
1                        J.V. MARTELLA
2           Q.    And what was your understanding of
3    why Mr. Fox was present at that meeting?
4           A.    Exactly why the employee told me
5    that she needed representation.
6           Q.    Was it your understanding that
7    Mr. Fox was representing management?
8           A.    He is a manager.
9           Q.    And after a break was taken at this
10   meeting, what else happened?
11          A.    Excuse me?
12          Q.    You said when the issue of
13   Weingarten rights came up, the meeting was
14   called off?
15          A.    Yes.
16          Q.    What happened after in that?
17          A.    She went to her regular duties and
18   I continued on my way.
19          Q.    Was there another time that you
20   attended a meeting with Ms. Akinyemi that had
21   to do with this same incident?
22          A.    A second meeting, yes.
23          Q.    Do you recall where that took
24   place?
25          A.    In an office.  I don't remember
```

1                        J.V. MARTELLA

2    exactly which one.

3        Q.    Do you recall who was present at

4    that meeting?

5        A.    I believe Supervisor Callese an

6    D.C.O. Fox.

7        Q.    Anyone else that you remember?

8        A.    Akinyemi and myself.

9        Q.    And do you recall what transpired

10   at that meeting?

11       A.    I don't remember exactly what

12   happened.

13       Q.    Based on your experience with the

14   union, at the time that Ms. Akinyemi was asked

15   to write a statement concerning this incident,

16   did you understand that statement to be part of

17   an investigation?

18       A.    No, I had no reason to believe that

19   it was part of an investigation.

20       Q.    The statement that Ms. Akinyemi was

21   asked to write had to do with what occurred on

22   a certain day at Newark International Airport;

23   correct?

24       A.    That's correct.

25       Q.    And this request that Ms. Akinyemi

```
 1                    J.V. MARTELLA
 2    provide this statement was made by someone in
 3    management; correct, that's what your
 4    understanding is?
 5         A.    That's correct.
 6         Q.    Was it your understanding that
 7    before taking this statement from Ms. Akinyemi
 8    concerning the incident that we are talking
 9    about, that she had to be given Weingarten
10    rights, Calkin rights and anything of the sort?
11         A.    The Weingarten rights, in general,
12    is when an employee is being in a formal
13    meeting and they are being questioned or an
14    inquiry is being made, they are entitled to
15    those rights which is, management gives the
16    right to have a union represent present.  It is
17    general notice.
18         Q.    Would it make a difference if the
19    question was in writing instead of the question
20    being made verbally?  Would it make a
21    difference if the question that the employee
22    is required to answer was put in writing?
23         A.    It all depends on who the question
24    is coming from.
25         Q.    If it is coming from somebody in
```

1                          J.V. MARTELLA

2      management?

3           A.     Whether a manager asks an employee

4      to write something down in writing or verbally,

5      it has the same meaning.  That would trigger

6      the employee being made aware of his or her

7      rights.  I don't follow where you are going

8      here.  Whenever there is a reason to believe

9      that disciplinary action may be taken against

10     the employee, the employee has a right to have

11     a union representative present.

12          Q.     If at the time that the employee

13     was asked to write the statement, if at that

14     time management was thinking of disciplinary

15     action against the employee, would they be

16     entitled to Weingarten and Calkin rights?

17          A.     Yes.

18          Q.     Do you know what CBP table of

19     offences and penalties means?

20          A.     Yes.

21          Q.     What are those?

22          A.     That is exactly what it says.  The

23     table of offences and the penalty that it

24     upholds.

25          Q.     To your knowledge, is that

```
1                         J.V. MARTELLA

2     something that's applied to probationary

3     employees?

4         A.     Yes.  It applies to all employees.

5         Q.     To your knowledge, do CBP officers

6     who are not on duty at the airport ever go

7     through security there in order to use the

8     restaurants or shops in the passenger waiting

9     areas?

10        A.     Say that question one more time.

11               MR. OKOLI:  Read back the question.

12               (Whereupon, the referred to

13        question was read back by the Reporter.)

14        A.     Depends on what terminal you are

15    talking about.

16        Q.     Do you know of any terminals where

17    they could go when they are not on duty?

18        A.     Terminal B.

19        Q.     How do you know that?

20        A.     There is no security checkpoint

21    before the restaurants at terminal B.

22        Q.     Are you say saying that somebody

23    could come from outside and get to the

24    restaurants in terminal B without going through

25    security?
```

23

1                          J.V. MARTELLA

2          A.    You don't have to be a ticketed

3     passenger to go through that area.  You don't

4     have to go through security to go to the

5     restaurants in terminal B.

6          Q.    Do you know what restricted areas

7     means or secured areas means?

8                MR. CLOPPER:  Objection, compound.

9                Answer to the best of your ability.

10         A.    I know what restricted is defined

11    as so yes, I would say I know what it means.

12         Q.    If a customs employee, a customs

13    officer is not assigned to a duty position say

14    in an airport, and they go there without

15    permission, would that place be a restricted

16    area for them?

17               MR. CLOPPER:  Objection, vague an

18               ambiguous.  Answer to the best of your

19               ability.

20         A.    Depends on what part of the

21    terminal you are going to.

22         Q.    Let's say the gate area, the gate

23    area in front of the jetway.  If somebody who

24    is not assigned there goes to that location

25    without permission, would that person be going

1                        J.V. MARTELLA

2    into a restricted area?

3         A.    I assume so, yes.

4         Q.    Do you have knowledge of any

5    customs officers who had gone into restricted

6    areas at the time they were not supposed to be

7    there?

8         A.    No, I do not.

9         Q.    Have you heard of any customs

10   officers who went to an area they shouldn't be

11   in at the time they were either off duty or

12   they didn't have permission to be there?

13              MR. CLOPPER:   Objection.

14        A.    I don't have any knowledge.

15        Q.    Do you know of any CBP officers who

16   had been terminated solely for going to the

17   gate area such as the one that Ms. Akinyemi

18   went to?

19              MR. CLOPPER:   Objection, vague and

20              ambiguous.

21        A.    No, I don't.

22        Q.    You have been doing union

23   representation activities for the past how many

24   years?

25        A.    I have been representing bargaining

1                      J.V. MARTELLA

2    unit employees for approximately five and a

3    half years.

4         Q.    During this time period, have you

5    ever seen anyone that was terminated for that

6    reason?

7         A.    I have no knowledge of anyone that

8    has been terminated for that reason.

9         Q.    Based on your representation of Ms.

10   Akinyemi, is it fair to say you were familiar

11   with the facts surrounding the incident

12   involving her on December 5th, 2005?

13        A.    I was familiar with the facts that

14   Ms. Akinyemi stated to me, yes.

15        Q.    In your union representational

16   activities, have you had to represent people

17   whose conduct was based on what Ms. Akinyemi

18   told you was what she did, whose conduct was

19   more egregious than Ms. Akinyemi?

20             MR. CLOPPER:  Objection, vague an

21             ambiguous.

22        A.    I don't remember.

23        Q.    Do you recall providing an unsworn

24   statement during the investigation of Ms.

25   Akinyemi's situation?

1                          J.V. MARTELLA

2          A.    I do recall speaking with an

3    investigator, yes.

4          Q.    Was there a time that you told the

5    investigator to send to you in writing

6    something for your review?

7          A.    Yes.

8          Q.    Did you review what was sent to

9    you?

10         A.    Yes, I did.

11         Q.    Did you sign what was sent to you?

12         A.    If my signature is on it, I did.

13               MR. OKOLI:  Can we have just a

14         short break?

15               (Whereupon, a brief recess was

16         taken.)

17               MR. OKOLI:  Mark this, please.

18               (Whereupon, the aforementioned

19         document was marked as Plaintiff's

20         Exhibit 3 for identification as of this

21         date by the Reporter.)

22         Q.    I'm showing you what has been

23   marked as Plaintiff's Exhibit 3.  Is that the

24   unsworn statement which you provided under the

25   penalty of perjury during the E.E.U.

```
 1                    J.V. MARTELLA

 2    investigation of Ms. Akinyemi's situation?

 3         A.    Appears to be a copy of it.

 4         Q.    Do you recognize the signature on

 5    the last page of the document?

 6         A.    I do.

 7         Q.    And whose signature is that?

 8         A.    It appears to be mine.

 9         Q.    When you said it appears to be

10    yours, do you have any reason to believe it is

11    not yours?

12         A.    No.

13         Q.    Take a moment and review the

14    document and I will have a few questions for

15    you when you are done reviewing.  Just look up

16    to show that you have completed your review.

17         A.    Okay.

18         Q.    Page 142 of the document, your

19    answer is written down as "based on my

20    experience with probationary employees who have

21    committed more egregious acts and have not been

22    terminated".  Have I read that correctly?

23         A.    Yes.

24         Q.    Is that true or false that you made

25    that statement?
```

1                         J.V. MARTELLA

2          A.    It is true that I made that

3    statement?

4          Q.    Is the statement itself correct,

5    that there are other probationary employees,

6    based on your experience, that have committed

7    more egregious acts but have not been

8    terminated?

9          A.    This is a document that was signed

10   on March 13th, 2006, which is when this

11   statement was made.  At the time I could have

12   had something on my mind that I stated.  I am

13   drawing a blank right now.

14         Q.    I am not asking for specific

15   individuals, you said based on your experience.

16   Let me put it this way.

17               Is it possible you could have

18   falsely made this statement?

19         A.    I made this statement, yes.  It is

20   a sworn document by me on the statement I made,

21   yes.  We are already there.

22               MR. TALARICO:  Objection.  It is an

23               unsworn document.

24         Q.    So that's a statement you made?

25         A.    Yes.

1                      J.V. MARTELLA

2          Q.    And at the time that you made this

3     statement, based on your experience, did you

4     know of other probationary employees that had

5     committed more egregious acts that had not been

6     terminated?

7          A.    Did I know --

8          Q.    Based on your experience?

9          A.    With that question, obviously at

10    the time I had some thoughts in mind.

11         Q.    You knew of some?

12         A.    At that time, I must have.

13         Q.    Do you have examples of other

14    conduct that you would considered more

15    egregious than what was described in Akinyemi's

16    situation that you had in mind when you made

17    this statement?

18         A.    I don't remember what I was

19    thinking of at the time that I made that

20    statement.

21                MR. OKOLI:    Thank you.

22                MR. CLOPPER:    I will step outside

23            for a while with my co-counsel and will

24            be right back.

25                (Whereupon, a brief recess was

```
 1                      J.V. MARTELLA

 2          taken.)

 3          Q.    Is there anything in the unsworn

 4     declaration which you have reviewed and which

 5     was marked at today's deposition as Plaintiff's

 6     Exhibit 3 which you find to be incorrect?

 7          A.    Nothing that I see here is

 8     incorrect.

 9               MR. OKOLI:  Thank you.

10               MR. CLOPPER:  I don't have any

11          questions.

12               (Whereupon, at 4:21 p.m., the

13          Examination of this Witness was

14          concluded.)

15

16                    _____

17                    JOSEPH VINCENT MARTELLA

18

19     Subscribed and sworn to before me

20     this _____ day of _____, 20___.

21
       _____
22          NOTARY PUBLIC

23

24

25
```