1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------------------X
     YEMISI AKINYEMI,

4                                          PLAINTIFF,

5

6              -against-              Case No.
                                      07 CV 4048

7
     MICHAEL CHERTOFF, SECRETARY, DEPARTMENT OF

8    HOMELAND SECURITY,

9                                          DEFENDANTS.
     ------------------------------------------------X

10

11

12                    DATE: October 4, 2007

13                    TIME: 10:04 a.m.

14

15              EXAMINATION BEFORE TRIAL of the

16    Defendant, DEPARTMENT OF HOMELAND SECURITY,

17    by a Witness, SUSAN MITCHELL, taken by the

18    Plaintiff, pursuant to a Court Order, held

19    at the law offices of K.C. Okoli, Esq., 330

20    Seventh Avenue, 15th floor, New York, New

21    York 10001, before Lieng Boua, a Registered

22    Professional Reporter and Notary Public of

23    the State of New York.

24

25

1

2    A P P E A R A N C E S:

3

4        LAW OFFICES OF K.C. OKOLI, ESQ.
                 Attorney for the Plaintiff
5                330 Seventh Avenue, 15th Floor
                 New York, New York 10001

6

7

         U.S. DEPARTMENT OF HOMELAND SECURITY
8                One Penn Plaza 11th Floor
                 New York, New York 10019
9                BY: KIMBERLY MORGAN, ESQ.

10

11       U.S. DEPARTMENT OF JUSTICE
         U.S. ATTORNEY'S OFFICE
12       SOUTHERN DISTRICT OF NEW YORK
                 86 Chambers Street
13               New York, New York 10007
                 BY: JOHN D. CLOPPER, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

1

2    S U S A N   M I T C H E L L, called as a

3    witness, having been first duly sworn by a

4    Notary Public of the State of New York, was

5    examined and testified as follows:

6    EXAMINATION BY

7    MR. OKOLI:

8         Q.    Please state your name for the

9    record.

10        A.    Susan Mitchell.

11        Q.    What is your business address?

12        A.    One Penn Plaza, Suite 11-0, New

13    York, New York 10119.

14        Q.    Good morning, Ms. Mitchell.  As

15    you know, we met before.  My name is K.C.

16    Okoli, and I represent Ms. Akinyemi in this

17    lawsuit.  I am going to be asking you a couple

18    of questions.

19             If at any time you don't hear a

20    question or you do not understand, please let

21    me know.  If you wish to take a break for any

22    reason during the course of the deposition,

23    you are entitled to do so.

24             Who is your current employer?

25        A.    The Department of Homeland

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                    MITCHELL
 2   Security, U.S. Customs and Border Protection.
 3        Q.    Since when did you become employed
 4   by your present employer?
 5        A.    The Department of Homeland
 6   Security was created on March 1st, 2003.  That
 7   is when I became an employee of Customs and
 8   Border Protection.
 9        Q.    Did you work for a predecessor
10   organization before that?
11        A.    (No response.)
12        Q.    Did you work for a predecessor
13   organization before that?
14        A.    Yes, I did.  I worked for the
15   United States Customs Service.
16        Q.    So in total, how many years have
17   you worked for United States Customs and then
18   Customs and Border Protection?
19        A.    From February 1978.
20        Q.    Okay.  What is your current job
21   title?
22        A.    I am the director of field
23   operations for the New York office of Customs
24   and Border Protection.
25        Q.    Since when did you become the
```

```
 1                    MITCHELL
 2   director of field operations?
 3        A.      In July of 2002 under the U.S.
 4   Customs Service, I became the director of
 5   field operations and that carried over into
 6   the Customs and Border Protection.
 7        Q.      And for the record, what is your
 8   race?
 9        A.      I am white.
10        Q.      And what is your national origin?
11        A.      I am Irish American.
12        Q.      What is your highest level of
13   education?
14        A.      I have a BA from St. Francis
15   College.
16        Q.      Where is St. Francis College
17   located?
18        A.      In Brooklyn.
19        Q.      When did you own that BA degree?
20        A.      In 1978.
21        Q.      And what was the major?
22        A.      Economics.
23        Q.      Do you know a Sharmila Haq, H-a-q?
24        A.      I do know that name.
25        Q.      Could you tell us briefly how you
```

```
 1                    MITCHELL
 2  came to know that name?
 3        A.    In the course of this complaint,
 4  her name was raised as an employee who had
 5  been treated differently.
 6        Q.    When you say she is an employee,
 7  she is an employee of Customs and Border
 8  Protection?
 9        A.    Correct.
10        Q.    Is she still working for Customs
11  and Border Protection?
12        A.    Yes, she is.
13        Q.    What is her current title?
14        A.    She is a Customs and Border
15  Protection officer, CBPO.
16        Q.    Do you know when she became
17  employed by the Customs and Border Protection?
18        A.    I don't know that date.
19        Q.    Do you know what year?
20        A.    No, I don't.
21        Q.    Do you know whether she passed a
22  probationary period before she became
23  permanent?
24        A.    Yes, she did.
25        Q.    As you sit here, do you know how
```

1                    MITCHELL

2    many years or what length of probationary

3    period she served?

4         A.    I don't know the term of her

5    probationary appointment.

6         Q.    When the name came up in

7    connection with the present lawsuit, what, if

8    anything, did you do?

9              MR. OKOLI:   Strike that.

10        Q.    When you say her name came up,

11   what was it?  What connection did her name

12   come up?

13        A.    I was advised by the EEO manager

14   that your client had, in her complaint to the

15   EEO manager, had raised her name as an

16   employee who had been treated differently.

17        Q.    Would you be able to determine

18   more specifically in what way my client

19   alleged she was treated differently?

20        A.    Based on a conversation with

21   Mr. Angevine, there was a claim that she had

22   been involved in some misconduct during her

23   probationary period.

24        Q.    And did you learn what misconduct

25   it was that she was involved in?

```
 1                    MITCHELL
 2        A.    Yes, I did.
 3        Q.    What was it that you learned?
 4        A.    What I had learned was that
 5   several months earlier while she was still in
 6   her probation, there was an incident with her
 7   weapon.
 8        Q.    And what did you --
 9              MR. CLOPPER:  Mr. Okoli, if I may
10         for a second, I just want to point out
11         that we will designate portions of the
12         transcript that are confidential under
13         the confidentiality order once the
14         transcript has been generated; but just
15         for the record now, we will deem this
16         entire line of questioning about Sharmila
17         Haq to be confidential under the
18         confidentiality order.
19              MR. OKOLI:  But my time to make an
20         application will not come up until you
21         make a formal designation because I
22         can't -- I mean, we don't have the
23         transcript.  I can't approach the judge
24         to determine confidentiality when I don't
25         have anything before me.
```

```
 1                       MITCHELL
 2            MR. CLOPPER:  Sure, yes.
 3            MR. OKOLI:  I just wanted to be
 4       clear on that.  I understand what your
 5       objection is but the point I am making is
 6       that my 14 days does not start running
 7       until you give me the transcript in which
 8       it's designated to be confidential.
 9            From that point, that is when I
10       can confirm the confidentiality.  Fair
11       enough?
12            MR. CLOPPER:  Yes, I think that is
13       fair enough.
14       Q.    So what was it that you learned
15   concerning Ms. Haq's weapon?
16       A.    That, again, several months
17   earlier from the time when I found out, she
18   had left her weapon in a restroom.
19       Q.    And did you know where the
20   restroom was?
21       A.    At one of the terminals at Newark
22   Airport.
23       Q.    Was this her service revolver?
24       A.    Yes, it was.
25       Q.    Was this restroom a public
```

```
 1                    MITCHELL
 2   restroom?
 3         A.     It was.
 4         Q.     Let me put it this way.  Was it a
 5   private restroom?
 6         A.     It was for the use of airport
 7   employees, CBP, and other airplane employees.
 8               MR. CLOPPER:  I object to this
 9         line of questioning on lack of personal
10         knowledge.
11               MR. OKOLI:  I am trying to find
12         out what she found.
13         Q.     Who was it that you spoke with
14   that gave you this information?
15         A.     It was part of a report of
16   investigation.
17         Q.     When you say "part of a report of
18   investigation," what report?
19         A.     After the allegations were made, I
20   asked for someone to look into these
21   allegations; and based on that, there was a
22   report that was prepared as part of a
23   disciplinary process.
24         Q.     Was this report an original
25   report?
```

```
 1                    MITCHELL
 2        A.     I --
 3        Q.     I mean, the report you said that
 4   was prepared, was it a verbal report or
 5   something in writing?
 6        A.     It was part of the discipline
 7   package.  I believe it was a written report.
 8        Q.     Who was it that you asked to
 9   investigate the allegation?
10        A.     The area director.
11        Q.     Who was the area director that you
12   asked to do this?
13        A.     Kathleen Haage.
14        Q.     How soon after you learned of this
15   allegation did you ask Ms. Haage to
16   investigate the allegation?
17        A.     Either the same day or the
18   following day, within 24 hours of the
19   allegation coming to my attention.
20        Q.     And how long did it take for
21   Ms. Haage to present you with a report, with
22   her report?
23        A.     I don't recall specifically.
24        Q.     Can you give us an estimation of
25   time?  Less than one month, more than one
```

1                    MITCHELL

2    month?

3        A.    I really did not specifically look

4    this case up, so I don't know.

5        Q.    Let me ask you this.  When did you

6    learn that you would be questioned at this

7    deposition?

8        A.    I don't know.  Um, probably two

9    weeks ago.

10       Q.    At the time, you knew that the

11   questioning would relate to Ms. Akinyemi in

12   this case, this particular case?  You knew

13   that; correct?

14       A.    Correct.

15       Q.    From then to now, did you review

16   any documents in connection with this case?

17       A.    Yes.  I reviewed Ms. Akinyemi's

18   case file.

19       Q.    What documents do you recall

20   reviewing?

21       A.    I recall reviewing the removal

22   letter and the statements that supported the

23   removal letter.

24       Q.    When you say "removal letter,"

25   what does that mean?

1                    MITCHELL

2          A.      The letter that I signed to

3    terminate Ms. Akinyemi to remove her from

4    service.

5          Q.      Was that the only thing that you

6    reviewed?  Did you review her letter and

7    the -- what else did you say you reviewed?

8          A.      The supporting documentation for

9    that -- the statements that were prepared as

10   supporting documentation for that removal

11   action.

12         Q.      When you say "statements that were

13   prepared," can you be more explicit about the

14   statements that you are talking about to the

15   extent that you can recall them?

16         A.      Yes.  I reviewed the statements

17   made by the officers the night of the

18   incident, of the supervisor the night of the

19   incident, of Ms. Akinyemi, two of her

20   statements or her two statements, excuse me,

21   and of another supervisor who had been her

22   supervisor that day of the incident.

23         Q.      Okay.

24         A.      Those are the statements that I

25   reviewed.

1                         MITCHELL

2          Q.     Do you recall the names of the

3    supervisors?

4          A.     I read the statements by Mitch

5    Landau and statements by -- one that was

6    Ms. Akinyemi's statement that was signed by

7    Ms. Akinyemi and Supervisor Calise and I read

8    a statement by Supervisor Herb Herter.

9          Q.     As you sit here today, do you know

10   whether an investigative file was created in

11   connection with this case?

12         A.     As far as I know, that is the

13   entire file.

14         Q.     Did you review the investigative

15   file?

16                MR. CLOPPER:  I will object on

17         vague and ambiguous grounds.  Which

18         investigative file do you mean?  You mean

19         the EEOC investigative file or the file

20         that she reviewed as part of the decision

21         to terminate Ms. Akinyemi?

22         Q.     You said you spoke with

23   Mr. Angevine; correct?

24         A.     I did speak with Mr. Angevine.

25         Q.     Who is Mr. Angevine?

```
 1                        MITCHELL

 2          A.     The EEO program manager.

 3          Q.     Are you aware that Ms. Akinyemi

 4   filed a formal charge with the EEOC?

 5          A.     Yes, I am.

 6          Q.     Do you know that an investigative

 7   file was generated as a result of that charge?

 8          A.     I don't know.  I've never seen

 9   one, but.

10          Q.     As you sit here, you've never seen

11   one?

12          A.     An investigative file for EEOC,

13   no, I never saw an investigative file.

14          Q.     Did you see an investigative file

15   generated by the U.S. Customs and Border

16   Protection?

17               MR. CLOPPER:  Objection,

18          ambiguous.  Are we speaking of

19          Ms. Akinyemi or Ms. Haq?

20               MR. OKOLI:  Ms. Akinyemi.

21          A.     Again, I guess -- can I ask a

22   clarifying question?  Are we talking about the

23   discipline file or the EEOC file?

24          Q.     I'm talking, are you aware of any

25   investigation that was conducted by the
```

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                   MITCHELL
 2   Customs and Border Protection after
 3   Ms. Akinyemi had filed a charge of
 4   discrimination?
 5        A.    I have seen no investigative file
 6   relative to the charge of discrimination.
 7        Q.    Did you provide an unsworn
 8   statement as part of the investigation of
 9   Ms. Akinyemi's claim of discrimination?
10        A.    Yes, I did.
11        Q.    Who did you provide that unsworn
12   statement to?
13        A.    I believe the investigator was
14   Janice Campbell.
15        Q.    Now, the question is, between the
16   time you provided that unsworn statement and
17   today, have you ever seen an investigative
18   file that was generated by Ms. Campbell?
19        A.    No.
20        Q.    Back to Ms. Haq, what did you
21   learn in connection with Ms. Haq's weapon
22   being left at the bathroom or in a bathroom?
23        A.    Was your first word "when" or
24   "what"?
25        Q.    What.
```

1                          MITCHELL

2          A.      Okay.  I learned that she did

3    indeed leave her weapon in the restroom.

4          Q.      Did you find out who it was that

5    was supervising her at the time?

6          A.      Yes, I did.

7          Q.      Did you speak with whoever was her

8    supervisor at the time?

9          A.      I did.

10         Q.      And who was that supervisor at the

11   time?

12         A.      Her supervisor?  I have to correct

13   myself.  I don't know -- I did not speak to

14   her supervisor.

15         Q.      Did you ask why the information

16   was not brought to your attention?

17         A.      Yes.

18         Q.      What did you learn was the reason

19   that the information was not brought to your

20   attention?

21         A.      I learned that there were two

22   officers involved in finding the weapon.  I

23   learned that a supervisor was involved in that

24   and that -- that is what I learned.

25         Q.      Did you learn whether the officers

1                    MITCHELL

2    that found the weapon made a report of it to

3    their supervisor?

4         A.     I did find out about that.

5         Q.     What did you find out is what I am

6    asking?  Did you then find out that the person

7    who found the weapon actually reported it?

8         A.     I found that they did not, for

9    several months, report it.

10        Q.     The people who found it did not

11   report it for several months?

12        A.     Correct.

13        Q.     Did you learn when they then

14   reported it?

15        A.     Several months later.

16        Q.     But how many months before

17   Ms. Akinyemi's issue came up?

18        A.     I don't know the exact time line

19   but it was before Ms. Akinyemi's issue came up

20   that they reported it to a supervisor.

21        Q.     Did you find out from them why it

22   took several months for them to report it at

23   the time that they did?

24        A.     I did find out.

25        Q.     What did you find out?

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

19

```
1                    MITCHELL
2        A.    They decided to take care of it
3    themselves.
4        Q.    What are the names of these people
5    who decided to take care of it themselves?
6        A.    CBPO Wescott.
7        Q.    Wescott, can you spell that?
8        A.    W-e-s-c-o-t-t.
9        Q.    Okay.
10       A.    And there's another individual
11   whose name is escaping me right now.
12       Q.    Is that individual's name a
13   female?
14       A.    Male.
15   _____
16       Q.    We will leave a space in the
17   transcript so you can provide the name of that
18   person.
19            MR. CLOPPER:  She is answering
20       that she does not know, but we will
21       respond to it in an appropriate discovery
22       request for that information.
23            MR. OKOLI:  She said the name is
24       escaping her.
25            Can you read back the answer?
```

```
 1              MITCHELL
 2         That is what she said.  The name
 3    is escaping her, so we are leaving a
 4    space for her to check the name and put
 5    it in the transcript.
 6         MR. CLOPPER:  No.  She stated she
 7    does not remember the name.  That is her
 8    answer.  We will respond to an
 9    appropriate discovery request.
10         MR. OKOLI:  She does not remember
11    the name.  We will still leave a space.
12    I will not get into an argument with you
13    on this.  The record will say what it
14    says.
15         What I heard her say is, the name
16    escapes her at the moment.  We are
17    leaving a space if it occurs to her or
18    she has a document that she can look at
19    and fill in.
20    Q.    Do you have a document where this
21    person's name would appear?
22    A.    Yes.  There is a file that would
23    have that person's name.
24    Q.    So I ask you to make a search of
25    that file, and then we will leave a space in
```

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1              MITCHELL
 2   the transcript so that you can put in the name
 3   of this person.
 4              Mr. Wescott -- it is Mr. Wescott;
 5   right?
 6      A.    Yes, it is.
 7      Q.    What is Mr. Wescott's race?
 8      A.    He is white.
 9      Q.    The other person that you talked
10   about that you said is a female, what is her
11   race?
12              MR. CLOPPER:  Objection.  I think
13         she said it was a male.
14              MR. OKOLI:  I am sorry.
15      Q.    The male who had decided to take
16   care of this situation was Mr. Wescott.  What
17   is his race?
18      A.    White.
19      Q.    By the way, what is Ms. Haq's
20   race?
21      A.    Black.
22      Q.    When you say "black," black as in
23   African-American?
24      A.    Yes, yes.
25      Q.    Did you actually see Ms. Haq?
```

1                    MITCHELL

2    Have you ever seen Ms. Haq?

3         A.    Yes, I have.

4         Q.    Did you ask Ms. Haq her race?

5         A.    No, I did not.

6         Q.    Would you know whether Ms. Haq is,

7    in fact, of Asian origin?

8         A.    Asian?

9         Q.    Asian, A-s-i-a-n.

10        A.    I don't know what her -- if she is

11   Asian.

12        Q.    Could you describe Ms. Haq for us,

13   please, her physical features?

14        A.    She is about my height, which I

15   guess is about five-five, heavy-set, not as

16   heavy-set as I, and black.

17        Q.    Approximately how much weight

18   would you say?  What would you say she

19   weighed?

20              MR. CLOPPER:  Objection.

21              MR. OKOLI:  Objection doesn't mean

22         she cannot answer the question.  Place

23         your objection unless you are instructing

24         the witness not to answer.

25              Are you instructing the witness

```
 1                    MITCHELL

 2        not to answer?

 3              MR. CLOPPER:  She can answer, I

 4        mean.

 5              MR. OKOLI:  Then that is okay.

 6        Q.    Go ahead and answer.

 7        A.    I have no idea what her weight is.

 8        Q.    Do you know the color of her eyes?

 9   You have seen her; right?

10        A.    We met.  I did have a meeting with

11   her.

12        Q.    Okay.  Color eyes?

13        A.    I don't know.

14        Q.    Hair, what kind of hair?

15        A.    She was in uniform so her hair was

16   put up.  I don't know.

17        Q.    Skin color?

18        A.    Again, black.

19        Q.    As you sit here today, do you know

20   whether Ms. Haq was born in Nigeria?

21        A.    I do not know where Ms. Haq was

22   born.

23        Q.    And you didn't ask her?

24        A.    No.  I would not.

25        Q.    What was the purpose of your
```

```
 1                    MITCHELL
 2   meeting with Ms. Haq?
 3        A.     It was part of a discipline
 4   process.
 5        Q.     When you say "part of a discipline
 6   process," specifically what was it that you
 7   met her for?
 8        A.     It was during her oral apply to
 9   her proposed disciplinary action.
10        Q.     Did you invite her to come and
11   make an oral reply?
12        A.     It is part of our process.
13        Q.     I am not asking what the process
14   is.  I am asking you.  Did you invite her to
15   come and make an oral reply?
16        A.     No, I did not personally invite
17   her to come and make an oral reply.
18        Q.     Did you ask someone on your behalf
19   to invite her so you could meet with her to
20   make an oral reply?
21        A.     I did not ask anyone to invite her
22   for an oral reply.
23        Q.     How did she know to come and make
24   an oral reply before you?
25        A.     Because part of our procedure
```

```
 1              MITCHELL
 2   during the discipline process, in her proposal
 3   letter, she is advised of her ability to make
 4   an oral reply.
 5        Q.    And did she then communicate to
 6   you that she wanted to make an oral reply?
 7        A.    No.   They go through labor and
 8   employee relations.
 9        Q.    Now, in making this oral reply,
10   was it just to you or to a panel of which you
11   were a member?
12        A.    It was just to me.
13        Q.    So how did you learn that she was
14   going to appear before you to make an oral
15   reply or she just walked into your office?
16        A.    As it tells her in her letter, she
17   contacts labor and employee relations and that
18   office contacts my assistant and they set up
19   an appointment.
20        Q.    So your office was contacted to
21   set up an appointment for her to come and meet
22   with you?
23        A.    Correct.
24        Q.    Did you ask her any questions when
25   she came to meet with you?
```

```
 1                      MITCHELL
 2        A.     I don't have the transcript in
 3   front of me.
 4        Q.     When you say "transcript," was the
 5   transcript of the interview between you and
 6   her created?
 7        A.     Correct.  For all oral replies, we
 8   have a transcript created.
 9        Q.     When you say "a transcript," is
10   this tape-recorded or is it taken
11   stenographically, this way?
12        A.     A stenographer, a court reporter
13   is there with the employee, their
14   representative.
15        Q.     Did she come with anyone else?
16        A.     Yes, her union representative.
17        Q.     Do you recall which union
18   representative she came with?
19        A.     Larry Tancredi.
20        Q.     And how long did her oral reply
21   take?
22        A.     I don't recall exactly.
23        Q.     Less than an hour?
24        A.     We don't have a time limit.  I
25   don't know how long it took.
```

```
 1                       MITCHELL
 2          Q.      Where did this take place?
 3          A.      Her oral reply was in a conference
 4    room at One Penn Plaza.
 5          Q.      And other than you, the
 6    stenographer, Mr. Tancredi and Ms. Haq, was
 7    anyone else in the conference room with you?
 8          A.      Yes.  Labor and employee relations
 9    was either there in person or by telephone.
10    In this case, I believe it was by phone.  By
11    the way, her name was not Haq at the time.
12          Q.      I'm sorry?
13          A.      She had changed her name by that
14    time.
15          Q.      What is the present name?
16          A.      Z-a-m-a-n.
17          Q.      Z-a-m-a-n?
18          A.      Yes, correct, Zaman.
19          Q.      At the time of her probation, she
20    was Haq?
21          A.      Correct.
22          Q.      As you sit here today, do you know
23    if Zaman is her married name or just a name
24    she just changed to?
25          A.      That is her married name.
```

1                       MITCHELL

2                  MR. OKOLI:  By the way, we will

3           ask for a transcript of Ms. Haq's oral

4           reply.

5                  MR. CLOPPER:  Sure.  As we've done

6           in the deposition of your client, I ask

7           that all these requests be placed in

8           writing.

9           Q.     Do you recall whether it was a

10   question-and-answer session or you just let

11   her talk?

12          A.     The oral reply is set up where the

13   employee and their representative just talk.

14          Q.     As you sit here today, do you

15   recall some of the things she talked about?

16          A.     Yes, I recall some of the things

17   she talked about.

18          Q.     What do you recall?

19          A.     I recall that, when she was

20   notified that her weapon was found, she

21   immediately asked if she should call the

22   police or a supervisor.

23          Q.     And then who did she ask that

24   question?

25          A.     That was asked of the officer

```
 1                    MITCHELL
 2    whose name I -- I am sorry.  I can't remember
 3    that officer's name as I sit here today.
 4         Q.      That is the officer who found the
 5    weapon?
 6         A.      Correct.
 7         Q.      And what did she say she was told
 8    when she asked the question whether she should
 9    call a supervisor or call a police?
10         A.      She was told by this officer that
11    he would handle it the following day and that
12    she should continue on her way home and he
13    would handle it the next day.
14         Q.      Was she given back her weapon on
15    that day?
16         A.      The next day.
17         Q.      The next day.  So another officer
18    kept her weapon overnight?
19         A.      Correct.  It was locked up.
20         Q.      And that officer whose name you
21    don't remember apparently did not take care of
22    it the next day?
23         A.      (No response.)
24         Q.      You said the officer said he would
25    take care of it?
```

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                    MITCHELL
 2        A.     Correct.
 3        Q.     Apparently he did not?  It wasn't
 4   reported to anyone?
 5        A.     It was not reported, correct.
 6        Q.     And when it was reported, do you
 7   know the name of the supervisor that it was
 8   reported to?
 9        A.     Yes.
10        Q.     What is the name of the
11   supervisor?
12        A.     Carol Fowlkes, F-o-w-l-k-e-s.
13        Q.     And what did you learn Carol
14   Fowlkes did when this was reported to her?
15        A.     She counseled the two employees
16   who reported it to her and did nothing else at
17   that time.
18        Q.     And the report that was made by
19   these employees, was it a verbal report or a
20   written report?
21        A.     Verbal.
22        Q.     The counseling that was done by
23   Fowlkes when it was reported to her, was it
24   memorialized?
25        A.     Not at the time.
```

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

1                      MITCHELL

2          Q.      Was it subsequently memorialized?

3          A.      Yes, it was.

4          Q.      What time elapsed from the time it

5     was reported to her to the time it was

6     memorialized?

7          A.      A long time, many months.

8          Q.      When you say "many months," do you

9     know why -- did you find out from her why it

10    took many months for her to memorialize what

11    was reported to her months earlier?

12         A.      She decided that, because time had

13    elapsed, that she just talked to the employees

14    and did nothing with it.  When I asked that

15    this be investigated or looked into, the

16    allegations by your client, that's when she

17    memorialized it in her statements relative to

18    that review.

19         Q.      Okay.  Just to be clear, as you

20    sit here today, are you aware of any documents

21    that exist within Customs and Border

22    Protection memorializing this incident or

23    anything anybody did about this incident

24    before my client raised the issue?

25         A.      I am not aware of any

```
 1                    MITCHELL
 2   documentation prior to your client raising the
 3   issue.
 4        Q.    Okay.  What is Ms. Fowlkes' race?
 5        A.    Black.
 6        Q.    Do you know Ms. Fowlkes' national
 7   origin?
 8        A.    No, I don't.
 9        Q.    Do you know whether she was born
10   in Nigeria?
11        A.    I do not know where Ms. Fowlkes
12   was born.
13        Q.    Subsequent to the oral response of
14   Ms. Haq, did you take any action?
15        A.    Yes, I did.
16        Q.    What action did you take?
17        A.    She was suspended.
18        Q.    For how long did you suspend her?
19        A.    She was suspended for three days.
20        Q.    Three days?
21        A.    Correct.
22        Q.    At which airport did she leave
23   this gun?
24        A.    Newark Airport.
25        Q.    And you said there are people
```

```
 1                      MITCHELL
 2    other than customs personnel that could access
 3    this airport bathroom; correct?
 4         A.       Correct.
 5         Q.       Could you give me an example of
 6    some of the people who could access that
 7    airport bathroom who are not CBP employees?
 8         A.       The airline representatives.
 9         Q.       And anyone who could go past
10    security?
11         A.       Any employee.  It was not in a
12    public area but it was in an area that airport
13    employees could if they had access to that
14    particular security area.
15         Q.       When you say "an area," could you
16    be more specific about this area?  Was it a
17    restricted area?
18         A.       It was a federal inspection site.
19         Q.       A federal inspection site?
20         A.       Yes, restricted from the public.
21         Q.       Did she explain what caused her to
22    leave the gun in that area?
23         A.       When she went to the ladies' room,
24    she left it there.  She took it off and left
25    it there.
```

1                        MITCHELL

2        Q.      This is a weapon that she is

3    supposed to be wearing on herself; correct?

4        A.      Correct.

5        Q.      Did she say where she went after

6    she left the ladies' room?

7        A.      Immediately into her car and went

8    home.  It was the end of her tour.

9        Q.      So when was it that she had this

10   conversation with the officers who found the

11   gun?

12       A.      The officer who found the gun

13   called her on her cell phone as she was

14   driving home.

15       Q.      So even as she was driving home,

16   she was unaware she had left her gun?

17       A.      Correct.

18       Q.      Now, do you know who a Jolanta

19   Gluba is?

20       A.      Yes, I do.

21               MR. CLOPPER:  Mr. Okoli, we also

22          designate this, once we get the

23          transcript, confidential.

24               MR. OKOLI:  It is a continuing

25          objection.  You don't have to repeat it.

```
 1                      MITCHELL
 2      When you get the transcript, designate
 3      it.  My time does not start running until
 4      after I get the transcript.
 5              MR. CLOPPER:  Very well.
 6      Q.     Who is Jolanta Gluba?
 7      A.     A CBPO, Newark Airport.  We will
 8 leave it airport.
 9              MR. CLOPPER:  Of course, we also
10      have a standing objection to the
11      relevance of these.
12              MR. OKOLI:  Okay.
13      Q.     Just quickly, at the time of her
14 probation, was Officer Haq someone who was
15 within your area of authority?
16      A.     During her probation period?
17      Q.     Yes.
18      A.     Yes.
19      Q.     And what about Officer Gluba?  Is
20 she somebody within your area of authority?
21      A.     Yes.
22      Q.     Do you know when she was employed
23 by Customs?
24      A.     No.
25              MR. CLOPPER:  I will just object;
```

```
1                    MITCHELL
2         ambiguous.  Are you asking about --
3         Q.    Is she somebody employed within an
4    area covered by you as the director of field
5    operations for Newark Airport?
6         A.    Yes.  As the director of field
7    operations, I would be considered her
8    sixth-line supervisor.
9         Q.    Thank you.  The same question
10   applies to Jolanta Gluba.  Is she somebody
11   within your --
12        A.    Correct, sixth line.
13        Q.    Very well.  How did you learn
14   about Jolanta Gluba?
15        A.    I don't recall.
16        Q.    As you sit here today, do you know
17   whether my client made an allegation that
18   Ms. Gluba was treated differently from her?
19        A.    I don't know if that was on the
20   list of names that Mr. Angevine gave me or
21   not.
22        Q.    As you sit here today, what do you
23   recall of Ms. Gluba?
24        A.    I know her name because she was
25   out for quite some time.  She was in a car
```

```
 1                    MITCHELL
 2   accident on government time, so I know her
 3   name from that.  That's my only personal
 4   interaction with Ms. Gluba's name.  I never
 5   met her.
 6          Q.    When you say she was out for a
 7   long time, how did that come to your attention
 8   that she was out for a long time?
 9          A.    When an employee gets hurt on the
10   job or in a government vehicle -- she was very
11   hurt.  She was extremely critical at one
12   time -- I am notified.
13          Q.    Did you ever see Ms. Gluba face to
14   face?
15          A.    No.  As I said, I never met her.
16          Q.    Do you know her race?
17          A.    No, I don't know her race.
18          Q.    In the course of your
19   investigating aspects of this underlying case,
20   either my client's case or the allegations
21   relating to Haq, did you come by the name of
22   Gluba?
23              MR. CLOPPER:  Objection.
24         Attorney-client privilege.
25              MR. OKOLI:  Attorney-client
```

```
 1                    MITCHELL
 2          privilege?
 3                    MR. CLOPPER:  Yes.  To the extent
 4          you are asking her to reveal
 5          conversations between herself and her
 6          attorney, me, I am objecting and
 7          instructing her not to answer.
 8                    MR. OKOLI:  I am not asking her to
 9          reveal conversations.  I am saying
10          whether she came by the name other than
11          in the context of this incident that she
12          talked about.
13                    MR. CLOPPER:  She can answer how
14          she came by the name to the extent it
15          doesn't reveal attorney-client
16          conversations.
17          Q.    Can you answer the question,
18     please?
19          A.    I don't recall.
20          Q.    As you sit here today, do you know
21     whether my client alleged that Ms. Gluba
22     revealed sensitive government information to
23     members of the public?
24          A.    Yes.  I think that is what
25     Mr. Angevine said.
```

```
 1                    MITCHELL
 2       Q.     And did you investigate that issue
 3    whether or not Ms. Gluba revealed sensitive
 4    government information to members of the
 5    public?
 6       A.     I asked the area director to look
 7    into that allegation as well.
 8       Q.     What was the outcome of that?
 9       A.     There was nothing that was brought
10    to my attention in that case.
11       Q.     The area director you are talking
12    about is Kathleen Haage?
13       A.     Yes.
14       Q.     So no one advised you as to
15    whether or not Ms. Gluba revealed government
16    information to members of the public?
17       A.     I know there was an allegation.
18    Now that you have refreshed my memory, I know
19    it was looked into and it was not raised to me
20    as an open issue.
21       Q.     But you asked somebody to
22    investigate it?
23       A.     I asked Ms. Haage to investigate
24    that, correct.
25       Q.     Did you ask Ms. Haage for the
```

```
 1                    MITCHELL
 2   result of her investigation?
 3        A.     I was advised that the case was
 4   closed.
 5        Q.     Did you ask her why the case was
 6   closed?
 7        A.     No, I did not.
 8        Q.     Did she tell you?
 9        A.     I believe it was handled at her
10   level, handled at the level below me.
11        Q.     But the question is this:  She did
12   not take action of her own volition?  You
13   instructed her to take action to look into the
14   matter?
15        A.     To look into the matter, yes.
16        Q.     And you didn't ask her whether or
17   not the matter you asked her to look into was
18   proven or not proven?
19        A.     She told me it was taken care of,
20   that it had been reviewed.
21        Q.     Did you understand that it was not
22   established or that it was established?  What
23   was your understanding?
24        A.     My understanding was that an
25   incident did occur and it was handled at a
```

```
 1                    MITCHELL
 2   level lower than myself.
 3        Q.     Your understanding was that an
 4   incident occurred?
 5        A.     Correct.
 6        Q.     What did you understand occurred?
 7   What incident, quote-unquote, did you
 8   understand occurred?
 9        A.     I never got a copy of the case
10   file because I was advised that any actions
11   that needed to be taken were already handled
12   below me.
13        Q.     And the person who handled it
14   below you is somebody you supervised; correct?
15        A.     Yes.
16        Q.     When you say it was handled, what
17   specifically do you mean?
18        A.     I was advised by my senior manager
19   that it was handled.
20        Q.     Okay.  And did you get the sense
21   of whether or not Ms. Gluba was disciplined
22   for it or not?
23        A.     I got the sense that there was
24   discipline taken.
25        Q.     What discipline did you learn was
```

```
 1                    MITCHELL
 2    taken?
 3         A.    I don't know the results.
 4         Q.    As you sit here today, you still
 5    don't know the results?
 6         A.    Not from my conversation with
 7    Ms. Haage.  I do not know the results.
 8         Q.    Regardless of what -- I'm saying
 9    as you sit here today, you don't know the
10    results.  Is that correct?
11         A.    Any knowledge that I might have
12    was based on a conversation with my attorney.
13         Q.    When you say based on a
14    conversation with your attorney, let me ask
15    you this.  Did you ever learn that your
16    attorney was present when the incident
17    involving Gluba occurred?
18         A.    Not that I know of.
19         Q.    Did you learn that your attorney
20    ever spoke with Haage?
21         A.    Not that I know of.
22         Q.    The investigation that was
23    conducted was conducted within Customs and
24    Border Protection; correct?
25         A.    Correct.
```

```
 1                    MITCHELL
 2        Q.    And your attorney was given
 3   information from Customs and Border
 4   Protection?
 5              MR. CLOPPER:  Objection.  Lack of
 6         personal knowledge.  She doesn't know
 7         where the attorney got the information.
 8              MR. OKOLI:  You don't have to give
 9         a speaking objection.
10        Q.    Now, do you have any reason to
11   believe that your attorney had personal
12   knowledge of what happened to Gluba?
13        A.    Yes.  I believe my attorney has
14   personal knowledge of what happened or has
15   knowledge of it.  I don't know.
16        Q.    I am asking you -- please listen
17   to the question.
18        A.    I don't understand the question.
19              MR. CLOPPER:  Mr. Okoli, hold on a
20         second.  I object and --
21              MR. OKOLI:  No, no.  If you have
22         an objection, put your objection but --
23              MR. CLOPPER:  My objection is,
24         you're inquiring into attorney-client
25         communications.  It is privileged, and
```

```
 1                      MITCHELL
 2         she told you she has no knowledge of
 3         Ms. Gluba's discipline.
 4               MR. OKOLI:  Okay.
 5               MR. CLOPPER:  There's documents
 6         that bear on this issue.  I am not quite
 7         sure where we are going with this.
 8         Q.    Just to be clear, you asked
 9    Ms. Haage to look into the allegation that
10    Ms. Gluba had revealed sensitive government
11    information; correct?
12         A.    Correct.
13         Q.    And you never found out
14    specifically from Ms. Haage what her
15    conclusion was as a result of the
16    investigation?
17         A.    I didn't say that.
18         Q.    Did you find out from Ms. Haage
19    what she found as a result of her
20    investigation?
21         A.    Yes, I did.
22         Q.    What did she tell you she found?
23         A.    That sensitive information was not
24    revealed to members of the traveling public.
25         Q.    Did you say that some discipline
```

```
 1                    MITCHELL

 2   was given to Gluba?

 3        A.     Yes, I did.

 4        Q.     What was the basis for the

 5   discipline that was given to Gluba if no

 6   information was revealed to the traveling

 7   public?

 8        A.     I don't have a copy of the file.

 9   I never saw the file.  I don't know what the

10   charges were.  It was handled at a level below

11   me.

12        Q.     You never asked to see the

13   charges?

14        A.     Absolutely not.

15        Q.     Is Ms. Gluba still working for the

16   Customs?

17        A.     To my knowledge, yes.

18        Q.     If it were true that Ms. Gluba

19   reviewed sensitive information to the public

20   at a time that she was on probation, will

21   that, in your judgment, merit a termination?

22        A.     I would have to see the entire

23   case file and find out the circumstances.  I

24   don't make broad-based decisions.

25        Q.     I am asking you a hypothetical
```

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

1              MITCHELL

2    question.  My question is, let's say -- I am

3    not saying it happened.  You said it did not

4    happen.  There was no revelation of sensitive

5    information.  That's your answer.

6              Then my question is, if indeed

7    there were revelations of sensitive

8    information by this probationary employee to a

9    member of the public, would that, in and of

10   itself, be sufficient to terminate her

11   employment?

12             MR. CLOPPER:  Objection.  It is

13       unclear.

14       Q.    Did you find out from Ms. Haage

15   whether, at the time the incident was alleged

16   to have occurred, whether Ms. Gluba was on

17   probation or a permanent employee?

18       A.    Yes.

19       Q.    What did you find out?

20       A.    She was a probationary employee.

21       Q.    Now, being a probationary

22   employee, if it were established that indeed

23   she revealed information to the public that

24   shouldn't be known to the public, will that be

25   sufficient to terminate her employment during

```
 1                    MITCHELL
 2   her probation?
 3        A.    It would have to be case specific.
 4   Perhaps, perhaps not.  It is dependent on the
 5   circumstances of the case.
 6        Q.    Thank you.  Is Ms. Gluba still on
 7   probation?
 8        A.    No.
 9        Q.    By the way, what is Kathleen
10   Haage's race?
11        A.    She is white.
12        Q.    Do you know Ms. Gluba's current
13   title?
14        A.    CBPO.
15        Q.    Just to be clear, you did not
16   become aware of the claim or allegation that
17   Ms. Gluba had revealed sensitive information
18   to the public until my client raised it in the
19   course of the investigation of her claim.
20   Correct?
21        A.    Correct.
22        Q.    Now, you said Ms. Haage did this
23   investigation and told you it was handled at
24   her level.  Correct?
25        A.    Correct.
```

```
 1              MITCHELL
 2         MR. OKOLI:  Okay.  Even though I
 3    will put it in writing, I want to have
 4    every memoranda relating to Ms. Haage's
 5    investigation of Ms. Gluba's situation or
 6    the investigation by anyone else at
 7    Customs relating to the allegation of
 8    Ms. Gluba revealing sensitive
 9    information.
10    Q.    Do you know an employee by the
11 name of Elba Mendez?
12    A.    Not personally.
13    Q.    Do you know of Elba Mendez?
14    A.    Yes.
15    Q.    How did you come to know of her?
16    A.    Your client's allegations.
17    Q.    And what did you learn were my
18 client's allegations against Ms. Mendez?
19    A.    I believe that Ms. Mendez had been
20 involved in a similar situation.
21    Q.    When you say "similar situation,"
22 would you be more specific to the best that
23 you recall?
24    A.    I believe the allegation was that
25 she also met family members arriving on a
```

1                    MITCHELL

2    flight.

3         Q.    At a gate area?

4         A.    I don't know that that was part of

5    the allegation.

6         Q.    As a result of that allegation,

7    did you take any steps?

8         A.    I referred the allegations to the

9    area director.

10        Q.    And who would the area director be

11   in that case?

12        A.    Kathleen Haage.

13        Q.    Do you recall when it was that you

14   referred the allegation to the area director?

15        A.    That day or the next day when

16   Mr. Angevine gave me the list of allegations.

17   It was the exact same time.

18        Q.    When you referred this allegation

19   to Ms. Haage, did you do that by memo or was

20   it just verbal?

21        A.    Verbal.

22        Q.    Did you give her any documents in

23   connection with the verbal instruction that

24   you gave her?

25        A.    No.

```
 1                    MITCHELL

 2        Q.     What was it that you told

 3   Ms. Haage to do?

 4        A.     To look into the allegations.

 5        Q.     Did you give her a time limit

 6   within which to look into the allegations?

 7        A.     No.

 8        Q.     Do you know whether she looked

 9   into the allegations?

10        A.     I trust that she did, yes.

11        Q.     Did you find out from her what she

12   found as a result of looking into the

13   allegations?

14        A.     I don't know of any results.

15        Q.     So she never told you the outcome

16   of the allegations?

17        A.     Not that I recall.

18        Q.     I take it there was nothing in

19   writing from Ms. Haage telling you about what

20   she did regarding Ms. Mendez?

21        A.     Correct.

22        Q.     And as you stated earlier, you

23   never wrote anything to her.  It was some kind

24   of verbal instruction to her to look into the

25   situation?
```

<pre>
 1                      MITCHELL
 2        A.      To look into the situation,
 3    correct.
 4        Q.      Did you ever question Ms. Mendez?
 5        A.      No.
 6        Q.      Did you ever ask Ms. Haage why you
 7    did not get a feedback from her regarding
 8    Ms. Mendez?
 9        A.      No.
10        Q.      If Ms. Mendez -- is Ms. Mendez
11    still employed by the CBP?
12        A.      I believe so.
13        Q.      If Ms. Mendez met relatives at a
14    restricted area, would you see a similarity
15    between that and Ms. Akinyemi's situation?
16                MR. CLOPPER:  Objection,
17            ambiguous.
18        Q.      Is the gate area a restricted area
19    at the airport for somebody who is not on
20    duty?
21        A.      The gate area is the -- are you
22    talking inbound flights or outbound flights?
23    I'm not exactly sure what you are talking act.
24        Q.      Let's deal with both.  For a
25    person, a customs officer, not on duty and not
</pre>

1                          MITCHELL

2    flying, would the gate area, the arrival gate

3    area, be a restricted area for that off-duty

4    customs officer?

5         A.    That is defined as a customs

6    restricted area, correct.

7         Q.    If it were an outbound flight and,

8    again, if a customs officer was not on duty

9    and not flying and not a passenger, would that

10   be a restricted area?

11        A.    It is restricted.  It is not a

12   customs restricted area, but it is a

13   restricted area.

14        Q.    So in a customs restricted area,

15   would it permit customs officers off duty to

16   be there?

17        A.    It would depend on the situation,

18   if they ask permission.

19        Q.    If a customs officer who is not on

20   duty did not ask permission, are they entitled

21   to be there to meet someone?

22        A.    If they did not ask permission?

23        Q.    Yes.

24        A.    Yes, they are not entitled to be

25   there if they are off duty and did not ask for

MITCHELL

1          permission.

2              Q.      Okay.  Even though this allegation

3          was made by my client, as you sit here today,

4          you do not know any specific facts as to

5          whether it happened or it didn't happen with

6          regard to Elba Mendez?

7              A.      I do not know.

8              Q.      So even as you sit here today, you

9          have no information one way or the other as to

10         whether Ms. Mendez, in the summer of 2005, met

11         relatives at --

12                     MR. CLOPPER:  Objection.  Asked

13             and answered.

14             A.      I have no knowledge.

15             Q.      Do you know Ms. Mendez's race?

16             A.      No, I don't.

17             Q.      Do you know her national origin?

18             A.      No, I don't.

19             Q.      Do you know of Gilbert Murphy?  Do

20         you know of any customs employee whose name is

21         Gilbert Pat Murphy?

22             A.      I know of that name.

23             Q.      How did you come to know of that

24         name?

```
 1                   MITCHELL
 2        A.     Your client made an allegation
 3   against him as well.
 4        Q.     Do you recall specifically what
 5   allegation my client made against him?
 6        A.     That he met family members at a
 7   crews terminal.
 8        Q.     Do you recall which crews
 9   terminal?
10        A.     No.
11        Q.     From the allegation, do you recall
12   whether my client said that she was actually
13   present and observed it herself?
14        A.     No, I don't recall that.
15        Q.     Did you investigate the
16   allegation?
17        A.     I referred it to the area
18   director.
19        Q.     The area director again would be
20   Kathleen Haage?
21        A.     Same area director.
22        Q.     And this reference was made
23   verbally?
24        A.     Correct.
25        Q.     All the references you made to her
```

1                         MITCHELL

2       in connection with investigating the

3       underlining complaints or allegations by my

4       client were done verbally?

5            A.    Yes.

6            Q.    Okay.  So in relation to that of

7       Mr. Murphy, it was also a verbal reference to

8       Ms. Haage to investigate it?

9            A.    Correct.

10           Q.    And did Ms. Haage come back to you

11      to tell you the results of the investigation?

12           A.    No.  I did not hear anything about

13      it.

14           Q.    How soon after you learned of the

15      allegation did you make this reference to

16      Ms. Haage to investigate Mr. Murphy's

17      situation?

18           A.    As I said before, all the

19      allegations were made to me by Mr. Angevine at

20      the same time and they were all referred to

21      Ms. Haage at the same time.

22           Q.    Where is Ms. Haage now?

23           A.    Retired.

24           Q.    So from the time that you referred

25      these three allegations to Ms. Haage until her

1                      MITCHELL

2    retirement, you never asked her the outcome of

3    the investigation?

4         A.    No.

5         Q.    Do you know whether Mr. Murphy, in

6    the summer of 2005, was a permanent employee

7    or a probationary employee?

8         A.    My understanding is that he was

9    not a probationary employee.  He was a

10   permanent employee.

11        Q.    As you sit here today, do you know

12   approximately how long Mr. Murphy had worked

13   for Customs?

14        A.    I have no idea.

15        Q.    As you sit here today, would you

16   expect an employee who's worked for Customs

17   for at least eight years to know that they

18   should not be in the restricted area without

19   authorization or permission?

20        A.    What did you say?  I didn't hear

21   how long.

22        Q.    Yes.  As you sit here today, do

23   you know whether an employee of Customs or

24   CBP -- when I say "Customs," I am talking

25   about CBP -- who's been employed for eight

1                          MITCHELL

2    years and is a permanent employee should know

3    not to go to a restricted area without

4    permission or authorization?

5         A.      I believe all employees should

6    know that, right.

7         Q.      Ms. Akinyemi's allegation was that

8    Mr. Murphy had gone to meet a family member at

9    a crews terminal?

10        A.      Correct.

11        Q.      When you say "crews terminal," a

12   restricted area?

13        A.      Parts of it are.

14        Q.      In either of the cases of

15   Mr. Murphy, Ms. Mendez, Ms. Haq or Ms. Gluba,

16   did you attempt to question Ms. Akinyemi?

17        A.      No.

18        Q.      Do you know whether Ms. Haage

19   attempted to question Ms. Akinyemi for more

20   detail regarding any of these allegations?

21        A.      I have no idea.

22        Q.      Did you ever question Mr. Murphy

23   about the allegations?

24        A.      No.

25        Q.      So as you sit here today, you

```
1                      MITCHELL
2    still have not questioned Mr. Murphy regarding
3    this allegation?
4         A.    No.
5         Q.    And you don't have any report back
6    from Ms. Haage as to what she found out as a
7    result of her investigation?
8         A.    No.
9         Q.    Okay.  Just quickly to go back,
10   you never met and spoke with Ms. Gluba
11   regarding the allegation.  Correct?
12        A.    No, I did not.
13        Q.    And you did not meet and speak
14   with Ms. Mendez regarding the allegation
15   against her either?
16        A.    No, I did not.
17        Q.    How did you come to learn about
18   Ms. Akinyemi?
19        A.    Say that again?
20        Q.    How did you come to know about
21   Ms. Yemisi Akinyemi?
22        A.    About her allegations or about her
23   misconduct?  I am not sure.
24        Q.    When did you first hear the name
25   Yemisi Akinyemi?
```

```
1                     MITCHELL
2        A.    Okay.  I was advised that an
3   incident had occurred by the area director.
4        Q.    And when did you receive this
5   information?
6        A.    I believe it was two days after
7   the incident occurred because Internal Affairs
8   was being notified.
9        Q.    And what was the incident you
10  heard from the area director that had
11  occurred?
12       A.    That Officer Akinyemi had bypassed
13  security and, while off duty and in full
14  uniform, was in a restricted area by the
15  outbound gates at Newark Airport.
16       Q.    The person you received this
17  information from was Ms. Haage?
18       A.    Correct.
19       Q.    Two days after it had occurred?
20       A.    Correct.
21       Q.    And this information, how did you
22  receive it?  Was it over the phone, in person,
23  or in writing?
24       A.    Over the phone.
25       Q.    And what did you do as a result of
```

1                           MITCHELL

2      that?

3           A.       I told them to follow up with

4      Internal Affairs and to prepare an

5      investigative report or to prepare a file on

6      it.

7           Q.       Was a file prepared?

8           A.       The only file I saw was the

9      statements that were taken in relation to the

10     incident.

11          Q.       When you say "the statements that

12     were taken," statements that were taken from

13     who?

14          A.       The list that we went through

15     earlier.

16          Q.       The officers who were --

17          A.       The two officers that met her at

18     the gate, Supervisor Herter and Supervisor

19     Landau, Supervisor Calise and the two

20     statements from your client.

21          Q.       Did you learn whether or not it

22     was true that Ms. Akinyemi had lost her

23     father-in-law that morning?

24          A.       I did not find out whether or not

25     that was true.

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

1                    MITCHELL

2          Q.    Did you find out whether she had

3    permission to leave work early to go see her

4    husband off at the airport?

5          A.    I did find out about that.

6          Q.    Did you find out what that was

7    or --

8          A.    It was true that she was excused

9    for 59 minutes to go to the airport.

10         Q.    Who was it that you found out

11   excused her?

12         A.    Supervisor Landau.

13              MR. OKOLI:  I'd like to have

14         marked for identification a document from

15         the Department of Treasury, U.S. Customs

16         Service.

17              (Whereupon, the aforementioned

18         document was marked as Plaintiff's

19         Exhibit 1 for identification as of this

20         date by the Reporter.)

21         Q.    Would you please take a look at

22   Plaintiff's Exhibit 1 and tell me if you

23   recognize what that document is?

24         A.    I am looking at a document that's

25   marked as Exhibit 1, Plaintiff's Exhibit 1.

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                    MITCHELL
 2              (Pause.)
 3       A.     Okay.  What is your question?
 4       Q.     Do you recognize what Exhibit 1
 5  is?
 6       A.     It is a notice.  It is called a
 7  general notice.
 8       Q.     Have you seen a similar document
 9  before today?
10       A.     I have seen them before, yes.
11       Q.     Does that document indicate that
12  it was for the investigation of the misuse of
13  position by Ms. Akinyemi?
14       A.     Yes, that is what it says.
15       Q.     So what Ms. Akinyemi was being
16  investigated for was not a possible criminal
17  misconduct?
18       A.     No, that is correct.  It is
19  checked off this interview was not related to
20  possible criminal misconduct.
21       Q.     And it is not related to a matter
22  that is criminal?
23       A.     That is also checked off, correct.
24  It say the general nature is administrative.
25       Q.     What did you find out as a result
```

```
 1                     MITCHELL
 2    of the investigation that you asked
 3    Ms. Haage?
 4         A.    I am handing you back Exhibit 1.
 5               (Handing document.)
 6         A.    What investigation?
 7         Q.    When you asked Ms. Haage to look
 8    into the matter of Ms. Akinyemi, did there
 9    come a time when you got a feedback from
10    Ms. Haage?
11         A.    The feedback that I got was from
12    Ms. Haage that an incident did occur, that she
13    was gathering the statements, and that she was
14    then going to forward them to labor and
15    employee relations.
16         Q.    Did there come a time when
17    Ms. Akinyemi was terminated?
18         A.    Yes.
19         Q.    Were you the person who made the
20    decision to terminate Ms. Akinyemi?
21         A.    Yes, I was.
22         Q.    Did you convey this termination in
23    writing?
24         A.    Yes, I did.
25               MR. OKOLI:  Could you mark this
```

1                    MITCHELL

2        for identification?

3                (Whereupon, the aforementioned

4        documents were marked as Plaintiff's

5        Exhibit 2 for identification as of this

6        date by the Reporter.)

7                MR. CLOPPER:  Let us take a

8        five-minute break, Mr. Okoli.

9                MR. OKOLI:  Sure.

10               (Whereupon, a recess was taken.)

11               MR. OKOLI:  Okay.  Just mark all

12       of these as well.

13               (Whereupon, the aforementioned

14       documents were marked as Plaintiff's

15       Exhibits 3 through 11 for identification

16       as of this date by the Reporter.)

17       Q.      Now, I am placing before you what

18  has been marked as Plaintiff's Exhibit 2.  Do

19  you recognize what it is?

20       A.      Yes, I do.

21       Q.      What is it?

22       A.      It is the notice of termination to

23  Ms. Akinyemi.

24       Q.      And did you sign it on the second

25  page of it?

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                        MITCHELL
 2        A.     Yes, I did.
 3        Q.     That is your signature?
 4        A.     Yes, it is.
 5        Q.     In the last full paragraph, I
 6   believe the third sentence --
 7               MR. CLOPPER:  On the second page?
 8               MR. OKOLI:  On the first page.
 9               MR. CLOPPER:  I am sorry.
10        Q.     (Continued) It says:  "These
11   policies are detailed in the standard of
12   conduct, Section 6.3.5.  Your misuse of
13   position and authority jeopardized and
14   tarnished how the public views CBP and its
15   employees."
16               Do you see that?
17        A.     Yes, I do.
18        Q.     Could you give us the facts on
19   which you based the conclusion that the misuse
20   of position and authority jeopardized and
21   tarnished how the public views CBP and its
22   employees?
23        A.     In this case?
24        Q.     Yes.
25        A.     Sure.  Based on the statements
```

MITCHELL

1

2  that I read and the details of the incident,

3  Ms. Akinyemi used her position and bypassed

4  TSA screening in full view of the traveling

5  public and entered an area that only traveling

6  members of the traveling public, ticketed

7  passengers or authorized employees on official

8  business are allowed to be in.  That was done

9  in the full view of the public.

10        Q.    Did you speak with any members of

11  the public regarding whatever it is that

12  happened at the airport on that day?

13        A.    No.

14        Q.    In any of the documents you read

15  in which you based your decision, did any of

16  those people -- Mr. Herter or the two

17  officers -- tell you that they spoke with any

18  members of the public regarding what

19  Ms. Akinyemi was alleged to have done?

20        A.    There was a conversation, I

21  believe, one of the statements mentioned, a

22  conversation with an airline employee.

23        Q.    What was that conversation?  What

24  did the airline employee say in the

25  conversation?

1                    MITCHELL

2        A.    I don't have the statement in

3    front of me.

4        Q.    In whose statement was that?

5        A.    One of the two officers, I

6    believe, that were there the night of the

7    incident.

8        Q.    Was it Alelong or Jozeck

9    (phonetic)?

10       A.    I don't know.

11       Q.    Is it your recollection that that

12   airline employee expressed an opinion as to

13   what Ms. Akinyemi did at the airport?

14       A.    I don't recall.  I just --

15             MR. CLOPPER:  Objection.  I mean

16        to the extent you are suggesting that

17        that is what she said.  That is not an

18        accurate quotation or reflection of her

19        testimony.

20             MR. OKOLI:  No.  I am asking the

21        question because I am interested in the

22        portion that says jeopardized and

23        tarnished how the public views CBP and

24        its employees.

25             She said she didn't speak to any

1                     MITCHELL

2           members of the public.  With the

3           exception of this possible airline

4           employee, the statements that she is

5           referring to did not say the traveling

6           members of the public either.  I want to

7           know the basis for this statement.

8                     MR. CLOPPER:  Okay.

9           Q.      In the first full paragraph of

10   page 2 beginning with furthermore, it says:

11    "Furthermore, in order to accomplish its

12   mission, CBP must be able to trust and depend

13   on its employees to conduct themselves in an

14   appropriate manner at all times."

15                     Do you see that?

16          A.      Yes, I do.

17          Q.      What mission of CBP were you

18   referring to in that paragraph?

19          A.      Are you asking me what is CBP's

20   mission?

21          Q.      No.  What mission are you

22   referring to here?  What mission of CBP were

23   you referring to when you said "in order to

24   accomplish its mission"?

25          A.      That actually means the entire

1                        MITCHELL

2       mission of CBP.  The mission of CBP is to

3       detect and deter terrorists and terrorist

4       weapons from entering and to enforce the laws

5       of the United States, to interdict

6       contrabands, narcotics, agriculture products,

7       and to facilitate legitimate trade and travel.

8       That is the mission of CBP.

9            Q.     What specifically did Ms. Akinyemi

10      do on that day that you considered an anathema

11      to the accomplishment of the mission of CBP?

12           A.     Well, I believe the misuse of

13      position to gain access to an area where the

14      normal public cannot is an anathema to that

15      mission.  If the mission is to protect and

16      defend the country, not to bypass security,

17      the very security that was set up, she used

18      the trappings of her office to bypass.

19           Q.     You do not believe that she was

20      acting as a terrorist though; did you?

21           A.     I believe she bypassed security

22      and used her position to -- the trappings of

23      her office to do that.

24           Q.     Do you think that by her,

25      Ms. Akinyemi, doing that, that would encourage

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
1                    MITCHELL
2    terrorism?
3         A.      No.  I think it is an anathema to
4    our mission.
5         Q.      What specific mission?
6         A.      The mission is to protect and
7    defend the border and she undermined that
8    position by misuse of her position.
9         Q.      In what way was the border
10   unprotected by her getting into the restricted
11   area to see her husband off?
12               MR. CLOPPER:  Objection.  That
13          mischaracterizes the witness' testimony.
14        Q.      I am asking, in what way do you
15   believe that Ms. Akinyemi going into the
16   restricted area as a customs officer
17   undermines the mission of Customs to protect
18   the citizens?
19        A.      She did not.  She did not do this
20   as a customs officer.  Therein lies the
21   problem.  She used the trappings of the
22   customs office to do that.  She was not acting
23   as a customs officer when she did that.
24        Q.      Was she employed by Customs as of
25   the time she was doing that?
```

```
 1                    MITCHELL
 2         A.     She was off duty, yes.
 3         Q.     But she was an employee of
 4    Customs; wasn't she?
 5         A.     Absolutely.
 6         Q.     Okay.  Do you know what an AOA
 7    badge means?
 8         A.     Yes.  It is an airport operator's
 9    authorization badge.
10         Q.     Okay.  And what does that do for
11    you?  I mean, what is it used for?  What is
12    the AOA badge used for?
13         A.     It is issued by airport
14    authorities to give access to secure areas,
15    various areas of an airport, for official
16    business.
17         Q.     You said the AOA badge is issued
18    by the Port Authority; correct?
19         A.     In this case, it is by the Port
20    Authority.
21         Q.     And they determine what area is
22    restricted and unrestricted; correct?
23         A.     They don't determine.  That
24    determination is made by a variety of
25    entities, law enforcement entities.  It can
```

72

1                    MITCHELL

2    either be the FAA, and those regulations are

3    articulated in the FAR or it could be by

4    Customs and Border Protection.

5              TSA also has some areas that they

6    have designated as security areas.  So it is a

7    variety of law enforcement entities that

8    determine that.

9        Q.    I did not ask the question

10   correctly.  If you did not have an AOA badge

11   and you are an Immigrations or Customs

12   officer, could you access the restricted area?

13       A.    If you are on official business

14   and you explain what you are doing, they would

15   probably, if you tried to access that area,

16   they would probably call a supervisor over if

17   you were on official business and needed to

18   get to that area to accomplish your work.

19       Q.    They would investigate to find out

20   whether you should be there; correct?

21       A.    Correct, if you didn't have one.

22       Q.    If you had an AOA badge, that will

23   give you automatic access to such areas that

24   you don't really have access to.  Correct?

25       A.    If you are on official business,

```
1                      MITCHELL

2    correct.

3         Q.     So is it fair to say that you do

4    not have to be a customs officer to be able to

5    get into certain restricted areas if you have

6    an AOA badge?

7         A.     And you are on official business,

8    correct.

9         Q.     Okay.  Did you know that

10   Ms. Akinyemi had worked for FedEx before

11   coming to work for the Customs and Border

12   Protection?

13        A.     No, I did not know that.

14        Q.     Did you know that she had an AOA

15   badge as an employee of FedEx?

16        A.     I don't know that for a fact.

17        Q.     But you do know that there are

18   other people who have access to restricted

19   areas with AOA badges who are not CBP

20   officers?  You do know that?

21        A.     Sure, as long as it is related to

22   their employment, absolutely.

23        Q.     Given your answer a few moments

24   ago that if you didn't have an AOA badge and

25   you went there as a customs officer and wanted
```

1                    MITCHELL

2      to access those areas that may trigger the

3      call to a supervisor to see whether you should

4      be there, do you believe that she was able to

5      access the area solely because of his uniform

6      or because he had an AOA badge on him?

7                    MR. CLOPPER:  Objection.  You mean

8           Ms. Akinyemi?

9                    MR. OKOLI:  Ms. Akinyemi, yes.

10          Sorry.

11          A.    I don't know what the TSA was

12     thinking when they let her by, but I know she

13     was standing in a uniform and her AOA badge

14     that was issued to her for her official duty

15     while working for Customs and Border

16     Protection.

17          Q.    Is someone on a break considered

18     to be on duty or off duty?

19          A.    (No response.)

20          Q.    If a person is on duty on a

21     certain day and during that person's break

22     period, is that person considered on duty or

23     off duty?

24          A.    They are on duty.

25          Q.    Even during their break period?

```
 1              MITCHELL
 2       A.    Oh, absolutely.  They are being
 3   paid.  They are on duty.
 4       Q.    As you sit here today, do you know
 5   whether any customs employees have ever
 6   accessed a restricted area and were not
 7   terminated for that?
 8       A.    In the course of their business,
 9   they access restricted areas every day.
10       Q.    I am talking about those not on
11   duty, a customs officer not on duty gaining
12   access to a restricted area and not being
13   fired?
14       A.    I --
15             MR. CLOPPER:  Objection.  It is
16       ambiguous.
17             MR. OKOLI:  Well, let me rephrase
18       it.
19             MR. CLOPPER:  Yes.
20       Q.    As you sit here today, are you
21   aware of any instances in which a customs
22   officer not on duty accessed a restricted area
23   and yet was not fired?
24       A.    Yes.  I do have personal knowledge
25   of an incident like that.
```

76

```
 1                    MITCHELL
 2      Q.     How many such incidents are you
 3   aware of?
 4      A.     I have personal knowledge of one
 5   specific incident.
 6      Q.     What is that incident that you are
 7   aware of?
 8      A.     It was an employee who was not on
 9   duty and bypassed security and accessed a
10   restricted area at Newark Airport.
11      Q.     Do you know the name of this
12   employee?
13      A.     Jill Von Wolkenn.
14      Q.     Could you spell that?
15      A.     J-i-l-l, next name V-o-n, next
16   name W-o-l-k-e-n-n.
17      Q.     That is a female, Jill?  You said
18   Jill?
19      A.     Yes.
20      Q.     That is a female?
21      A.     Yes, it is.
22      Q.     When did this occur?
23      A.     Several years ago at Newark
24   Airport.
25      Q.     When you say "several years ago,"
```

```
 1                    MITCHELL
 2   less than five years ago, more than five years
 3   ago?
 4        A.     Less than five years ago.
 5        Q.     What was the outcome of that?
 6        A.     She was disciplined.
 7        Q.     What discipline was imposed on
 8   her?
 9        A.     There were several charges
10   involved, and I believe it was a proposed
11   14-day suspension.
12        Q.     Did you say there were several
13   charges?
14        A.     Correct.
15        Q.     In addition to accessing a
16   restricted area, she did other things that
17   were considered inappropriate by Customs?  Is
18   that what you are saying?
19        A.     Correct.
20        Q.     How many additional things?  I
21   mean two more or three more in addition to --
22        A.     She also argued with the security
23   company and she used the agency letterhead
24   inappropriately.
25        Q.     When you say she used the agency
```

```
 1                     MITCHELL
 2   letterhead, what did she do?
 3        A.     (No response.)
 4        Q.     What is your recollection of what
 5   she did with it?
 6        A.     She wrote a letter of complaint to
 7   the Port Authority police.
 8        Q.     With the agency letterhead?
 9        A.     Correct.
10        Q.     And this got her 14 days
11   suspension?
12        A.     That was her proposal.
13        Q.     And what was the final outcome?
14        A.     There was a five-day suspension.
15        Q.     So for these offenses, she got a
16   total of five days suspension?
17        A.     That was the decision, yes.
18        Q.     At the time, were you the director
19   of field operations?
20        A.     Yes, I was.
21        Q.     And what is Jill Von Wolkenn's
22   race?
23        A.     She is white.
24        Q.     Do you know her national origin?
25        A.     No, I don't.
```

MITCHELL

1

2     Q.     So other than Jill Von Wolkenn's

3  case, are you aware of any other incident

4  while you were a director of field operations,

5  not which you have personal knowledge because

6  you said you have personal knowledge of this,

7  but are you aware of any other incident in

8  which it was alleged that someone had accessed

9  restricted areas while not on duty?

10     A.     Not that I recall.

11          MR. CLOPPER:  Excuse me.  When the

12        person was not disciplined or not

13        terminated?

14          MR. OKOLI:  Not terminated.

15          MR. CLOPPER:  Okay.  Is that your

16        question?

17          MR. OKOLI:  Yes.

18          MR. CLOPPER:  Whether she's aware

19        of any person who accessed a restricted

20        area while off duty and not terminated?

21          MR. OKOLI:  Yes.

22     Q.     You are not aware of that?

23     A.     No.

24     Q.     Are you aware of anyone who

25  accessed the restricted area that was not

```
 1                      MITCHELL
 2    disciplined?
 3        A.      I don't -- I can't recall any that
 4    I know of.
 5        Q.      Could you take a look at
 6    Plaintiff's Exhibit 11?
 7        A.      I am giving back Plaintiff's
 8    Exhibit 2.
 9                (Witness handing.)
10        Q.      Well, before we get into
11    Plaintiff's Exhibit 11, what was Ms. Von
12    Wolkenn's title at the time that this incident
13    occurred?
14        A.      At the time that the incident
15    occurred, she was an immigration inspector.
16        Q.      She was an immigration inspector?
17        A.      Correct.  At the time of that
18    incident, she was an immigration inspector.
19        Q.      But she was employed by the CBP?
20        A.      Not at the time of that incident.
21    CBP had not been created yet.
22        Q.      She was --
23        A.      At the time of discipline, she was
24    employed by CBP.
25        Q.      At the time of the incident, was
```

```
 1                    MITCHELL
 2    she employed by U.S. Customs?
 3         A.    No, she was not.  She was employed
 4    by INS.
 5         Q.    I see, okay.  Did you say she
 6    used -- pardon me if I asked this.  What
 7    letterhead did you say she used?
 8         A.    At the time of the incident, she
 9    used the INS letterhead.
10         Q.    Okay.
11         A.    But the agency letterhead is the
12    wording I used.
13         Q.    Do you know whether she was a
14    permanent employee or a probationary employee
15    at the time?
16         A.    She was a permanent employee not
17    in uniform.
18         Q.    Now, back to Plaintiff's Exhibit
19    11, do you recognize what that is?
20         A.    Yes, I do.
21         Q.    Did you provide that unsworn
22    declaration?
23         A.    Yes, I did.
24         Q.    Is that your signature on page 139
25    at the bottom?
```

1 ·                          MITCHELL

2          A.      Yes.

3          Q.      On page 139?

4          A.      Yes.

5          Q.      That is your signature?

6          A.      Correct.

7          Q.      Is everything that you stated in

8   Exhibit 11 correct?

9          A.      I believe so.

10         Q.      Thank you.

11                 MR. CLOPPER:  Wait a minute.

12         Let's clarify, if you don't mind.

13                 MR. OKOLI:  Yes.

14                 MR. CLOPPER:  Or I can follow up.

15         She hasn't read the declaration as we are

16         sitting here today.

17         Q.      At the time that you gave the

18   declaration, did you believe you were giving

19   correct information?

20         A.      Yes.

21         Q.      Okay, thank you.  Did you review

22   your declaration from the time you knew you

23   were going to testify here to today?

24         A.      I am sure I read through it again.

25         Q.      Do you recall when it was that you

```
 1                        MITCHELL
 2   last read through it?
 3        A.    Sometime last week, I believe.
 4        Q.    Do you know who Scott Hobbs is?
 5        A.    Yes, I recognize the name.
 6        Q.    Who is that?
 7        A.    He was an employee with CBP.
 8        Q.    And he is no longer an employee?
 9        A.    No, he is not.
10        Q.    He was terminated?
11        A.    I believe so.
12        Q.    Do you recall why he was
13   terminated?
14        A.    I don't recall right now.
15        Q.    Let me put Plaintiff's Exhibit 11
16   before you.
17              (Handing.)
18        A.    Okay.
19        Q.    Could you turn to page 137?
20              (Witness complying.)
21        Q.    Just review pages 137 through 138
22   and I will ask you questions.
23              (Pause.)
24        A.    Okay.
25        Q.    Do you know whether Scott Hobbs
```

```
 1                       MITCHELL
 2    was terminated for a crime?
 3         A.     No.
 4         Q.     Does your review of page 137
 5    refresh your recollection as to whether he was
 6    terminated for second-degree burglary?
 7         A.     He was terminated for being
 8    arrested for second-degree burglary.
 9         Q.     For being arrested for a crime?
10         A.     Correct.
11         Q.     Okay.
12         A.     And harassing a neighbor.
13         Q.     And Michelle Cronin, do you recall
14    the underlining facts of her termination?
15         A.     No, just what it says here in the
16    statement.
17         Q.     So you have no recollection of the
18    facts that constitute acting unprofessionally
19    on the job?
20         A.     Specifically in her case, no, I
21    don't.  I don't have the underlining facts.
22         Q.     Okay.  I can have that back.
23                (Witness handing.)
24                MR. CLOPPER:  Returning
25           Plaintiff's Exhibit 11.
```

```
 1                    MITCHELL

 2        Q.    I am placing before you what is

 3   marked Plaintiff's Exhibit 3.  Do you

 4   recognize Plaintiff's Exhibit 3?

 5        A.    It is a letter that I signed.

 6        Q.    Do you know who you sent it to?

 7        A.    No.

 8              MR. OKOLI:  Counsel, I will ask

 9        for an unredacted copy of this letter

10        which is marked, I believe it is, 166

11        through 168.

12        Q.    Could you review the letter, and

13   then I will ask you a few questions?

14              (Witness complying.)

15        A.    Okay.

16        Q.    Was this employee on probation at

17   the time?

18        A.    Based on the letter, yes.

19        Q.    Was this employee terminated for

20   repeatedly failing to comply with overtime

21   policy?

22        A.    Yes, that is what it says here.

23        Q.    This person was scheduled for

24   overtime and didn't show up?

25        A.    There's several specifications,
```

1                          MITCHELL

2      right.

3          Q.      So it is more than one incident

4      and more than one date that this occurred?

5          A.      Based on this letter, yes.

6          Q.      Other than the incident that

7      occurred on December 5th, was Ms. Akinyemi

8      terminated for anything else other than the

9      incident that occurred on December 5th?

10         A.      She was terminated for the misuse

11     of her position on that date.  That is it.

12         Q.      May I have that?

13         A.      Yes, returning Exhibit 3.

14                 (Witness handing.)

15         Q.      I am placing before you Exhibit 4.

16     Do you recognize Exhibit 4?

17         A.      It is another letter signed by

18     myself dated June 20, 2005.

19         Q.      Do you know who it was sent to?

20         A.      No, I don't.

21                 MR. OKOLI:  Again, Counsel, we ask

22             for an unredacted version of this letter.

23                 MR. CLOPPER:  We may or may not

24             have objections to doing that.

25         Q.      Was the addressee of the letter on

```
 1                        MITCHELL

 2    probation at the time of the termination?

 3         A.      Based on this letter, yes.

 4         Q.      Was this person arrested by

 5    police, by law enforcement?

 6         A.      Based on this letter, yes,

 7    arrested.

 8         Q.      And was charged with two counts of

 9    aggravated assault?

10         A.      That is what it says on this.

11         Q.      He was arrested and charged with

12    crimes?

13         A.      He was arrested, yes, uh-huh.

14         Q.      And it says "charged."  Do you see

15    the letter, the second full paragraph,

16    arrested and charged with two counts?

17         A.      That is what it says.

18         Q.      Do you have any reason to believe

19    that he was not charged?

20         A.      That he was not charged?  No, I

21    have no reason to believe he was not charged.

22         Q.      Okay.  May I have that?

23         A.      Returning Exhibit 4.

24                 (Witness handing.)

25         Q.      I am placing before you
```

```
 1                    MITCHELL
 2    Plaintiff's Exhibit 5.  Do you recognize
 3    Plaintiff's Exhibit 5?
 4         A.    Yes.  It is another letter signed
 5    by me dated December 22, 2004.
 6         Q.    Do you know who it was addressed
 7    to?
 8         A.    No, I don't.
 9               MR. OKOLI:  Again, Counsel, we ask
10          for an unsanitized version of this
11          letter.
12         Q.    Based on the letter, it suggests
13    the addressee was hired on a
14    career-conditional appointment in December
15    2003.  Is that correct?
16         A.    That is what it says, yes.
17         Q.    And was on probation?
18         A.    Yes.
19         Q.    Does this letter suggest that the
20    addressee tried to strangle his wife?
21         A.    That's what the letter suggests.
22         Q.    And does this suggest that the
23    addressee admitted assaulting the wife by
24    grabbing her by the neck?
25         A.    That is what it suggests.
```

```
 1                      MITCHELL
 2         Q.     Let me place before you
 3    Plaintiff's Exhibit 6.  Do you recognize
 4    Plaintiff's Exhibit 6?
 5         A.     Yes.
 6         Q.     Is that another letter of
 7    termination?
 8         A.     It is signed by me dated September
 9    20, 2005.
10         Q.     And does it show that the
11    addressee was arrested pursuant to a warrant
12    issued by a court in New Jersey?
13         A.     Yes, that is what it suggests.
14         Q.     And it suggests that the addressee
15    had taken money improperly from someone from
16    undercover, $2,300.  Is that what it suggests,
17    second full paragraph?
18         A.     That is what it suggests.
19         Q.     And that would suggest criminal
20    behavior; would it not?
21         A.     That would suggest criminal
22    behavior.
23         Q.     Okay.
24         A.     I am returning Plaintiff's Exhibit
25    6.
```

1                    MITCHELL

2                    (Witness handing.)

3          Q.     Placing before you Exhibit 7,

4     Plaintiff's Exhibit 7, do you recognize what

5     it is?

6          A.     It is another letter signed by

7     myself dated March 30, 2005.

8          Q.     Was this addressee on probation at

9     the time of this termination?

10         A.     Yes.

11         Q.     Is there more than one incident or

12    more than two incidents referenced in the

13    letter?

14         A.     There are more than two incidents

15    referenced in the letter.

16         Q.     Does it indicate --

17         A.     Excuse me, I apologize.  There are

18    only two incidents listed.

19         Q.     Okay.

20         A.     The third paragraph relates to the

21    second incident.  I apologize.  I had to read

22    through it.

23         Q.     That is okay.  Does it indicate

24    that the addressee had permitted a member of

25    the traveling public to take a look at a

1                         MITCHELL

2      customs computer?

3           A.      I have to read it.  I'm sorry.

4           Q.      Okay.

5                   (Pause.)

6           A.      Actually, no, it doesn't say that

7      this person allowed anyone to read a computer.

8      In fact, by giving me the opportunity to read

9      it, it is all a singular incident.  All of

10     this relates to one incident.

11          Q.      What do you mean when you said the

12     passenger stated there was no problem with the

13     passport?  You attempted to resolve it as the

14     primary officer.  What do you mean by that?

15          A.      The passenger was a lookout in our

16     automated system.  The requirement of the

17     procedure is, if someone is a lookout, they

18     get referred to secondary for resolution of

19     that lookout.

20                  In this case, it says that the

21     officer, rather than refer the passenger to

22     secondary, attempted to resolve the lookout as

23     the primary officer as opposed to secondary.

24          Q.      Then you admitted the lookout

25     passenger electronically referred her to

1                          MITCHELL

2      secondary and made a computer notation that

3      she was in A-2 category and exempt from

4      further action and allowed her to proceed with

5      that photo inspection.

6                     What does that mean?

7           A.      That means that the officer

8      admitted the passenger, stamped her passport,

9      allowed her entry into the United States.

10     However, electronically in our system,

11     referred her into secondary and then again in

12     their computer system made a notation about

13     the type of Visa and why he let the passenger

14     go.

15          Q.      When you say referred her to

16     secondary, would that suggest that there was

17     no reference to secondary?

18          A.      No.   It was electronic only.

19          Q.      Was this supposed to be done

20     physically instead of electronically when you

21     say referred her to secondary?

22          A.      Should have been both.

23          Q.      Okay.   Was this person who came in

24     ever found?

25          A.      Not based on this letter.   I don't

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                    MITCHELL
 2   know if they were found later on.
 3        Q.    As you sit here, you do not know
 4   the identity of this person who was let into
 5   the country?
 6        A.    No.  Based on this, the only thing
 7   I can tell was that they were admitted as a
 8   diplomat with an A-2 Visa.
 9        Q.    And given the circumstances of
10   this passport and admission, we don't know
11   whether this person was, in fact, a diplomat;
12   do we?
13        A.    I can't tell that from this
14   letter.
15        Q.    And we don't know whether this
16   person is a terrorist?
17        A.    I can't tell that from this
18   letter.
19        Q.    May I have the document back?
20        A.    Returning Exhibit 7.
21              (Witness handing.)
22        Q.    Do you know who Camille Polimeni
23   is?
24        A.    Yes.
25        Q.    Who is Camille Polimeni?
```

```
 1                    MITCHELL
 2        A.    The area director at JFK Airport.
 3   She reports to me.
 4              MR. CLOPPER:  Can you spell the
 5        name for my purposes?
 6              THE WITNESS:  P-o-l-i-m-e-n-i.
 7              MR. CLOPPER:  Thank you.
 8        Q.    Did she report to you in April
 9   2005?
10        A.    Yes, she did.
11        Q.    Could you take a look at Exhibit
12   8?
13        A.    Okay.
14        Q.    Based on this letter, the
15   addressee had two charges, one of
16   unprofessional behavior and another of misuse
17   of position.  Correct?
18        A.    Based on this letter, yes.
19        Q.    And does it suggest that, when the
20   misuse of position incident occurred, she was
21   off duty?  Sorry, the addressee was off duty?
22        A.    That's what it says, yes.
23        Q.    And it says that you used your
24   position to gain access to secure areas of the
25   JFK Airport?
```

1                    MITCHELL

2         A.      It says to a secure area of the

3    JFK Airport.

4         Q.      Is a secure area the same thing as

5    a restricted area?

6         A.      Those words seem similar to me,

7    yeah.

8         Q.      (Continued) "You entered the

9    inspections area of Terminal One wearing a CBP

10   baseball cap and stood near the baggage

11   carousel with your AOA identification card

12   awaiting the arrival of incoming passengers."

13             Have I read that correctly?

14        A.      Correct.

15        Q.      (Continued) "You did not have

16   authorization to greet incoming passengers in

17   a secure area of Terminal One on that day and

18   there was no other official reason for your

19   presence there."

20             Have I read it correctly so far?

21        A.      That is what it says.

22        Q.      (Continued) "You were ordered to

23   leave the area and were escorted to the lobby

24   by an on-duty supervisor."

25             Is that correct?

```
 1                      MITCHELL
 2        A.      That is what it says.
 3        Q.      And the proposed penalty for this
 4   person for this incident was two calendar
 5   days.  Is that correct?
 6        A.      That is what it says.
 7        Q.      Do you have any reason to believe
 8   that this penalty was not imposed, suspension
 9   for two calendar days?
10        A.      I don't.  Based on this, I cannot
11   tell you that.
12        Q.      Okay.  Let's go to page 180,
13   second to the last paragraph.  It says:  "You
14   have the right to be represented by an
15   attorney or other representative of your
16   choice.  Any designation of representative
17   should be furnished in writing to Ms. Susan T.
18   Mitchell, director of field operations, New
19   York, One Penn Plaza, 11th floor, New York,
20   New York 10119."
21                Do you see that?
22        A.      Yes, I do.
23        Q.      Do you recall whether there was
24   anything in writing sent to you on this?
25        A.      I have no idea who this is.
```

1                    MITCHELL

2          Q.    But would that be the procedure to

3    be followed in this kind of situation for

4    something to be sent to you in writing based

5    on the facts that you see here?  Would the

6    procedure be that something be sent to you in

7    writing?

8          A.    Yes.

9                 MR. CLOPPER:  The procedure in

10            this case, in the case that is the

11            subject of this?

12         A.    Of this letter?

13         Q.    Yes.

14                MR. CLOPPER:  Okay.

15         A.    Uh-huh, yes.

16         Q.    As you sit here today, do you have

17   any reason to believe that the suspension

18   proposed here was not carried out?

19         A.    I cannot tell you that from this.

20         Q.    May I have that?

21         A.    Returning Exhibit 8.

22                (Witness handing.)

23                MR. OKOLI:  Again, Counsel, we ask

24            for an unredacted version of Plaintiff's

25            Exhibit 8.

```
 1                    MITCHELL
 2              MR. CLOPPER:  We will consider it.
 3        Q.     I am placing before you what is
 4   marked Plaintiff's Exhibit 9.  Do you
 5   recognize what it is?
 6        A.     It is a letter signed by me
 7   undated.
 8        Q.     Is there a reason that you did not
 9   date the letter?
10        A.     The procedure is that I sign these
11   types of letters and give them to labor and
12   employee relations who dates them and gets
13   them to the employee.  I don't do to that.
14        Q.     But the signature on the second
15   page is your signature?
16        A.     Correct.
17        Q.     And there appears a receipt of
18   reprimand dated January 2006 by the
19   recipient?
20        A.     That is what it says, yes.
21        Q.     It says, in paragraph one, "In
22   order to promote efficiency of the agency, I
23   am issuing you this official letter of
24   reprimand for your unprofessional behavior and
25   misuse of position."
```

```
 1                      MITCHELL
 2              Is that correct?
 3      A.      That is what it says.
 4      Q.      Now, the third paragraph, the
 5   third full paragraph says:  "On October 2004
 6   while off duty, you used your position to gain
 7   access to a secure area of the JFK Airport."
 8              Is that correct?
 9      A.      Correct.
10      Q.      (Continued) "You entered the
11   inspections area of Terminal One wearing a CBP
12   baseball cap and stood near the baggage
13   carousel with your AOA identification card
14   awaiting the arrival of incoming passengers."
15              Have I read that so far correctly?
16      A.      Correct.
17      Q.      The next paragraph says:  "In
18   consideration of your offenses," are you
19   talking about the misuse when you say "in
20   consideration"?  Are you referring to both the
21   misuse of position and unprofessional behavior
22   that you have referenced earlier?
23      A.      That is what it appears.
24      Q.      (Continued) "As well as
25   aggravating or mitigating circumstances, I
```

1                         MITCHELL

2    find this official reprimand to be both

3    reasonable conduct and appropriate."

4                   Have I read that correctly?

5         A.     That is what it says, yes.

6         Q.     So as a matter of fact, the

7    addressee was reprimanded?  That was the

8    discipline?

9         A.     That is what this letter says,

10   yes.

11        Q.     No suspension?

12        A.     For this letter, right, there's no

13   suspension in this letter.  I don't know what

14   was proposed unless it is the exact same case.

15        Q.     Yes.  If you look at -- let me

16   give you back Plaintiff's Exhibit 8.

17                   (Counsel handing.)

18        Q.     If you look at the specifications,

19   can you compare the specifications in

20   Plaintiff's Exhibit 8 with the third paragraph

21   of --

22        A.     They appear to be the same.

23        Q.     Your subordinate had recommended

24   two days suspension; correct?

25        A.     In this case, correct.

```
 1                    MITCHELL
 2        Q.    And you decided that what was
 3   appropriate was a mail reprimand?
 4        A.    A letter of reprimand was the
 5   final decision in this case.
 6        Q.    So this person neither lost a day
 7   of work nor was he terminated; correct?
 8        A.    Correct.
 9        Q.    For two offenses committed:  One,
10   accessing a restricted area and then being
11   unprofessional when approached by someone in
12   October?  Is that correct?
13        A.    That's what it says here.
14              MR. CLOPPER:  Do you need to take
15        a break to check that?
16              THE WITNESS:  It is okay.
17        Q.    Do you know who the addressee of
18   this letter is?
19        A.    No, not from this.  No, I don't.
20              MR. OKOLI:  Again, I will ask for
21        an unredacted or unsanitized copy of this
22        exhibit.
23              MR. CLOPPER:  As with the others,
24        we will consider the request.
25        Q.    Now, can you explain to me, based
```

1                       MITCHELL

2      on your review of Exhibits 8 and 9, why the

3      appropriate punishment for misuse of position

4      by the individual referenced in Exhibits 8 and

5      9 is reprimand and the appropriate punishment

6      for the plaintiff for the misuse of position

7      was termination?

8           A.      In looking at this file, I cannot

9      tell you because it is not a complete file.

10     So I don't have any of the full procedures and

11     any of the due process that was given to this

12     non-probationary employee in this case.

13                 So I have to have the complete

14     case file in front of me to consider what was

15     different other than the probationary status

16     and he was not in uniform.  Those are the

17     differences that jump up, but I would need the

18     full file to be able to articulate it any

19     further.

20          Q.      When you say he was not in

21     uniform, he was off duty.  Correct?

22          A.      Based on this letter, yes.

23          Q.      And he wore a baseball cap with a

24     CBP insignia on it?

25          A.      Correct.

```
 1              MITCHELL
 2        Q.    And he knew he was not supposed to
 3   be there and he went there anyway to the
 4   secure area?
 5        A.    That is what it says here.
 6        Q.    Okay.  And, in fact, in the case
 7   of the individual, he was ordered to leave the
 8   area and was, in fact, escorted out of the
 9   area.  Correct?
10        A.    That is what it says here.
11        Q.    Ms. Akinyemi was not ordered to
12   leave the area neither was she escorted out of
13   the area; correct?
14        A.    I don't know that she was,
15   correct.
16        Q.    May I have those exhibits back?
17        A.    Returning Exhibits 8 and 9.
18              (Witness handing.)
19        Q.    Do you know who John Mirandona is?
20        A.    He is the assistant area director
21   for passenger operations at JFK Airport.
22        Q.    And did he report to you in
23   January 2005?
24        A.    He reports to Camille Polimeni who
25   reports to me, so I am his second-line
```

```
 1                     MITCHELL

 2     supervisor.

 3              MR. CLOPPER:   Just spell the name.

 4              THE WITNESS:   M-i-r-a-n-d-o-n-a.

 5         Q.    I am placing before you what is

 6     marked as Plaintiff's Exhibit 10.  Do you know

 7     who the recipient of that letter is?

 8         A.    No, I can't tell from this.

 9         Q.    Does the letter suggest that the

10     assistant area director was proposing to

11     suspend the recipient from duty and pay for 14

12     days?

13         A.    That's what it says here.  The

14     supervisory officer for 14 days, correct.

15         Q.    The charge was use of position or

16     authority for other than official purposes?

17         A.    That is what it says there.

18         Q.    The specifications that -- let me

19     read out the specifications and correct me if

20     I am wrong:

21              "On September 2005 at

22     approximately 8:45 a.m., you were observed in

23     uniform at the American Airlines terminal at

24     JFK Airport escorting a male passenger through

25     Transportation Security Administration (TSA)
```

```
 1                    MITCHELL
 2   screening to the gate area."
 3              Have I read that correctly so far?
 4        A.    Yes.
 5        Q.    (Continued) "You were not
 6   scheduled to work on this day and you had no
 7   official reason to enter the secure gate area
 8   or to escort this male passenger through the
 9   TSA screening process."
10              Have I read that correctly so far?
11        A.    Correct.
12        Q.    (Continued) "Subsequently, you
13   submitted a memorandum dated October 2005
14   addressing these allegations in which you
15   affirmed that on September 2005, you
16   accompanied your husband to the American
17   Airlines terminal where he was scheduled to
18   depart on a flight to Barbados."
19              Have I read it correctly so far?
20        A.    Correct.
21        Q.    (Continued) "You stated that you
22   thought you were scheduled to work the
23   10:00-18:00 shift at Terminal One but learned
24   when you arrived at the airport that you were
25   not scheduled to work until the next day.  You
```

```
 1                    MITCHELL
 2   stated that you wore a blue windbreaker and
 3   that no CBP emblem was visible but that your
 4   airport operations area (AOA) card was visible
 5   at all times."
 6                    Have I read that correctly so far?
 7        A.    Correct.
 8        Q.    (Continued) "You stated that your
 9   husband and his bags went through the security
10   scanner and that TSA took three cans of spray
11   starch from your husband, which you picked up
12   on the way out of the secure area."
13                    Is that correct so far?
14        A.    That is what it says, uh-huh.
15        Q.    (Continued) "You stated that you
16   did not request special treatment and that no
17   special treatment was accorded to your
18   husband."
19                    Is it fair to say that, based on
20   this letter, there was no recommendation for
21   this person to be terminated?
22        A.    The proposal is for a 14-day
23   suspension.
24        Q.    Not termination?
25        A.    Correct.
```

```
 1                    MITCHELL
 2          Q.     Okay.  Now, if I may ask again,
 3     can you perhaps distinguish the case of the
 4     person in Exhibit 10 and that of the
 5     plaintiff?
 6          A.     I was not involved in this case.
 7     From the look of it being that the proposal
 8     was from the assistant area director, the
 9     deciding official would have been the area
10     director.  So I have no direct knowledge of
11     this case as it is read here.
12          Q.     But given now that you know about
13     this from what you read and based on what you
14     know about the plaintiff, can you tell me what
15     distinguishes this case from the plaintiff's
16     case?
17          A.     I would say from reading this
18     letter, a supervisory officer is not a
19     probationary employee and has been a long-time
20     employee.
21          Q.     So the only difference is that
22     this person was not on probation.  That is, to
23     your mind, that is the only thing that
24     distinguishes both?
25          A.     I don't know.
```

1                    MITCHELL

2              MR. CLOPPER:  That is

3         mischaracterizing the witness' testimony.

4         Q.       Is there anything other than the

5    fact that the addressee of Exhibit 10 was not

6    on probation at the time of the offense,

7    anything else that distinguishes this

8    situation from the plaintiff's situation to

9    your mind?

10        A.       I would have to see the entire

11   case file.

12        Q.       Without --

13        A.       I think it is unfair for me to

14   make an assumption about this letter versus

15   your client.

16        Q.       Without the entire case file, you

17   cannot say that.  Correct?

18        A.       Correct.

19             MR. OKOLI:  Counsel, we will be

20        asking for -- in fact, I will be asking

21        for this letter, the unredacted portions,

22        and every document that backs up each and

23        every one of these incidents.

24             MR. CLOPPER:  We will consider the

25        written request.

```
 1                    MITCHELL
 2            MR. OKOLI:  Yes.
 3       Q.    As you sit here today --
 4       A.    I am returning Exhibit 10.
 5            (Witness handing.)
 6       Q.    As you sit here today, are you
 7  aware or have you ever heard that customs
 8  employees were profiling Nigerian passengers
 9  at the airports whether or not it is true?
10            Have you ever heard that whether
11  it is true or something that is not true?
12  Have you ever heard about that suggestion,
13  complaint, or allegation that customs officers
14  were targeting Nigerian passengers for
15  profiling?
16            MR. CLOPPER:  By any person at any
17       time?
18            MR. OKOLI:  Yes.
19       Q.    At the airports since you became
20  director of fields operations?
21       A.    Since 2002 and I must ask you
22  which word you actually want to use because
23  you used two different words?
24       Q.    Let me --
25       A.    One time, you said "profiling" and
```

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                      MITCHELL
 2    another time you said "targeting."
 3         Q.    Sorry, let me rephrase it.  Since
 4    you became the director of field operations,
 5    have you heard any allegations, whether it is
 6    true or false, that customs officers were
 7    profiling Nigerian airline passengers?
 8         A.    Since 2002, I have not heard
 9    anyone make a claim of profiling Nigerian
10    passengers by Customs.
11         Q.    When did you first become a
12    director of field operations?
13         A.    In July 2002.
14         Q.    Since 2002, have you ever heard of
15    any allegation that customs officers were
16    targeting Nigerian passengers?
17         A.    Since 2002, I have not heard
18    anyone claiming Nigerian passengers have been
19    targeted.  I have not heard that personally.
20              MR. CLOPPER:  I will object.  If
21         you could, clarify whether you are
22         talking about passengers on Nigerian
23         planes bound to and from Nigeria or
24         Nigerian citizens or nationals?
25              MR. OKOLI:  Passengers.  I said
```

1                           MITCHELL

2          passengers, Nigerian passengers.

3          A.      I stand by my statement.  I have

4     not heard anyone claiming the targeting of

5     Nigerian passengers since 2002.

6          Q.      Had you ever heard that prior to

7     2002?

8          A.      Yes.

9          Q.      Where did you hear it from?

10         A.      There have been many claims of

11    profiling by many nationalities and Nigerians

12    did claim that there were claims of profiling

13    by the U.S. Customs Service of Nigerian

14    passengers.

15         Q.      From what you recall, who claimed

16    that Nigerian passengers were being profiled?

17         A.      The press usually.

18         Q.      I'm sorry?

19         A.      The press.

20         Q.      So it was in the press that you

21    heard it or you saw it?

22         A.      Uh-huh, yes.

23         Q.      Are you aware whether or not it's

24    factually correct, since 2002, of a perception

25    that Nigerians were being profiled, Nigerian

                              MITCHELL

 1
 2    passengers were being profiled?
 3                MR. CLOPPER:  Again, I object.
 4         Maybe this is my misunderstanding, but I
 5         don't know if we are talking about people
 6         who are on Nigerian planes who may be
 7         from anyplace in the world or who are
 8         ethnically Nigerians?
 9                MR. OKOLI:  We are talking of
10         people who are either ethnically Nigerian
11         on other planes or people going or coming
12         from Nigeria who are dark-skinned.  That
13         is what we are talking about.
14                I am not talking about a Nigerian
15         American diplomat living in or traveling
16         to Nigeria, a white American diplomat or
17         a worker of IBM.  That is not what I am
18         talking about or oil workers.  I am
19         talking of a dark-skinned negroid.
20         A.    We have many complaints from many
21    passengers from many flights that are claiming
22    that they are being profiled.
23         Q.    Sorry, but I'm not asking you
24    about complaints of other people.  My question
25    is very, very clear.  It is yes or no.  I am

```
 1                    MITCHELL
 2    not interested in profiling of Polish people,
 3    Bulgarians.  All that I am interested in is
 4    Nigerian passengers.  If it is not for
 5    Nigerian passengers, I will be glad to take
 6    the answer no.
 7              MR. CLOPPER:  Repeat the
 8         question.
 9              MR. OKOLI:  My question does not
10         relate to anyone else.  It is about
11         Nigerians, so I will ask you to instruct
12         your client to be responsive to that.  If
13         she doesn't know, she doesn't know.
14         Q.    Are you aware of any perception
15    that ethnic Nigerians or Nigerian passengers,
16    whether traveling out of the United States or
17    coming into the United States, are being
18    profiled or targeted for different treatment
19    by CBP or U.S. Customs?
20              MR. CLOPPER:  Objection.  At this
21         time?
22              MR. OKOLI:  Has she ever?
23              MR. CLOPPER:  Ever?
24              MR. OKOLI:  Yes, of that
25         perception I am talking about.
```

```
 1                    MITCHELL
 2        A.      I don't know what people's
 3   perceptions are.
 4        Q.      Okay.  Did you ever hear any
 5   rumors, not in the press, from the workplace?
 6        A.      So now is your question employees?
 7        Q.      Employees.
 8        A.      I have never heard employees say
 9   that we are profiling Nigerians or passengers
10   on Nigerian planes.
11        Q.      Now, I will ask a slightly
12   different question.  Since Ms. Akinyemi's
13   case, have you learned, maybe third-hand or
14   fourth-hand, learned that a customs employee
15   thought that Nigerian passengers were being
16   profiled?
17        A.      I have never learned that a
18   customs employee thought that Nigerian
19   passengers were being profiled.
20        Q.      Okay.  If they were being
21   profiled, would you see anything wrong with
22   that?
23        A.      We don't profile passengers at
24   all.
25        Q.      I am just asking.  If they were,
```

```
 1               MITCHELL
 2   would you find anything wrong with that?
 3        A.    Yes.  I don't believe profiling is
 4   an effective law enforcement tool.
 5        Q.    As the director of field
 6   operations, are you aware of any policies in
 7   place regarding drug trafficking that are
 8   applied differently to Nigerians than they are
 9   applied to others?
10        A.    I don't know of any policy that
11   applies to one nationality versus another.
12        Q.    So as you sit here today, you do
13   not know whether Nigerians have ever been
14   profiled by customs officers within your area
15   of command based on the perception of
16   trafficking and drugs?
17        A.    I don't know of any of my
18   employees that ever profiled anyone.  I do
19   believe that flights from Nigeria have been
20   targeted, but it is the country as opposed to
21   the people.
22        Q.    What is the distinction between
23   the country and the people?
24        A.    We have a variety of countries of
25   interest, whether for terrorism or for
```

1                MITCHELL

2    narcotics.  Anyone coming from that country

3    could be questioned for those reasons, not

4    necessarily the people, the nationality.

5              It is the country where the flight

6    is coming from, where the passenger is coming

7    from, not where the passenger was born, that

8    is of interest for a law enforcement

9    perspective.

10       Q.     When you say "the country where

11   the flight is coming from," as a matter of

12   common sense, would you expect more people on

13   that flight be citizens of that country than

14   non-citizens?

15       A.     That would be the norm.

16       Q.     So if you were targeting a flight

17   coming from Nigeria, you would expect the

18   majority of the people flying on that plane to

19   be Nigerian citizens?

20       A.     Correct, but they may not be the

21   ones of interest to us.  In fact, it may be

22   the non-Nigerians that is of more interest to

23   us from a law enforcement perspective.

24       Q.     Do you have any documentation of

25   the people that you have interdicted or

1          MITCHELL

2   challenged as persons of interest coming on

3   flights from Nigeria?  Do you have any such

4   documents?

5          A.      Every passenger coming through has

6   to go through a clearance process, so I could

7   tell you every passenger has been talked to

8   and has been examined for CBP.

9          Q.      That is not my question.  When you

10  talk about targeting, what does targeting mean

11  to you?  Explain that to us when you say

12  certain countries, flights from certain

13  countries are targeted.  Explain that to us.

14  What does that mean?

15         A.      Certain countries might be --

16  depending on the particular area of interest,

17  certain flights coming from certain countries

18  might have more interest and so I would expect

19  that resources would be more dedicated to

20  looking and determining the threat of those

21  individual passengers in that flight.

22         Q.      When you say certain flights

23  coming from certain countries have more

24  interest, what is that in plain speak?

25         A.      It could be for terrorism.  We

1              MITCHELL

2    have a variety of flights that are of interest

3    for that.  For narcotics, we have flights of

4    interest.  For agriculture, we have flights of

5    interest for those various items.

6         Q.      Could you name the flights of

7    interest in relation to narcotics that you are

8    aware of since you became director of field

9    operations?

10              MR. CLOPPER:  Objection.  I think

11         we need to take a break.  I need to --

12              MR. OKOLI:  Not while a question

13         is pending on the record and the fact

14         that counsel is asking for a break --

15              MR. CLOPPER:  Sure.  I am

16         concerned about a privilege issue here.

17              Do you think you can answer that

18         question without violating a privilege,

19         including law enforcement privilege?

20              THE WITNESS:  That is law

21         enforcement sensitive information.

22              MR. CLOPPER:  I am with National

23         Security.  I am instructing my client not

24         to answer.

25         Q.      But you do admit that there are

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                    MITCHELL
 2    flights coming from certain countries that
 3    Customs targets?
 4         A.     Correct, we do have targets.
 5         Q.     Okay.  And some of the targets are
 6    based on the perception that those flights are
 7    likely to have drug traffickers?
 8         A.     I would not use the word
 9    "perception."
10         Q.     In terms of drugs, what would
11    cause you to have specific interest in flights
12    coming from a certain country, whatever that
13    country is?
14         A.     It could be the region of the
15    world that it is.  It could be specific
16    information.  It could be general information
17    in the intelligence community.  It could be
18    past history of successful interdiction.
19    There's a variety of reasons that together
20    could form the basis for a risk assessment.
21         Q.     So if a customs officer were to
22    say that they targeted Nigerians because of
23    their possible drug involvement, that would be
24    incorrect?
25         A.     I would think that it would be
```

```
 1                    MITCHELL
 2     incorrect to target Nigerians.
 3         Q.      No, no, no.  I am --
 4         A.      That is the question you asked
 5     though.
 6         Q.      No.  My question is -- let me
 7     rephrase my question.  My question is, if a
 8     customs officer were to testify that they, at
 9     their location at the airport, targeted
10     Nigerian passengers, you would say that that
11     customs officer's testimony is incorrect?
12         A.      In the context that you just said,
13     yes, I would say that is incorrect.
14         Q.      But you do not work at the
15     airport; do you?
16         A.      Not anymore.  That is within my
17     area of responsibility, but I am not assigned
18     at the airport.
19         Q.      So even as the director of field
20     operations, if a customs officer who actually
21     works at the airport were to say that they
22     targeted Nigerians, Nigerian passengers, you
23     would dispute that?
24         A.      I would think that that was not a
25     good law enforcement tool, and I don't think
```

```
 1                    MITCHELL
 2   that that's appropriate.
 3        Q.     Well, it is not whether it is
 4   appropriate but whether you are going to say
 5   that that officer is not telling the truth?
 6        A.     I don't know what's making him say
 7   that, so it is hard for me to assess the
 8   truthfulness of his statement.
 9        Q.     In other words, you are not in a
10   position to say one way or the other what is
11   actually going on at the airports except what
12   somebody reports to you.  Correct?
13        A.     That's correct.
14             MR. OKOLI:  All right.  That would
15        be it.
16             MR. CLOPPER:  Great.  Let us take
17        a five-minute break.  I may have
18        follow-up questions and it would be just
19        a couple, if any.
20             MR. OKOLI:  Okay.
21             (Whereupon, a short recess was
22        taken.)
23             MR. CLOPPER:  I will ask two
24        questions.
25             MR. OKOLI:  Sure.
```

```
 1                    MITCHELL
 2    EXAMINATION BY
 3    MR. CLOPPER:
 4         Q.    Ms. Mitchell, my name is John
 5    Clopper and I represent the defendants in this
 6    case.  I am going to be asking you a couple of
 7    questions.
 8              Earlier in the deposition, you
 9    were questioned by Mr. Okoli about the
10    investigation and/or discipline of Sharmila
11    Haq Zaman.
12              At the time you became aware of
13    the allegations against Ms. Zaman, was
14    Ms. Zaman a probationary or permanent
15    employee?
16         A.    She was a permanent employee by
17    that time.
18         Q.    Earlier in the deposition,
19    Mr. Okoli asked you a few questions about
20    Ms. Zaman and I don't want to misquote you but
21    part of the procedure in that situation called
22    for the possibility of an oral reply.
23              Did the procedure that applied in
24    that case differ as a result of Ms. Zaman's
25    status as a permanent employee at that time?
```

1                     MITCHELL

2        A.        Permanent employees do have a

3    different distinct process in the discipline

4    or adverse action.

5                 MR. CLOPPER:  Thank you.  I don't

6        have any further questions.

7                 MR. OKOLI:  Okay.

8    CONTINUED EXAMINATION BY

9    MR. OKOLI:

10       Q.        Please listen carefully to my

11   question.  I don't want to know what you

12   discussed with counsel, but my question is

13   this:  During the break, did you have any

14   conversation -- it is a yes or no answer that

15   I am looking for.  Did you have any

16   conversation with counsel regarding how you

17   were going to respond to the questions that

18   were just put to you?

19       A.        Absolutely not.

20                 MR. OKOLI:  Thank you.

21                 MR. CLOPPER:  During the break,

22       Ms. Mitchell and I discussed certain

23       subject areas.  I did not and she did

24       not -- we discussed the subject areas.

25       We did not -- I wasn't quite sure what

```
1                    MITCHELL

2        your question was.

3              Just to clarify, I did not direct

4        my client to answer the questions in a

5        specific way.

6              MR. OKOLI:  I don't think there's

7        anything to say.  He is just making a

8        statement on the record.

9              MR. CLOPPER:  Okay.

10             (Whereupon, at 12:46 p.m., the

11       examination of this witness was

12       concluded.)

13

14

15

16                            _____

17                                SUSAN MITCHELL

18       Subscribed and sworn to before me

19       this 11th day of November 2007.

20       _____

21                NOTARY PUBLIC

22       Mary McGarvey-DePuy
         Notary Public, State of New York
23           No. 02MC6040900
         Qualified in Queens County
24         Commission Expires  5/1/10

25
```

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

1

2                       E X H I B I T S

3

4    PLAINTIFF'S EXHIBITS:

5

6    EXHIBIT        EXHIBIT                      PAGE

7    NUMBER         DESCRIPTION

8      1            U.S. Department of            61

9                   Treasury document

10

11     2            CBP documents,                64

12                  notice of termination

13

14   3 - 10        Letters                        64

15

16    11           Unsworn declaration            64

17

18

19                      I N D E X

20

21   EXAMINATION BY                             PAGE

22   MR. OKOLI                                 3, 123

23   MR. CLOPPER                                122

24

25

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241