1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

3   -------------------------------------------X
    YEMISI AKINYEMI,

4
                        PLAINTIFF,

5
        -against-        Case No.

6                      07-CV-4048(CM)(AJP)

7
    MICHAEL CHERTOFF, Secretary, Department of

8   Homeland Security,

9                   DEFENDANT.
    -------------------------------------------X

10

11            DATE:  November 6, 2007

12            TIME:  11:34 a.m.

13

14

15       EXAMINATION BEFORE TRIAL of the

16   Defendant, Department of Homeland Security, by

17   GREGORY JON JURCZAK, taken by the Plaintiff,

18   pursuant to a Notice and to the Federal Rules

19   of Civil Procedure, held at the U.S. Attorney's

20   Office, 86 Chambers Street, 3rd Floor, New York

21   New York 10007, before a Notary Public of the

22   State of New York.

23

24

25

```
 1

 2    A P P E A R A N C E S:

 3

 4    LAW OFFICES OF K.C. OKOLI, P.C.
             Attorney for the Plaintiff
 5           330 Seventh Avenue
             15th Floor
 6           New York, New York 10001
             BY:  KENECHUKWU CHUDI OKOLI, ESQ.
 7

 8

 9    UNITED STATES ATTORNEY'S OFFICE
      SOUTHERN DISTRICT OF NEW YORK
10           Attorney for the Defendant
             86 Chambers Street
11           3rd Floor
             New York, New York 10007
12           BY:  JOHN DALTON CLOPPER, ESQ.
                  Assistant United States Attorney
13

14

15    ALSO PRESENT:
             CYNTHIA J. PREE, ESQ., Assistant
16           Counsel, U.S. Customs and Border
             Protection, U.S. Department of Homeland
17           Security

18           DAVID B. BUNA, ESQ., Associate Legal
             Advisor, Commercial and Administrative
19           Law Division, Immigration and Customs
             Enforcement Principal Legal Advisors
20           Office, U.S. Department of Homeland
             Security
21                 *          *          *
22

23

24

25
```

                          G. J. JURCZAK
1
2    G R E G O R Y     J O N     J U R C Z A K,
3         called as a witness, having been first
4         duly sworn by a Notary Public of the
5         State of New York, was examined and
6         testified as follows:
7    EXAMINATION BY
8    MR. OKOLI:
9         Q.    Please state your name for the
10   record.
11        A.    Gregory Jon Jurczak.
12        Q.    What is your address?
13        A.    601 West 26th Street, Suite 700,
14   New York, New York 10001.
15        Q.    My name is K.C. Okoli.  I represent
16   the plaintiff in this lawsuit.  I will ask you
17   some questions in connection with this lawsuit.
18   All I ask is for your best recollection.  If I
19   ask a question and you don't understand, say
20   that you don't understand.
21             I will also ask you to be patient,
22   wait until I finish with the question before
23   you begin to answer.  The simple reason for
24   that is that we want to make sure we get the
25   responses on the record.  I will also not barge

G. J. JURCZAK

1

2  in until you finish your answer for the same

3  reason I just stated.  If I ask a question and

4  you respond, I will assume that you fully

5  understood the question; clear so far?

6          A.    Understood.

7          Q.    You must also verbalize all your

8  answers.  It is yes or no or I don't recall or

9  whichever way you wish to respond.  No shakes

10 or nods of the head.  If during the course of

11 the deposition you wish to take a break or if

12 you wish to consult with counsel or for any

13 other reason, you can call for a break.  We

14 will make a record of it.

15              The address you just gave, is that

16 your work address?

17         A.    It is.

18         Q.    Who do you work for?

19         A.    Immigration and Customs

20 Enforcement.

21              MR. OKOLI:  Counsel, I just need to

22              be clear on this.  Are you going to

23              accept the Subpoena on behalf of the

24              witness should this matter come to

25              trial?

G. J. JURCZAK

1

2          MR. CLOPPER:  Yes.

3          Q.    What's your place of birth, where

4    were you born?

5          A.    Orange, New Jersey.

6          Q.    For how long have you been employed

7    by your current employer?

8          A.    Since approximately May of 2006.

9          Q.    Prior to your present employer, who

10   were you employed by?

11         A.    Customs and Border Protection.

12         Q.    For what time period were you

13   employed by Customs and Border Protection?  I

14   will call it CBP for short.

15         A.    From its inception.  I don't know

16   the exact date.  From its creation as an

17   agency.

18         Q.    When was the last time you worked

19   for the CBP?

20         A.    Approximately May of 2006.

21         Q.    Prior to the creation of CBP, did

22   you work with a predecessor organization of

23   CBP?

24         A.    Yes.

25         Q.    Which organization did you work

```
1                        G. J. JURCZAK

2    for?

3            A.    Immigration and Naturalization

4    Service.

5            Q.    When did you first become employed

6    by the INS?

7            A.    It was either June or July of 2001.

8            Q.    Was the INS the first Federal

9    agency that you worked for?

10           A.    Yes.  I am sorry, sir, I need to

11   amend that.  I did internships at Federal

12   agencies.  I don't know if you would classify

13   that as work.

14           Q.    Regular employment?

15           A.    Paid work, yes.

16           Q.    What's your current job title?

17           A.    Special Agent.

18           Q.    For the record, what's your race?

19           A.    Caucasian.

20           Q.    What's your highest level of

21   education?

22           A.    College.  Bachelor's degree.

23           Q.    What year did you obtain this

24   Bachelor's degree?

25           A.    Completed study in 1998.  Maybe it
```

1                      G. J. JURCZAK

2    was 1997.

3         Q.    I note that you said completed

4    studies.  What was the year of graduation?

5         A.    I think it was 1998.  I think when

6    the paperwork came through it was 1998.  I am

7    not sure.  I don't recall when my last semester

8    was, whether it ended in the calendar year of

9    1997.  I don't know what year my diploma says,

10   whether it is 1997 or 1998.

11        Q.    During the time you worked for the

12   CBP what title did you hold?

13        A.    Customs and Border Protection

14   Officer.

15        Q.    And as a Customs and Border

16   Protection Officer, what were your duties?

17        A.    I had various duties.  Inbound

18   inspections, outbound inspections.  A Customs

19   and Border Protection Officer was a derivative

20   of the inspector position, but they renamed the

21   job title.  But you were doing the same type

22   work, inspectional work.

23        Q.    What does inspection mean?

24        A.    Primarily inspecting people and

25   things when they come in or depart the United

1                    G. J. JURCZAK

2    States.

3         Q.    When you say inspect people and

4    things, could you be more elaborate about what

5    that is?

6         A.    To determine a person's

7    admissibility into the United States, to

8    ascertain citizenship, to obtain removability.

9    I think there was a second part of your

10   question, counselor, but I don't remember what

11   it was.

12              MR. OKOLI:   Could you read back the

13        second portion of the question?

14              (Whereupon, the referred-to

15        question was read back by the Reporter.)

16        A.    We inspect people and determine

17   their admissibility.  Check their documents,

18   inspect their bags.  Make sure they are in

19   compliance with what they can or cannot bring

20   into or out of the country.

21        Q.    How is this inspection different

22   from what you did as an INS officer?

23        A.    How is it different?

24        Q.    Yes.

25        A.    I was doing a combination of

1                           G. J. JURCZAK

2    immigration and customs enforcement whereas

3    immigration inspector I focus more on

4    admissibility and removability of individuals.

5           Q.    Is there any difference between an

6    inspection and an exam?

7           A.    Yes.

8           Q.    What is the difference?

9           A.    You will have to bear with me as I

10   think about it.  It has been a couple years

11   since I had to define the difference.  An exam

12   is more geared towards U.S. citizens and it is

13   just determining information that you already

14   have.  It is confirming information.  I am not

15   sure if this is the textbook explanation.  This

16   is as I recall.  An inspection is having that

17   person prove to me that they are who they say

18   with documentary evidence, what they tell me

19   verbally and any other information available to

20   me.  It is an intensive exam.

21          Q.    Were you on duty on December 5th,

22   2005?

23          A.    Yes.

24          Q.    And where was the location of that

25   duty, where were you assigned?

1                    G. J. JURCZAK

2          A.    I was assigned to Newark Airport.

3    However, my duties were not limited to the

4    airport.  I was on a roving team.  So my job

5    responsibilities could take me to a seaport or

6    anywhere within the airport or outer airport

7    area.

8          Q.    Do you recall, on the 5th, whether

9    your job duties took you anywhere else other

10   than Newark International Airport?

11         A.    I don't recall.

12         Q.    Do you recall what tour of duty you

13   did?

14         A.    On the 5th?

15         Q.    Yes.

16         A.    On that day I do recall working at

17   the terminals at Newark Airport.

18         Q.    What terminal was that?

19         A.    I think I worked at terminals B and

20   C.  But I don't -- for the -- I recall working

21   at B but I may have worked at C.  But I

22   couldn't know because I was all over the place.

23         Q.    Do you recall what tour of duty it

24   was?  What time did your duty start and when

25   did it end for that date?

```
1                        G. J. JURCZAK

2        A.    I don't recall.

3        Q.    Do you recall whether it was a

4   morning assignment or evening assignment?

5        A.    I believe it was a 12 to 8 tour but

6   we worked various tours.  I think it was an

7   afternoon tour which would be a 12 to 8.

8        Q.    When you say 12 to 8, that would be

9   12 noon to 8 p.m.?

10       A.    Correct.

11       Q.    Prior to December 5th, 2005, had

12   you ever seen Yemisi Akinyemi?

13       A.    I believe I had.

14       Q.    Approximately how many times would

15   you say you had seen her prior to December 5th,

16   2005?

17       A.    Very difficulty for me to put a

18   number to that.

19       Q.    More than five, less than five?

20       A.    I don't know.  I didn't really know

21   her.

22       Q.    Do you recall when it was that you

23   had seen her prior?

24       A.    I recognized her.  I thought it was

25   from Raymond Boulevard or perhaps in the
```

1                         G. J. JURCZAK

2    terminals, but I couldn't pin point where

3    exactly I knew her from.

4         Q.    Do you know who Alyse Long is?

5         A.    Yes.

6         Q.    Who is Alyse Long?

7         A.    Alyse Long was a CBPO that I worked

8    with.

9         Q.    Prior to December 5th, had you

10   worked with Alyse Long as a CBP officer before?

11        A.    Yes.

12        Q.    And on December 5th, during your

13   tour of duty, did you work with Alyse Long?

14        A.    I did.

15        Q.    Do you recall working with Alyse

16   Long at terminal B.

17        A.    On the 5th?

18        Q.    Yes.

19        A.    Yes.

20        Q.    Was there any other CBP officer

21   that worked with you and Alyse Long at terminal

22   B?

23        A.    Perhaps, but not for a certain time

24   period.

25        Q.    When you say perhaps, could you

1                    G. J. JURCZAK

2    explain that to me?

3         A.    I would have worked with other

4    people that could have been working a different

5    shift.  For example, they were working -- we

6    are an overtime job.  They worked, you know, 12

7    to 3 on overtime.  From 12 to 3 they work

8    during our shift so we could have worked with

9    other people.  once they went home, I don't

10   think there are other officers assigned to our

11   tours or duty.  That would be the two of us.

12   That would be a typical scenario if there were

13   no other officers assigned to that tour.  And

14   we frequently would assist other teams or

15   officers upon request.

16        Q.    Now, during your tour, your 12 to 8

17   tour, do you recall performing your job

18   responsibilities in connection with an outbound

19   Air France flight?

20        A.    I do.

21        Q.    Do you recall where that flight was

22   headed?

23        A.    My recollection was it was bound

24   for Paris, France.

25        Q.    In connection with that flight, did

1                          G. J. JURCZAK

2        you work with Ms. Long?

3              A.    I did.

4              Q.    What did you do in relation to that

5        flight or the passengers on that flight?

6              A.    I am not sure I understand.

7              Q.    What did you, did you do anything

8        as a CBP officer in relation to the passengers

9        who were to be on that flight?

10             A.    I think are you asking me if I

11       conducted any inspections of people during that

12       flight?

13             Q.    Yes, inspection or anything else.

14       I don't know whether there is anything other

15       other than inspection that you may have done.

16             A.    Yes.

17             Q.    So did you do inspections?

18             A.    I did several inspections.

19             Q.    Did you do anything else other than

20       an inspection with relation to those

21       passengers?

22             A.    Yes.    Inspection encompasses many

23       things, whatever relates to an inspection.    To

24       answer your question, I did everything that

25       relates to inspection.    It doesn't necessarily

1                        G. J. JURCZAK

2    mean just talking to someone.

3         Q.    You say an inspection encompasses

4    several other things?

5         A.    It potentially could.

6         Q.    Like what?

7               MR. CLOPPER:  You can answer that

8          in a general level.

9         A.    For example, search baggage, search

10   individuals, do a pat down of an individual,

11   request canine, request other law enforcement

12   agencies.

13        Q.    Are you done with your answer?  I

14   just didn't want to interject when you still

15   have something to say.

16        A.    With your permission, if I remember

17   something, can I add it after the fact?

18              MR. CLOPPER:  You absolutely may.

19        Q.    Did you inspect every passenger

20   that went on that flight or was it a random

21   kind of inspection that you did?

22        A.    It was random.

23              MR. CLOPPER:  Objection, compound.

24              But go ahead and answer to the best

25          you can.

1              G. J. JURCZAK

2        A.    It was random for the most part.

3        Q.    When you say it was random for the

4   most part, what does that mean?

5        A.    Meaning we didn't examine or

6   inspect every individual.  We inspected or

7   examined several different individuals that

8   were boarding that flight.

9        Q.    How did you make a determination as

10  to who to inspect?

11            MR. CLOPPER:  Let's take a break.

12        I may object to this question.  I will

13        step outside with Agent Jurczak one

14        moment and we will be right back.

15            (Whereupon, a brief recess was

16        taken.)

17            MR. CLOPPER:  Counsel, I'll object

18        to this question but I am going to allow

19        the witness to answer the question

20        without describing specific law

21        enforcement techniques.

22            MR. OKOLI:  Depending on what the

23        answer, is I don't know what your

24        objection is.

25            MR. CLOPPER:  Law enforcement

Case 1:07-cv-04048-AJP    Document 45-35    Filed 03/14/2008    Page 17 of 127

17

G. J. JURCZAK

1

2      privilege.

3          Q.    Could you answer the question?

4              MR. CLOPPER:  Read back the

5          question.

6              (Whereupon, the referred-to

7          question was read back by the Reporter.)

8          A.    Based on our experience and

9      training, we used different targeting

10     techniques to select people for examination or

11     inspection.

12         Q.    Is it then fair to say that the

13     people that you inspected were only those that

14     were targeted?

15         A.    No.

16         Q.    Do you did you exclude those that

17     were not inspected?

18             MR. CLOPPER:  Objection.  Assumes

19         facts in evidence that anyone who is not

20         inspected was excluded, affirmatively

21         excluded.  There were those that were

22         let go without inspection; correct?

23         There were some passengers that boarded

24         the flight and they were not inspected,

25         they were not stopped.

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

17

1                    G. J. JURCZAK

2              THE WITNESS:  Yes.

3         Q.    How did you make a determination as

4    to who should not be stopped and boarded the

5    flight without an inspection?

6              MR. CLOPPER:  Same objection.  Law

7         enforcement privilege.  He can answer

8         the question without revealing specific

9         law enforcement techniques.

10        A.    There were two inspectors and there

11   were several hundred people on the flight.

12   Logistically, it would be impossible to inspect

13   every single person.

14        Q.    I understand that but that doesn't

15   answer my question.

16        A.    I don't understand your question.

17        Q.    Are you saying that the reason some

18   people were not inspected was simply because

19   there were only two inspectors; is that what

20   your testimony is?

21        A.    I am confused.  Yes, that's fair to

22   say.

23        Q.    Do you know how many people boarded

24   that flight on that day, approximately how many

25   people boarded the flight?

```
 1              G. J. JURCZAK
 2        A.    Approximately, no.
 3        Q.    Do you know whether they were more
 4   or less than 100 passengers on that flight?
 5        A.    No, I do not.
 6        Q.    Did you make a record of those that
 7   you inspected?
 8        A.    For that day on that flight I would
 9   have to go back and check the law enforcement
10   database.  I would be guessing if I said yes or
11   no.
12        Q.    As matter of practice, do you make
13   a note of everybody who is inspected?
14        A.    No.
15        Q.    Your last answer, you had to go
16   check --withdrawn.
17        A.    I didn't say that.
18              MR. CLOPPER:  He is withdrawing the
19        question.
20        Q.    Let me go back quickly to the
21   question of Akinyemi prior to December 5th,
22   2005.  Had you ever spoken with her?
23        A.    I don't recall.
24        Q.    Prior to December 5th, 2005, had
25   you ever heard her speak?
```

G. J. JURCZAK

1

2          A.       I don't recall.

3          Q.       What was your specific duty

4    location at the time you were conducting this

5    inspection of the Air France flight?

6                   MR. CLOPPER:  What's the question

7          again?  Your physical location at the

8          time you were conducting the inspection?

9                   Can you answer that?

10         A.       One of the gates at terminal B. At

11   Newark Airport.  One of the outbound gates.

12         Q.       Now, when you say outbound gate,

13   can you describe what part of the gate you were

14   situated at in relation to the, I guess it is

15   jetway, the place that passengers go through in

16   order to get onto the aircraft?

17         A.       Sure.  Based on everybody's

18   knowledge of what a typical airport or terminal

19   would look like, there are satellites where you

20   check in.  Then you go to different arms of the

21   airport.  In a satellite would be multiple

22   airplanes coming through that portal and then

23   specific jetways that went to each specific

24   airplane destined for different places.  Where

25   I was physically was in the outermost portal

G. J. JURCZAK

1

2    closest to the jetway of Air France on that

3    particular day which we are discussing.

4        Q.    Is that anywhere close to where the

5    ticketing agents would normally take passengers

6    boarding flights or check passenger's boarding

7    passes?

8        A.    Could you put it in context of

9    distance, sir?

10        Q.    Yes.  Where you were physically,

11    where you were doing this inspection, how close

12    was it, or should I say, is it anywhere near to

13    the part where airline staff or employees check

14    the boarding passes of passengers that are

15    supposed to be boarding a particular flight?

16        A.    I am not sure I understand your

17    question, sir.

18        Q.    At the place where you were, can

19    you describe for us where you were doing this

20    inspection?  If you looked around, what would

21    you see?  Would you see an airline staff desk

22    or anything of the sort anywhere near you where

23    doing the inspection?

24            How close were you to that desk?

25        A.    21 feet.

1                       G. J. JURCZAK

2            Q.    If you used this room, could you

3      use this room from --

4            A.    From here to the far wall.

5            Q.    How close were you to the entrance,

6      I guess, I don't know whether that is the

7      jetway, but the place where you go when you

8      start going down what looks like a tunnel until

9      you get to the aircraft, the entrance to that

10     tunnel for want of a better expression, how

11     close were you to that?

12           A.    About the same distance from the

13     desk.  21 feet, seven yards.

14           Q.    Between you and the desk, who was

15     closer to that entrance?

16           A.    Between me --

17           Q.    Where you were located and the

18     where the airline staff was located, which one

19     was closer to the entrance that we are talking

20     about?

21           A.    I was closer to the entrance to the

22     jetway.  But that's different from where people

23     check in because we never addressed where that

24     was.  That was out --

25           Q.    I asked you could you put it in

1                    G. J. JURCZAK

2    context of distance and we moved onto a

3    different topic from where people actually

4    check in.

5                    Even after you checked in before

6    you boarded the flight, unless there is a

7    different scenario that applies to Air France,

8    you could check in anywhere before you get on

9    the flight, you will have a boarding pass and

10   you have to show this to somebody to be sure

11   that the person that checked in is the person

12   that's boarding?

13       A.    Yes.

14       Q.    I am talking where you present the

15   boarding pass.

16       A.    Yes.

17       Q.    The inspection was nowhere near

18   where the checking in was done?

19       A.    No.  We couldn't see but it was

20   couple of hundred yards, if I was to estimate.

21       Q.    The place where you were doing this

22   inspection, in that general vicinity, is that

23   where there are seats that airline passengers

24   could sit until they announced an actual

25   boarding of the flight?

```
 1                          G. J. JURCZAK

 2          A.    Yes.

 3          Q.    In relation to these sites, how

 4     close were you?

 5          A.    Could I draw a diagram?

 6          Q.    Sure.

 7          A.    I don't know how to answer that

 8     question because there is not just one area of

 9     seats.  I could give you a explanation of the

10     closest seats where we were.

11          Q.    It would be great if we have some

12     drawing.

13          A.    It will be really crude

14     (indicating).  I will write AF and that will

15     represent the jetway and I will put a D which

16     will represent the desk.  And then I will write

17     an S where there is seats, to my recollection.

18     I will write seats.  And then, to your earlier

19     question as to satellite and portal, I will put

20     O for other jetways and I will mark my

21     location.

22          Q.    Could you write it?  Where you put

23     O, could you put jetways?

24          A.    No problem.

25          Q.    D is just desk?
```

1                          G. J. JURCZAK

2          A.    (Indicating).

3          Q.    And where were you located in

4    relation to that?

5          A.    May I mark it with an X?

6          Q.    Yes.

7          A.    This is an approximation.  Should I

8    mark it in distance?

9          Q.    No, the X. Will do.  The X was

10   where you were located?

11         A.    Correct (indicating).

12         Q.    Where was Ms.  Long located?

13         A.    Should I use an O?

14         Q.    Yes.

15         A.    (Indicating).

16         Q.    Next to you?

17         A.    Or behind me or in front of me or

18   to the other side.  Within touching distance.

19         Q.    What did you say A.F. was again?

20         A.    Air France.  That's representing

21   the jetway to where the airplane was parked

22   next to.

23                MR. OKOLI:  Let's have this marked

24            for identification.

25                (Whereupon, the aforementioned

G. J. JURCZAK

1
2          document was marked as Plaintiff's
3          Exhibit 1 for identification as of this
4          date by the Reporter.)
5          Q.    Let me place before you what has
6   been marked as Plaintiff's Exhibit 1.  Where
7   you have A.F., could you please indicate that
8   it is a jetway?  Just write jetway on that A.F.
9   to distinguish from the other.
10         A.    Should I put jetway where Air
11  France was located?
12         Q.    Yes.
13         A.    (Indicating).
14         Q.    On Plaintiff's Exhibit 1, could you
15  draw an arrow to indicate the direction from
16  which the passengers were approaching you, the
17  passengers that were going to board the
18  aircraft, what direction they were coming from?
19         A.    There will be multiple arrows.  Is
20  that permissible?
21         Q.    Yes.
22         A.    (Indicating).
23         Q.    Could you just write beneath it
24  arrows represent the areas from which
25  passengers would approach?

```
 1                         G. J. JURCZAK
 2         A.    (Indicating).
 3         Q.    Let me ask you this, were you
 4    present when the boarding announcement was made
 5    for that particular Air France flight?
 6         A.    I don't recall.
 7         Q.    Do you recall there being any line
 8    of passengers being formed prior to you having
 9    to inspect passengers?
10         A.    On that day, I don't recall.
11         Q.    From your previous experience,
12    would passengers form a line as they approach
13    you when you were doing an outbound inspection
14    or would they just be coming from different
15    areas as shown by the arrows?
16         A.    There would be both, sir.  To
17    answer your question, there would be a line or
18    choke point to give the boarding passes to the
19    ticket representatives but they would be coming
20    from all over the terminal to get on line.
21         Q.    Do you recall there being a line on
22    that day?
23         A.    As I stated, sir, on that date I
24    don't recall whether there was a line.  I don't
25    remember if I had gotten there prior or at the
```

G. J. JURCZAK

2  time the flight was boarding.

3      Q.    At the time you were doing the

4  inspection, was there a line that you could

5  observe of passengers approaching from either

6  boarding or inspection?

7      A.    If I was conducting inspections, I

8  wasn't looking at what was out beyond the

9  terminal area.  I can't do two things at once.

10     Q.    Where you placed the X and O, which

11 represents where you and Ms. Long were

12 stationed on that day, that's exactly at the

13 entrance of the jetway?

14     A.    It is more or less.  It is, once

15 you pass the desk but it is before you enter

16 the jetway.  In fact, you just jarred my

17 memory.  Some of the jetways would actually

18 split once you got to that point.  We would use

19 the center area as a search area and we have

20 partitions for the passenger privacy in the

21 event we searched a bag or patted down an

22 individual.  I believe this is one of those

23 jetways that actually split.  To answer your

24 question, standing there is a generalization of

25 where we would stand.  I would have to draw

1                          G. J. JURCZAK

2      something to scale which is beyond my

3      abilities.

4          Q.    You are saying that it's your

5      testimony that the jetway that was used on that

6      day for the inspection of the Air France

7      passengers was a jetway that was split in two;

8      is that what are you saying?

9          A.    I don't recall, but in past

10     experience in that terminal, in those jetways,

11     they had ones that split.

12         Q.    Now, the desk that you represented

13     there, how high would that desk be from the

14     floor?

15         A.    I don't know.

16         Q.    Higher than this desk?

17         A.    I believe so, yes.

18         Q.    Higher than five feet from the

19     floor?

20         A.    I don't think so.

21         Q.    How tall are you, sir?

22         A.    Approximately 5'10".

23         Q.    Do you believe that this desk would

24     get to your chest if you were standing in front

25     of this desk?

1                    G. J. JURCZAK

2          A.    If I recall correctly, they sat on

3    stools.  So they were higher than a standard

4    desk but not having to stand and write above

5    their shoulders.  And may I add that this was a

6    split jetway, because the planes didn't

7    necessarily go to the same jetways every day.

8    They rotate or vary or sometimes go to

9    different terminals.

10         Q.    But we are talking terminal B on

11   that day?

12         A.    Yes.  And if there was, in fact, a

13   split in the jetway, there would be another

14   desk for the other plane that was boarding

15   often times simultaneously.  Should I reflect

16   that?

17                MR. CLOPPER:  I think we've gotten

18         past your artistic ability so let's

19         stick to verbal answers.  But I will

20         asked for a signed copy of that.

21         Q.    When you performed an inspection,

22   were you seated or standing?

23         A.    While I performed what inspection?

24         Q.    When you performed inspections on

25   that day, would you be sitting on a chair like

1                      G. J. JURCZAK

2    this when passengers were proceeding or were

3    you standing as passengers approached you?

4         A.    When?  Would I either be observing

5    --

6         Q.    Withdrawn.

7               You indicated that both you and Ms.

8    Long were located in the place where you marked

9    X and O.

10        A.    Correct.

11        Q.    As you were located there, was

12   there a seat you were sitting on or were you

13   standing?

14        A.    I don't recall but we would rarely

15   sit.  We were normally standing.  We might be

16   kneeling as we were examining luggage or, you

17   know, squatting against the wall waiting for

18   passengers or just for the flight time to come.

19        Q.    That's squatting, kneeling or

20   standing?

21        A.    Yes.

22        Q.    Do you recall, at any previous

23   locations, having a seat there and actually

24   sitting?

25        A.    At times there would be wheelchairs

1                    G. J. JURCZAK

2      and I have on occasion sat in a wheelchair, but

3      this is normally out of the view of the public

4      sight.  But in the view of the public sight you

5      try to look professional and stand.

6           Q.    If you were standing, would there

7      be anything blocking your view beyond the desk?

8                 If you were standing at X and O,

9      would there be anything blocking your view

10     beyond the desk that is depicted?

11          A.    Theoretically several things could

12     obscure your view.

13          Q.    Like what?

14          A.    Pillars, structural pieces to the

15     building, other passengers.

16          Q.    Passengers?

17          A.    Other passengers, vendors, the

18     carts that people drive around in, luggage

19     containers that are in excess of my height so I

20     wouldn't be able to see through them.  Poor

21     lighting conditions.  These are just some

22     examples.

23          Q.    Let me take the carts that people

24     are driving by in.  Where would those carts be

25     driven past if you were sitting here

1                    G. J. JURCZAK

2     (indicating)?  Could you indicate where the

3     cart would be driven that's on that diagram if

4     a cart was being pulled or driven past that

5     location?

6                    MR. CLOPPER:  I think we have

7              exhausted the diagram.  He can describe

8              where the carts would be.

9                    MR. OKOLI:  I am asking him to mark

10             on the diagram where the cart would be

11             the cart he just described.

12             Q.    If it was being pulled or driven by

13     and you were here (indicating), where would it

14     be in relation to the seats of those

15     passengers?

16                    MR. CLOPPER:  I am unaware of any

17             right to require a witness to mark

18             anything on a diagram.  I could be wrong

19             about that but I am not sure.  I will

20             object.

21                    MR. OKOLI:  The Witness created the

22             diagram and there have been questions

23             further on that.  If he says he cannot,

24             that's what it is.  I don't think your

25             objection is well taken.  We can leave

1        G. J. JURCZAK

2        that for asking the Judge.  I have a

3        responsibility to question him on the

4        diagram.  You were not there, I wasn't

5        there, he was there.

6              MR. CLOPPER:  He can give verbal

7        answers.  I think we are done with the

8        artwork.

9              MR. OKOLI:  You are not testifying,

10       you didn't say we are done.  You are not

11       testifying, sir.

12       Q.    Can you please honor me and mark on

13   this diagram what you just testified to, a cart

14   that could theoretically obstruct your view?

15   Could you please mark that on Plaintiff's

16   Exhibit 1?

17             MR. CLOPPER:  I am unaware that a

18       witness has to mark anything.

19             MR. OKOLI:  Are you instructing the

20       witness not to answer?

21             MR. CLOPPER:  We are done marking.

22             MR. OKOLI:  Let's have that marked

23       for a ruling.

24       Q.    The cart that you talked about,

25   would that be in some area, a passage way

1                    G. J. JURCZAK

2    that's meant either for foot traffic or for

3    carts to go by?

4         A.    Can I just add to this?  You had

5    asked what the closest sites were to the desk

6    area.

7         Q.    That wasn't my question.  Could you

8    please answer the question that's right now

9    before you?  The carts that you talked about,

10   would they be carts going in the place meant

11   for carts to go by or where human beings could

12   walk by or would they be somewhere else?

13        A.    In the hypothetical situation you

14   are describing, it would be impossible for me

15   to describe based on this diagram.

16             MR. CLOPPER:  Answer it not based

17        on the diagram.

18        Q.    I am not talking about based on the

19   diagram.  Have you ever been at the airport

20   where some passengers climb on things that look

21   like trolleys and then are driven and then you

22   here beep, beep, beep and they are driving down

23   the pathway?  Have you ever seen that kind of

24   cart?

25        A.    Yes.

1                    G. J. JURCZAK

2           Q.     The cart that are you talking

3    about, would they pass the same place where

4    those vehicles that would carry some passengers

5    and beep or would they be located at some other

6    place?

7           A.     Those are the vehicles that I was

8    referring to.

9           Q.     Exactly.

10              So these vehicles would then be

11   beyond the seats that you have just described

12   here; correct?

13          A.     I can't say whether there were ever

14   carts that came up any closer or farther away.

15   I would be speculating on that.

16          Q.     Would the passengers, these seats

17   that we are talking about, are passengers

18   approaching between you and the carts or beyond

19   where the carts would be passing?

20          A.     Forgive me counselor, I am confused

21   as to what your question is.

22          Q.     Let us use the diagram again for

23   purposes of assumption. Let us assume that the

24   carts would be going by in some area where they

25   could drive past. The passengers that you are

1                    G. J. JURCZAK

2    talking about, who would approach you for

3    inspection, would they be on the other side of

4    the passage way where the carts would be or

5    would they be closer to you?

6         A.    Based on this diagram, counselor?

7         Q.    Yes.

8         A.    Based on this diagram, I can't

9    answer that question because there are seats

10   all over the place.

11        Q.    The carts that are you talking

12   about, would they be driving into seats or

13   would they have a clear path where they are

14   passing?

15        A.    They wouldn't be driving into

16   seats, they would be driving in between rows of

17   seats.  It is an open area.  There are seats

18   all over the place and these carts go all over

19   the place.

20        Q.    So where you just indicated seats

21   are is not the only place where you have seats

22   in that area?

23        A.    Yes.  What I was trying to answer,

24   you had asked me originally where the closest

25   seats passengers would sit in relation to the

1                   G. J. JURCZAK

2     desk and where we usually might set up for a

3     flight.  But this isn't representative of all

4     seats nor could I ever draw where they are

5     because A, I wouldn't know how to do it and B,

6     the layout changes.  There is constant

7     construction.  Jetways are closed.  Partitions

8     are put in.  New restaurants are added.

9          Q.     My question is your recollection as

10    of that day, not what happened before or after.

11    It is you know the questions you are being

12    asked relates to December 5th, 2005?

13         A.     Sir, what's your question.

14         Q.     My question is, as you sit here

15    today, you know the questions I am asking you

16    relate to December 5th, 2005; is that fair?

17         A.     That's fair.

18         Q.     I wasn't asking you any questions

19    about what the situation might have been way

20    before December 5th, 2005 or what the situation

21    is today; you understand that?

22              MR. CLOPPER:  Asked and answered.

23         A.     Yes.

24         Q.     Other than you and Alyse Long, was

25    there any other CBP officer who was working the

1                    G. J. JURCZAK

2    outbound flight at that particular point in

3    time?  I am talking about the Air France

4    flight.

5         A.    I don't recall.

6         Q.    Is there any document that you have

7    anywhere that would jog your memory or help you

8    recall whether there was anyone else other than

9    you and Ms. Long working the outbound flight on

10   that day?

11        A.    Is your question, sir, were we the

12   only two people working Air France in the

13   terminal area?

14        Q.    Yes.

15        A.    Correct, it would be Officer Long

16   and I.

17        Q.    Were you present at the time that

18   the passengers began to board the flight?

19        A.    I don't recall.

20        Q.    Were you present when the last

21   passengers boarded the flight?

22        A.    I believe so.

23        Q.    Was Ms. Long with you throughout

24   the time that you performed this inspection?

25   Was she in the same vicinity, close by, give or

1                         G. J. JURCZAK

2     take three feet, five feet?

3          A.    Counsel, when are you saying this

4     inspection, are you talking about a particular

5     inspection?

6          Q.    The entire outbound flight.

7                During the course of the boarding

8     of that flight, did you ever leave that

9     location to go elsewhere for any reason?

10         A.    I believe we verified someone's

11    money and a couple of bags, but that was

12    located further back in the jetway.  But we

13    never left that area.

14         Q.    When you say located further back,

15    that would be going further from where you were

16    towards the aircraft; is that what it is?

17         A.    Based on my diagram, it would be

18    where the F is based on A.  But I didn't

19    represent the split in the jetway.

20         Q.    When you verified that were you

21    with Officer Long?

22         A.    Yes.

23         Q.    What I am trying to get at,

24    throughout the time that you worked this

25    outbound flight you were together with Officer

```
 1                    G. J. JURCZAK
 2    Long; is that a fair statement?
 3          A.    Yes.
 4          Q.    There what no time when Officer
 5    Long left and you were doing an inspection?
 6                MR. CLOPPER:  Objection, vague.
 7                Answer to the best of your ability.
 8          A.    As I recall, yes.
 9          Q.    Did there come a time when you
10    spoke to an Air France passenger who we know to
11    be Olubukola Seweje?
12          A.    Yes.
13          Q.    At what point in time did you first
14    notice Mr. Seweje?
15          A.    I recall or I believe it was when
16    he was approaching the jetway.
17          Q.    Was there anything that caused you
18    to notice Mr. Seweje?
19                MR. CLOPPER:  Objection, vague.
20                You can go ahead and answer to the
21          best of your ability.
22          A.    The question again, please?
23                (Whereupon, the referred to
24          question was read back by the Reporter.)
25          A.    I don't recall.
```

```
 1                        G. J. JURCZAK

 2          Q.    Between you and Ms. Long, who was

 3    it that first spoke to Mr. Seweje?

 4          A.    I don't recall.

 5          Q.    Did there come a time that you

 6    personally spoke to Mr. Seweje?

 7          A.    I did.

 8          Q.    At what point did you speak to

 9    Mr. Seweje?

10          A.    Are you asking me for a time?  I

11    don't understand the question.

12          Q.    When you spoke to Mr. Seweje where

13    were you and where was he?

14          A.    In the jetway beyond the desk.

15          Q.    And what, if anything, did you say

16    to him?

17          A.    I would be speculating exactly what

18    I said.  What's common is --

19          Q.    You don't recall what you said?  If

20    you don't recall, you don't recall.

21          A.    I usually say pretty much the same

22    thing to all the passengers that I deal with.

23    I identify myself as to what I am and I ask

24    them where they are going.  I request to see

25    their travel documents.
```

1                    G. J. JURCZAK

2          Q.    And this is your general practice?

3          A.    Yes, this is what I do, what I try

4    to do with every passenger.

5          Q.    But you have no specific

6    recollection whether you did it with this

7    particular passenger?

8          A.    It is my recollection that I did do

9    this with this passenger because I do it with

10   all my passengers that I interview.  I am

11   confident that I did do those two things, which

12   is identify myself and ask for travel documents

13   and I try to establish a rapport with hello or

14   something like that.

15         Q.    Mr. Seweje approached you and you

16   introduced yourself; correct?

17               MR. CLOPPER:  Objection, asked and

18         answered.

19         Q.    So what specifically did you ask

20   Mr. Seweje?

21         A.    I don't recall exactly what I said

22   to Mr. Seweje.

23         Q.    Do you recall whether you asked

24   Mr. Seweje for his passport?

25         A.    Yes.

G. J. JURCZAK

1

2      Q.    And what did he say to you?

3      A.    I don't recall exactly what he said

4  to me.

5      Q.    Did he do anything in response to

6  your request for his passport?

7      A.    Did he say anything in --

8      Q.    Did he do anything.  You don't

9  recall if he said anything.  My question is,

10  did he do anything in response to you asking

11  him for his passport?

12      A.    He presented me with his passport.

13      Q.    Did you take the passport?

14      A.    Yes.

15      Q.    Did you examine it?

16      A.    I looked through it.

17      Q.    Did you see his name there?

18      A.    Yes, I did.

19      Q.    You saw his citizenship?

20      A.    Yes, I did.

21      Q.    What did you do as a result of

22  that?

23      A.    I continued my questioning.

24      Q.    What was your questioning, what did

25  you question him about?

1                    G. J. JURCZAK

2          A.    I don't recall exactly what I asked

3    him but typically, with this type of inspection

4    on outbound inspections, we determine the

5    purpose of the travel, ultimate destination and

6    how much currency they are carrying with them.

7          Q.    Did he tell you where he was going

8    to?

9          A.    I don't recall.

10         Q.    Did you determine where he was

11   going to, his ultimate destination?

12         A.    I believe so, during the course of

13   the conversation.

14         Q.    How did you determine that?

15         A.    I asked him.

16         Q.    If you asked him, then did he

17   respond?

18         A.    If I asked a question, he answered

19   the question, yes.

20         Q.    He told you his ultimate

21   destination; correct?

22         A.    Yes.

23         Q.    Did you ask him the purpose of his

24   trip?

25         A.    I believe I did.

```
 1                         G. J. JURCZAK
 2             Q.   And did he tell you?
 3             A.   My recollection is that he said he
 4    was leaving because the weather was bad.
 5             Q.   That's your recollection?
 6             A.   Yes.
 7             Q.   Did you make a note of this
 8    anywhere, that this was what he told you?
 9             A.   At that time or after the fact?
10             Q.   First at that time.
11             A.   At that time, no, we were having a
12    conversation.
13             Q.   Did you record this conversation?
14             A.   With a digital recorder?
15             Q.   Yes.
16             A.   No.
17             Q.   At some point, did you make a note
18    of what you believe he told you?
19             A.   Yes.
20             Q.   How long after this encounter did
21    you make a note of what you believe he told
22    you?
23             A.   I think it is important to note --
24    I want to answer your question but during the
25    course of the initial encounter, Mr. Seweje was
```

```
 1              G. J. JURCZAK

 2    quick to tell me that his wife worked for us.

 3    I didn't understand what us meant.  And to

 4    answer your question, I did make a report of

 5    what he told me during our interview.

 6         Q.     Did you make a note or did you

 7    create some written document of what you

 8    believe he told you?  Whether it is in the

 9    written form or not, I am interested in what's

10    written, not what you may have said, because I

11    have no way of checking what you said.

12              Did you create some document

13    stating whatever it was that Mr. Seweje told

14    you as you recall it?

15         A.     For example, as on a note pad or a

16    document that explained it?  I am trying to

17    answer your question.  We do have currency

18    declaration forms where we advise the passenger

19    of the law.  And they sign the declaration and

20    state they carry XYZ money.  They read it

21    themselves.  They acknowledge it, they make a

22    declaration.  It is a formal document.  I might

23    write notes on that.  I don't recall what I

24    wrote or if I took that documentation at the

25    time.
```

1                    G. J. JURCZAK

2          Q.    Let me be more specific.

3               Do you have a written document or

4     did you create a written document where he told

5     you he was leaving because the weather was bad?

6          A.    There was a statement made to me at

7     the time which I later wrote down.

8          Q.    At what point did you write it

9     down, how soon after the statement was

10    allegedly made to you?

11         A.    In terms of hours or days?

12         Q.    Hours, days.  Your choice.

13         A.    I want to say within two or three

14    hours.

15         Q.    And would that document be the

16    document in which you wrote down that Seweje

17    told you that he was going because the weather

18    was bad?

19         A.    Where would that document be?

20         Q.    Yes.

21         A.    I don't know if I created a

22    document stating that until a later date or

23    time.

24         Q.    That's what I am trying to

25    determine.  When was the first time you created

1                          G. J. JURCZAK

2       this document?

3              A.    I don't recall.

4              Q.    Was it created the same day?

5              A.    I don't recall.

6              Q.    Did you have a document in which

7       Mr. Seweje told you that his wife worked for

8       us, for you?

9                    MR. CLOPPER:  Objection, vague and

10                   ambiguous.

11             A.    My impression, when he said he

12      worked for us meant nothing to me inasmuch as

13      people will say he worked for you, meaning he

14      works for the airline, he works for the T.S.A.

15      People don't know what we do or who we are for

16      the most part.  He could have thought we were

17      the airline, a private security company.  I

18      don't know what meant by us.  During the course

19      of our conversation I tried to determine who

20      exactly he was referring to in trying to

21      ascertain what he meant by us.

22             Q.    Now, had you ever seen or met

23      Mr. Seweje before that day?

24             A.    Not that I can recall.

25             Q.    So it's fair to say that you did

1                          G. J. JURCZAK

2    not know anything about his background?

3         A.    That's correct.

4         Q.    So you do not know what he knew or

5    what he did not know.  Did you ask him whether

6    he knew the difference between CBP and vendors

7    or anything of the sort?

8         A.    I did ask him.

9         Q.    What did he tell you?

10        A.    He said no for you, and my

11   follow-up question to that was, well, who did I

12   work for.  He said where people come in.  He

13   couldn't articulate or say where we were.

14        Q.    What was the question that you

15   posted to him for him to first tell you that he

16   worked for you or us?  You didn't ask him any

17   question, he just volunteered that statement?

18        A.    That was one of the first things he

19   volunteered.

20        Q.    Did he volunteer any other

21   information?

22        A.    Not that I recall, other than

23   answering the questions that were asked of him.

24   He was insistent that he call his wife.

25        Q.    This was during the first time you

1                       G. J. JURCZAK

2      met with him, he was insistent that he call the

3      wife?  Did he tell you why he wanted to call

4      the wife?

5            A.    No.

6            Q.    Did you ask him why he wanted to

7      call the wife, what was the purpose of calling

8      the wife?

9            A.    No, I don't know.  I -- I just

10     wanted to ask him a couple of questions.

11                 MR. CLOPPER:  Objection.  There is

12                 compound question there.

13           Q.    You said you asked for his

14     passport.  Did you find anything wrong with his

15     passport?  By looking at his passport, was

16     there anything you found wrong with his

17     passport?

18           A.    I am not sure I understand what you

19     mean by wrong.

20           Q.    By looking at his passport on that

21     day, was there anything that jumped out at you

22     on his passport that was out of place during

23     that inspection?

24                 MR. CLOPPER:  Objection, vague.

25                 Go ahead and answer to the best of

```
1                        G. J. JURCZAK

2         your ability.

3         A.    Not that I recall.

4         Q.    At some point you gave him back his

5    passport?

6         A.    Yes.

7         Q.    You were satisfied that there was

8    nothing wrong with this passport and you gave

9    it back to him?

10        A.    No.

11        Q.    You weren't satisfied?

12        A.    No.

13        Q.    Why didn't you stop him.  Why

14   didn't you detain him?

15        A.    We don't detain.  We have

16   conversations.  There were other things

17   simultaneously going on.  On some level I

18   believe I was dealing with a colleague's

19   husband even though I was unable to determine

20   who that person was.  He was saying things to

21   me that didn't really make sense to me.

22        Q.    Like what?  That's the purpose of

23   this deposition.  What was he saying to you?

24        A.    He was giving me vague answer as to

25   his trip.
```

1                    G. J. JURCZAK

2          Q.    What vague answers?  What was your

3    question and what was his answer that you

4    considered vague?

5          A.    The fact that he couldn't describe

6    who we were initially right off the bat.  One

7    of his statements right off the bat was my wife

8    is working for you.

9          Q.    You had asked who does your wife

10   work for and he couldn't tell you the wife

11   worked for Customs and Border Protection?

12         A.    Yes.  And sir, it's as if I asked

13   you what you did and you couldn't tell me you

14   were an attorney.  That's why it struck me as

15   odd.

16         Q.    What other question that you asked

17   him that he was vague about.  Tell us every

18   question that you recall asking him that he was

19   vague about or did not respond to, to the best

20   of your recollection?

21         A.    To the best of my recollection, my

22   suspicions lay in the fact that immediately he

23   told me that his wife worked for me.

24   Typically, I don't know whether this is a law

25   enforcement --

1                    G. J. JURCZAK

2              MR. CLOPPER:  Answer the question

3         in terms of what you recall about what

4         he said that was vague.

5         Q.    First of all, I did not ask about

6    suspicions.  I am asking factual questions.

7    What questions, to the best of your

8    recollection, every question that you recall

9    asking him and his responses you considered

10   vague?

11        A.    I don't recall every question I

12   asked.  I typically ask the same questions to

13   every passenger that I deal with.  I got a

14   sense -- I don't recall exactly what I asked

15   him so I can't respond what exactly his answer

16   was.

17        Q.    Other than not being able to tell

18   you that his wife worked for Customs and Border

19   Protection, was there anything else that he

20   told you that you considered vague?

21        A.    I don't recall at this time.

22        Q.    Did you make a note of it at the

23   time that it was occurring as to what it was

24   that he responded to or didn't respond to?

25        A.    I don't recall.

G. J. JURCZAK

1

2      Q.    You don't recall if you were making

3   notes?

4      A.    No, I typically don't make notes as

5   I am conducting an interview unless it is

6   documented because I was actually allowing him

7   to board the flight after we got through the

8   cursory questions.

9      Q.    Do you recall documenting these

10  facts some time after the inspection?

11     A.    Documenting the facts of the

12  initial conversation?

13     Q.    Yes.

14     A.    I recall documenting the entire

15  encounter.  However, at this point in time I

16  can't recall what happened before certain

17  circumstances and what happened after certain

18  circumstances.  I can't answer that question.

19     Q.    You have no recollection as to the

20  chronology of the events that you described; is

21  that fair to say?

22     A.    Not fair to say because there was a

23  specific chronology of events but that explicit

24  question and answer detail at that point in

25  time, I don't remember the exact questions at

1                        G. J. JURCZAK

2    that time or answers.  For the most part, what

3    I recall from that initial encounter was him

4    telling me right off the bat that his wife

5    worked for us.

6            Q.    Did you at any point determine what

7    kind of work he did?

8            A.    I believe I asked him what his

9    occupation was.

10           Q.    Was he vague about that or was he

11   clear about it?

12           A.    I believe he told me he was a limo

13   driver.

14           Q.    Was it during this investigation he

15   told you he was a limo driver?

16                 MR. CLOPPER:  Objection, asked and

17                 answered.  But answer to the best of

18                 your ability.

19                 MR. OKOLI:  It wasn't asked before.

20           A.    The question was again?

21           Q.    The question is, did he tell you he

22   was a limo driver during this first encounter

23   inspection where he told you that his wife

24   worked for you?

25           A.    I believe so.

1                    G. J. JURCZAK

2          Q.    And at that point, you had an

3    opportunity to examine his passport; correct?

4          A.    Yes, I believe so.

5          Q.    Did you scoff at the idea that he

6    was traveling to Nigeria?

7                MR. CLOPPER:  Objection,

8          argumentative.

9          A.    Can you -- can you use another word

10   to describe what you are talking about?

11         Q.    Withdrawn.

12               Did you ask him where he got the

13   money to purchase an airline ticket to Nigeria

14   as a limo driver?

15         A.    I don't recall asking that

16   question.

17         Q.    During this inspection, do you

18   recall whether there was any interactions

19   whatsoever between Mr. Seweje and Alyse Long

20   this first period of your encounter?

21         A.    Given the proximity of where she

22   was standing to me, I believe she was privy to

23   the information that was being disclosed from

24   the subject to me.  I don't recall exactly

25   whether she was involved in the examination

1                   G. J. JURCZAK

2    that was going on simultaneously.  However, I

3    do recall there being the three of us talking

4    because we all -- the both of us worked and

5    when he was trying to explain where his wife

6    worked, I believe Ms. Long was asking

7    additional questions to try to figure out who

8    he was referring to.

9          Q.    After the inspection, at some point

10   you let Mr. Seweje go.  You released him;

11   correct?

12         A.    I believe he boarded the flight.

13         Q.    As you sit here today you believe

14   that he boarded that flight?

15         A.    Yes.

16         Q.    How did you make that

17   determination?

18         A.    He walked towards the direction of

19   the airplane and out of my sight of view.  From

20   where I was standing, I could look down the

21   jetway and you would be obscured for about

22   three feet of the jetway before you stepped

23   onto the airplane.  Unless he went to the end

24   of the jetway, turned sideways and put his back

25   up against the wall like someone would do if

1                    G. J. JURCZAK

2    they were trying hide.  He would have to step

3    on the plane or step on the jetway.  If he was

4    on the jetway, I would see him.

5         Q.    Was he the last passenger that you

6    inspected?

7         A.    No, he was not.

8         Q.    There were other passenger that you

9    inspected?

10        A.    After him, yes.

11        Q.    As you are doing your inspection,

12   you were still able to see where Mr. Seweje

13   went and that he boarded the flight?

14        A.    I can't speculate to that, sir.

15   That would be an assumption.  There is really

16   nowhere else to go.  once people passed us,

17   they get on the plane in normal brackets.

18   However, I want to address your other question

19   which I did not fully answer.  We were

20   discussing Officer Long and I asking him

21   questions.  We weren't asking him anything

22   other than who his wife was because we were

23   curious as to who his wife is because we work

24   with several people and if we run into someone

25   that we know.  And so we will ascertain for the

1                    G. J. JURCZAK

2    person and we will say to a colleague we saw

3    your spouse or mother or friend.  That portion

4    of the exam was more of trying to determine who

5    he was referring to.

6          Q.    Thank you for that.

7                What I am trying to determine is

8    that portion of the exam where you an Ms. Long

9    were questioning him about the identity of the

10   wife.  Did that occur before he was released

11   into the jetway or did it occur after he came

12   back up the jetway?

13         A.    I think it happened before and

14   after.

15         Q.    It happened on both occasions?

16         A.    It is one occasion.

17         Q.    You are saying both you and Ms.

18   Long questioned him about the identity of his

19   wife before he was released into the jetway and

20   questioned him again about the identity of the

21   wife after he came out of the jetway?

22               Is that what are you testifying to

23   today?

24         A.    I think we are leaving out the fact

25   that he boarded the plane and came back off the

1                    G. J. JURCZAK

2    plane.

3         Q.    If you choose to call it that he

4    boarded the plane I won't question that.

5    According to you he boarded the plane, you saw

6    him board the plane?

7         A.    No.

8         Q.    Did anyone tell you, any Air France

9    staff tell you that he actually boarded the

10   plane?

11        A.    Yes.

12        Q.    Who told you that?

13        A.    I don't recall the woman's name.   I

14   did document that however, I believe, after the

15   fact.

16        Q.    And in your documentation you

17   stated that the Air France staff told you that

18   Mr. Seweje actually boarded the plane and came

19   off the plane?

20        A.    It was inferred.

21        Q.    I am not asking you what was

22   inferred, I am asking you what was stated.   We

23   can infer anything that we wish.

24              I am asking you what was stated in

25   the documentation that you are referring to?

1               G. J. JURCZAK

2    Are you saying that this person of the Air

3    France staff told you that Mr. Seweje in fact

4    boarded the plane and came off the plane?  Is

5    that what are you saying?

6         A.    I can't affirmatively answer that.

7         Q.    In one of your answers you said

8    suspicion, you used the word suspicion.

9               What was your suspicion when you

10   were questioning Mr. Seweje?  You said your

11   suspicion was raised.  When you say that your

12   suspicion was raised, what were you --

13        A.    You are asking me a general

14   question as to what I said.  I was, as you say,

15   suspicious when he volunteered right off the

16   bat that his wife worked for us.

17        Q.    What were you suspicious of when he

18   volunteered that statement, what were you

19   suspicious of?  You can go ahead and answer

20   that question.

21        A.    In my experience and training,

22   people will typically assert certain

23   information that would defer examination or

24   inspection by saying that you had a family

25   member working for you.  Who you worked for

1                    G. J. JURCZAK

2    would be a prime text book example of using

3    information to perhaps end an examination

4    prematurely.

5         Q.    In your examination of him, did

6    that cause to you end his examination

7    prematurely?

8         A.    Partially, yes.

9         Q.    The fact that he mentioned that his

10   wife worked for you influenced you as a CBP

11   officer not to do your job; is that what are

12   you saying?

13              MR. CLOPPER:  Objection.  That's

14         not what the Witness testified to.

15         Q.    As a CBP officer, is it your

16   testimony that you stopped an investigation

17   that would otherwise have been longer because a

18   passenger that you did not know told that you

19   the wife worked for you?

20         A.    It was not an investigation but --

21         Q.    Interview?

22         A.    That did contribute, along with

23   other factors, that I chose to end the

24   interview at that time based on that and other

25   things that were happening at the same time.

64

```
 1                      G. J. JURCZAK

 2          Q.    What else was happening at the same

 3   time that contributed to this statement that

 4   caused you to end the examination at that time?

 5          A.    Officer Long was interviewing a

 6   couple that was carrying over $10,000 and we

 7   needed to verify that money.

 8          Q.    Anything else other than the fact

 9   that you needed to verify the money that

10   another passenger was carrying that Ms. Long

11   was examining, and the fact that Mr. Seweje

12   mentioned that the wife worked for CBP?

13   Anything else that contributed to your ending

14   the examination or inspection at the time that

15   you did?

16          A.    Those are four questions.

17                MR. CLOPPER:  Objection, compound.

18          Q.    Other than what you have testified

19   to, is there anything else that contributed to

20   you not questioning Mr. Seweje further than you

21   did?

22          A.    My desire is to help my partner.

23   The fact is, although they didn't add up to me

24   at the time, I was giving that passenger the

25   benefit of the doubt that he was who he said he
```

1                    G. J. JURCZAK

2    was and was doing whatever he was doing and I

3    chose -- I used my officer discretion to end

4    the interview at that time.

5              MR. CLOPPER:  Let's take a five

6         minute break.

7              (Whereupon, a brief recess was

8         taken.)

9              MR. OKOLI:  Could we have the last

10        question and answer?

11             (Whereupon, the referred-to

12        question and answer were read back by

13        the Reporter.)

14        Q.   How did you end your examination or

15   inspection of Mr. Seweje?

16        A.   I believe I made a statement to

17   have a nice night, have a nice flight.

18        Q.   For the record, could you describe

19   Mr. Seweje for us?

20        A.   Male.

21        Q.   As best you recall him?

22        A.   Black male, maybe 5'10", 215

23   pounds.  That's pretty much what I remember.

24        Q.   During that first inspection before

25   you sent him on his way, before you concluded

66

G. J. JURCZAK

1

2    your inspection of Mr. Seweje, did you ever

3    hear Ms. Long ask for his passport?  Other than

4    you asking him for his passport, did you hear

5    Ms. Long ask Mr. Seweje for his passport?

6        A.    I don't recall.

7        Q.    Did there come a point in time that

8    after you released Mr. Seweje you saw him again

9    that day?

10       A.    Yes.

11       Q.    How soon after you released him did

12   you see him again?

13       A.    It is difficult for me to put an

14   exact time period to that, but it was before --

15   I believe we were talking about one of the last

16   passengers boarding the flight, so it was while

17   the flight was still boarding.  I would be

18   guessing if I said five minutes or ten minutes.

19       Q.    So you have no recollection of how

20   much time passed before you saw him again?

21       A.    I have some recollection based on

22   the overall time period in which we were

23   working.  We weren't there for an hour.  He was

24   towards the end of the flight and we had spoken

25   to -- we verified the money from the people

1                       G. J. JURCZAK

2    that we had verified.  I think Officer Long had

3    done a pretty intense exam of another passenger

4    and we were discussion the flight and

5    everything that had occurred during the course

6    the flight and including the last passenger.

7    If I recall correctly, Mr. Seweje came back up

8    from the area where only the plane is.  So you

9    can deduce the time period from that

10   description.  I don't know how long it was.

11   Couple of minutes.

12        Q.    Could you give us an approximation?

13              MR. CLOPPER:  Objection.  I think

14        he just did.

15        Q.    When you say a couple of minutes,

16   what does that mean, five minutes, ten minutes,

17   two minutes?

18              MR. CLOPPER:  Go ahead and answer

19        to the best your about.

20        A.    As I recall, it could have been

21   five or ten minutes.  Perhaps 15 minutes.  I

22   don't know.  I was involved in other things.

23   As I again stated, it was towards the end of

24   the flight.  There were only a couple of

25   passengers.  If you recall, usually an exam

1                    G. J. JURCZAK

2     takes two to three minutes.  Maximum number,

3     five to ten minutes.  I wouldn't say it

4     exceeded more than ten minutes.

5          Q.    At the time that you performed an

6     inspection on Mr. Seweje, approximately how

7     many passengers do you recall remaining to be

8     inspected or to board, whichever you choose?

9          .    A.    That's impossible for me to answer.

10    Would you like an explanation as to why, sir?

11         Q.    Yes.

12         A.    Not all passengers are present in

13    the boarding area at the time.  And we are not

14    keeping track of, you know, the flight manifest

15    as to how many people walk pass us.  We are not

16    checking.

17         Q.    Thank you.

18              At the time that you first saw

19    Seweje coming back up, were you still in the

20    place where you marked as X and O on

21    Plaintiff's Exhibit 1?

22         A.    Yes, sir, approximately.  That area

23    could have been a few feet back, could have

24    been a few feet forward.

25         Q.    Do you see on that diagram where it

1                    G. J. JURCZAK

2     was that you first observed Seweje as he was

3     coming back?

4          A.     He came from behind us, from the

5     plane, from the only way that you could get to

6     the plane, the jetway.

7          Q.     So is it fair to say that you did

8     not see him walking up until he got to you,

9     until he got to where you were?  You said he

10    came from behind you?

11         A.     I can only conclude that he came

12    from the airplane because he would have been

13    observed coming from any other direction or any

14    other place.

15         Q.     I am trying to clarify.  At the

16    time that he came up to you, did you have your

17    back towards the jetway?

18         A.     Yes.

19         Q.     So is it fair to say then that you

20    did not see him as he walked up until he got to

21    where it was clear that he was coming from the

22    jetway?

23         A.     I don't understand your question,

24    sir.  Could you repeat the question?

25               MR. OKOLI:  Read back the question.

1              G. J. JURCZAK

2                   (Whereupon, the referred to

3              question was read back by the Reporter.)

4         A.    Yes, you can conclude that.  That

5    just means he was just coming from the plane or

6    from the direction of the plane; correct?

7         Q.    Yes.

8         A.    Okay.

9         Q.    And tell us, the first time that

10   you saw him after he walked up from the

11   direction of the plane, tell us what you first

12   observed?

13        A.    He was looking into the terminal

14   area.  I am pointing to the diagram.  That's a

15   wide open space and I think I made a statement

16   such as hi, did you forget something or

17   something to that effect.  He walked past

18   Officer Long and ignored my question.  Officer

19   Long, I believe, asked him a question and right

20   behind him was the Air France representative

21   who we looked at, shrugged or looked to her for

22   explanation and she rolled her eyes and

23   shrugged and he said something to the effect

24   that I think I have to make a phone call or

25   something to that effect.

1                    G. J. JURCZAK

2            Q.    Did he ever ask you if you had a

3      cell phone he could use to make a call because

4      he wasn't getting a signal in the jetway?

5            A.    No, and to that point, cell phones

6      aren't allowed in that area during inspections

7      so --

8            Q.    No, no.  As he walked back up to

9      where you say cell phones are not allowed in

10     that area, do passengers take their cell phones

11     as they are traveling, do they take them onto

12     aircraft?

13           A.    Yes.

14           Q.    Do you have any way of controlling

15     whether a passenger, whether in compliance or

16     in violation of the law, chooses to make a call

17     once they go past you?

18           A.    No.

19           Q.    The airline representative that you

20     talked about, was that male or female?

21           A.    She was a female.

22           Q.    Do you recall the person's name?

23           A.    I do not.

24           Q.    Other than looking at this lady and

25     she rolling her eyes, did she ever say

1                        G. J. JURCZAK

2      anything, did she ever verbalize anything to

3      you on that occasion?

4            A.    I think she was saying something to

5      the effect that, sir, you need to get on board

6      and we need to leave.  Something to that

7      effect.  She wasn't directing it to me.  My

8      back was turned to him.  He basically surprised

9      us.  That wasn't the case.  We were having a

10     conversation and he approached from the jetway

11     and walked up to us.  On his approach, she was

12     saying something to him.  He was ignoring her

13     much as he ignored us as he walked by.

14           Q.    When you say that she was saying

15     something to him, do you recall what she was

16     saying to him?

17           A.    I wasn't able to hear what she was

18     saying to him.

19           Q.    Different question now.

20                 At the time were you able to make

21     out what it was that this lady was saying to

22     him, even if you have forgotten what it was?

23           A.    I don't recall what she was saying.

24     I thought she was saying you need to get back

25     on the plane.

1                          G. J. JURCZAK

2            Q.    I am not interested in what you

3      think, either you know or you don't know?

4            A.    I don't know, counselor.

5            Q.    You stated that Mr. Seweje ignored

6      you.  What did he do after he ignored you or

7      ignored the question you were asking him?

8            A.    He walked past us towards the desk

9      area where they accept boarding passes and

10     started to look around in the terminal area.

11           Q.    Did you observe any cell phone in

12     his hand at the time?

13           A.    I don't remember whether you told

14     me this or whether I am recollecting it.  He

15     was in the process of making a phone call.  He

16     made like he was trying to call his wife or

17     something.

18           Q.    Other than that, did he say

19     anything else to you or did you ask why he was

20     trying to call the wife?

21           A.    I just wanted -- I asked him if

22     there was a problem, if he had forgotten

23     something.

24           Q.    And his only response was he was

25     trying to call the wife?

1              G. J. JURCZAK

2              Did he give any other response?

3         A.   He basically ignored us and mumbled

4    something indiscernible and walked by.

5         Q.   At what point was he trying to call

6    the wife?  Was it after he ignored you and

7    mumbled something?

8         A.   I don't recall.

9         Q.   You do recall at some point he came

10   back and said he was trying to call the wife;

11   that much you recall?

12        A.   After the fact.  But more

13   importantly, I remember his ignoring us in our

14   questioning.

15        Q.   In this deposition I am trying to

16   get the facts.  It is my responsibility to ask

17   questions.  I am trying to get from you if you

18   recall whether he said he was trying to call

19   the wife before he ignored your question and

20   mumbled something or after he had ignored you

21   and mumbled something?

22        A.   It is my recollection that he said

23   that after he walked by us.

24        Q.   And did you see him make a call?

25        A.   I don't recall.

1                          G. J. JURCZAK

2                  MR. CLOPPER:  I have to step out

3              and go down and deal with the next

4              witness.

5                  (Whereupon, a brief recess was

6              taken.)

7                  MR. OKOLI:  Read back the last

8              question and answer.

9                  (Whereupon, the referred to

10             question and answer were read back by

11             the Reporter.)

12         Q.    What else happened that you recall

13     on that occasion after he came up and ignored

14     you, what else do you recall occurred?

15         A.    At that point I recall him saying I

16     called my wife and she is coming back or

17     something to that effect.  It is difficult to

18     remember exactly what happened.  As I was

19     asking questions Officer Long was asking

20     questions.  We were both taken aback looking to

21     the Air France representative for an

22     explanation of what this passenger appeared

23     for.  It was highly abnormal for a passenger to

24     come back from an airplane especially after the

25     duration had been five minutes or ten minutes.

1                      G. J. JURCZAK

2   Whether it had been at the end of the jetway or

3   on the airplane for the passenger to come back.

4   Additionally, because I believe all passengers

5   had boarded at that point.

6        Q.    When you said you were asking

7   questions and Ms. Long was asking questions,

8   what questions were you asking?

9        A.    I asked to see his passport.

10       Q.    Was it you that asked that question

11  or was it Ms. Long?

12       A.    I don't recall.

13       Q.    On that second occasion, did you

14  look at his passport again?

15       A.    Yes.

16       Q.    What was the reason for looking at

17  his passport a second time?

18       A.    Biding time.  Seeing if there was

19  something that I missed the first time going

20  through it.  I was perplexed as to why a

21  passenger that had been inspected and boarded

22  an airplane, as far as I knew, would get off an

23  airplane and ignore us as he came back up the

24  jetway with an airline representative in tow,

25  ignore us and mention something about calling

1                    G. J. JURCZAK

2    his wife when part of our discussion earlier,

3    before he had gone down the jetway, before he,

4    I believe, boarded his plane, was I want to

5    call my wife and I said that's not necessary.

6         Q.    Now, did you hear him on that

7    occasion when he said he had just called his

8    wife and said that he wanted to give the wife

9    money?  Did you hear him say that?

10        A.    I don't know whether it was after

11   the fact or at that time I heard that.  I

12   believe -- I think he said something to that

13   effect.  I think this was his justification for

14   calling her.

15        Q.    You don't recall at what point in

16   time he said he had to give the wife money; do

17   you?

18        A.    Based on my report and reviewing my

19   report, I saw that he had said that and that I

20   recorded it in my report.

21        Q.    When did you review your report,

22   when was the last time that you reviewed your

23   report?

24        A.    Yesterday.

25        Q.    When you say your report, are you

```
 1                       G. J. JURCZAK

 2    talking of the report that you gave to Herbert

 3    Herter?

 4         A.    That report in addition to the

 5    unsworn declaration.  I don't remember the date

 6    of the unsworn declaration.

 7         Q.    The unsworn declaration, you gave

 8    that in connection with an investigation of Ms.

 9    --

10         A.    I don't know what it pertained to.

11         Q.    How did you come to provide that

12    unsworn declaration?

13         A.    I was contacted telephonically by

14    someone asking about the events.  I spoke to my

15    superiors who told me to disclose whatever

16    information they were asking for.

17         Q.    The person that contacted you, was

18    it male or female?

19         A.    My recollection was she was a

20    female.

21         Q.    Was all the contact you had with

22    this female by telephone contact or was there a

23    time that you ever appeared for an in person

24    interview before this female?

25         A.    I never met with anybody.
```

1                    G. J. JURCZAK

2          Q.    And did you get a chance to review

3     the unsworn declaration that you talked about?

4          A.    I did, and I just want to add that

5     not only did I speak to her on the phone but I

6     think I e-mailed or faxed her documents that

7     pertained to the interview.  Yes, I did have a

8     contact with her.  She provided me a document

9     that represented our telephone interview and I

10    made changes as I saw fit that accurately

11    depicted our conversation that was different

12    than what she represented.

13         Q.    After you made those changes, did

14    you sign the document?

15         A.    Yes.

16         Q.    You made changes to what you

17    thought did not quite reflect what you had said

18    during the telephone conversation?

19         A.    I knew that I didn't say certain

20    things in a certain order at that time because

21    there was a much closer time period.  We are

22    talking about things that happened two years

23    ago if I recalled hearing something.  My

24    recollection is a little bit shadier now, but

25    at the time the events happened, between a

1                    G. J. JURCZAK

2    couple of weeks and months, it was very fresh

3    in my mind.  I recall when I got the written

4    version of our conversation that it wasn't

5    representative of our conversation.

6            Q.    The report that you provided to

7    Herter, did that predate the unsworn

8    declaration?  Did the report that you gave to

9    Herter come before or after the unsworn

10   declaration?

11           A.    I am not sure.  I know that the

12   report that went up through my chain of command

13   would be DCO Herter preceded the -- the report

14   to DCO Herter preceded the amended unsworn

15   declaration.  If I recall correctly, the report

16   to my superiors, the four page document versus

17   13-page account which I believe is in

18   possession of both sides here, that was done

19   after the report went through the chain of

20   command.

21           Q.    Just to go back to everything that

22   happened during this second encounter, can you

23   tell us everything you remember about this

24   second encounter?

25                 MR. CLOPPER:  Other than what he

1                    G. J. JURCZAK

2          already said?  Asked and answered.

3          A.    I am unclear as to how detailed.

4          Q.    As detailed as you could possibly

5    be, everything that you recall about this

6    second encounter in the chronology you remember

7    it happening?

8          A.    Pertaining to my encounter with

9    Seweje?

10         Q.    The second time after he came up

11   and said he had just called the wife.  From

12   that point on, could you tell us what happened,

13   what he said, what you said, anything else that

14   you remember?

15         A.    I can describe what I -- as far as

16   people?  Are you asking me who else came to the

17   jetway area?

18         Q.    What else you witnessed during this

19   or if you said something to him, what did you

20   say to him?  When he said something to you,

21   what did you say to him?

22         A.    I believe he eventually ignored our

23   questioning from the time he came up the

24   jetway.  I believe he said he called his wife.

25   And Officer Long and I and the Air France

1                       G. J. JURCZAK

2    representative, amongst ourselves were trying

3    to figure out what the situation was.  At that

4    time I don't -- I can't put a time to it,

5    whether it was 30 second or three minutes

6    later.  From what I will describe as the

7    terminal area, I saw a CBPO, another CBPO

8    approaching and she was, you know, saying

9    something like, as she came into earshot, she

10   was saying, like, that's my husband, that's my

11   husband and she was waving her arm and saying

12   that's her husband.  At that time, as she

13   approached, she walked up to Officer Long and

14   gave her a one sided hug.  Meaning she hugged

15   Officer Long and Officer Long didn't move.  It

16   wasn't reciprocal and she looked uncomfortable.

17   And the Air France rep and I, and again, this

18   is what I witnessed, looked at each other in

19   shock and awe.  Then Mr. Seweje said something

20   about, like, giving his wife money and

21   meanwhile, at the time, I didn't know who the

22   CBPO was.  I know now it is Ms. Akinyemi.  She

23   said this is my husband and we were like great,

24   okay, congratulations.  And this had created

25   eventually a stir because in coming up the

1                      G. J. JURCZAK

2      jetway, him ignoring us, we were trailing

3      Mr. Seweje and the Air France rep, there were

4      other passengers around.  And there was the

5      spec of a uniformed officer walking down and

6      yelling as she approached, distances I don't

7      know, that's my husband, that's my husband.

8      Waving her arms and then hugging an officer.

9      Mr. Seweje, I believe, took out a wallet or a

10     money clip and in a highly theatrical way,

11     which I can only describe as -- this is my

12     recollection, like pulling it out of his wallet

13     in slow motion and taking out bills and

14     snapping them as though you are displaying it.

15     I don't know whether he stuffed it in her front

16     lapel pocket or handed it to her and she said,

17     you know, thank you, honey, or something and he

18     said this is my wife.  And again, my

19     recollection is there wasn't much dialogue

20     between myself, Officer Long and the Air France

21     representative because we were so baffled as to

22     this whole exchange.  At which point, you know,

23     the Air France rep may have said, sir, we need

24     to board you on the plane and Mr. Seweje and

25     Officer Akinyemi did a very public display of

1                   G. J. JURCZAK

2    affection that was, in my opinion,

3    inappropriate for the circumstances.  It was a

4    very public display of affection.  It was a

5    kiss, a very visible kiss.  I don't know how

6    much detail you want me to get into.

7         Q.    As detailed as you can possibly be.

8         A.    Tongues were exchanged in a visible

9    way.  It was not a peck on the cheek, it wasn't

10   a kiss on the mouth.  It was a French kiss for

11   lack of a better description.  Lasting more

12   than just a second.  I think I turned away out

13   of embarrassment.  And they parted and Officer

14   Akinyemi walked backup to the T.S.A. checkpoint

15   area and Mr. Seweje walked down towards the

16   plane and I was speechless.  I looked at

17   Officer Long and she looked at me and I think

18   we said something like we need to get out of

19   here now based on what we just witnessed.  That

20   is what I witnessed, I believe, in full.

21        Q.    At the time of this exchange of

22   tongues, how close were you to them?

23        A.    I would say as far as you are to

24   them.

25        Q.    That would be about six feet, no

1                          G. J. JURCZAK

2     more than six feet?

3          A.    That's accurate.

4          Q.    How close was Ms. Long?

5          A.    I would approximate her at the same

6     distance.

7          Q.    And in terms of Ms. Long, how close

8     were you to Ms. Long when this exchange of

9     tongues took place?

10         A.    Probably as close to Mr. Clopper as

11    I was to Officer Long.

12         Q.    That would be about maybe a foot,

13    foot an a half?

14         A.    That's fair to say.

15         Q.    And when this exchange of tongues

16    took place, were you looking directly at both

17    Ms. Akinyemi and Mr. Seweje?

18         A.    Initially, yes.

19         Q.    And was Ms. Long also faced towards

20    them at the time that you were facing them

21    during this exchange of tongues?

22         A.    Yes, because we were talking to

23    them as four or five people would talk.   We

24    were facing each other in close quarters.   They

25    had talked to themselves.   She had addressed

1                    G. J. JURCZAK

2    both Officer Long and I.  They had addressed

3    each other.  Officer Long and I may have

4    addressed each other.  We were all pretty much

5    facing each other.

6         Q.    At the very moment of this exchange

7    of tongues, was anyone between Ms. Akinyemi and

8    Mr. Seweje and you and Ms. Long?  Was there

9    anyone standing in between you?

10        A.    No, we had a clear line of sight.

11        Q.    Throughout your encounter with

12   Mr. Seweje, did he ever tell you that he had

13   been bereaved and was traveling to Nigeria

14   because he had lost his father and was

15   traveling to Nigeria?

16        A.    I don't recall that ever being

17   disclosed to me.

18        Q.    Did Ms. Akinyemi, at any point when

19   she came to the scene, say that she was seeing

20   off the husband that was traveling because he

21   had lost his father?

22        A.    No, I don't recall that ever being

23   disclosed to myself or Officer Long.  This was

24   a very positive interaction from the initial

25   interview to the end.  There was no, as I

1                        G. J. JURCZAK

2    recall, talk of death or mourning or anything

3    to that effect.

4         Q.    After Ms. Akinyemi left the scene

5    and Mr. Seweje boarded the aircraft, did there

6    come a time that you got back to your office?

7         A.    Yes.

8         Q.    And did you speak to anyone at the

9    office concerning what had transpired earlier

10   or at the gate area?

11        A.    Are you asking me if I discussed

12   with someone the interview with Mr. Seweje?

13        Q.    Correct.

14        A.    Yes.

15        Q.    Who was it that you discussed it

16   with?

17        A.    Officer Long.

18        Q.    And other than Officer Long, anyone

19   else?

20        A.    At the time, no.  When we got back

21   to the office?

22        Q.    Yes.

23        A.    After witnessing what we witnessed

24   and the drive from the gate where we were, we

25   discussed many things.  Many things about the

1                      G. J. JURCZAK

2    evening, the different individuals we

3    encountered but primarily we were discussing

4    the interaction between Mr. Seweje and CBPO

5    Akinyemi and how there were several different

6    factors that drew suspicion and embarrassment

7    to us and to the agency and things that were

8    strange to us and I will defer to you here,

9    John, as far as what else I can disclose,

10   indicators that something was not quite right.

11        Q.   As you sit here today, do you know

12   whether anything was not right with Mr. Seweje?

13             MR. CLOPPER:  Objection.  Vague and

14        ambiguous.

15        A.   The question was to this day am I

16   aware of anything being not right with

17   Mr. Seweje?

18        Q.   Correct.

19        A.   No.

20        Q.   Now, when you said you witnessed

21   Mr. Seweje give money to Ms. Akinyemi in the

22   you described as a theatrical manner, did you

23   observe the denomination of the currency that

24   was given?

25        A.   I believe so, yes.

1                              G. J. JURCZAK

2           Q.    What did you see?

3           A.    I thought there were $50 bills.

4           Q.    How many $50 bills did you see?

5           A.    My recollection is two.

6           Q.    At the time, you had testified you

7    said something like, and when correct me if I

8    am wrong, when Ms. Akinyemi was coming towards

9    Mr. Seweje she was yelling that's my husband,

10   that's my husband, meaning she said it more

11   than once; is that fair?

12          A.    That's what I recall, yes.

13          Q.    You recall that she was yelling?

14                MR. CLOPPER:   Objection, asked and

15          answered.

16          A.    That's what I recall.

17          Q.    And I believe you testified to

18   something like, you used the word

19   congratulations.  Do you remember this

20   testimony?  You said something like

21   congratulations.  Did you say that earlier

22   during this testimony?

23          A.    Did I use the word congratulations?

24                MR. OKOLI:   Could you please go

25          back?

1                    G. J. JURCZAK

2                (Whereupon, the referred to

3            testimony was read back by the

4            Reporter.)

5        Q.    What was the reason that you said

6    great, congratulations to her, saying that her

7    seeing that Mr. Seweje was her husband?

8                MR. CLOPPER:  Objection,

9            argumentative.

10       A.    I don't know whether I said great,

11   congratulations.  I know that I said nothing

12   along those lines.  Okay, congratulations.  The

13   whole question was so bizarre that I eventually

14   was at loss for words and may have said

15   something to the effect of okay, great,

16   congratulations.  I pretty much followed suit.

17   We have a fallback of something that's said.

18       Q.    At the time, did you believe Ms.

19   Akinyemi that Mr. Seweje was the husband?

20       A.    I had my doubts that he was not.

21   You are asking my opinion?

22       Q.    I am asking at the time, I am not

23   talking about after the fact.  At the time that

24   Ms. Akinyemi said this is my husband, did you

25   believe that Mr. Seweje was Ms. Akinyemi's

1         G. J. JURCZAK

2    husband or did you have your doubts?

3         A.    Belief and doubts, that's all.  I

4    can't answer that question whether I believed

5    or had my doubts.  It's really the same thing.

6         Q.    At the time that Ms. Akinyemi said

7    that Mr. Seweje was the husband and you said

8    congratulations and whatever else you said, did

9    you believe that Mr. Seweje was Ms. Akinyemi's

10   husband?

11        A.    No.

12        Q.    You cannot believe then that Ms.

13   Akinyemi told the truth when she said that

14   Mr. Seweje was her husband?

15        A.    I don't want to argue semantics.

16   Belief is a very strong word.  I had my, as you

17   say, picks that I didn't think or believe,

18   which is a softer way of saying it.

19        Q.    You thought she was lying?

20        A.    I am not saying she was lying.  I

21   said I had my doubts that they were married.

22        Q.    And what caused you to have the

23   doubts that they were married in spite of the

24   affirmative statement of Miss Akinyemi that

25   they were?

```
 1                    G. J. JURCZAK
 2          MR. CLOPPER:  Objection, hold on a
 3      second.  Let's go out for a second, real
 4      quick.
 5          (Whereupon, a brief recess was
 6      taken.)
 7          MR. CLOPPER:  I will allow the
 8      witness to go ahead and answer.
 9          MR. OKOLI:  I hope the record
10      reflects that whenever we had those
11      questions we had a break.
12          MR. CLOPPER:  To consult regarding
13      the law enforcement privilege.
14          THE WITNESS:  Could you repeat the
15      question?
16          (Whereupon, the referred to
17      question was read back by the Reporter.)
18          MR. CLOPPER:  I will allow the
19      Witness to answer.  I hope it was
20      recorded on the record that my objection
21      was based on law enforcement privilege.
22      A.   I suspected that they were not a
23  married couple based on the fact of the
24  previous conversation we had since the initial
25  encounter including, but not limited to, that
```

1                    G. J. JURCZAK

2      he was unable to articulate who she worked for.

3      He never told us the name of the agency.  He

4      only described very vaguely what she did.

5      During the course of the exam, he was evasive

6      and based on our training and experience,

7      certain behaviors that were unfolding before

8      our eyes led to these suspicions.

9           Q.    When you said he was evasive, was

10     it anything other than what you have testified

11     to at this point?

12          A.    This afternoon I testified to the

13     fact that he --

14          Q.    My question is very simple.  When

15     you used the word evasive, is it something

16     other than what you have testified to at this

17     deposition?

18          A.    I am restating so I can formulate

19     an answer, sir.

20                Based on what he said, being

21     evasive, I don't recall him being evasive other

22     than instead of answering my questions, him

23     giving statements such as my wife works for

24     you.  But I don't remember exactly every

25     question that was asked and every question that

1                         G. J. JURCZAK

2    was answered verbatim.

3              Q.    Do you recall the questions to

4    which he was evasive, any of the questions that

5    you asked that he did not answer, that he was

6    avoiding?

7              MR. CLOPPER:  Objection, asked and

8         answered.

9              A.    From prior to him boarding the jet

10   area where his wife worked to walking past us

11   after he had already gone down the jetway where

12   you can only get on an airplane and coming back

13   up, avoiding eye contact and ignoring our

14   questions, those were the instances where I

15   feel he was evasive in answering our questions.

16   And at this point in time, that's all I can

17   recall.

18             Q.    Did you make a report of this

19   incident to Herbert Herter?

20             A.    Which incident, sir?

21             Q.    Your encounter with Seweje?

22             A.    Initially, we informed him verbally

23   due to the fact that it was a highly unorthodox

24   evening and encounter even for my job, where we

25   see a lot of strange things.  This ranked up

1                    G. J. JURCZAK

2   with being very out of the ordinary and

3   strange.  I am talking about the overall

4   circumstances.  And we told him we felt

5   obligated to inform him of what we had

6   witnessed based on certain things, also

7   including observations made that we haven't

8   discussed during this deposition.

9          Q.    What other observations did you

10  make that you haven't discussed at this

11  deposition that caused you to make this report

12  to Herter?

13         A.    When I saw Officer Akinyemi come

14  down from the terminal area, she was wearing

15  her uniform.  However, uniform means it is

16  uniform and she was out of uniform.  For

17  example, her duty belt was not on, she was

18  carrying a firearm, however it was in an off

19  duty holster.  She didn't have any extra

20  magazines, she didn't have an intermediate

21  force weapon.  She didn't have handcuffs on.

22  The handgun was positioned in such a way that

23  was tactically unsound and she -- I also

24  noticed that she didn't have a displayed -- and

25  I don't know if I could disclose this having to

1              G. J. JURCZAK

2    do with what identification is required to be

3    in certain areas.

4              MR. CLOPPER:  Tell me what it is.

5              (Whereupon the witness whispered in

6         the attorney's ear.)

7         A.    What I observed on Officer

8    Akinyemi's uniform was a Raymond Boulevard

9    identification that allows you answer to

10   Raymond Boulevard, which is not located at

11   Newark International Airport.  What I also know

12   is that in order for CBPO or any employee to

13   freely walk into any terminal is to display an

14   A.O.A. badge.  It's special because the A.O.A.

15   badge, which is issued by the Port Authority,

16   allow you entrance to different locations.

17   This is a snap shot of what I observed as she

18   approached and the ensuing encounter with the

19   kiss and money exchange and introductons, from

20   all that, combined with the previous

21   discussion, after the fact increased suspicions

22   that I felt initially.

23        Q.    Just to take you back to that, from

24   the time that Akinyemi arrived at the scene to

25   when she left, other than saying this is my

1                           G. J. JURCZAK

2       husband more than once, is there anything else

3       that she said at that time that you recall?

4              A.    I don't remember who said it or who

5       I heard it from.  I thought it was something to

6       the extent he was giving her money or he told

7       me that or the Air France rep told me that.

8              Q.    You don't remember who told you

9       that Seweje was giving money to Akinyemi; is

10      that what are you saying?

11             A.    I believe I heard or I thought I

12      heard Ms. Akinyemi said he has money for me or

13      something to that effect.

14             Q.    At what point did you hear this?

15             A.    When we were talking amongst

16      ourselves, going back to the description when

17      you asked about distance, where Mr. Akinyemi

18      and Seweje were standing in relation to Officer

19      Long and myself.  It was six feet and two feet

20      and a foot and a half.

21             Q.    At the time that you observed Ms.

22      Akinyemi give Officer Long a half hug, did you

23      hear her say anything?

24             A.    I believe she made the statement I

25      know you.

1                        G. J. JURCZAK

2          Q.    And did you hear Officer Long say

3    anything in response?

4          A.    Yes.

5          Q.    What did she say?

6          A.    She said I know you, just like

7    that, with her tone being I know you.  What was

8    said and what was said in body language versus

9    verbal language is very different.

10         Q.    We can't take body language.  We

11   are talking about things that were verbalized.

12         A.    You asked what I observed.

13         Q.    I asked you what was said?

14         A.    What was said is, I know you.

15         Q.    After you reported, you made a

16   verbal report of this to Officer Herter, what,

17   if anything, did Mr. Herter tell you?

18         A.    D.C.O. Herter instructed me to

19   determine who, in fact, we were talking about

20   because when he asked who did you see, I said I

21   don't know.  I think I have seen her around.  I

22   don't know exactly her name and I don't know

23   whether I mentioned this or not, but Mr. Seweje

24   has a different surname than Mr. Akinyemi which

25   was another contributing factor to disbelief

1                    G. J. JURCZAK

2    there was a relation there.  There were no

3    supports by the name of Seweje.  He had asked

4    me to find out, first of all, the identify of

5    who we were talking about.  Also to find out

6    whether that person was working in the airport.

7        Q.    Were you asked to conduct any

8    inquiries on Mr. Seweje?

9        A.    Yes.

10       Q.    Was that to determine his

11   immigration status?

12       A.    Yes, amongst other things.

13       Q.    Was it to determine his marital

14   status?

15             MR. CLOPPER:  Go ahead and tell me.

16             (Whereupon, the witness whispered

17        in his attorney's ear.)

18             MR. CLOPPER:  I think the witness,

19        based on my conversation with him, was

20        talking about potential application of

21        law enforcement privilege.  If you read

22        back the question, I think the witness

23        will be able to answer it provided the

24        Witness does not divulge particular

25        techniques of law enforcement.

1                    G. J. JURCZAK

2          Q.    I am asking you, were you asked to

3    determine his marital status?  That has nothing

4    to do with any techniques.  I am not asking you

5    how you determine it but were you asked to

6    determine his marital status?

7          A.    I was asked to attempt to determine

8    his marital status.

9          Q.    Was that because you did not

10   believe that Seweje and Akinyemi were married?

11         A.    Based on my explanation of the

12   circumstances.  I can't speak for D.C.O.

13   Herter.

14         Q.    You took a look at his passport;

15   correct?

16         A.    Yes.

17         Q.    Was that for the purpose of

18   investigating his immigration status?

19         A.    Whether he was still in status.

20         Q.    I see.

21               Let me place before you what was

22   marked as Plaintiff's Exhibit 3 at a deposition

23   on October 25th, 2007.  I will ask you to take

24   a look at it and tell me if you recognize what

25   that document is?

1                      G. J. JURCZAK

2          A.     This document appears to be the

3     internal memo that I forwarded to my superior

4     officer after this occasion.

5          Q.     It appears to be or it is a copy of

6     it?

7               MR. CLOPPER:   Objection,

8          argumentative.

9          A.     This appears to be the photocopy of

10    the document that I provided to my chain of

11    command.

12         Q.     On the first page there is an

13    initial; do you know whose initials that is?

14         A.     It appears to be my handwriting.

15         Q.     And could you turn to the second

16    page?  Do you see another initial there?

17         A.     I do.

18         Q.     And whose initial is that?

19         A.     It would appear to be G.J.

20         Q.     Who's initial is that?

21         A.     It would be Greg Jurczak.

22         Q.     Do you recall whether you signed

23    the document that you forwarded to your

24    superiors?

25         A.     I do.

1                    G. J. JURCZAK

2          Q.    I ask you again, the initials you

3     are looking at in the document before you, did

4     you write in that initial?

5                    MR. CLOPPER:  Go ahead and answer

6                to the best of your ability.

7          A.    This appears to be my initials on

8     every page of the document.

9          Q.    Could you turn to the last page?

10    Do you see a signature there.

11         A.    I do.

12         Q.    Do you know whose signature that

13    is?

14         A.    That would be appear to be my

15    signature.

16         Q.    Now, do you see dates written in

17    hand next to the signature?  That's December,

18    whatever it is, 12th?  Can you read out that

19    date?

20         A.    12/13/05.

21         Q.    Did you write in that date?

22         A.    That appears to be my handwriting.

23         Q.    Does that date appear on all the

24    other pages of the document?

25         A.    It does.

1                   G. J. JURCZAK

2          Q.    Are those dates on the other pages

3    of the document in your hand writing?

4          A.    They appear to be my handwriting,

5    yes.

6          Q.    The exhibit that's before you is

7    the first documented account of what occurred

8    on December 5th in connection with this case?

9          A.    Would you define documented as in

10   written documentation or verbal documentation?

11         Q.    Written.   Is that the first time

12   that you created a document concerning this

13   incident?

14              MR. CLOPPER:   Do you need to speak

15         to me about it?

16         A.    As far as I recall, this is the

17   first comprehensive document written.

18         Q.    Is there any other written document

19   that is comprehensive relating to the incident?

20         A.    Aside from --

21         Q.    From what you are looking at?

22         A.    I don't understand your question.

23         Q.    The first comprehensive document.

24              My question is, whether it is

25   comprehensive or not.   Something that is

1                    G. J. JURCZAK

2    written against something that is verbal, that

3    was created by you in connection with this

4    incident.  That's what my question is.  Very

5    simple.

6         A.    I don't know whether I used notes

7    to create this document or other documents.

8         Q.    You are familiar with the contents

9    of this report?  It is my privilege to ask the

10   question.

11        A.    This is an account of several days

12   and was a collection at different times and

13   different dates of information and eventually,

14   facts put together in chronological order and

15   forwarded to my commanding officer.

16        Q.    Did you make any written notes

17   between December the 5th and December the 13th

18   in connection with any of the incidents that

19   are documented in the exhibit before you?

20             MR. CLOPPER:  Objection, asked and

21        answered.  He said he didn't know.

22        Q.    You don't know if you made any

23   notes?

24        A.    I don't recall.

25        Q.    Typically, would you make notes in

1                      G. J. JURCZAK

2    connection with incidents like this?

3         A.    As I mentioned to you before, this

4    was extraordinary and wasn't commonplace.  And

5    something like this, I would only be

6    speculating as to whether I kept notes.  To put

7    together a comprehensive report like this, I

8    would probably have notes at the time with

9    names and dates and times of people I spoke

10   with, and then put it into one report.

11        Q.    If you made these notes, where

12   would you have them now?

13        A.    I wouldn't.

14        Q.    Would you have destroyed the notes?

15        A.    Most likely, yes.

16        Q.    In any event, I ask you to make a

17   search of your records and if you find notes

18   that you prepared in connection with this, to

19   provide me with those notes?

20             MR. CLOPPER:  Counsel, there are

21        couple different ways you can do it.

22        You could propound a discovery request

23        to the defendant in this case or if you

24        felt that you were entitled to, you

25        could Subpoena Officer or Agent Jurczak

1
G. J. JURCZAK

2
himself.  Your choice.

3
MR. OKOLI:  Subpoena him?  What do

4
you mean?  He is here at the deposition

5
and he testified he is not sure whether

6
he has them or not.

7
MR. CLOPPER:  I am simply pointing

8
it out if you have a discovery request

9
you should direct it to the defendant

10
and not the agent.

11
MR. OKOLI:  No, because I will

12
still ask him to make a search for it

13
and then if he finds it, to then hand it

14
over to counsel who then hands it over

15
to me.

16
MR. CLOPPER:  The Witness has

17
nothing to say as to what he will or

18
will not do.

19
MR. OKOLI:  There are ways if you

20
want to go this way.  I am now putting

21
my request on the record, Mr. Clopper.

22
I am placing on the record that I will

23
not put it in writing.  I am placing on

24
the deposition record right now whether

25
this particular witness has any

G. J. JURCZAK

1
2    documents, scraps, notes that he may

3    have relied upon in creating the exhibit

4    that's right before him.  If you do find

5    that, provide me with copies of those.

6         MR. CLOPPER:  You do recall that

7    during the deposition of your client the

8    government asked for certain documents.

9         MR. OKOLI:  Listen, we are not at

10   my client's deposition, we are at this

11   person's deposition.  I will not be

12   paying for this and you are making

13   statements that are totally irrelevant.

14   You raised it before the Judge yesterday

15   and we will address that.

16        MR. CLOPPER:  Are you finished?

17        MR. OKOLI:  I am not done.

18        MR. CLOPPER:  Are you finished with

19   your statement?  You will recall during

20   the deposition of your client I had

21   asked for certain documents.  You

22   requested that the government put its

23   request in writing.  The government has

24   done so on every occasion.  We have

25   agreed to put these document requests in

1          G. J. JURCZAK

2     writing.  I would ask that you continue

3     to extend me the same courtesy.

4          MR. OKOLI:  I never agreed with

5     this.  There was no blanket agreement

6     from me to you.

7          MR. CLOPPER:  Ask your next

8     question.

9          MR. OKOLI:  We can't do it this

10    way.  What I am saying is that I never

11    agreed with you that in each and every

12    case that it has to be done a certain

13    way.  There was some requests that you

14    made and I acceded to the request at

15    that time.  I am making a different kind

16    of request here and I am putting on the

17    record what I extend to you by way of

18    courtesy.  I say different things all

19    together.  I am making a request the way

20    it could be made in a federal case or

21    any other case.

22         MR. CLOPPER:  My witness has asked

23    to speak to me and I will go outside and

24    speak with him for a moment.

25         (Whereupon, a brief recess was

G. J. JURCZAK

1

2       taken.)

3           MR. OKOLI:   Let's have this marked

4       for identification.

5           (Whereupon, the aforementioned

6       document was marked as Plaintiff's

7       Exhibit 2 for identification as of this

8       date by the Reporter.)

9       Q.   I am placing before you what is

10  marked as Plaintiff's Exhibit 2 for

11  identification.  Is that the unsworn

12  declaration that you testified to earlier in

13  your deposition today?

14      A.   I don't recall testifying to this

15  earlier today but this does appear to be an

16  unsworn declaration.

17      Q.   Did you mention some unsworn

18  declaration earlier during your testimony

19  today?

20      A.   I did.

21      Q.   Is that the unsworn declaration

22  that you mentioned earlier today?

23      A.   This appears to the unsworn

24  declaration that I mentioned earlier today.

25      Q.   The document has initials that

1                    G. J. JURCZAK

2    appear to be initials all over virtually every

3    page of the document; do you see those?

4         A.    Yes.

5         Q.    Are those your initials?

6         A.    They appear to be my initials.

7         Q.    And on the first page, the document

8    begins by saying "in accordance with the

9    following provisions of 28 U.S. C 1746, I,

10   Gregory J. Jurczak, the undersigned, do hereby

11   make the following unsworn declaration under

12   the penalty of perjury." Do you see that?

13        A.    Yes.

14        Q.    Did you read what I just read into

15   the record now before you made the corrections

16   that you made?

17        A.    I did.

18        Q.    And is your signature the signature

19   on the last page of that document that appears

20   to be page 093?

21        A.    That appears to be my signature.

22        Q.    The document says it was executed

23   on March 25th, 2006?

24        A.    Yes.

25        Q.    Do you have any reason to believe

1                        G. J. JURCZAK

2    that it was executed on a date other than March

3    25th, 2006?

4            A.    I need to ask you a question to

5    clarify that.  I didn't finish this in one

6    sitting.  So I completed it and signed it in

7    full and delivered it.  However, it was

8    received, wherever it was going, on March 25th,

9    2006.

10           Q.    And just to quickly go back to

11   Exhibit 3 of the deposition of 10/25/07, if you

12   take a look at Exhibit 3 you will see the

13   places where specifically, I think the last

14   full paragraph, it has wife in quotes.  Do you

15   see wife in quotes?

16           A.    Yes.

17           Q.    If you look elsewhere you will see

18   wife in quotes as well.  Take your time to

19   review the document if you need to.

20           A.    You are asking me if I see wife in

21   quotes?

22           Q.    Yes.

23           A.    I take your word that I see wife in

24   quotes.  I see it too.

25           Q.    Is there any reason for wife being

1                         G. J. JURCZAK

2        in quotes?

3                    MR. CLOPPER:  Objection,

4              argumentative.

5              A.    At the time of this document being

6        produced, I had no conclusive information that

7        the two people here in this document were, in

8        fact, husband and wife.

9              Q.    As you sit here today, do you know

10       whether they are husband and wife?

11             A.    I have no idea.

12             Q.    When you prepared Plaintiff's

13       Exhibit 3 at the deposition of 10/25/07, did

14       you state exactly what you had done or

15       witnessed in that document?

16             A.    Is this reflective of what happened

17       on the day in question, the 5th of December

18       2005?

19             Q.    Yes, from what you observed or your

20       own perspective?

21             A.    From what I recall, yes.

22             Q.    When you executed Plaintiff's

23       Exhibit 2 at today's deposition, the

24       corrections that you made, do those reflect

25       what you actually told the officer who had

1                     G. J. JURCZAK

2     interviewed you?

3          A.    Including my corrections?

4          Q.    Correct.

5          A.    As far as I can recall, yes.

6          Q.    During the time that you were a CBP

7     officer, did you ever observe any CBP officer

8     going to a restricted area at any time that

9     they did not get permission to go to a

10    restricted area?

11         A.    Not that I recall.

12         Q.    Had you ever seen any CBP officer,

13    after their tour of duty, go to receive or see

14    off relations at a gate area of an airport?

15         A.    Did I see CBPOs after their tour of

16    duty see off people that were leaving the

17    airport?

18         Q.    Yes.   After their tour of duty, see

19    off people that are leaving the airport when

20    they were not assigned to that area?

21         A.    I don't recall personally ever

22    witnessing that.

23         Q.    During the time that you worked for

24    customs and border protection, were you ever

25    aware of any CBP officer who went to not just

1                    G. J. JURCZAK

2       the gate area but to any restricted area at the

3       time that they were not supposed to be there?

4            A.    I am not -- I don't think I can

5       answer in the context of your question.

6                  MR. CLOPPER:   I missed it too.

7                  Maybe we could read back the question.

8                       (Whereupon, the referred to

9                       question was read back by the Reporter.)

10           Q.    Let me rephrase the question.

11                 Throughout the time that you worked

12      for the CBP, were you aware of any CBP officer

13      who without permission accessed a restricted

14      area?

15           A.    Can you define accessed a

16      restricted area?

17           Q.    Do you know what restricted areas

18      are at any airport?

19           A.    Yes.

20           Q.    Do you know what restricted areas

21      are?

22           A.    In general terms, yes.  But there

23      are policies in every airport I would imagine.

24           Q.    My question is this, are you aware,

25      as you sit here today, of any CBP officer who

1                       G. J. JURCZAK

2    went to a restricted area without permission?

3         A.    I am still getting hung up on

4    restricted area.

5         Q.    You don't know what restricted area

6    is?

7         A.    Can you define what a restricted

8    area is to me and I will be able to answer your

9    question better I think.

10        Q.    You should be able to tell me.  You

11   were a CBP officer once?

12        A.    Yes.

13        Q.    Are there place that you could not

14   go unless you had permission?

15        A.    That's still really --  I want to

16   answer your question but I will not give you

17   information if I don't have it.  I would like

18   you to define what you mean by a secure area

19   because your definition of a secure area may be

20   very different from my definition of a secure

21   area.

22        Q.    Based on your understanding of a

23   restricted area?

24        A.    I don't think I can answer that

25   question based on the question.

1                    G. J. JURCZAK

2               MR. CLOPPER:  He is answering it

3          the best he can.

4          Q.    I will move on.  If the answer is

5     you can't answer the question, it is okay, I

6     will move on.

7               Have you ever heard of CBP officers

8     going to areas of the airport where they should

9     not be without permission?

10         A.    I have heard of officer

11    indiscretions but specifically not in the terms

12    that you phrased that question.  And I think

13    some of the things I have first-hand knowledge

14    of predate the creation of Customs and Border

15    Protection.

16         Q.    Now, let me change it slightly.

17              Are you aware of any employees of

18    the U.S. Customs or any agency of the CBP going

19    to areas of an airport that they were not

20    permitted to go to?

21              MR. CLOPPER:  Answer to the best of

22         your ability.

23         A.    I am still hung up on areas they

24    are not supposed to go.  There are certainly

25    protocols and procedures that are supposed to

1              G. J. JURCZAK

2    be followed.  What I am remembering are

3    instances where people -- there were gray

4    areas.  That it wasn't definitive.  I can only

5    assume you are asking me did people go in

6    uniform, off duty, to places representing that

7    they were working when they weren't.  Is that a

8    fair statement back to you?

9         Q.    Not necessarily representing that

10   they were working when they were not, but yes,

11   that they went with uniform but not telling

12   someone that I am working when I am not

13   working.

14              Let's start with that.

15              Do you have an answer if frame the

16   question that way?

17        A.    I think so because I am trying to

18   make heads or tails of what you are actually

19   asking me.

20        Q.    Based on your framing the question,

21   do you have an answer to that?

22        A.    Could you read back the question as

23   he framed it?

24              (Whereupon, the referred to

25              question was read back by the Reporter.)

1                    G. J. JURCZAK

2          A.    I recall an incident when I worked

3    for INS where an officer showed up at work in

4    uniform and met his family and it turned out,

5    and this may be privileged information how I

6    found out about it was, he wasn't working that

7    day.  However, he did it in clear sight of

8    supervisors and upper management but he was not

9    working that day or he wasn't on duty at that

10   time.

11               THE WITNESS:  Can I just --

12               (Whereupon, the Witness whispered

13          in his attorney's ear.)

14               MR. CLOPPER:  You don't need to

15          discuss that.  Just answer the question

16          to the best of your ability about what

17          you heard or saw.

18         A.    That's a situation that I recall

19   where someone did similar -- well, something to

20   the light of what we are discussing here today.

21         Q.    Approximately how long, in terms of

22   how far removed, was this to December 2005 when

23   you observed this?

24         A.    This was pre-creation of CBP which

25   happened -- I don't remember.  I want to say

1                    G. J. JURCZAK

2      2003. I couldn't give you a definitive answer.

3            Q.    Without alluding to who this person

4      is, do you know whether this person is still

5      working?

6            A.    I don't know if that person is

7      still working.

8            Q.    Shortly after you observed this,

9      did you see this person still employed?

10           A.    I didn't observe it. I heard about

11     it.

12           Q.    You heard about it?

13           A.    Yes.

14           Q.    And other than this incident which

15     you heard about, which predated the creation of

16     CBP, since the creation of CBP, have you heard

17     of any other incident or of anybody other than,

18     of course, Ms. Akinyemi, who had accessed a

19     restricted area at an airport?

20           A.    I am sorry. The restricted access

21     is throwing me every time you use it.

22           Q.    Somebody that went to any place at

23     an airport that they did not have permission to

24     be at? I will define it.

25                 If you are off duty, are you not

1                    G. J. JURCZAK

2    permitted to be certain places?  If you are off

3    duty, you couldn't just show up at the airport

4    for instance and go to where customs officers

5    would normally go?

6            A.    Certainly you could.

7            Q.    Without permission?

8            A.    Are you saying calling ahead of

9    time and requesting permission to access an

10   area where you work?

11           Q.    No, no.  I said without permission.

12   If you were not permitted, if you were for

13   instance, in the situation where somebody is

14   posted to, let's say J.F.K. and they turn up at

15   Newark International Airport where they are not

16   assigned without any permission, wouldn't that

17   be accessing a restricted area if that was a

18   place that only customs officers could get to?

19           A.    I don't have an answer for that.  I

20   don't know what the rules and regulations for

21   people going to J.F.K. or to Newark conversely.

22   I could answer you but it would speculation.  I

23   don't know what the formal rules are.  There is

24   a form you can complete that you forward

25   through the chain of command.  We are not

```
 1                    G. J. JURCZAK

 2    talking in general terms.  I can't answer the

 3    question in general terms.

 4         Q.    If you fill out a form you are

 5    asking for permission; aren't you?

 6         A.    Yes.

 7         Q.    I am talking about a person that

 8    didn't fill out a form.  My question is very

 9    simple.  That's why I keep saying without

10    permission.

11               If you go to your boss you are

12    asking for permission.  If you just went on

13    your own, a person that did not get permission

14    and went to an area where they are not assigned

15    on duty, where they shouldn't be, since your

16    employment, have you ever heard of any such

17    situation?

18         A.    Are you asking me if I heard of

19    things like that happening?

20         Q.    Yes.

21         A.    I heard rumors.

22         Q.    And this is separate and apart from

23    Ms. Akinyemi's situation?

24         A.    That's correct.  I have heard

25    rumors.  I want that clear.
```

1                    G. J. JURCZAK

2            Q.    Are you aware of anyone other than

3    Ms. Akinyemi who was terminated solely for

4    being in a restricted area of an airport?

5            A.    I was not aware of Ms. Akinyemi

6    being fired because she was in a restricted

7    area until I got deposed for this deposition.

8    I don't keep tabs on who gets fired for what.

9    I know there is a high turnover rate within

10   CBPs and what they did --

11           Q.    You don't know of anyone, to your

12   own knowledge, that was fired?

13           A.    At this time I don't recall anyone

14   being fired for being in area that they were

15   not supposed to be.  But then again, we never

16   defined what you mean by being in area you are

17   not supposed to be.

18           Q.    Have you heard of anyone being

19   fired for being in a secure area or restricted

20   area or an area they are not supposed to be

21   without permission?

22           A.    I don't think so.

23                 MR. OKOLI:  Thank you.

24                 MR. CLOPPER:  I have no questions

25           at this time.

1          G. J. JURCZAK

2              (Whereupon, at 2:40 p.m., the

3          Examination of this Witness was

4          concluded.)

5

6

7          _____
           GREGORY JOHN JURCZAK

8

9     Subscribed and sworn to before me

10    this _____ day of _____, 20___.

11

12    _____
           NOTARY PUBLIC

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    G. J. JURCZAK

 2                  E X H I B I T S

 3

 4     PLAINTIFF'S EXHIBITS:

 5

 6     EXHIBIT     EXHIBIT                        PAGE

 7     NUMBER      DESCRIPTION

 8       1         Diagram                         26

 9       2         Unsworn declaration            109

10

11

12                   I N D E X

13

14     EXAMINATION BY                            PAGE

15     MR. OKOLI                                   3

16

17

18       INFORMATION AND/OR DOCUMENTS REQUESTED

19     INFORMATION AND/OR DOCUMENTS              PAGE

20     Signed copy of diagram                     30

21

22     Search for notes and provide them to

23     attorney                                  105

24

25     Provide documents, scraps and notes       107
```

```
 1                  G. J. JURCZAK

 2          QUESTIONS MARKED FOR RULINGS

 3    PAGE    LINE    Question

 4    33      13      If it was being pulled or

 5                    driven by and you were here

 6                    (indicating), where would it be

 7                    in relation to the seats of

 8                    those passengers?

 9

10    34      13      Can you please honor me and

11                    mark on this diagram what you

12                    just testified to, a cart that

13                    could theoretically obstruct

14                    your view?  Could you please

15                    mark that on Plaintiff's

16                    Exhibit 1?

17

18

19

20

21

22

23

24

25
```

```
 1                    G. J. JURCZAK

 2               C E R T I F I C A T E

 3

 4    STATE OF NEW YORK        )
                               :  SS.:
 5    COUNTY OF KINGS          )

 6

 7

 8         I, ROBERT GONZALEZ, a Notary Public for

 9    and within the State of New York, do hereby

10    certify:

11         That the witness whose examination is

12    hereinbefore set forth was duly sworn and that

13    such examination is a true record of the

14    testimony given by that witness.

15         I further certify that I am not related

16    to any of the parties to this action by blood

17    or by marriage and that I am in no way

18    interested in the outcome of this matter.

19         IN WITNESS WHEREOF, I have hereunto set

20    my hand this 6th day of November, 2007.

21

22

23              Robert Gonzalez
                ROBERT GONZALEZ

24

25
```

Diamond Reporting, Inc.

# ERRATA SHEET

**Plaintiff(s):** _____

_____

_____

**Defendant(s):** _____

_____

_____

| Page | Line No. | Error | Correction |
|------|----------|-------|------------|
| 90 | 11 | NOTHING | SOMETHING |
| 96 | 9 | ANSWER | ACCESS |
| 99 | 3 | SUPPORTS | REPORTS |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**DATE:** _____

**NAME OF WITNESS:**  GREG JURCZAK

**SIGNATURE:** _____

Subscribed and sworn to before me
this _____ day of _____, 2007.

_____

NOTARY PUBLIC