1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------------------X
     YEMISI AKINYEMI,

4

                                        PLAINTIFF,

5

6              -against-          Case No.
                                  07 CV 4048

7

     MICHAEL CHERTOFF, SECRETARY, DEPARTMENT OF

8    HOMELAND SECURITY,

9                                  DEFENDANTS.
     ------------------------------------------------X

10

11

12                     DATE: October 4, 2007

13                     TIME: 10:04 a.m.

14

15           EXAMINATION BEFORE TRIAL of the

16   Defendant, DEPARTMENT OF HOMELAND SECURITY,

17   by a Witness, SUSAN MITCHELL, taken by the

18   Plaintiff, pursuant to a Court Order, held

19   at the law offices of K.C. Okoli, Esq., 330

20   Seventh Avenue, 15th floor, New York, New

21   York 10001, before Lieng Boua, a Registered

22   Professional Reporter and Notary Public of

23   the State of New York.

24

25

```
1                    MITCHELL
2       A.      The EEO program manager.
3       Q.      Are you aware that Ms. Akinyemi
4  filed a formal charge with the EEOC?
5       A.      Yes, I am.
6       Q.      Do you know that an investigative
7  file was generated as a result of that charge?
8       A.      I don't know.  I've never seen
9  one, but.
10      Q.      As you sit here, you've never seen
11 one?
12      A.      An investigative file for EEOC,
13 no, I never saw an investigative file.
14      Q.      Did you see an investigative file
15 generated by the U.S. Customs and Border
16 Protection?
17              MR. CLOPPER:  Objection,
18         ambiguous.  Are we speaking of
19         Ms. Akinyemi or Ms. Haq?
20              MR. OKOLI:  Ms. Akinyemi.
21      A.      Again, I guess -- can I ask a
22 clarifying question?  Are we talking about the
23 discipline file or the EEOC file?
24      Q.      I'm talking, are you aware of any
25 investigation that was conducted by the
```

```
 1                    MITCHELL
 2    that found the weapon made a report of it to
 3    their supervisor?
 4         A.     I did find out about that.
 5         Q.     What did you find out is what I am
 6    asking?  Did you then find out that the person
 7    who found the weapon actually reported it?
 8         A.     I found that they did not, for
 9    several months, report it.
10         Q.     The people who found it did not
11    report it for several months?
12         A.     Correct.
13         Q.     Did you learn when they then
14    reported it?
15         A.     Several months later.
16         Q.     But how many months before
17    Ms. Akinyemi's issue came up?
18         A.     I don't know the exact time line
19    but it was before Ms. Akinyemi's issue came up
20    that they reported it to a supervisor.
21         Q.     Did you find out from them why it
22    took several months for them to report it at
23    the time that they did?
24         A.     I did find out.
25         Q.     What did you find out?
```

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                MITCHELL
 2       A.      They decided to take care of it
 3   themselves.
 4       Q.      What are the names of these people
 5   who decided to take care of it themselves?
 6       A.      CBPO Wescott.
 7       Q.      Wescott, can you spell that?
 8       A.      W-e-s-c-o-t-t.
 9       Q.      Okay.
10       A.      And there's another individual
11   whose name is escaping me right now.
12       Q.      Is that individual's name a
13   female?
14       A.      Male.
15   _____
16       Q.      We will leave a space in the
17   transcript so you can provide the name of that
18   person.
19            MR. CLOPPER:  She is answering
20         that she does not know, but we will
21         respond to it in an appropriate discovery
22         request for that information.
23            MR. OKOLI:  She said the name is
24         escaping her.
25            Can you read back the answer?
```

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                    MITCHELL
 2  result of her investigation?
 3      A.     I was advised that the case was
 4  closed.
 5      Q.     Did you ask her why the case was
 6  closed?
 7      A.     No, I did not.
 8      Q.     Did she tell you?
 9      A.     I believe it was handled at her
10  level, handled at the level below me.
11      Q.     But the question is this:  She did
12  not take action of her own volition?  You
13  instructed her to take action to look into the
14  matter?
15      A.     To look into the matter, yes.
16      Q.     And you didn't ask her whether or
17  not the matter you asked her to look into was
18  proven or not proven?
19      A.     She told me it was taken care of,
20  that it had been reviewed.
21      Q.     Did you understand that it was not
22  established or that it was established?  What
23  was your understanding?
24      A.     My understanding was that an
25  incident did occur and it was handled at a
```

                                    MITCHELL

1
2    level lower than myself.
3         Q.    Your understanding was that an
4    incident occurred?
5         A.    Correct.
6         Q.    What did you understand occurred?
7    What incident, quote-unquote, did you
8    understand occurred?
9         A.    I never got a copy of the case
10   file because I was advised that any actions
11   that needed to be taken were already handled
12   below me.
13        Q.    And the person who handled it
14   below you is somebody you supervised; correct?
15        A.    Yes.
16        Q.    When you say it was handled, what
17   specifically do you mean?
18        A.    I was advised by my senior manager
19   that it was handled.
20        Q.    Okay.  And did you get the sense
21   of whether or not Ms. Gluba was disciplined
22   for it or not?
23        A.    I got the sense that there was
24   discipline taken.
25        Q.    What discipline did you learn was

```
1                     MITCHELL

2        she told you she has no knowledge of

3        Ms. Gluba's discipline.

4                     MR. OKOLI:  Okay.

5                     MR. CLOPPER:  There's documents

6             that bear on this issue.  I am not quite

7             sure where we are going with this.

8             Q.     Just to be clear, you asked

9    Ms. Haage to look into the allegation that

10   Ms. Gluba had revealed sensitive government

11   information; correct?

12            A.     Correct.

13            Q.     And you never found out

14   specifically from Ms. Haage what her

15   conclusion was as a result of the

16   investigation?

17            A.     I didn't say that.

18            Q.     Did you find out from Ms. Haage

19   what she found as a result of her

20   investigation?

21            A.     Yes, I did.

22            Q.     What did she tell you she found?

23            A.     That sensitive information was not

24   revealed to members of the traveling public.

25            Q.     Did you say that some discipline
```

1                      MITCHELL

2    her probation?

3          A.      It would have to be case specific.

4    Perhaps, perhaps not.  It is dependent on the

5    circumstances of the case.

6          Q.      Thank you.  Is Ms. Gluba still on

7    probation?

8          A.      No.

9          Q.      By the way, what is Kathleen

10   Haage's race?

11         A.      She is white.

12         Q.      Do you know Ms. Gluba's current

13   title?

14         A.      CBPO.

15         Q.      Just to be clear, you did not

16   become aware of the claim or allegation that

17   Ms. Gluba had revealed sensitive information

18   to the public until my client raised it in the

19   course of the investigation of her claim.

20   Correct?

21         A.      Correct.

22         Q.      Now, you said Ms. Haage did this

23   investigation and told you it was handled at

24   her level.  Correct?

25         A.      Correct.

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                      MITCHELL

 2              MR. OKOLI:  Okay.  Even though I

 3         will put it in writing, I want to have

 4         every memoranda relating to Ms. Haage's

 5         investigation of Ms. Gluba's situation or

 6         the investigation by anyone else at

 7         Customs relating to the allegation of

 8         Ms. Gluba revealing sensitive

 9         information.

10         Q.      Do you know an employee by the

11    name of Elba Mendez?

12         A.      Not personally.

13         Q.      Do you know of Elba Mendez?

14         A.      Yes.

15         Q.      How did you come to know of her?

16         A.      Your client's allegations.

17         Q.      And what did you learn were my

18    client's allegations against Ms. Mendez?

19         A.      I believe that Ms. Mendez had been

20    involved in a similar situation.

21         Q.      When you say "similar situation,"

22    would you be more specific to the best that

23    you recall?

24         A.      I believe the allegation was that

25    she also met family members arriving on a
```

1                    MITCHELL

2    flight.

3        Q.      At a gate area?

4        A.      I don't know that that was part of

5    the allegation.

6        Q.      As a result of that allegation,

7    did you take any steps?

8        A.      I referred the allegations to the

9    area director.

10       Q.      And who would the area director be

11   in that case?

12       A.      Kathleen Haage.

13       Q.      Do you recall when it was that you

14   referred the allegation to the area director?

15       A.      That day or the next day when

16   Mr. Angevine gave me the list of allegations.

17   It was the exact same time.

18       Q.      When you referred this allegation

19   to Ms. Haage, did you do that by memo or was

20   it just verbal?

21       A.      Verbal.

22       Q.      Did you give her any documents in

23   connection with the verbal instruction that

24   you gave her?

25       A.      No.

```
 1                    MITCHELL
 2    in connection with investigating the
 3    underlining complaints or allegations by my
 4    client were done verbally?
 5         A.    Yes.
 6         Q.    Okay.  So in relation to that of
 7    Mr. Murphy, it was also a verbal reference to
 8    Ms. Haage to investigate it?
 9         A.    Correct.
10         Q.    And did Ms. Haage come back to you
11    to tell you the results of the investigation?
12         A.    No.  I did not hear anything about
13    it.
14         Q.    How soon after you learned of the
15    allegation did you make this reference to
16    Ms. Haage to investigate Mr. Murphy's
17    situation?
18         A.    As I said before, all the
19    allegations were made to me by Mr. Angevine at
20    the same time and they were all referred to
21    Ms. Haage at the same time.
22         Q.    Where is Ms. Haage now?
23         A.    Retired.
24         Q.    So from the time that you referred
25    these three allegations to Ms. Haage until her
```

```
 1                    MITCHELL
 2        for identification?
 3              (Whereupon, the aforementioned
 4        documents were marked as Plaintiff's
 5        Exhibit 2 for identification as of this
 6        date by the Reporter.)
 7              MR. CLOPPER:  Let us take a
 8        five-minute break, Mr. Okoli.
 9              MR. OKOLI:  Sure.
10              (Whereupon, a recess was taken.)
11              MR. OKOLI:  Okay.  Just mark all
12        of these as well.
13              (Whereupon, the aforementioned
14        documents were marked as Plaintiff's
15        Exhibits 3 through 11 for identification
16        as of this date by the Reporter.)
17        Q.      Now, I am placing before you what
18        has been marked as Plaintiff's Exhibit 2.  Do
19        you recognize what it is?
20        A.      Yes, I do.
21        Q.      What is it?
22        A.      It is the notice of termination to
23        Ms. Akinyemi.
24        Q.      And did you sign it on the second
25        page of it?
```

```
 1                        MITCHELL
 2       A.       Yes, I did.
 3       Q.       That is your signature?
 4       A.       Yes, it is.
 5       Q.       In the last full paragraph, I
 6  believe the third sentence --
 7                MR. CLOPPER:  On the second page?
 8                MR. OKOLI:  On the first page.
 9                MR. CLOPPER:  I am sorry.
10       Q.       (Continued) It says:  "These
11  policies are detailed in the standard of
12  conduct, Section 6.3.5.  Your misuse of
13  position and authority jeopardized and
14  tarnished how the public views CBP and its
15  employees."
16                Do you see that?
17       A.       Yes, I do.
18       Q.       Could you give us the facts on
19  which you based the conclusion that the misuse
20  of position and authority jeopardized and
21  tarnished how the public views CBP and its
22  employees?
23       A.       In this case?
24       Q.       Yes.
25       A.       Sure.  Based on the statements
```

```
1                    MITCHELL

2     that I read and the details of the incident,

3     Ms. Akinyemi used her position and bypassed

4     TSA screening in full view of the traveling

5     public and entered an area that only traveling

6     members of the traveling public, ticketed

7     passengers or authorized employees on official

8     business are allowed to be in.  That was done

9     in the full view of the public.

10         Q.      Did you speak with any members of

11    the public regarding whatever it is that

12    happened at the airport on that day?

13         A.      No.

14         Q.      In any of the documents you read

15    in which you based your decision, did any of

16    those people -- Mr. Herter or the two

17    officers -- tell you that they spoke with any

18    members of the public regarding what

19    Ms. Akinyemi was alleged to have done?

20         A.      There was a conversation, I

21    believe, one of the statements mentioned, a

22    conversation with an airline employee.

23         Q.      What was that conversation?  What

24    did the airline employee say in the

25    conversation?
```

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                     MITCHELL
 2        A.      I don't have the statement in
 3   front of me.
 4        Q.      In whose statement was that?
 5        A.      One of the two officers, I
 6   believe, that were there the night of the
 7   incident.
 8        Q.      Was it Alelong or Jozeck
 9   (phonetic)?
10        A.      I don't know.
11        Q.      Is it your recollection that that
12   airline employee expressed an opinion as to
13   what Ms. Akinyemi did at the airport?
14        A.      I don't recall.  I just --
15             MR. CLOPPER:  Objection.  I mean
16        to the extent you are suggesting that
17        that is what she said.  That is not an
18        accurate quotation or reflection of her
19        testimony.
20             MR. OKOLI:  No.  I am asking the
21        question because I am interested in the
22        portion that says jeopardized and
23        tarnished how the public views CBP and
24        its employees.
25             She said she didn't speak to any
```

```
 1                      MITCHELL
 2        members of the public.  With the
 3        exception of this possible airline
 4        employee, the statements that she is
 5        referring to did not say the traveling
 6        members of the public either.  I want to
 7        know the basis for this statement.
 8             MR. CLOPPER:  Okay.
 9        Q.      In the first full paragraph of
10   page 2 beginning with furthermore, it says:
11   "Furthermore, in order to accomplish its
12   mission, CBP must be able to trust and depend
13   on its employees to conduct themselves in an
14   appropriate manner at all times."
15             Do you see that?
16        A.      Yes, I do.
17        Q.      What mission of CBP were you
18   referring to in that paragraph?
19        A.      Are you asking me what is CBP's
20   mission?
21        Q.      No.  What mission are you
22   referring to here?  What mission of CBP were
23   you referring to when you said "in order to
24   accomplish its mission"?
25        A.      That actually means the entire
```

1                    MITCHELL

2    mission of CBP.  The mission of CBP is to

3    detect and deter terrorists and terrorist

4    weapons from entering and to enforce the laws

5    of the United States, to interdict

6    contrabands, narcotics, agriculture products,

7    and to facilitate legitimate trade and travel.

8    That is the mission of CBP.

9         Q.        What specifically did Ms. Akinyemi

10   do on that day that you considered an anathema

11   to the accomplishment of the mission of CBP?

12        A.        Well, I believe the misuse of

13   position to gain access to an area where the

14   normal public cannot is an anathema to that

15   mission.  If the mission is to protect and

16   defend the country, not to bypass security,

17   the very security that was set up, she used

18   the trappings of her office to bypass.

19        Q.        You do not believe that she was

20   acting as a terrorist though; did you?

21        A.        I believe she bypassed security

22   and used her position to -- the trappings of

23   her office to do that.

24        Q.        Do you think that by her,

25   Ms. Akinyemi, doing that, that would encourage

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                    MITCHELL
 2   terrorism?
 3        A.      No.   I think it is an anathema to
 4   our mission.
 5        Q.      What specific mission?
 6        A.      The mission is to protect and
 7   defend the border and she undermined that
 8   position by misuse of her position.
 9        Q.      In what way was the border
10   unprotected by her getting into the restricted
11   area to see her husband off?
12             MR. CLOPPER:   Objection.   That
13        mischaracterizes the witness' testimony.
14        Q.      I am asking, in what way do you
15   believe that Ms. Akinyemi going into the
16   restricted area as a customs officer
17   undermines the mission of Customs to protect
18   the citizens?
19        A.      She did not.   She did not do this
20   as a customs officer.   Therein lies the
21   problem.   She used the trappings of the
22   customs office to do that.   She was not acting
23   as a customs officer when she did that.
24        Q.      Was she employed by Customs as of
25   the time she was doing that?
```

```
 1                    MITCHELL
 2      A.      Oh, absolutely.  They are being
 3   paid.  They are on duty.
 4      Q.      As you sit here today, do you know
 5   whether any customs employees have ever
 6   accessed a restricted area and were not
 7   terminated for that?
 8      A.      In the course of their business,
 9   they access restricted areas every day.
10      Q.      I am talking about those not on
11   duty, a customs officer not on duty gaining
12   access to a restricted area and not being
13   fired?
14      A.      I --
15              MR. CLOPPER:  Objection.  It is
16      ambiguous.
17              MR. OKOLI:  Well, let me rephrase
18      it.
19              MR. CLOPPER:  Yes.
20      Q.      As you sit here today, are you
21   aware of any instances in which a customs
22   officer not on duty accessed a restricted area
23   and yet was not fired?
24      A.      Yes.  I do have personal knowledge
25   of an incident like that.
```

```
 1                    MITCHELL
 2        Q.     How many such incidents are you
 3   aware of?
 4        A.     I have personal knowledge of one
 5   specific incident.
 6        Q.     What is that incident that you are
 7   aware of?
 8        A.     It was an employee who was not on
 9   duty and bypassed security and accessed a
10   restricted area at Newark Airport.
11        Q.     Do you know the name of this
12   employee?
13        A.     Jill Von Wolkenn.
14        Q.     Could you spell that?
15        A.     J-i-l-l, next name V-o-n, next
16   name W-o-l-k-e-n-n.
17        Q.     That is a female, Jill?  You said
18   Jill?
19        A.     Yes.
20        Q.     That is a female?
21        A.     Yes, it is.
22        Q.     When did this occur?
23        A.     Several years ago at Newark
24   Airport.
25        Q.     When you say "several years ago,"
```

```
 1                      MITCHELL

 2  less than five years ago, more than five years

 3  ago?

 4         A.      Less than five years ago.

 5         Q.      What was the outcome of that?

 6         A.      She was disciplined.

 7         Q.      What discipline was imposed on

 8  her?

 9         A.      There were several charges

10  involved, and I believe it was a proposed

11  14-day suspension.

12         Q.      Did you say there were several

13  charges?

14         A.      Correct.

15         Q.      In addition to accessing a

16  restricted area, she did other things that

17  were considered inappropriate by Customs?  Is

18  that what you are saying?

19         A.      Correct.

20         Q.      How many additional things?  I

21  mean two more or three more in addition to --

22         A.      She also argued with the security

23  company and she used the agency letterhead

24  inappropriately.

25         Q.      When you say she used the agency
```

```
  1                    MITCHELL
  2   letterhead, what did she do?
  3        A.      (No response.)
  4        Q.      What is your recollection of what
  5   she did with it?
  6        A.      She wrote a letter of complaint to
  7   the Port Authority police.
  8        Q.      With the agency letterhead?
  9        A.      Correct.
 10        Q.      And this got her 14 days
 11   suspension?
 12        A.      That was her proposal.
 13        Q.      And what was the final outcome?
 14        A.      There was a five-day suspension.
 15        Q.      So for these offenses, she got a
 16   total of five days suspension?
 17        A.      That was the decision, yes.
 18        Q.      At the time, were you the director
 19   of field operations?
 20        A.      Yes, I was.
 21        Q.      And what is Jill Von Wolkenn's
 22   race?
 23        A.      She is white.
 24        Q.      Do you know her national origin?
 25        A.      No, I don't.
```

61

```
1                    MITCHELL
2   she employed by U.S. Customs?
3        A.      No, she was not.  She was employed
4   by INS.
5        Q.      I see, okay.  Did you say she
6   used -- pardon me if I asked this.  What
7   letterhead did you say she used?
8        A.      At the time of the incident, she
9   used the INS letterhead.
10       Q.      Okay.
11       A.      But the agency letterhead is the
12  wording I used.
13       Q.      Do you know whether she was a
14  permanent employee or a probationary employee
15  at the time?
16       A.      She was a permanent employee not
17  in uniform.
18       Q.      Now, back to Plaintiff's Exhibit
19  11, do you recognize what that is?
20       A.      Yes, I do.
21       Q.      Did you provide that unsworn
22  declaration?
23       A.      Yes, I did.
24       Q.      Is that your signature on page 139
25  at the bottom?
```

```
1              MITCHELL
2         MR. OKOLI:  Yes.
3    Q.    As you sit here today --
4    A.    I am returning Exhibit 10.
5         (Witness handing.)
6    Q.    As you sit here today, are you
7  aware or have you ever heard that customs
8  employees were profiling Nigerian passengers
9  at the airports whether or not it is true?
10         Have you ever heard that whether
11  it is true or something that is not true?
12  Have you ever heard about that suggestion,
13  complaint, or allegation that customs officers
14  were targeting Nigerian passengers for
15  profiling?
16         MR. CLOPPER:  By any person at any
17     time?
18         MR. OKOLI:  Yes.
19    Q.    At the airports since you became
20  director of fields operations?
21    A.    Since 2002 and I must ask you
22  which word you actually want to use because
23  you used two different words?
24    Q.    Let me --
25    A.    One time, you said "profiling" and
```

MITCHELL

1  MITCHELL

2  another time you said "targeting."

3      Q.      Sorry, let me rephrase it.  Since

4  you became the director of field operations,

5  have you heard any allegations, whether it is

6  true or false, that customs officers were

7  profiling Nigerian airline passengers?

8      A.      Since 2002, I have not heard

9  anyone make a claim of profiling Nigerian

10 passengers by Customs.

11     Q.      When did you first become a

12 director of field operations?

13     A.      In July 2002.

14     Q.      Since 2002, have you ever heard of

15 any allegation that customs officers were

16 targeting Nigerian passengers?

17     A.      Since 2002, I have not heard

18 anyone claiming Nigerian passengers have been

19 targeted.  I have not heard that personally.

20         MR. CLOPPER:  I will object.  If

21     you could, clarify whether you are

22     talking about passengers on Nigerian

23     planes bound to and from Nigeria or

24     Nigerian citizens or nationals?

25         MR. OKOLI:  Passengers.  I said

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                    MITCHELL
 2        passengers, Nigerian passengers.
 3        A.      I stand by my statement.  I have
 4   not heard anyone claiming the targeting of
 5   Nigerian passengers since 2002.
 6        Q.      Had you ever heard that prior to
 7   2002?
 8        A.      Yes.
 9        Q.      Where did you hear it from?
10        A.      There have been many claims of
11   profiling by many nationalities and Nigerians
12   did claim that there were claims of profiling
13   by the U.S. Customs Service of Nigerian
14   passengers.
15        Q.      From what you recall, who claimed
16   that Nigerian passengers were being profiled?
17        A.      The press usually.
18        Q.      I'm sorry?
19        A.      The press.
20        Q.      So it was in the press that you
21   heard it or you saw it?
22        A.      Uh-huh, yes.
23        Q.      Are you aware whether or not it's
24   factually correct, since 2002, of a perception
25   that Nigerians were being profiled, Nigerian
```

```
 1              MITCHELL
 2   passengers were being profiled?
 3          MR. CLOPPER:  Again, I object.
 4      Maybe this is my misunderstanding, but I
 5      don't know if we are talking about people
 6      who are on Nigerian planes who may be
 7      from anyplace in the world or who are
 8      ethnically Nigerians?
 9          MR. OKOLI:  We are talking of
10      people who are either ethnically Nigerian
11      on other planes or people going or coming
12      from Nigeria who are dark-skinned.  That
13      is what we are talking about.
14          I am not talking about a Nigerian
15      American diplomat living in or traveling
16      to Nigeria, a white American diplomat or
17      a worker of IBM.  That is not what I am
18      talking about or oil workers.  I am
19      talking of a dark-skinned negroid.
20      A.    We have many complaints from many
21   passengers from many flights that are claiming
22   that they are being profiled.
23      Q.    Sorry, but I'm not asking you
24   about complaints of other people.  My question
25   is very, very clear.  It is yes or no.  I am
```

<pre>
 1                    MITCHELL
 2   not interested in profiling of Polish people,
 3   Bulgarians.  All that I am interested in is
 4   Nigerian passengers.  If it is not for
 5   Nigerian passengers, I will be glad to take
 6   the answer no.
 7              MR. CLOPPER:  Repeat the
 8         question.
 9              MR. OKOLI:  My question does not
10         relate to anyone else.  It is about
11         Nigerians, so I will ask you to instruct
12         your client to be responsive to that.  If
13         she doesn't know, she doesn't know.
14         Q.    Are you aware of any perception
15   that ethnic Nigerians or Nigerian passengers,
16   whether traveling out of the United States or
17   coming into the United States, are being
18   profiled or targeted for different treatment
19   by CBP or U.S. Customs?
20              MR. CLOPPER:  Objection.  At this
21         time?
22              MR. OKOLI:  Has she ever?
23              MR. CLOPPER:  Ever?
24              MR. OKOLI:  Yes, of that
25         perception I am talking about.
</pre>

```
 1                    MITCHELL
 2      A.      I don't know what people's
 3 perceptions are.
 4      Q.      Okay.  Did you ever hear any
 5 rumors, not in the press, from the workplace?
 6      A.      So now is your question employees?
 7      Q.      Employees.
 8      A.      I have never heard employees say
 9 that we are profiling Nigerians or passengers
10 on Nigerian planes.
11      Q.      Now, I will ask a slightly
12 different question.  Since Ms. Akinyemi's
13 case, have you learned, maybe third-hand or
14 fourth-hand, learned that a customs employee
15 thought that Nigerian passengers were being
16 profiled?
17      A.      I have never learned that a
18 customs employee thought that Nigerian
19 passengers were being profiled.
20      Q.      Okay.  If they were being
21 profiled, would you see anything wrong with
22 that?
23      A.      We don't profile passengers at
24 all.
25      Q.      I am just asking.  If they were,
```

MITCHELL

1

2    would you find anything wrong with that?

3        A.    Yes.  I don't believe profiling is

4    an effective law enforcement tool.

5        Q.    As the director of field

6    operations, are you aware of any policies in

7    place regarding drug trafficking that are

8    applied differently to Nigerians than they are

9    applied to others?

10       A.    I don't know of any policy that

11   applies to one nationality versus another.

12       Q.    So as you sit here today, you do

13   not know whether Nigerians have ever been

14   profiled by customs officers within your area

15   of command based on the perception of

16   trafficking and drugs?

17       A.    I don't know of any of my

18   employees that ever profiled anyone.  I do

19   believe that flights from Nigeria have been

20   targeted, but it is the country as opposed to

21   the people.

22       Q.    What is the distinction between

23   the country and the people?

24       A.    We have a variety of countries of

25   interest, whether for terrorism or for

MITCHELL

1

2  narcotics.  Anyone coming from that country

3  could be questioned for those reasons, not

4  necessarily the people, the nationality.

5          It is the country where the flight

6  is coming from, where the passenger is coming

7  from, not where the passenger was born, that

8  is of interest for a law enforcement

9  perspective.

10      Q.      When you say "the country where

11  the flight is coming from," as a matter of

12  common sense, would you expect more people on

13  that flight be citizens of that country than

14  non-citizens?

15      A.      That would be the norm.

16      Q.      So if you were targeting a flight

17  coming from Nigeria, you would expect the

18  majority of the people flying on that plane to

19  be Nigerian citizens?

20      A.      Correct, but they may not be the

21  ones of interest to us.  In fact, it may be

22  the non-Nigerians that is of more interest to

23  us from a law enforcement perspective.

24      Q.      Do you have any documentation of

25  the people that you have interdicted or

1                          MITCHELL

2    challenged as persons of interest coming on

3    flights from Nigeria?  Do you have any such

4    documents?

5         A.      Every passenger coming through has

6    to go through a clearance process, so I could

7    tell you every passenger has been talked to

8    and has been examined for CBP.

9         Q.      That is not my question.  When you

10   talk about targeting, what does targeting mean

11   to you?  Explain that to us when you say

12   certain countries, flights from certain

13   countries are targeted.  Explain that to us.

14   What does that mean?

15        A.      Certain countries might be --

16   depending on the particular area of interest,

17   certain flights coming from certain countries

18   might have more interest and so I would expect

19   that resources would be more dedicated to

20   looking and determining the threat of those

21   individual passengers in that flight.

22        Q.      When you say certain flights

23   coming from certain countries have more

24   interest, what is that in plain speak?

25        A.      It could be for terrorism.  We

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                    MITCHELL
 2  have a variety of flights that are of interest
 3  for that.  For narcotics, we have flights of
 4  interest.  For agriculture, we have flights of
 5  interest for those various items.
 6        Q.      Could you name the flights of
 7  interest in relation to narcotics that you are
 8  aware of since you became director of field
 9  operations?
10             MR. CLOPPER:  Objection.  I think
11        we need to take a break.  I need to --
12             MR. OKOLI:  Not while a question
13        is pending on the record and the fact
14        that counsel is asking for a break --
15             MR. CLOPPER:  Sure.  I am
16        concerned about a privilege issue here.
17             Do you think you can answer that
18        question without violating a privilege,
19        including law enforcement privilege?
20             THE WITNESS:  That is law
21        enforcement sensitive information.
22             MR. CLOPPER:  I am with National
23        Security.  I am instructing my client not
24        to answer.
25        Q.      But you do admit that there are
```

1                    MITCHELL

2    flights coming from certain countries that

3    Customs targets?

4         A.       Correct, we do have targets.

5         Q.       Okay.  And some of the targets are

6    based on the perception that those flights are

7    likely to have drug traffickers?

8         A.       I would not use the word

9    "perception."

10        Q.       In terms of drugs, what would

11   cause you to have specific interest in flights

12   coming from a certain country, whatever that

13   country is?

14        A.       It could be the region of the

15   world that it is.  It could be specific

16   information.  It could be general information

17   in the intelligence community.  It could be

18   past history of successful interdiction.

19   There's a variety of reasons that together

20   could form the basis for a risk assessment.

21        Q.       So if a customs officer were to

22   say that they targeted Nigerians because of

23   their possible drug involvement, that would be

24   incorrect?

25        A.       I would think that it would be

```
 1                    MITCHELL
 2   incorrect to target Nigerians.
 3        Q.      No, no, no.  I am --
 4        A.      That is the question you asked
 5   though.
 6        Q.      No.  My question is -- let me
 7   rephrase my question.  My question is, if a
 8   customs officer were to testify that they, at
 9   their location at the airport, targeted
10   Nigerian passengers, you would say that that
11   customs officer's testimony is incorrect?
12        A.      In the context that you just said,
13   yes, I would say that is incorrect.
14        Q.      But you do not work at the
15   airport; do you?
16        A.      Not anymore.  That is within my
17   area of responsibility, but I am not assigned
18   at the airport.
19        Q.      So even as the director of field
20   operations, if a customs officer who actually
21   works at the airport were to say that they
22   targeted Nigerians, Nigerian passengers, you
23   would dispute that?
24        A.      I would think that that was not a
25   good law enforcement tool, and I don't think
```

DIAMOND REPORTING-718-624-7200-16 Court St.,B'klyn,NY 11241

```
 1                    MITCHELL
 2   that that's appropriate.
 3        Q.     Well, it is not whether it is
 4   appropriate but whether you are going to say
 5   that that officer is not telling the truth?
 6        A.     I don't know what's making him say
 7   that, so it is hard for me to assess the
 8   truthfulness of his statement.
 9        Q.     In other words, you are not in a
10   position to say one way or the other what is
11   actually going on at the airports except what
12   somebody reports to you.   Correct?
13        A.     That's correct.
14             MR. OKOLI:  All right.  That would
15        be it.
16             MR. CLOPPER:  Great.  Let us take
17        a five-minute break.  I may have
18        follow-up questions and it would be just
19        a couple, if any.
20             MR. OKOLI:  Okay.
21             (Whereupon, a short recess was
22        taken.)
23             MR. CLOPPER:  I will ask two
24        questions.
25             MR. OKOLI:  Sure.
```