doing assignments. Ms. Mitchell learned of the December 5th incident from Ms. Haage who forwarded reports by Mr. Herter and Mr. Landau. She states she made the termination decision after consulting with Labor and Employee Relations and their Associate Chief Counsel. She states it was Complainant's presence in the gate area in full uniform while off duty for personal reasons that was the deciding issue in the removal. (Exhibits F12,15)

Ms. Mitchell states she considered a lesser penalty but Complainant's misuse of her badge to gain access to an area where others could not go was so fundamental to the job that it warranted termination. She also states that management has greater flexibility in dealing with disciplining probationary employees. Ms. Mitchell adds she is unaware of the incidents alleged by Complainant involving CBP Officers A and B. Both Ms. Mitchell and Ms. Haage-Gaynor were aware of the incidents involving CBP Officer C (i.e., allegedly allowing access to classified information to a passenger), and CBP Officer D (i.e., leaving her weapon in a public area), but they would not discuss details because of Privacy Act concerns. Ms. Mitchell states that the circumstances of the CBP Officer C incident were not exactly as Complainant related, and that she looked into the CBP Officer D incident after the Complainant raised it in her complaint. (Exhibit F12)

**Mr. Martella** states Complainant was not originally informed about why she was being questioned, or provided with a statement of her rights. He alleges CBP Officers in uniform have access to restricted areas with a Port Authority ID. He also states, to the best of his knowledge, the CBP Table of Offenses and Penalties applies to all CBP Offices, including probationary Officers. He adds other probationary employees with more egregious acts than Complainant's have not been terminated, but offers no further information on those employees. (Exhibit F13)

Comparative data on terminations and discipline in the New York Field Office is at Exhibit F16.

Relevant regulations are at Exhibit F17.

## IV.   SURVEY OF THE GENERAL ENVIRONMENT

A workforce profile of the CBP New York Field Office by race as of December, 2005, shows the following: (Exhibit F1b)

Total: 631 Supervisory CBP and CBP Officers

|  | White | Black | Hispanic | Asian American | Native American | Total |
|---|---|---|---|---|---|---|
| SCBPO | 59 | 7 | 10 | 3 |  | 79 |
| CBPO | 407 | 51 | 67 | 27 |  | 552 |

A survey of CBP Officers terminated during probation in the New York Field Office, from December, 2003, through December, 2005, shows the following, by race and national origin when known: (Exhibit F12,16)

| Number of Officers Terminated | Race | National Origin |
|---|---|---|
| One (Complainant) | Black | Nigerian |
| Four | White | unknown |
| One | Hispanic | unknown |

Reasons for Termination (Exhibit F12)

Arrested (2)
Failure to show up for overtime (1)
Domestic abuse (1)
Negligence in performance of duty (1)
Use of CBP identification for personal gain (1)   Complainant

One permanent CBP Officer and one permanent Supervisory CBP Officer received proposals of disciplinary action for accessing secure areas at the Newark airport while off duty from December, 2003, through January, 2006. The actions taken against them were:

CBP Officer J (race: white) proposed two-day suspension with final Letter of Reprimand for accessing a secure area and rudeness to a passenger.

Supervisory CBP Officer K (race: Black): proposed 14-day suspension for accompanying her husband to a departure gate (employee retired before final discipline decision).

7