# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

TIMOTHY O. SONUGA,

Plaintiff,

v.

SECRETARY MICHAEL CHERTOFF,

Defendant.

------------------------------x

06 Cr. 1751 (AKH)

Argument and Decision

New York, N.Y.
August 9, 2007
4:20 p.m.

Before:

HON. ALVIN K. HELLERSTEIN

District Judge

APPEARANCES

K.C. OKOLI, ESQ.
Attorney for Plaintiff
330 Seventh Avenue
New York, New York 10001
(212) 564-8152

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
86 Chambers Street
New York, New York 10007
JOSEPH PANTOJA
Assistant United States Attorney

(Case called)

THE CLERK: In the matter Sonuga v. Chertoff. Parties, please state your name for the record.

MR. OKOLI: May it please the Court, K.C. Okoli, appearing for the plaintiff.

MR. PANTOJA: Your Honor, Joseph Pantoja, Assistant United States Attorney, for the defendant Michael Chertoff, Department of Homeland Security.

THE COURT: Good afternoon. Let me recite the facts as I understand them from the submissions of the parties.

First, this lawsuit has been brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000 and following, complaining that the plaintiff was not promoted by the department of customs and the Department of Homeland Security.

There was an EEOC investigation in 2003 instigated by the plaintiff. During the pendency of that investigation, plaintiff again applied for promotion and was not given the position, and complains that the position was not given because of retaliation. Subsequent to the case, in April of this year, plaintiff was promoted to the grade that plaintiff sought.

Defendant moves for summary judgment. Plaintiff asks for leave to take the deposition of John Leonard, an official in the Department of Homeland Security. I told Mr. Okoli that I would deal with that issue in the context of the present

motion.

This is the background. The plaintiff is Timothy Sonuga. He is 62 years old. He was born in Lagos, Nigeria, attended high school in Nigeria, came to the United States in 1971, earned a bachelor's degree in 1976 from Southern Illinois University, and then a master's degree from that same university in management and public administration in 1978. Throughout he has pursued different courses to gain proficiency and background in various tasks that he was performing for the Department of Homeland Security.

The defendant is the secretary of the Department of Homeland Security, Michael Chertoff. The case also involves various other people:

The director of the New York-Newark area and plaintiff Sonuga's fourth line supervisor Kathleen Haage-Gaynor;

The director of field operations in New York office Susan Mitchell, who is Sonuga's fifth line supervisor and was responsible for personnel recommendations made by Haage-Gaynor. So Susan Mitchell is the direct supervisor of Gaynor;

John Leonard, the chief of summary management at the office of field operations in Washington, D.C., a person who appears to have a policy position of oversight responsibility over field directors such as Mitchell.

The jurisdiction of this court arises from 28 U.S.C. sections 1331 and 1343 as a case arising under the laws or

Constitution of the United States.

Sonuga began employment with the United States customs in 1989 as an import specialist. He worked in that capacity for seven years and then was promoted to entry specialist team leader in 1996. He functioned between 1996 and April 2007 in that capacity as an entry specialist team leader, first operating in the World Trade Center, and, after the terrorist bombing of the center, thereafter in New Jersey.

The position of entry specialist team leader is said to be a technical position with no official supervisory duties and is classified as grade 12 or lower. Sonuga had a grade 12 classification and alleges that he was much involved in instruction, teaching, leadership, and other aspects that entailed supervisory responsibilities. But the job itself was considered a technical position.

On February 24, 2003, he learned that he had not been selected for promotion to grade 13, which was the classification for the next higher position of supervisory customs entry specialist. He complained to the EEOC on March 26, 2003, filing his complaint a few months later, on July 12, 2003. Sonuga complained that two younger females of European descent had been selected to the two vacant positions, and he complained against Mitchell and Haage-Gaynor, who were very much involved at the present time as well.

In October 2004, while his complaint was pending, two

vacancies opened for grade 13 supervisory import specialist positions. The supervisory position in grade 13 has many similarities to Sonuga's position in grade 12, but it is said that the grade 13 position emphasizes management and leadership skills and functions.

In November 2004, a month later, the agency issued a vacancy announcement notifying employees that there were two vacancies for supervisory import specialist soliciting applications. The next month, on December 16, 2004, Haage-Gaynor recommended to Mitchell, her supervisor, two individuals as in her opinion best qualified to fill the open slots of supervisory import specialist.

One recommended person was Sonuga. A second was a younger person, a white male, Salvatore Ingrassia. Sonuga testified to the EEOC that she wrote a memo on December 16, 2004, in which she considered Sonuga to be the better qualified applicant to fill one of the positions.

Sonuga did not get the position. Mitchell asserts -- Mitchell again is Haage-Gaynor's supervisor -- that between the opening in October 2004 until March of 2005 the agency was moving forward on a long-pending personnel issue regarding a third position, a field national import specialist. This was also a grade 13 position.

But the Department of Homeland Security considered that the people who filled that position were doing the same

kinds of activities that were done by supervisory import specialists and were not doing the added characteristic for the field national import specialist of preparing binding classification and rulings.

Since they were not performing that additional work, the agency, in a letter of March 2000 to the relevant federal employee union, announced its intention to eliminate almost all the positions of field national import specialist by selecting the people who filled those slots for reassignment to open supervisory import specialist positions, the very position that Sonuga aspired to obtain.

This was the tension that confronted Mitchell and Haage-Gaynor. The position they considered open and which Sonuga Ingrassia wished to fill by promotion had also been designated for lateral transfers of people already occupying grade 13 who were doing a job that the Department of Homeland Security largely wished to cancel, therefore freeing those people who occupied that position soon to be canceled for lateral reassignment.

The lateral reassignment had to be in the same grade, if it was open, and therefore the position of supervisory import specialist held an attraction to those who were going to be transferred from the previous position they occupied of field national import specialist.

In January 2005 there were 19 grade 13 employees in

the New York area and within easy commuting distance of the New York area who were excessed from the position of field national import specialist and who were available for transfer to fill the two vacancies of supervisory import specialist. Five of these thirteen people were in the Newark area, and the balance and several more were in the JFK area.

Mitchell testified that she held up making any selections for the two vacancies as supervisory import specialist until she heard from her boss Leonard regarding what would be the case with the excessed position of field national import specialist.

On February 14, 2005, the EEOC denied the complaint that Sonuga had filed in 2003 when he was denied promotion from his grade 12 position of entry specialist team leader. Three weeks later, on March 9, 2005, Mitchell participated in a conference call with John Leonard in which they agreed that they would move forward with the plan to laterally transfer the field national import specialists into the two vacant supervisory import specialist positions.

On March 10, 2005, the next day, Leonard sent an email to Mitchell and others instructing them to move forward as was discussed in the previous day's telephone conversation. He asked for a status report on the actions taken with regard to filling the supervisory import specialist vacancies with field national import specialists.

On March 15, 2005, a few days later, the supervisory import specialists were filled with two grade 13 employees who previously had been field national import specialists: Michael Opper and Kevin Gordon. Accordingly, Sonuga and Ingrassia were not selected for promotion.

On April 4 Sonuga discovered that he had not been selected when he saw an email sent to all employees advising them that Opper and Gordon were filling the vacancies. On April 21, 2005, he began EEO counseling regarding the failure to promote him to one of the two vacant slots, and he filed a formal complaint on June 23, 2005.

On December 2, 2005, EEOC denied Sonuga's claim, and on March 6, 2006, a little over a month later, Sonuga filed the complaint in this court. His complaint is timely and it raises the issues that he has been complaining about. He seeks compensatory damages of $2 million, punitive damages of $2 million, injunctive relief, and fees and costs.

Let me pause for a moment. Mr. Okoli, have I substantially gotten the facts right as stated?

MR. OKOLI: No. There are a few things. For instance, the last one, the EEOC never denied his claim. He asked for them to make a decision without a hearing and give him the right to sue.

THE COURT: I'm sorry. So there was no denial by the EEOC with a right-to-sue letter?

MR. OKOLI: Right, with regards to the termination.

THE COURT: Thank you for correcting me.

MR. OKOLI: It may be minor, but . . .

THE COURT: No, no. I stopped to be corrected, and I thank you for correcting me.

MR. OKOLI: The master's degree is from a different university. I believe you said it was from the same university.

THE COURT: I think the important point here is that he deserves to be commended for his diligence in improving himself educationally and in his job. That's the reason I noted that.

MR. OKOLI: You referred to Ingrassia's position as a promotion. Ingrassia was not being promoted. He was selected because he was already a level 13. Had he been selected, that would be a lateral move. So he was not in the same category as Mr. Sonuga.

THE COURT: That's correct. But he was another applicant for the position, and Haage-Gaynor favored Sonuga to fill that position until she learned of the lateral transfers of grade 13 from the field national import specialist position?

MR. OKOLI: That's correct.

THE COURT: Mr. Pantoja, have I gotten anything wrong from your point of view?

MR. PANTOJA: Just one clarification. With respect to

the two individuals, the field national import specialists who ultimately were selected to fill the vacancies, I think you mentioned or suggested that the supervisory import specialist position, because it was a grade 13 position, appealed to them because it was of a similar grade and therefore the lateral transfer was appealing to them. The transfers were involuntary in that these two individuals were not consulted.

THE COURT: I understand.

MR. PANTOJA: So it could very well be that they might not have opposed it, that they welcomed it, but we don't know. All I know is that the agency thought it would be desirable and it was appealing to the agency to fill these two positions with these two lateral FNIS placements.

THE COURT: Thank you.

MR. PANTOJA: Thank you, your Honor.

THE COURT: Let me go on to the operative legal standards. I need not discuss the standards on a motion for summary judgment. They are well known and the cases are well known. In the Title VII context, although cases are often fact-intensive, I still have to go through the usual type of analysis with regard to these kinds of discrimination claims, namely, the burden-shifting analysis of the McDonnell Douglas case as elaborated by other cases in this circuit, particularly Tomka v. Seiler Corp., 66 F.3d 1295, decided in 1995; Terry v. Ashcroft, 336 F.3d 128, decided in 2003; and many other cases.

It seems to me clear that Sonuga is proficient, proficient in the sense of competent, to fill the position he aspired to be promoted to, and indeed he has been most recently appointed to that position.

Having made out that case and shown that he is in a protected classification, which I find, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action of which plaintiff complains. I hold that defendant has done that by showing that the preference was given to employees already filling a grade 13 category and shifting them involuntarily, as Mr. Pantoja states, to occupy a different position.

The position they occupied, field national import specialist, was being largely closed out, and the position to which they were transferred of supervisory import specialist, also in grade 13, had two spots available, and the two particular employees involuntarily were transferred to fill those slots, closing the slot to which Sonuga aspired. That constitutes a nonpretextual, nondiscriminatory reason why Sonuga was not promoted.

The burden then shifts back to the plaintiff again. Plaintiff must show sufficient evidence to raise a triable issue to the effect that the reason given by the defendant was a pretext in that in truth and in fact there was discrimination in the form of retaliation for having exercised a right given

to him by the statute, that is, seeking counseling and complaining to the EEOC. With regard to that point, Mr. Okoli, I find that there is no sufficient evidence in the record, but I wish you to argue that point.

I find also that there is no reason to have a deposition of John Leonard at this particular point in time, because the position that he would take, namely, that the grade 13 position employees were involuntarily transferred, is documented in the record and there is no reason to gain redundant information.

Mr. Okoli.

MR. OKOLI: Yes, your Honor. Your Honor, we need to be very clear about what the protected activity here comprises. It is not just simply the filing of the complaint. In fact, Title VII, 42 U.S.C. 2000e-3 includes also not only the making of a charge but, quote, where a person has, quote, participated in any manner in an investigation proceeding or hearing.

I say "hearing" advisedly. Your Honor, the hearing continued until February 14th, when a decision came down. So Mr. Sonuga fully participated in a hearing. His protected activity is not just the simple fact that he complained about discrimination but that he fully participated, testified, continued, and pursued to hearing to its final conclusion.

THE COURT: I accept that point. When I said that he complained, that meant necessarily that an investigation

resulted and all of this was protected activity under Section 2000e-3 subparagraph (a).

MR. OKOLI: Yes. The significance of the conclusion of the hearing is that I submit that that is the time from which you begin to measure, not when the complaint was filed. He could have withdrawn at any point. He could have withdrawn his complaint or abandoned the complaint. But he was assiduous in pursuing the complaint until the final conclusion, including a hearing, which resulted in termination.

THE COURT: But an employee who participates in protected activity doesn't get a guarantee of promotion.

MR. OKOLI: I considered that, your Honor. I'll come to that.

Your Honor, if we accept that, then we go to the fact that in the record before you there is not one shred of document to show that the Department of Homeland Security or Susan Mitchell did anything about the transfer or discussion relating to the transfer of field national import specialist between May 2000 and March 9, 2005, a hiatus of almost five years. Nothing happened.

The testimony by her immediate supervisor, that is, Kathy Haage-Gaynor, is that it takes a maximum of eight weeks from the time that the recommendation is made to when permission is effected. She also further testified that since Ms. Mitchell became the director of field operations, she had

never, never refused to follow any recommendation by her except in Sonuga's case.

Furthermore, the record, there are documents showing that promotions involving Susan Mitchell had been accomplished within anywhere between 6 days and 25 days of the recommendation being made, between 6 days and 25 days for supervisory positions such as the ones under consideration.

If we take the outside limits, which is just the say-so of Kathy Haage, which is 8 weeks, instead of the 25 days which you see in documents before you, if you take those 8 weeks, had Susan Mitchell taken timely action on the recommendation made to her on December 14, 2004, Mr. Sonuga would have been promoted at the latest by the end of January 2005. Oh, no. Middle of February. Sorry. That would be eight weeks. Eight weeks would take us to the middle of February. That is if we were to believe, even though this Court doesn't make a credibility determination, if you were to accept that.

THE COURT: We are not involved with the first problem that Sonuga had.

MR. OKOLI: No. It is the retaliation that I'm dealing with.

THE COURT: Right.

MR. OKOLI: I am dealing with the retaliation.

THE COURT: You're making the point that he wasn't

promoted from 2000. That was the first complaint.

MR. OKOLI: No, no. What I said was that the reason that Mitchell has given, Mitchell is saying the reason is now we had to lateral FNIS to this position. The point I'm making is that 2000 was the last document you will find in this record. That was the last document in which the FNIS was discussed. No other document entered this record until March 2005.

THE COURT: That's correct.

MR. OKOLI: Yes. So in between that, what was going on? That matter was dead for all practical purposes. That is my submission. Otherwise, there would be some document showing --

THE COURT: I wouldn't infer that.

MR. OKOLI: Your Honor, now we're done looking at the timing. Now they decided they knew of that problem, they still went ahead and posted this position, the position that we are dealing with now. Haage-Gaynor recommended Mr. Sonuga together with Mr. Ingrassia. Ms. Mitchell did nothing about that recommendation for more than eight weeks, and there is nothing in the record showing what she was doing regarding the recommendation or regarding the FNIS. Nothing in the record.

The first thing in the record relating to FNIS that we see during the time that this recommendation was pending was an email of March 10th, which referred to a conversation of the

previous day, March 9th. By her own admission, she learned of the problem of the denial of the original claim in March. That was when she learned about it. She couldn't discriminate against us unless she knew, if she was delaying it on purpose, and there is nothing to indicate otherwise, because there is nothing to show what she was doing, that it was not a deliberate delay.

Once she knew that the original complaint had been dismissed, she was emboldened now to initiate a call to D.C. There is a document here in which Mr. Leonard took pains to explain to someone else that the initiative did not come from him, the initiative came from the field. Who is the director of field operations in the field? Susan Mitchell. So why would she wait? What was the purpose of waiting five years, doing nothing?

THE COURT: What initiative are you talking about?

MR. OKOLI: The initiative of moving, filling lateral transfer of FNIS to SIS position.

THE COURT: She was responding to Leonard's directive.

MR. OKOLI: That's what I'm saying. Leonard himself clarified in a document -- let's take two documents here. One is a letter, an email, referring to a conversation of March 9th --

THE COURT: Right.

MR. OKOLI: -- in which Susan may have participated.

Then there is Exhibit 9 to the declaration of Timothy Sonuga, which is an email from Leonard to another gentleman Carl in which he was explaining that the move of FNIS was not headquarter mandated, it was field office initiated. Basically, what she was saying is that it wasn't their idea.

THE COURT: Where do you see this? Show me where the document says that. It says here, "Yes, field national import specialists have been placed into NAM." I don't know what NAM means.

MR. OKOLI: Yes, in other ports.

THE COURT: -- "positions in other ports. Bottom line, until FNIS's go away, they'll be placed into alternate staffing positions in comparable GS13 jobs, SIS first choice, NAM second choice. We will not approve any actions for new GS-13 announcements until this accomplished. Finally, until the realigning plan is fully blessed and implemented, which will be soon, these movements are field office issued, not headquarter mandated."

I don't know what you do there. Obviously, the junior supervisor who was given responsibility is responding to what her headquarters tells her she has to do.

MR. OKOLI: But it was her that told the headquarters they wanted to do this. Remember the conversation, the earliest reference after 2000. There is nothing, no document in this record.

THE COURT: I understand that.

MR. OKOLI: It references a conversation.

THE COURT: Mr. Okoli, governments are not swift. Governments don't win races. They are very slow. Bureaucracies are not swift.

MR. OKOLI: Your Honor, let's look at the timing.

THE COURT: I take your point. There is a coincidence in time between the date of announcement of EEOC that the prior hearings and investigations and complaints are closed and a ruling comes down adverse to Sonuga and the action that's taken denying Sonuga the appointment to supervisory import specialist and giving it to other GS-13's who were being involuntary transferred from a closed-out position, but not every coincidence in time raises a prima facie case.

MR. OKOLI: Your Honor, I will be the first to concede that. But when there is coincidence after coincidence, somehow there was this delay beyond the time that that was normal as we know it, by their own account. She did nothing about this position within eight weeks. That's one coincidence. Not until she heard that Mr. Sonuga's original complaint had been denied, that was when she then calls headquarters.

THE COURT: Before that she even recommended Sonuga, indicating that she was not interested in keeping him down. But there was no action taken because action was paralyzed because of the problem that was created by closing out the FNIS

position.

MR. OKOLI: Your Honor, I don't know how to characterize this. She says that, and we don't see any document to support this paralysis of action, not one shred of document. Do we expect her to say, yes, I did this? Of course she would say things that are self-serving. What was the document in this record to show that there was any paralysis of action between 2000 and 2005 and all of a sudden now, once this happened, she calls?

Besides, your Honor, even here there is something, that is incorrect. This document says we will not approve any actions for new GS-13 announcements to the computer by G-12's until this is accomplished. Your Honor, they still haven't lateralled out every FNIS, but my client is now a level 13, so this is not even true. This is not even true. They will not put in new people until the laterals everywhere. My client is now level 13, and we know there are still FNIS's all over the place. Now, we see conflicting information coming from highly placed people in customs.

THE COURT: Because he got his employment, we should infer that previously it was a retaliation that caused him to not get the appointment? If they were retaliating, why would they give him an appointment now, when there were other FNIS's floating around?

MR. OKOLI: I wish I could answer that, your Honor,

the question why they were retaliating. The fact is that the man is imminently qualified. You can only do so much.

THE COURT: No, it says he is not.

MR. OKOLI: When you run out of vacancies, you have to do the obvious. Hence, he was recommended by Haage. But then Mitchell did not want to go along with the recommendation and sat on the recommendation beyond what is reasonable according to the --

THE COURT: There is not a shred of evidence that suggests retaliation as the motive for Mitchell's inactivity, and there is every indication that he was prompted by the need to place 13 people who were filling a position that was now to be canceled.

Mr. Okoli, I have read all your papers and I hear your argument. I think the coincidence in time is not sufficient. I cannot see any evidence of discrimination based on retaliation which can raise a triable issue of fact, and I grant the government's motion to dismiss the complaint.

There are no issues to be tried. There is no reason to take the deposition of Mr. Leonard. The events that came out are clear. The reason for the denial of promotions had been fully approved by the government, namely, the surfeit of candidates who were being involuntarily transferred from a grade 13 position that was being closed out.

Thank you very much. A summary order will follow.

(Adjourned)